**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

PHARMACEUTICAL RESEARCH AND )
MANUFACTURERS OF AMERICA, )
1100 Fifteenth Street, N.W. )
Washington, D.C. 20005, )
       )
           Plaintiff, )
       )
          v. )                 Civil Action No. _____
       )
THE DISTRICT OF COLUMBIA )
1350 Pennsylvania Avenue, N.W. )
Washington, D.C. 20004, )
       )
ANTHONY A. WILLIAMS, )
in his official capacity as Mayor )
of the District of Columbia, )
1350 Pennsylvania Avenue, N.W. )
Suite 600 )
Washington, D.C. 20004, )
       )
OFFICE OF THE ATTORNEY )
GENERAL OF THE DISTRICT OF )
COLUMBIA )
1350 Pennsylvania Avenue, N.W. )
Suite 409 )
Washington, D.C. 20004, )
       )
ROBERT J. SPAGNOLETTI, )
in his official capacity as the Attorney )
General of the District of Columbia )
1350 Pennsylvania Avenue, N.W. )
Suite 409 )
Washington, D.C. 20004, )
       )
OFFICE OF DOCUMENTS AND )
ADMINISTRATIVE ISSUANCES )
OF THE DISTRICT OF COLUMBIA )
441 4th Street, N.W. )
Suite 520 )
Washington, D.C. 20001, )
       )
and )
       )

ARNOLD R. FINLAYSON,                  )
in his official capacity as Administrator    )
of the Office of Documents and         )
Administrative Issuances               )
of the District of Columbia,            )
441 4th Street, N.W.                   )
Suite 520                             )
Washington, D.C.  20001,              )
                                      )
            Defendants.               )
_____ )

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiff Pharmaceutical Research and Manufacturers of America ("PhRMA") alleges as follows:

## INTRODUCTION

1.       Over many years, the United States Congress has enacted a comprehensive set of laws creating incentives for the invention and development of new life-saving and life-enhancing medications.  These statutes have been frequently revised and recalibrated to balance all competing interests, including the interests in spurring discovery of new medications and in promoting access by patients to those new medications.  Congress has recognized that such discoveries, essential to the public health and human progress, come only with substantial investments of talent and resources.  For that reason, these federal statutes ensure that successful inventors will have a limited period of time during which they hold the exclusive right to market their inventions at prices sufficient to recover the substantial costs of their efforts and to spur future invention.  The federal patent system, as supplemented by legislation targeting pharmaceuticals specifically, is designed to allow inventors of medications a fair opportunity to obtain the financial rewards that Congress has determined to be necessary for crucial future investments and, in turn, discoveries.

2

2.      The District of Columbia is home to more than 500,000 citizens, most of whom have relied at some point on prescription medications to regain or preserve their health or the health of their loved ones.  The District's residents, like all Americans, reap the benefits of the breakthroughs in medical and pharmaceutical science that have been made possible by the federal patent system.  The public health, in the District as around the country, depends on the ongoing development of new prescription drugs.

3.      In this action, PhRMA challenges an unprecedented District of Columbia law, D.C. Act 16-171, the "Prescription Drug Excessive Pricing Act of 2005" (the "D.C. Act" or the "Act") (attached as Exhibit 1).  By imposing price controls on patented prescription drugs, the D.C. Act directly undermines the system Congress established to promote invention and the public health.  This sweeping legislation targets only on-patent drugs and attempts to deny the very benefit that Congress conferred; it punishes patent holders for recouping research and development costs and realizing the incentives that Congress has deemed necessary to promote future discoveries to benefit public health.  The D.C. Act authorizes *any person or organization claiming to represent the public interest* to sue PhRMA members for treble damages over potentially *every single patented drug purchased in the District.*

4.      Moreover, in attempting to impose these price controls, the Act reaches throughout the United States.  The Act makes it unlawful for a manufacturer or licensee to sell a patented prescription drug anywhere – whether within or outside the District of Columbia – if that sale at any point "*results in* the prescription drug being sold in the District for an excessive price."  Act § 2 (D.C. Code § 28-4553) (emphasis added).

5.      The Act defines an "excessive price," in large part, through arbitrary and ill-considered comparisons to prices charged in Australia, Canada, Germany, and the United

3

Kingdom – four countries where systems of government-managed or government-provided healthcare artificially constrain patented drug prices. These countries use systems of reference pricing, socialized medicine, and/or price controls to limit the returns that pharmaceutical manufacturers may earn; in doing so, they undercut the financial incentives, made possible by a patent's grant of exclusivity, that drive future research and discovery.

6.      The Act's government-mandated price controls, like some of the foreign price control systems the Act would transplant to the United States, will severely impede the discovery of new life-saving and life-enhancing medications. If it operates as intended, the D.C. Act would lower drug prices in the District, leaving it for patients in other states to provide the compensation necessary to spur critical investment and invention, if that compensation is to be provided at all. Its true effect, however – particularly if it is replicated by other states – will be to damage the health of residents of the District of Columbia and the Nation by stifling innovation and frustrating the search for new drugs.

7.      Because the D.C. Act imposes punishment on patent holders merely for obtaining the incentives established by federal law, it is manifestly inconsistent with the system of laws created by the U.S. Congress to promote and reward the discovery of life-saving and life-enhancing drugs, and it is preempted by federal law and thus invalid.

8.      Because the D.C. Act regulates economic activity that occurs wholly outside the District, it violates the Commerce Clause of the United States Constitution.

9.      Because the D.C. Act insists that domestic prices be linked to the price restraints imposed through the regulatory acts of foreign governments, it violates the Foreign Commerce Clause of the United States Constitution. The foreign implications of the Act provide another basis for invalidating the legislation; the consideration of foreign healthcare policy that local

4

courts must engage in under the Act unconstitutionally encroaches on the federal government's power to conduct the Nation's foreign affairs.

10.     The Act, passed by the D.C. Council on September 20, 2005, provides that it "shall take effect following approval by the Mayor (or in the event of veto by the Mayor, action by the Council to overrule the veto), a 30-day period of Congressional review as provided in section 602(c)(1) of the District of Columbia Home Rule Act . . . , and publication in the District of Columbia Register." Act § 4; *see also* D.C. Code §§ 1-206.02(c)(1) (30-day review period), 2-602 (publication requirement). The Act was signed by the Mayor on October 4, 2005. It will thus take effect following the expiration of the period for Congressional review provided that the Act has been published in the D.C. Register. The Act may be published in the D.C. Register as soon as October 14, 2005.

11.     Both PhRMA members and the broader public interest in innovation and discovery in the pharmaceutical field will be irreparably harmed if the Act is published. Once in effect, the Act will unleash a potentially unlimited number of enforcement actions seeking to punish PhRMA members for prices charged for patented drugs in extraterritorial transactions where the patented drugs are eventually resold in the District of Columbia. The enormous burden created by these lawsuits for PhRMA members will itself undermine Congress's regime, potentially force reductions in price or changes in sales, or threaten the public health.

12.     For these reasons, and as explained below, PhRMA seeks a permanent injunction against the publication and enforcement of the D.C. Act, a declaration that the D.C. Act is unconstitutional and invalid, and other appropriate relief. Because publication could occur as early as Friday of this week, PhRMA is also seeking emergency relief – a temporary restraining order and preliminary injunction barring publication and enforcement by the District.

## JURISDICTION AND VENUE

13.     PhRMA's causes of action arise under 42 U.S.C. § 1983 and the United States Constitution.  Consequently, this Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331.

14.     Pursuant to 28 U.S.C. §§ 2201-2202, the Court may issue a declaratory judgment and further necessary or proper relief.

15.     Venue is appropriate in this district pursuant to 28 U.S.C. § 1391(b).

## THE PARTIES

16.     PhRMA is a non-profit corporation organized and existing under the laws of the State of Delaware, with offices located in Washington, D.C.  PhRMA members are the country's leading research-based pharmaceutical and biotechnology companies, which are devoted to discovering and developing new medications that allow people to live longer, healthier, and more productive lives.  Together, these companies account for close to 70% of the sales of prescription drugs in the United States.  PhRMA serves as the pharmaceutical industry's principal policy advocate, representing its members' interests in matters before Congress, the Executive Branch, state regulatory agencies and legislatures, and the courts.  PhRMA is committed to, *inter alia*, advancing public policies that foster continued medical innovation and educating the public about the drug development and discovery process.  A list of PhRMA members can be found at http://www.phrma.org.  Many of the prescription drugs discovered, developed, and then sold by PhRMA members are covered by patents and thus their sale is directly regulated by the Act.

17.     The District of Columbia is a municipal corporation established by Congress by the Act of February 21, 1871, ch. 62, § 1, 16 Stat. 419. The D.C. Act at issue here specifically empowers the District to bring civil actions seeking fines, treble damages, and injunctive relief. *See* Act § 2 (§ 28-4555).

18.     Defendant Anthony A. Williams is the Mayor of the District of Columbia and is sued in his official capacity as the Mayor of the District. Mayor Williams signed the Act into law, and is authorized by the D.C. Code to direct the actions of the Office of the Attorney General, which (as noted below) handles all suits made by and against the District and will litigate suits brought by the District under the Act. D.C. Code § 1-301.111. Under D.C. law, the Office of Documents and Administrative Issuances, and ultimately the Mayor, are responsible for publishing Council acts in the D.C. Register. *See id.* §§ 2-611(b)-(c), 2-612(1), 2-504(a); D.C. Mun. Regs. tit. 1, § 305.1(a).

19.     The Office of the Attorney General of the District of Columbia has "charge and conduct of all law business of the said District, and all suits instituted by and against the government thereof." D.C. Code § 1-301.111. Accordingly, it is the Office of the Attorney General that is charged with bringing suits on behalf of the District of Columbia under the Act. Robert J. Spagnoletti is the Attorney General of the District of Columbia and is sued in his official capacity as the Attorney General and the senior officer of the Office of the Attorney General.

20.     The Office of Documents and Administrative Issuances of the District of Columbia was established "within the executive office of the Mayor," D.C. Code § 2-611(b), and (among other things) is required to "supervise, manage, and direct the preparation, editing, and publishing of the District of Columbia Register," *id.* § 2-553(a), which "shall contain the entire

7

text of . . . [e]very act, resolution, and notice of the Council," *id.* § 2-553(b)(4). *See also* D.C. Mun. Regs. tit. 1, § 205.1(a) ("The Office of Documents and Administrative Issuances shall publish a weekly serial publication called the District of Columbia Register, which shall contain . . . each act adopted by the Council and approved by the Mayor . . . ."). The Office is "under the supervision and control of an Administrator appointed by the Mayor." D.C. Code § 2-611(b). The Administrator is required to "[s]upervise, manage, and direct the preparation, editing, printing and public distribution of all legal publications of the District of Columbia government including the District of Columbia Statutes-at-Large, the District of Columbia Register, and the District of Columbia Municipal Regulations." *Id.* § 2-612(1). Arnold R. Finlayson is the Administrator of the Office of Documents and Administrative Issuances and is sued in his official capacity as the Administrator of the Office.

## BACKGROUND

### Federal Patent Law and Supplemental Pharmaceutical Regulations

21.    The United States Constitution grants Congress the authority to "secur[e] for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries." U.S. Const. art. I, § 8, cl. 8. The stated objective of Congress's constitutional power to issue patents is to "promote the Progress of Science and useful Arts." *Id.* In furtherance of this objective, the federal patent system is designed to achieve complementary goals – to encourage and reward invention, to promote disclosure of inventions in order to stimulate further innovation, to encourage widespread use of and benefit from inventions, and to assure that ideas in the public domain are available for free use by the public.

22.    Congress has carefully balanced the complementary goals of the patent system, and has designed federal patent law accordingly. Under the federal patent laws, innovation is

rewarded primarily by granting a patent holder the exclusive right to make, use, and sell the patented invention for a limited period of time. 35 U.S.C. § 154. Most recently, Congress has concluded that patent holders are entitled to seventeen or twenty years of exclusive use of their inventions, depending on when the patent application was filed. *Id.* During the applicable period of exclusivity, federal law protects the patent by prohibiting patent infringement, defined as the unauthorized making, using, offering for sale, or selling of any patented invention within the United States. *Id.* § 271(a).

23.    Critically, the grant of the exclusive right to use and sell a patented product also conveys the right to sell the product at the market price that exclusivity permits, which gives patents their economic value and encourages invention. The United States Supreme Court and Congress have long recognized that it is in part the prospect of obtaining the exclusive rights to an invention for a limited period of time and the corresponding ability to recoup initial outlays and to profit during that period that motivates inventors to expend the substantial sums of money on research and development that are often required. "Patents are designed to promote innovation by providing the right to exclude others from making, using, or selling an invention. They enable innovators to obtain greater profits than could have been obtained if direct competition existed. These profits act as incentives for innovative activities." H. Rep. No. 98-857(I), at 17 (1984), *reprinted in* 1984 U.S.C.C.A.N. 2647, 2650 (describing purpose of the patent extension contained in the Drug Price Competition and Patent Term Restoration Act described below).

24.    In *Mazer v. Stein*, 347 U.S. 201, 219 (1954), the Supreme Court explained: "The economic philosophy behind the clause empowering Congress to grant patents and copyrights is the conviction that encouragement of individual effort by personal gain is the best way to

advance public welfare through the talents of authors and inventors in 'Science and useful Arts.' Sacrificial days devoted to such creative activities deserve rewards commensurate with the services rendered." The Court has observed that one of the primary purposes of the federal patent laws is "to *foster and reward* invention." *Aronson v. Quick Point Pencil Co.*, 440 U.S. 257, 262 (1979) (emphasis added).

25.    The need to provide incentives to developers of prescription drugs is particularly great. According to a recent article in the Journal of Law and Economics, it takes approximately 16 years to bring a new chemical entity to market. Carmelo Giaccotto et al., *Drug Prices and Research and Development Investment Behavior in the Pharmaceutical Industry*, 48 J. L. & ECON. 195, 196 (2005). Moreover, "only a fraction of drugs in the R&D 'pipeline' ever succeed in making it to market." *Id.* at 196 n.2. A 2004 study by the Department of Commerce estimated that the cost of bringing a new drug to market (including the cost associated with unsuccessful drugs) in 2003 was approximately $1.3 billion. *See* U.S. Dep't of Commerce, Int'l Trade Admin, *Pharmaceutical Price Controls in OECD Countries: Implications for U.S. Consumers, Pricing, Research and Development, and Innovation* 30-31 (Dec. 2004) ("*2004 Commerce Report*").

26.    Against this backdrop, Congress has fine-tuned the incentives offered by the patent system for the pharmaceutical industry, supplementing the patent laws with laws applicable to pharmaceuticals specifically. In 1984, Congress provided for the extension of the patent term of prescription drugs subject to Food and Drug Administration ("FDA") approval in the Drug Price Competition and Patent Term Restoration Act of 1984, Pub. L. No. 98-417, 98 Stat. 1585 (codified at 21 U.S.C. §§ 355, 360cc and 35 U.S.C. §§ 156, 271, 282) ("Patent Term Restoration Act"). As federal courts have observed, these additional incentives to innovation, as

intended, serve to benefit the public. *Glaxo, Inc. v. Novopharm, Ltd.*, 110 F. 3d 1562, 1568 (Fed.

Cir. 1997); *Pfizer Inc. v. Dr. Reddy's Labs., Ltd.*, 359 F.3d 1361, 1364 (Fed. Cir. 2004).

27.    The President recognized the balance Congress had achieved, and the objectives

of that balance, when he signed the 1984 patent extension provision into law: "This bill will

promote medical breakthroughs and drug innovation by granting drug companies up to 5 more

years of patent protection for new drugs. And this extension will help compensate for the years

of patent life lost due to the time-consuming, but essential, testing required by the Food and Drug

Administration." Drug Price Competition and Patent Term Restoration Act of 1984:  Remarks

of President Ronald Reagan on Signing S. 1538 Into Law, 20 Weekly Comp. Pres. Doc. 1359

(Sept. 24, 1984).

28.    Congress has further adjusted incentives to research and development in the

pharmaceutical field. In the Food and Drug Administration Modernization Act of 1997, Pub.L.

No. 105-115, 111 Stat. 2296, Congress permitted the FDA to offer additional incentives, in the

form of extended market exclusivity beyond the patent term, for development of drugs deemed

socially important, such as pediatric medications. *See* 21 U.S.C. § 355a. And Congress has used

extended market exclusivity to encourage investment in drugs for rare conditions or diseases in

the Orphan Drug Act, Pub. L. 97-414, and the amendments thereto. *See* 21 U.S.C. §§ 360aa-

360dd.

29.    That the patent laws and supplemental legislation regarding market exclusivity are

Congress's prerogative is clear from the Constitution itself. As the Supreme Court has

recognized, "it is Congress that has been assigned the task of defining the scope of the limited

monopoly that should be granted to authors or to inventors in order to give the public appropriate

access to their work product." *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417,

429 (1984). And Congress has gone to extraordinary lengths to strike the proper balance of patent exclusivity and economic competition with respect to patented prescription drugs.

30.      The Constitution bars the District from altering or obstructing this carefully crafted regime. The Supremacy Clause of the United States Constitution provides that the "Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land." U.S. Const. art. VI. A District of Columbia law is preempted when it stands as an obstacle to the accomplishment and execution of Congress's objectives in the patent system and the supplementary regulations for pharmaceuticals.

Limitations on Extraterritorial Regulation by the District

31.      The United States Constitution grants Congress the authority to regulate interstate and foreign commerce. *See* U.S. Const. art. I, § 8, cl. 3. This grant of authority to the Congress precludes the regulation of interstate and foreign commerce by the states and the District, absent express congressional authorization.

32.      The United States Constitution was "framed upon the theory that the peoples of the several states must sink or swim together, and that in the long run prosperity and salvation are in union and not division." *Baldwin v. G.A.F. Seelig, Inc.*, 294 U.S. 511, 523 (1935). The delegation of the authority to regulate interstate commerce to Congress, and Congress alone, "reflect[s] a central concern of the Framers that was an immediate reason for calling the Constitutional Convention: the conviction that in order to succeed, the new Union would have to avoid the tendencies toward economic Balkanization that had plagued relations among the Colonies and later among the States under the Articles of Confederation." *Hughes v. Oklahoma*, 441 U.S. 322, 325 (1979).

12

33.    The Constitution embodies a "special concern both with the maintenance of national economic union unfettered by state-imposed limitations on interstate commerce and with the autonomy of the individual States within their respective spheres." *Healy v. Beer Inst., Inc.*, 491 U.S. 324, 335-336 (1989).  Accordingly, the "Commerce Clause . . . precludes the application of a state statute to commerce that takes place wholly outside of the State's borders, whether or not the commerce has effects within the State." *Id.* at 336 (citation omitted); *see also Brown-Forman Distillers Corp. v. New York State Liquor Auth.*, 476 U.S. 573, 579 (1986).  For that reason, "a statute that directly controls commerce occurring wholly outside the boundaries of a State exceeds the inherent limits of the enacting State's authority and is invalid." *Healy*, 491 U.S. at 336.  "The critical inquiry is whether the practical effect of the regulation is to control conduct beyond the boundaries of the State." *Id.; see also In re Brand Name Prescription Drugs Antitrust Litig.*, 123 F.3d 599, 613 (7th Cir. 1997) ("A state cannot regulate sales that take place wholly outside it.").

34.    The Constitution also grants Congress power "to regulate Commerce with foreign Nations." U.S. Const. art. I, § 8, cl. 3, "Foreign commerce is pre-eminently a matter of national concern." *Japan Line, Ltd. v. County of Los Angeles*, 441 U.S. 434, 448 (1979).  Indeed, the Supreme Court has observed that "[i]n international relations and with respect to foreign intercourse and trade the people of the United States act through a single government with unified and adequate national power." *Barclays Bank PLC v. Franchise Tax Bd.*, 512 U.S. 298, 311 (1994) (internal quotation marks omitted).  The Court has recognized that in the area of foreign affairs, the Framers of the Constitution had an "overriding concern that the Federal Government must speak with one voice." *Japan Line*, 441 U.S. at 439 (internal quotation marks omitted).  Accordingly, as compared with Congress's power over interstate commerce, "there is

13

evidence that the Founders intended the scope of the foreign commerce power to be the greater."
*Id.*

35.    The Constitution thus prohibits the District from regulating economic activity
wholly outside of its borders, whether in other states or other nations.  Consequently, the District
may not constitutionally pass a law regulating the price of a product sold wholly outside of the
District, even if that product may eventually be resold in the District.  It also may not seek to tie
commerce in the District to commerce in foreign countries.

The D.C. Act

36.    The D.C. Act was approved by the D.C. Council on September 20, 2005, and was
signed by Mayor Anthony A. Williams on October 4, 2005.  Unless the United States Senate and
House of Representatives adopt a joint resolution disapproving the Act within thirty legislative
days of the Act's transmission to Congress, and the President signs the resolution or it passes
over his veto, the D.C. Act will become effective at the end of that 30-day period, *provided* that
the has also been published in the District of Columbia Register.

37.    The D.C. Act adds a new Chapter 45B, "Excessive Pricing," in the District of
Columbia Official Code Title 28, which covers "Commercial Instruments and Transactions."
The Act states that "[i]t shall be unlawful for any drug manufacturer or licensee thereof,
excluding a point of sale retail seller, to sell or supply for sale or impose minimum resale
requirements for a patented prescription drug that results in the prescription drug being sold in
the District for an excessive price."  Act § 2 (§ 28-4553).

38.    A plaintiff can make a prima facie showing of excessive pricing if the "wholesale
price of a patented prescription drug in the District is over 30% higher than the comparable price
in any high income country in which the product is protected by patents or other exclusive

marketing rights." *Id*. (§ 28-4554(a)). Under the Act, "high income country" means Australia, Canada, Germany, and the United Kingdom. *Id*. (§28-4552(2)). Thus, a plaintiff can make a prima facie case of excessive pricing for a retail transaction in the District of Columbia against a drug manufacturer if he can show that the wholesale price of a drug in the District is more than 30% higher than the wholesale price of the same drug in any one of Australia, Canada, Germany, or the United Kingdom.

39.    Once a plaintiff has made a prima facie case, the burden shifts to the defendant drug manufacturer or licensee to prove that the price is not excessive based on a variety of factors including the "costs of invention, development and production . . . , global sales and profits to date, consideration of any government funded research . . . , and the impact of price on access to the prescription drug by residents and the government of the District of Columbia." *Id*. (§ 28-4554(b)). The proper weighing of the listed factors necessarily must be decided on a case-by-case basis, with all of the risk and uncertainty inherent in such a system.

40.    Pursuant to the Act, "[a]ny affected party, including the District of Columbia" has standing to file suit for a violation of this provision and to seek relief, including "[a]ppropriate fines for each violation," treble damages, and injunctive relief. *Id*. (§ 28-4555). The Act thus authorizes suits by every person who buys drugs in the District – one suit for every sale. Moreover, and in addition, the D.C. Act expressly authorizes suits by "any person or organization representing the public interest," *id*. (§ 28-4552(1)), and thus apparently authorizes literally an unlimited number of actions.

The Act's Disruption of the Patent System and Supplemental Drug Regulations

41.    The Act applies only to patented drugs and applies against only drug manufacturers (often the patent holders) and their licensees. *See id*. (§ 28-4553). It purports to

15

regulate the price of those patented drugs – setting presumptive price caps and requiring courts to decide claims alleging excessive prices and to impose penalties accordingly. *Id.* (§§ 28-4553 to -4555). By regulating prices, the Act regulates the compensation and incentives to future innovation in a manner inconsistent with Congress's determination. This inconsistency is plain from the purpose and effect of the Act – to penalize patent holders for realizing the incentives for invention that were established, and carefully calibrated, by Congress.

42.    Congress has addressed, and continually reassessed, the proper incentives for innovation. It has created a comprehensive system, as outlined above, encompassing not only the patent laws but also supplemental legislation applicable to pharmaceuticals alone. One essential purpose of these laws is to grant patent holders the economic benefit of exclusivity for a period of years – a benefit that the District now seeks to dilute or eviscerate.

43.    By requiring courts to weigh policy considerations to ascertain whether prices are excessive, the Act supplants the judgments that have already been made by Congress. The price limits of the D.C. Act, and the penalties for exceeding these limits, punish patent holders for recovering development outlays and realizing the incentives for future investment that Congress enabled them to obtain under the patent laws and pharmaceutical regulations. Where, as here, a District law directly cabins the effect of a decision made by Congress in order to pursue alternate policy goals, or punishes individuals for doing what Congress enabled them to do, the law plainly stands as an obstacle to the achievement of the federal objectives advanced through the patent laws and supplemental drug regulations.

The Extraterritorial Reach of the D.C. Act

44.    By its terms, the D.C. Act prohibits a "drug manufacturer or licensee thereof, excluding a point of sale retail seller" from selling patented drugs anywhere – inside or outside

16

of the District – at a price "that *results in* the prescription drug being sold in the District for an

excessive price." *Id.* (§ 28-4553) (emphasis added). Thus, pharmaceutical manufacturers and

their licensees – and their prices on patented drugs – are the direct and intended targets of the

D.C. Act.

45.    The vast majority of patented prescription drugs that are eventually provided to

patients in the United States, including patients in the District, are initially sold by

pharmaceutical manufacturers either to drug wholesalers, such as AmerisourceBergen Corp.,

McKesson Corp., or Cardinal Health, Inc., or to large retail pharmacy chains that warehouse

their own drugs ("warehousing retail chains"), such as CVS and Rite-Aid. Typically, a

manufacturer ships the drugs by common carrier from its warehouse to the wholesaler's or retail

chain's warehouse.

46.    Patented prescription drugs sold to wholesalers are then typically resold

(sometimes through another wholesaler) to retail pharmacies and healthcare institutions that

dispense the drugs to patients with a prescription for them. Patented prescription drugs initially

sold to a warehousing retail chain are generally distributed to the chain's retail outlets, where

they are dispensed to patients. Patented prescription drugs are thus finally sold to patients by

retail pharmacies as well as by health care institutions.

47.    Under this distribution system, the vast majority of patented prescription drug

sales by manufacturers occur entirely outside of the District of Columbia. The manufacture of

patented prescription drugs occurs outside of Washington, D.C. Not a single member of PhRMA

is based in the District, nor are any PhRMA members' manufacturing facilities located in the

District. And not a single PhRMA member has a warehouse in the District from which it ships

patented prescription drugs. Moreover, the principal wholesalers and warehousing retail chains

to which manufacturers sell the vast majority of their patented prescription drugs are based outside of the District, and the warehouses at which they receive shipments of drugs from manufacturers are located outside the District. Thus, in a typical manufacturer sale, patented prescription drugs are shipped from the manufacturer's warehouse outside of D.C. to the purchaser's warehouse, also outside D.C. The vast majority of patented prescription drugs, therefore, are not even arguably sold in the District unless and until a wholesaler sells a drug to a retail pharmacy or healthcare institution in the District (which itself may take possession of the pharmaceutical outside the District), or until a warehousing retail chain that takes possession of the drugs outside the District transports them to the District and fills a prescription for a patient in the District.

48.    Thus, the only involvement a drug manufacturer has in the overwhelming majority of the sales of patented prescription drugs in the District is an upstream sale that occurred wholly outside of the District. These wholly extraterritorial transactions are the target of the Act.

49.    In addition to targeting out-of-state transactions by PhRMA members, the Act also has implications for transactions abroad. The Act creates a presumption of excessive prices based on government-regulated prices in select foreign countries. *See id.* (§ 28-4554). By tying the legality of domestic prices to prices abroad, the Act necessarily creates a link between the District's regulation and the manufacturers' marketing decisions abroad.

The Effect of the D.C. Act on the Sale and Distribution of Drugs in Interstate Commerce

50.    In passing the Act, the D.C. Council left no doubt that it believes that the prevailing prices in the District presently are "excessive" under the Act. The D.C. Council purported to "find[]" that "[t]he excessive prices of prescription drugs in the District of Columbia

is [sic] threatening the health and welfare of the residents in the District as well as the District government's ability to ensure that all residents receive the health care they need, and these excessive prices directly and indirectly cause economic harm to the District and its residents." *Id.* (§ 28-4551(1)). The D.C. Council also found that it was "incumbent on the government of the District of Columbia to take action to restrain the excessive prices of prescription drugs." *Id.* (§ 28-2551(2)).

51.    The governments of the countries defined by the D.C. Act as "high income" – Australia, Canada, Germany, and the United Kingdom – all act to artificially constrain the price of patented prescription drugs. Among other measures, these nations have taken the following steps. In Australia, the price of patented prescription drugs is negotiated by a government agency called the Pharmaceutical Benefits Pricing Authority that purchases drugs to be provided to patients at subsidized prices under Australia's national healthcare system. *See 2004 Commerce Report* at 62. For new, on-patent drugs, the price is initially determined, when possible, by reference to the price of older drugs intended to treat similar symptoms or conditions – including generics. *See Pharmaceutical Benefits Pricing Authority, Policies, Procedures and Methods Used in the Pricing of Pharmaceutical Products* 8-9 (Jan. 2005) ("PBPA Policies"). Strict conditions are imposed on a manufacturer seeking to charge a higher price and, when a higher price is allowed, that price is determined by reference to a cost-effectiveness analysis that gives almost no consideration to the costs of development or the need to encourage future discovery. *Id.* In Canada, which has a universal healthcare system, price controls on patented prescription drugs are imposed through various means, including limits on prices at the national level and capped reimbursement rates set by the Provinces and Territories at levels below those national limits. *See 2004 Commerce Report* at 107. In Germany, some patented prescription

drugs are subject to reference prices set by a committee of doctors and insurance funds that are part of the statutory health insurance system; patients are required by law to pay 100% of the difference between actual drug prices and reference prices, which imposes a de facto price cap on drugs for which there is a reference price. *See id.* at 85-86. In the United Kingdom, the government negotiates the profits that drug manufacturers are permitted to make on sales of branded prescription drugs to the National Health Service – which provides comprehensive healthcare including prescription drug coverage to U.K. residents – and in turn controls drug prices to ensure that the profit limits are not exceeded. *See id.* at 99-100.

52.    The price control systems in these countries do not provide the same incentives to invest and innovate that Congress has deemed necessary to the public health. By restraining prices and returns on investment, these nations inherently set limits on compensation to inventors and incentives for future investment. In certain of these countries, such as Australia, moreover, it is not simply that the government has set the incentive targets differently from Congress; rather, the pricing scheme almost always excludes consideration of compensation for research and development costs and incentives to future discovery. *See PBPA Policies* at 8-9.

53.    PhRMA members are at significant risk of being sued by plaintiffs claiming that U.S. prices exceed the lowest government-controlled price in one of those four nations by 30% or more. Although comparisons of this type are open to serious question, the *2004 Commerce Report* compared the average price at which a manufacturer sells drugs to a wholesaler for a number of patented drugs in nine foreign countries to the average price in the United States. The report found that government-controlled prices in Australia were 40 to 49% of U.S. prices; that government-controlled prices in Canada were 54 to 56% of U.S. prices; that government-controlled prices in Germany were 52 to 59% of U.S. prices; and that government-

controlled prices in the United Kingdom were 47 to 57% of U.S. prices. *See 2004 Commerce Report* at 15 fig.3. Another study based on year 2000 price data concluded that on average retail prices of patented drugs in Canada are 35% less than in the United States. *See* John R. Graham & Beverly A. Robson, *Prescription Drug Prices in Canada and the United States—Part 1: A Comparative Survey*, PUBLIC POLICY SOURCES, NO. 42, SEPT. 2000, at 13, tbl.9 (Sept. 2000), *available at* http://www.fraserinstitute.ca/admin/books/files/PrDrgPr1(42).pdf.

54.    More generally, the *2004 Commerce Report* concluded that the governments in eleven developed foreign countries (including the four countries referenced in the D.C. Act) "have relied heavily on government fiat rather than competition to set prices, lowering drug spending through price controls applied to new and old drugs alike." *2004 Commerce Report* at vii. When applied to new drugs, the study concluded, these price controls "reduce company compensation to levels closer to direct production costs, leaving less revenue for R&D." *Id.* In addition to documenting the government price controls on patented prescription drugs present in many foreign countries, the Department of Commerce also studied the effect of eliminating those price controls on innovation by drug manufacturers. The Study concluded that doing so would increase expenditures on research and development by about 17% and could result in three to four new medicines being brought to market each year. *Id.* at 29, 31. The Department of Commerce study concluded that these new medications, in turn, could provide health benefits to U.S. purchasers of pharmaceuticals worth from $4.9 billion to $7.5 billion annually. *See id.* at 25.

55.    A drug manufacturer whose drug is sold at a price that arguably triggers the D.C. Act's presumption of excessiveness will face tremendous risk under the Act. Whenever such a manufacturer has reason to fear that the wholesale price of the drug may exceed the lowest

"comparable" foreign price by more than 30%, the drug manufacturer will have no way of being certain that it will be able to persuade a court that the ultimate retail price is not "excessive" under the Act. Given the indeterminacy of this statutory standard, drug manufacturers will likely face a choice between modifying their pricing or distribution practices in an attempt to assure compliance or operating under the continuous threat of enormous liability under the Act. Given that the Act authorizes suits by any person or organization purportedly representing the public interest as well as any purchasers, the liability threat is both enormous and continuous – manufacturers face a multiplicity of burdensome lawsuits.

56.    The Act could also cause substantial disruptions in the interstate markets for patented prescription drugs. If it works as intended, the Act would artificially drive a wedge between the prices of patented prescription drugs sold in the District and the prices in other states. As a result, the Act would create an incentive for wholesalers, retailers, hospitals – and even patients – to purchase drugs in the District instead of other states, simply to resell or use them in other jurisdictions with higher prices. This incentive, of course, may serve the District's parochial interest by reducing prices for its own residents, increasing tax revenues, and possibly increasing local employment, but the gain to the District will come at a cost to other jurisdictions. These jurisdictions will lose the transactions lured to the District while their citizens will – through non-price-controlled sales that continue to occur outside the District – continue to fund the research and development that benefits all patients. The D.C. Act ultimately creates incentives for other States to enact similar price controls in order to prevent the loss of commerce within their borders and to join the District in allowing their residents to "free-ride" on the research and development funded by others. The Commerce Clause guarantees a nationwide marketplace precisely to prevent states from acting in such a self-interested manner.

## PLAINTIFF'S CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

(Declaratory/Injunctive Relief - Preemption by Federal Patent Law Under
the Supremacy Clause of Art. VI, cl. 2 of the United States Constitution)

57.    PhRMA re-alleges and incorporates herein by reference the allegations of the

preceding paragraphs of this Complaint.

58.    Federal patent laws embody a careful balance struck by Congress in an attempt to

reconcile the competing goals of the patent system:  providing an incentive for innovation and

the disclosure of new inventions but also facilitating access to new inventions.  Innovation is

rewarded and encouraged under the patent laws primarily by granting patent holders the

exclusive right to manufacture, use, and sell their inventions for a limited period of time and to

obtain the economic benefits that come with exclusivity.  Congress has addressed innovation in

the pharmaceutical field with special care, enacting legislation directed at pharmaceuticals

specifically, such as the Patent Term Restoration Act and other laws that offer particular

incentives for certain products, such as "orphan" drugs and drugs subject to pediatric testing.

59.    Under the Supremacy Clause of the Constitution, these federal laws are the

"supreme Law of the Land." U.S. Const. art. VI., cl. 2.  Laws that "stand[] as an obstacle to" the

achievement of federal objectives are, accordingly, preempted. *Jones v. Rath Packing Co.*, 430

U.S. 519, 526 (1977).

60.    The D.C. Act is preempted by federal patent law because it stands as a clear

obstacle to the goals of the federal patent system.  The D.C. Act targets *patented* prescription

drugs (and only *patented* prescription drugs) and the holders of such patents, and it sets severe

limits on the prices that patent holders may charge for their patented products.  It punishes patent

23

holders for obtaining the very rewards Congress intended to enable them to obtain as the means for fully recouping the enormous research and development outlays and as the incentive for their investments in new life-saving innovations.  In this respect, the D.C. Act is not a generally applicable statute that incidentally affects the price of patented products; rather it is directed at patented drugs alone and seeks specifically to punish patent holders for pricing their patented products pursuant to the system of investment recoupment and incentives that Congress established.  Indeed, under the D.C. Act, a drug ceases to be subject to price regulation on the day that its patent protection *expires*.

61.    Although Congress has modified the patent laws and related statutes for pharmaceuticals over the years, several foundational features have remained constant.  Among them is the exclusive right of patent holders to make and sell the patented products for a defined period of time and to recoup their research and development costs and obtain the financial reward that exclusivity permits as an incentive to future investment.  The Act, however, seeks to undermine that foundational principle; it denies patent holders the ability to fully recoup their investment costs and obtain this reward – opportunities that have been carefully calibrated by Congress.  The obstacle to the public health objective advanced by Congress's scheme could not be more clear:  the Act seeks to punish patent holders for doing precisely what Congress intended to enable, namely earning the returns necessary to compensate for past investment and to create incentives for investment in future innovation.  Under the Supremacy Clause, the District is simply not permitted to make unlawful the very conduct that Congress has enabled in order to promote the public health.

62.    The D.C. Act is accordingly preempted by federal law and void.

## SECOND CLAIM FOR RELIEF

(Declaratory/Injunctive Relief - Violation of the Commerce Clause
of Art. I, § 8, cl. 3 of the United States Constitution)

63.     PhRMA re-alleges and incorporates herein by reference the allegations of the

preceding paragraphs of this Complaint.

64.     The Commerce Clause vests Congress with the authority to "regulate Commerce

. . . among the several States," U.S. Const. art. I, § 8, cl. 3, and simultaneously precludes states

and the District of Columbia from doing so.  A state law that regulates commerce that takes place

wholly outside of the state's borders violates the Commerce Clause, whether or not the

commerce has effects within the state.

65.     The D.C. Act violates the Commerce Clause because it purports to regulate

transactions wholly outside of the District's borders.  The Act is not limited to sales that occur

within the District or even to sales that occur between an entity outside of the District and an

entity within the District.  Rather, the Act provides that it is "unlawful for any drug manufacturer

or licensee thereof, excluding a point of sale retail seller, to sell or supply for sale or impose

minimum resale requirements for a patented prescription drug *that results in the prescription*

*drug being sold in the District* for an excessive price."  Act § 2 (§ 28-4553) (emphasis added).

The Act thus regulates the prices of manufacturer transactions wherever they occur.

66.     No manufacturers of patented prescription drugs are headquartered, have their

principal place of business, or ship or make available for pick-up pharmaceuticals from any

location in the District, and no major wholesalers of patented prescription drugs or warehousing

retail pharmacy chains are headquartered, have their principal place of business, or take

possession of purchased prescription drugs in the District.  The Act thus targets transactions occurring wholly outside of the District.

67.    The Act also seeks to advance the District's own parochial interests at the expense of the interests of other states and the nation as a whole.  The Act creates incentives for companies to purchase patented drugs in the District, taking advantage of the below-market prices imposed under the Act, and then resell the patented drugs in other markets.  The Act also creates incentives for patients living in other States to buy patented pharmaceuticals from pharmacies or hospitals located in the District.

68.    Because the D.C. Act regulates conduct occurring outside of the District and advances the District's parochial interests at the expense of other states and the Nation as a whole, it violates the Commerce Clause and is void.

### THIRD CLAIM FOR RELIEF

(Declaratory/Injunctive Relief - Violation of the Foreign Commerce Clause
of Art. I, § 8, cl. 3 of the United States Constitution and the Exclusive Power of the Federal
Government Over Foreign Affairs )

69.    PhRMA re-alleges and incorporates herein by reference the allegations of the preceding paragraphs of this Complaint.

70.    The Constitution expressly grants to the federal government the power "[t]o regulate Commerce with foreign Nations."  U.S. Const., art I, § 8, cl. 3.  Because federal uniformity is essential with respect to foreign intercourse and trade, the Foreign Commerce Clause has been understood to bar states from intruding upon the federal government's efforts to regulate foreign commerce.  A state law violates the Foreign Commerce Clause if it prevents the federal government from "speaking with one voice" in matters regulating foreign commerce. *Japan Line*, 441 U.S. at 451.  The constraints on states under the Foreign Commerce Clause can

properly be understood as greater than those under the Interstate Commerce Clause. *See, e.g., id.* at 448. Accordingly, just as state laws that tie in-state prices to out-of-state prices violate the Interstate Commerce Clause, so too do state laws that tie in-state prices to foreign prices violate the Foreign Commerce Clause; the price tying arrangement necessarily affects foreign transactions. The fact that a law targets only domestic prices is irrelevant if the law has the effect of influencing foreign commerce.

71.    The D.C. Act impermissibly ties domestic prices to foreign prices. The Act prohibits "excessive" pricing and provides that a "prima facie case of excessive pricing" is established where the wholesale price of a patented prescription drug in the District is more than 30% above the comparable price in Australia, Canada, Germany, or the United Kingdom. Act § 2 (§ 28-4554(a)). The Act thus expressly ties the prices at which drugs may be sold in the District to the prices at which the same drugs are sold abroad and thereby implicates matters of foreign policy and commerce, which are the prerogative of the federal government alone.

72.    This tying of commerce in the District to foreign commerce will have direct and indirect effects on foreign commerce, because it will prompt commercial actors to weigh the consequences of their dealings in the District of Columbia when they decide whether or how to do business in Australia, Canada, Germany, or the United Kingdom. If multiple states enact comparable legislation, then a manufacturer selling in the smaller foreign markets would be punished for the price charged in the primary market (the United States); the rational response would be to limit sales abroad.

73.    In addition to granting authority over foreign commerce to Congress, the Constitution also entrusts the power over foreign affairs and international relations solely to the federal government, expressly forbidding states to exercise comparable authority. *See, e.g.*, U.S.

27

Const. art. I, §§ 8, 10. The constitutional provisions give the "Federal Government . . . full and exclusive responsibility for the conduct of affairs with foreign sovereignties," *Hines v. Davidowitz*, 312 U.S. 52, 63 (1941), and make clear that "[p]ower over external affairs is not shared by the States," *United States v. Pink*, 315 U.S. 203, 233 (1942).

74.    For that reason, the Supreme Court has held that state laws violate the Constitution when they prevent the federal government from speaking with "one voice." *Id.*. at 242 (Frankfurter, *J.*, concurring). "If state laws and policies did not yield before the exercise of the external powers of the United States, then our foreign policy might be thwarted. These are delicate matters. If state action could defeat or alter our foreign policy, serious consequences might ensue. The nation as a whole would be held to answer if a State created difficulties with a foreign power." *Id.* at 232.

75.    The Act impermissibly invades the federal government's exclusive authority over questions affecting foreign affairs. The countries identified in the D.C. Act as providing the statutory benchmark for domestic prices impose governmental price restraints on patented prescription drugs. A court considering whether to declare unlawful a price 30% higher than the price set by a foreign government inevitably would consider whether the foreign country's regulation is reasonable, whether it adequately compensates manufacturers, and how it compares to (and interacts with) U.S. law and practice. Such consideration and the resulting judgments would impede the federal government's ability to conduct foreign policy and thus cannot stand.

76.    Accordingly, the D.C. Act both violates the Foreign Commerce Clause and is unconstitutional because it intrudes upon the federal government's authority over foreign affairs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff PhRMA prays:

A.  For a temporary restraining order enjoining Defendants from publishing, or taking any step to facilitate publication of, the text of the "Prescription Drug Excessive Pricing Act of 2005" in the *District of Columbia Register*, *District of Columbia Statutes-at-Large*, or the *District of Columbia Municipal Regulations*, and directing Defendants to take all necessary steps to ensure that publication does not occur during the period that the temporary restraining order is in effect;

B.  For a preliminary injunction enjoining Defendants from publishing, or taking any step to facilitate publication of, the text of the "Prescription Drug Excessive Pricing Act of 2005" in the *District of Columbia Register*, *District of Columbia Statutes-at-Large*, or the *District of Columbia Municipal Regulations*; directing Defendants to take all necessary steps to ensure that publication does not occur during the period that the preliminary injunction is in effect; and enjoining Defendants from implementing and enforcing the Act against Plaintiff or its member companies or their agents or licensees;

C.  For a declaration that the Act is invalid;

D.  For a permanent injunction enjoining Defendants from publishing, or taking any step to facilitate publication of, the text of the "Prescription Drug Excessive Pricing Act of 2005" in the *District of Columbia Register*, *District of Columbia Statutes-at-Large*, or the *District of Columbia Municipal Regulations*; directing Defendants to take all necessary steps to ensure that publication does not occur; and enjoining Defendants

from implementing and enforcing the Act against Plaintiff or its member companies or their agents or licensees;

E.    For such costs and reasonable attorneys' fees to which it might be entitled by law; and

F.    For such other relief as this Court may deem just and appropriate.

Dated:  October 12, 2005

Respectfully submitted,

David W. Ogden (D.C. Bar No. 375951)
Randolph D. Moss (D.C. Bar No. 417749)
Jonathan J. Frankel (D.C. Bar. No. 450109)
WILMER CUTLER PICKERING HALE AND
DORR LLP
2445 M Street, N.W.
Washington, D.C.  20037-1420
(202) 663-6000
(202) 663-6363 (facsimile)

*Counsel for Plaintiff Pharmaceutical Research and Manufacturers of America*