# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

PHARMACEUTICAL RESEARCH AND )
MANUFACTURERS OF AMERICA, )
                                  )
           Plaintiff, )
                                  )
       v. )                Civil Action No. _____
                                  )
THE DISTRICT OF COLUMBIA, et al., )
                                  )
         Defendants. )
_____)

## PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ITS MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

David W. Ogden (D.C. Bar No. 375951)
Randolph D. Moss (D.C. Bar No. 417749)
Jonathan J. Frankel (D.C. Bar No. 450109)
WILMER CUTLER PICKERING HALE AND
    DORR LLP
2445 M Street, N.W.
Washington, D.C. 20037-1420
(202) 663-6000
(202) 663-6363 (facsimile)

*Counsel for Plaintiff Pharmaceutical Research and Manufacturers of America*

Pursuant to Fed. R. Civ. P. 65, the Pharmaceutical Research and Manufacturers of America ("PhRMA") seeks a temporary restraining order and preliminary injunction against the District of Columbia and three of its senior officials enjoining publication of D.C. Act 16-171, the Prescription Drug Excessive Pricing Act of 2005 (the "D.C. Act" or "Act"), in the D.C. Register, Statutes-at-Large, or Municipal Regulations.  By the terms of the Act itself, the requested relief would prevent the D.C. Act from going into effect, and would thus avert irreparable injury to PhRMA members and the public interest during the pendency of this litigation.  Because publication could take place as early as Friday, October 14, 2005, a TRO is needed no later than close of business Thursday, October 13, 2005.

The D.C. Act is a sweeping local law, passed on September 20, 2005 by the D.C. Council and signed on October 4, 2005 by the Mayor, that imposes severe price controls on patented drugs — and on *only* those drugs that are currently under patent.  It does so, moreover, by tying the legally-permissible price for patented prescription drugs to benchmark prices in four designated countries where government-managed and/or government-provided healthcare artificially depress prices. This *local* law is unique in its attempt to punish pharmaceutical patent holders for recouping research and development costs and realizing the incentives to investment as intended by Congress.  It is also unique because it serves to regulate the prices of transactions that occur entirely outside D.C.  Specifically, it regulates the terms on which manufacturers located outside the District may sell to wholesalers located outside the District, provided only that the patented drug at issue is someday resold by some third party in the District at a price that is "excessive" under the Act.  And, if allowed to go into effect, the Act would authorize the District as well as "any person directly or indirectly affected by excessive prices of patented prescription drugs, including any organization representing such persons or any person or

1

organization representing the public interest," to sue PhRMA members for treble damages and other draconian penalties. Act § 2 (§§ 28-4552(1), 28-5555).[1]  In short, if allowed to go into effect, the D.C. Act would permit the District and an army of self-appointed "private attorneys general" to bring a limitless parade of lawsuits against drug manufacturers and expose those manufacturers to the risk of overwhelming liability for doing what Congress intended to enable them to do in transactions occurring well beyond the confines of the District of Columbia.

As discussed below, the D.C. Act is unconstitutional on at least three grounds:

*First*, the D.C. Act undermines the structure and objectives of federal patent law and related federal laws applicable to pharmaceuticals and is thus, under the Supremacy Clause, preempted by these federal statutes.  Congress has enacted a comprehensive set of pharmaceutical patent and market protections specifically designed to give the inventors of new medications economic returns sufficient to reward their investment in innovation and to spur development of the next generation of medications.  The D.C. Act strikes directly at the heart of these laws by singling out patented drugs — and only those drugs that are currently protected by patent — for regulation and tying their prices to the prices charged under four foreign countries' very different regulatory regimes.  By altering the rewards that Congress intended to provide for obtaining a U.S. Patent, the D.C. Act countermands Congress's determination of what incentives for medical innovation best serve the public health.  Indeed, the Act punishes manufacturers merely for doing what Congress intended to enable by bestowing the patent right:  pricing patented drugs so as to recoup research and development outlays and to realize the incentive for future innovation that Congress deemed necessary to meet public health objectives.

---

[1]    In this Memorandum, Act citations include the Act's section number followed by a parenthetical containing the corresponding section in chapter 28 of the D.C. Code specified in the Act: Act § _ (§ 28-___).

*Second*, the D.C. Act violates the Interstate Commerce Clause under well-settled precedent because it predominantly regulates manufacturer transactions that occur entirely outside of the District.    The Act punishes drug manufacturers for the sale of patented pharmaceuticals *anywhere* in the Nation to the extent those out-of-District sales eventually pass through the distribution chain and "result[] in" the resale of those drugs at "excessive" prices in D.C.    *Id.* (§ 28-4553).    Because almost all manufacturers' sales take place entirely outside the District, and it is these sales that are the express target of the Act, the primary application of the Act is to out-of-District transactions; the pharmaceutical sales that necessarily take place in the District — retail point-of-sale transactions — are specifically exempted from regulation.

*Third*, by tying the prices of U.S. transactions to prices set by foreign governments, the Act violates the Foreign Commerce Clause and intrudes upon the exclusive federal authority over foreign affairs.    By defining "excessive" price in terms of the government-regulated prices in Australia, Canada, Germany, or the United Kingdom, the Act interferes with drug companies' marketing decisions in other countries.    This unconstitutionally impedes federal uniformity in the regulation of foreign commerce.    Because the Act invites local courts to render judgment on the wisdom of foreign governments' public health regimes, it also unconstitutionally injects the D.C. into the foreign affairs arena reserved to the federal government.

The Act provides that it will become effective when published in the D.C. Register and after the expiration of a 30-legislative-day period for Congress to review the law.[2]  *Id.* § 4.    Once publication occurs, this Court's ability to order a complete remedy will disappear.    If the Act is allowed to take effect, myriad lawsuits could well be underway before this Court can issue a

---

[2]    Under the D.C. Code, apart from an injunction against publication, the only manner in which the D.C. Act could not go into effect would be by a joint resolution of the U.S. Congress, signed by the President, overturning the Act. D.C. Code 1-206.02(C)(1).

final judgment. The extraordinary "private attorney general" enforcement provisions of the D.C. Act will leave PhRMA members subject to a hailstorm of public and private lawsuits seeking treble damages, fines and penalties, and injunctions against selling their patented drugs. In addition, and in the face of this extensive litigation threat, PhRMA members will have to examine their business practices to decide whether and how they need to alter those practices to comply with the Act — and will also have to consider their sales in the four foreign countries whose government-regulated prices serve as benchmarks — lest they face massive liability in D.C. Calculating damages at some later date for these disruptions associated with compliance with the Act would be impossible. A preliminary or permanent injunction against the District of Columbia barring enforcement by the District alone or a declaratory judgment issued as a final judgment against the District alone could not abate or forestall the theoretically unlimited number of unconstitutional "private attorney general" suits authorized by the D.C. Act, and therefore would not fully avoid or redress the manifold unconstitutional effects of such actions and the threat they pose. If this Court bars publication of the Act, however, the Act will not become effective, and then no suit could be filed to enforce its provisions whether by the District, individual litigants, or public interest groups. If this Court issues such relief, then PhRMA members will be able to continue to conduct their interstate and foreign commerce involving patented products under the rules and principles established by the U.S. Congress, free from the D.C. Act's unconstitutional effects.

Only the requested relief — a TRO and preliminary injunction preventing the Act from being published, and thus becoming effective, during the pendency of this suit — can fully avert

these severe irreparable harms.[3]  PhRMA therefore seeks preliminary relief against publication of the Act in the D.C. Register to maintain the status quo while its constitutional challenge proceeds.[4]

## STATEMENT OF FACTS

### Federal Incentives and Legal Protection for the Development of New Drugs

The public health depends on the continued development of new prescription drugs. More than 300 new medications, vaccines, and biologics for more than 150 conditions have been developed by private companies and approved by the Food and Drug Administration in the last ten years alone,[5] and these drugs have profoundly improved the public welfare.  New medications to treat HIV, for example — most of which were developed, patented, and brought to the public by PhRMA members — have contributed to a decline of approximately 70% in the U.S. death rate from AIDS.[6]  The number of medications available to fight cancer — most of which have been developed by PhRMA members — has tripled since the war on cancer was

---

[3]     PhRMA has also requested an injunction barring the District from enforcing the D.C. Act while this litigation is pending.  Such an injunction by itself would not stop private plaintiffs from filing suit, however.

[4]     The Court has authority to enjoin the purely ministerial act of official publication.  In *National Federation of Federal Employees v. Devine*, 591 F. Supp. 166 (D.D.C. 1984), this Court held that permanently enjoining publication of a regulation determined to be invalid is a proper remedy.  *See id* at 169-70.  Courts have regularly preliminarily enjoined publication of a challenged law or regulation in order to permit consideration of the validity of the law or decision.  In *Comanche Nation, Oklahoma v. United States*, No. Civ.-05-328-F, 2005 WL 1322994 (W.D. Okla. May 27, 2005), for example, the court issued a temporary restraining order and then a preliminary injunction to block publication in the Federal Register of a Department of Interior decision approving a gaming compact between the State of Oklahoma and an Indian tribe.  *See id.* at *5, *11-*14.  Other courts have also permanently or preliminarily enjoined publication of challenged laws that, like the D.C. Act, did not become effective until publication.  *See Minneapolis St. Ry. Co. v. City of Minneapolis*, 155 F. 989, 991-93 (D. Minn. 1907); *City of El Reno v. Cleveland-Trinidad Paving Co.*, 107 P. 163, 166-68 (Okla. 1910); *Minneapolis Gen. Elec. Co. v. City of Minneapolis*, 194 F. 215, 223-24 (D. Minn. 1911).  *Cf. City of Detroit v. Guaranty Trust Co.*, 168 F. 608, 608-09 (6th Cir. 1909) (dismissing appeal from injunction enjoining publication of invalid city ordinance).

[5]     *See* Powell Decl. ¶ 3.

[6]     *See* CASCADE Collaboration, *Determinants of Survival Following HIV-1 seroconversion after introduction of HAART*, 362 The Lancet 1267, 1267-74 (2003).

declared in 1971, and it has been estimated that new drugs account for 50-60% of the increase in cancer survival rates since 1975.[7]

Developing these new drugs — and taking them through clinical trials and the rigorous regulatory approval process — is time-consuming, expensive, and financially risky. PhRMA members invested more than $38.8 *billion* in researching and developing new medications, vaccines, and biologics in 2004 alone.[8] A 2004 Department of Commerce study estimated that bringing each new drug to market costs its developers approximately $1.3 billion, including the costs associated with unsuccessful drugs.[9] Another study notes that it takes approximately sixteen years to bring a new chemical entity to market and that "only a fraction of drugs in the R&D 'pipeline' ever succeed in making it to market."[10]

Recognizing the enormous benefits offered by new drugs as well as the staggering costs and financial risks of developing them, Congress has taken steps to ensure that private companies have the proper resources and incentives to overcome these obstacles. The federal patent laws form the core of this effort. The overall objective of the federal patent regime is to provide property and market rights that will both recompense inventors for the costs of development and create incentives for future innovation. Under the patent laws, in exchange for disclosure, the federal government grants the inventor a patent that gives it the exclusive right to

---

[7]     *See* Frank R. Lichtenberg, *The Expanding Pharmaceutical Arsenal in the War on Cancer* (Nat'l Bureau of Econ. Research, Working Paper No. 10328, 2004).

[8]     *See* Powell Decl. ¶ 3.

[9]     *See* U.S. Dep't of Commerce, Int'l Trade Admin., *Pharmaceutical Price Controls in OECD Countries: Implications for U.S. Consumers, Pricing, Research and Development, and Innovation* 30-31 (Dec. 2004), *available at* http://www.ita.doc.gov/td/chemicals/drugpricingstudy.pdf ("*2004 Commerce Report*").

[10]    Carmelo Giancatto et al., *Drug Prices and Research and Development Investment Behavior in the Pharmaceutical Industry*, 48 J.L. & Econ. 195, 196 n.2 (2005).

make, use, or sell the invention for a period of time. *See* 35 U.S.C. § 154. In Congress's words, "[p]atents are designed to promote innovation by . . . enabl[ing] innovators to obtain greater profits than could have been obtained if direct competition existed. *These profits act as incentives for innovative activities.*"[11] Over the years, Congress has adjusted patent protections to calibrate those incentives, by, for example, changing the patent duration, which is currently set at 17 or 20 years.[12]

Congress has approached drug development with particular care, modifying and supplementing the general patent laws with a detailed set of rules directed specifically toward pharmaceuticals. In 1984, for example, Congress enacted the Drug Price Competition and Patent Term Restoration Act ("Patent Term Restoration Act"),[13] which addressed the significant interplay between the patent laws and the regulatory system of the Food and Drug Administration ("FDA"). Under the Food, Drug, and Cosmetic Act,[14] the FDA reviews the safety and effectiveness of any new drug before it is marketed by a manufacturer. This regulatory process determines, *inter alia,* when a patent holder may actually start selling its product and when, after the expiration of the patent, other manufacturers may sell generic versions of it. In the Patent Term Restoration Act, Congress extended the patent term for drugs to compensate for the period that the drug is subject to FDA review and involved in pre-approval clinical testing. It further fine-tuned patent holders' actual exclusivity period by restructuring the

---

[11]    H.R. Rep. No. 98-857(I), at 17 (1984) *reprinted in* 1984 U.S.C.C.A.N. 2647, 2650 (emphasis added) (describing purpose of the patent extension contained in the Drug Price Competition and Patent Term Restoration Act, which is described below).

[12]    *See* 35 U.S.C. § 154(a), (c)(1).

[13]    Pub. L. No. 98-417, 98 Stat. 1585 (codified in relevant part at 21 U.S.C. §§ 355, 360cc (2000), and 35 U.S.C. §§ 156, 271, 282 (2000)).

[14]    21 U.S.C. § 301 *et seq.*

approval process for generic manufacturers and granting additional exclusivity to reward supplementary clinical testing and the creation of new chemical entities not previously approved by the FDA.[15]   Congress has revisited these issues multiple times,[16] offering additional incentives in the form of extended market exclusivity beyond the patent term in certain circumstances.[17]

Together, the various patent and drug laws reflect the evolution of Congress's careful and comprehensive approach to encouraging pharmaceutical innovation.  The progress of these laws shows that Congress is constantly refining its approach, but the heart has been and remains Congress's recognition of the importance of exclusivity and the incentive it provides for invention through the economic value it creates.  The manufacturer of a patented drug relies on the return earned during the exclusivity period to pay for the past investments in that drug and in the many other drugs that did not pan out.[18]  Federal law thus reflects the understanding that this period of returns is essential to funding the enormous costs of ongoing research and spurring the continued development of new life-saving and life-enhancing medications.

### The D.C. Act

The D.C. Act is specifically intended to negate the special opportunity that federal law confers on pharmaceutical patent holders to recoup past research and development outlays and

---

[15]     *See* 35 U.S.C. § 156; 21 U.S.C. § 355(c)(3)(E), (j)(5)(F).

[16]     Congress updated provisions of the Patent Term Restoration Act in the Medicare Prescription Drug, Improvement, and Modernization Act of 2003, Pub. L. No. 108-173, 117 Stat. 2066 (codified as amended at 21 U.S.C.A. § 355(j)(5)(C)(i), and 35 U.S.C.A. § 271(e)(5)), which, *inter alia*, refined the provisions regarding the entry of generic manufacturers and, in turn, the end of the exclusivity period for manufacturers of patented drugs.

[17]     This supplemental legislation is addressed in detail in Part I.A.1., *infra*.

[18]     *See 2004 Commerce Report* at 27 (recognizing the "basic rule that innovative pharmaceutical firms rely on internal cash flow and profits as their primary source of investment funds"); *id.* at 25 (recognizing that "empirical evidence indicate[s] a close correlation between revenues, cash flow, and profit margins on the one hand and R&D expenditures on the other").

the incentive it provides for future innovation. The D.C. Act applies only to *patented* prescription drugs, altering the reward for obtaining a U.S. Patent by pegging the prices of patented drugs to prices set under four foreign countries' very different drug pricing regimes. The D.C. Act does not apply to off-patent drugs at all, even if the manufacturers of those drugs retain exclusive rights to market them under the various non-patent protections that Congress has provided. Thus, the D.C. Act singles out the holders of federal patent rights for regulation and imposes punishment on them specifically for pricing their patented products pursuant to the system of investment recoupment and incentive established by Congress.

Specifically, the D.C. Act broadly declares that patented prescription drug prices in the District are "excessive." Act § 2 (§ 28-4551). The Act makes it "unlawful for any drug manufacturer or licensee thereof, excluding a point of sale retail seller, to sell or supply for sale . . . a patented prescription drug that results in the prescription drug being sold in the District for an excessive price." *Id.* (§ 28-4553). "Any affected party, including the District of Columbia," may file suit claiming a violation of the Act. *Id.* (§ 28-4555(a)). The District of Columbia may sue "on its own behalf, on behalf of all residents of the District of Columbia, or both." *Id.* In addition, the Act creates a stunningly broad private right of action by providing that any individual or organization may bring suit by claiming to represent "the public interest." *Id.* (§ 28-4552(1)). Such "private attorney general" actions apparently could be brought by virtually any one or any entity at all.

A plaintiff — including the District or any "private attorney general" — may establish a "prima facie case of excessive pricing" by demonstrating that the "wholesale price" for a patented drug is "over 30% higher than the comparable price for the same drug in any" of four designated "high income" countries: Australia, Canada, Germany, and the United Kingdom. *Id.*

(§§ 28-4554(a), 28-4552(2)). The use of the word "any" makes clear that the *lowest* price among the four countries becomes the benchmark. Although comparisons of this type are open to serious question, the Department of Commerce reports that the "ex-manufacturer" price (*i.e.*, the price at which the manufacturer sells to a wholesaler) of a patented drug in these four countries is typically 40-59% of the ex-manufacturer price of the same drug in the United States, typically with Australia at the low end and Germany at the high. *See 2004 Commerce Report* at 15 fig.3. But any price differential among U.S. prices and these benchmark prices occurs in the context of fundamental differences among the countries' approaches to patented drug pricing and healthcare goals generally. Critically, the foreign systems are not keyed to the same investment and innovation levels that Congress has deemed necessary to serve the public health.[19]

Under the D.C. Act, once a plaintiff establishes a prima facie case of "excessive pricing" by showing that a drug's wholesale price exceeds the foreign benchmark by more than 30%, "the burdens of providing evidence and of proving by a preponderance of the evidence shall shift to the defendant." Act § 2 (§ 28-4554). The defendant must then "show that a given prescription drug is not excessively priced given [1] demonstrated costs of invention, development and production of the prescription drug, [2] global sales and profits to date, [3] consideration of any government funded research that supported development of the drug, and [4] the impact of price on access to the prescription drug by residents and the government of the District of Columbia." *Id.* If the court finds that the price of the patented drug is "excessive," it may order an injunction against sale of that drug in D.C. at current prices, and impose "[a]ppropriate fines for each violation," treble damages, attorneys fees and costs, and any other relief the court deems proper. *Id.* (§ 28-4555(b)).

---

[19]    The details of these systems are described in greater detail in Part I.A.2., *infra*.

The D.C. Act provides that it "shall take effect following approval by the Mayor . . . , a 30-day period of Congressional review as provided in section 602(c)(1) of the District of Columbia Home Rule Act . . . , and publication in the District of Columbia Register." Act § 4. Because the Act was signed by the Mayor on October 4, 2005, it will thus take effect following the expiration of the period for Congressional review and publication in the D.C. Register. The D.C. Act was transmitted to Congress on October 6, 2005 and the end of the congressional review period is difficult to predict. The Act has not yet been published in the D.C. Register,[20] but publication could occur as soon as Friday, October 14, 2005.[21]

### Distribution Of Patented Prescription Drugs In The United States

Drug manufacturers do not sell directly to the public; instead, they sell the vast majority of their products either to independent drug wholesalers (such as AmerisourceBergen Corp., McKesson Corp., and Cardinal Health, Inc.) or to large retail pharmacy chains that warehouse their own drugs (such as CVS and Rite-Aid).[22] The independent wholesalers resell the drugs to other wholesalers, or to retail pharmacies or healthcare institutions, which then resell the drugs to

---

[20]   *See* District of Columbia Register (Oct. 7, 2005). Publication in the D.C. Register would also satisfy D.C. Code § 2-602, which provides "No act or resolution shall be effective until the act or resolution has been published in the District of Columbia Register, the District of Columbia Statutes-at-Large, or the District of Columbia Municipal Regulations . . . ." Under D.C. law, the Office of Documents and Administrative Issuances, and ultimately the Mayor, are responsible for publishing Council acts in the D.C. Register. *See* D.C. Code §§ 2-611(b), (c); 2-612(1); 2-504(a); 2-553(a); D.C. Mun. Regs. tit. 1, § 305.1(a).

[21]   *See* D.C. Mun. Regs. tit. 1, § 306.3 ("The D.C. Register is published on Friday each week."); § 306.4 ("The deadline for submission of documents for publication in each Friday edition of the D.C. Register is 12:00 p.m. (NOON)" on the Friday "of the previous week.").

[22]   *See* Powell Decl. ¶ 7; Marmontello Decl. ¶ 4; Broughton Decl. ¶ 4; Belknap Decl. ¶ 4; Fish Decl. ¶ 4; Soto Decl. ¶ 5. Typically, a manufacturer ships the drugs by common carrier from its warehouse to the wholesaler's or retail chain's warehouse. *See* Powell Decl. ¶ 7. Title to the drugs generally passes when the drugs are delivered to the common carrier. *See* Broughton Decl. ¶ 5. Some manufacturers do sell limited quantities of drugs directly to doctors, hospitals or pharmacies in the District, *see* Marmontello Decl. ¶ 4, while others do not make even these limited sales, *see* Broughton Decl. ¶ 4; Belknap Decl. ¶ 4. In general, however, the vast majority of sales are made to wholesalers and warehousing retail chains outside the District. *See* Powell Decl. ¶ 8.

patients.[23] The warehousing retail pharmacies distribute the drugs to their retail pharmacies and then resell to patients.[24] Virtually none of the transactions targeted by the D.C. Act (the manufacturers' sales) take place in the District. *No* PhRMA members are based in the District, or even has a warehouse in the District from which it ships patented prescription drugs.[25] Moreover, *none* of the wholesalers to which the manufacturers are selling has warehouses in the District,[26] *none* of the warehousing retail chains is headquartered in the District, and *none* of the wholesalers or warehousing retail chains receives in D.C. shipments of patented prescription drugs from manufacturers.[27] And the only businesses in the distribution chain with a physical presence in the District — retail pharmacies and hospitals — are expressly *excluded* from the Act. Act § 2 (§ 28-4553) (excluding "point of sale retail seller[s]" from price regulation).

The net result is that the Act is predominantly directed to conduct beyond D.C.'s borders and exempts the only relevant commercial conduct that necessarily occurs within its borders.

## SUMMARY OF ARGUMENT

PhRMA can establish all of the criteria for obtaining a TRO and preliminary injunction barring defendants from publishing the Act in the D.C. Register or enforcing the Act.

**PhRMA is likely to succeed on the merits.** PhRMA has a very high likelihood of succeeding on each of its challenges to the Act.

---

[23]    *See* Powell Decl. ¶ 7; *see also* Marmontello Decl. ¶ 4; Broughton Decl. ¶ 6; Belknap Decl. ¶ 4; Fish Decl. ¶ 5; Soto Decl. ¶ 5.

[24]    *See* Powell Decl. ¶ 7; *see also* Powell Decl. ¶ 6; Belknap Decl. ¶ 4; Fish Decl. ¶ 5; Soto Decl. ¶ 5.

[25]    *See* Powell Decl. ¶ 8.

[26]    *See id.*

[27]    *See id.*

- <u>The D.C. Act is preempted</u>.  Congress has adopted a comprehensive set of laws designed to protect the public health by giving pharmaceutical manufacturers effective economic incentives — in the form of temporary exclusive rights to market their products — to develop new drugs.  Congress has carefully calibrated those incentives over the years to give successful innovators the opportunity to achieve returns sufficient to recover past investments in research and development and to provide an incentive for investment in developing the next generation of life-saving drugs.  The Act directly conflicts with this statutory scheme, targeting patented drugs (and only patented drugs) and altering the incentives that Congress determined are essential to protect the public health.

- <u>The D.C. Act violates the Interstate Commerce Clause</u>.  Cases stretching back nearly a century make clear that the District may not regulate transactions that occur entirely in other states.  But that is the primary objective of the Act.  It directly targets manufacturer sales that almost always take place beyond the District's borders.  At the same time, it expressly exempts the pharmaceutical sales that necessarily take place in D.C. — namely, retail transactions.

- <u>The D.C. Act violates the Foreign Commerce Clause and interferes with the federal government's exclusive authority to speak on matters of foreign affairs</u>.  By tying prices in the District to prices in certain foreign countries, the Act necessarily influences pricing and market decisions in those other nations. The Foreign Commerce Clause bars states (and the District) from enacting legislation with this sort of extra-national effect.  In addition, these provisions of the D.C. Act threaten unconstitutionally to enmesh the District in important questions of foreign policy because they will inevitably require D.C. courts to render opinions on the propriety and wisdom of other countries' drug pricing regimes.

**PhRMA members will suffer irreparable injury.**  The Act places PhRMA members in an untenable situation.  They must immediately decide whether to alter their day-to-day operations across the country and perhaps around the globe (in ways that cannot be untangled or compensated for at the end of litigation) in an effort to reduce the liability risk posed by the Act. Regardless of whether or how they change their business practices in attempting to comply with the law, drug companies will likely face a multiplicity of lawsuits if the Act is published and becomes effective, and will have to relitigate their legal arguments in every single one.  And they will potentially be subject to multiple governmental schemes for valuing patented products when Congress intended that there be only one — a situation in which courts have found *per se*

13

irreparable injury.

**The balance of hardships tilts decidedly in PhRMA's favor.** Whereas irreparable injury would be imposed on PhRMA members as a result of publication of the Act, the District will suffer no harm at that point: until the congressional review period expires, the Act cannot be enforced anyway. Even if temporary relief extends past the congressional review period, the harm to the District is minimal. The District has no legitimate interest in enforcing a preempted statute or regulating in an area reserved to the federal government. And the discretionary drug prices that would prevail in D.C. while litigation is pending would simply be the prices supported by the incentive-based patent system that Congress deemed appropriate nationwide.

**An injunction would further the public interest.** Congress has adopted a legal regime that it has determined best serves the public health by giving drug manufacturers broad incentives to continue investing in life-saving and life-enhancing new medicines. Congress's determination of what best serves the public interest is dispositive. The D.C. government's claimed interest in lowering prices for only its citizens at best simply shifts the burdens of funding pharmaceutical research to other states, and at worst diminishes the amount of funding available. Neither result serves the public's long-term interests.

**ARGUMENT**

In deciding whether to grant a temporary restraining order or a preliminary injunction, a court must consider whether:

> (1) the party seeking the injunction has a substantial likelihood of success on the merits; (2) the party seeking the injunction will be irreparably injured if relief is withheld; (3) an injunction will not substantially harm other parties; and (4) an injunction would further the public interest.

*CSX Transp., Inc. v. Williams*, 406 F.3d 667, 670 (D.C. Cir. 2005) (preliminary injunction); *see also Al-Fayed v. CIA*, 254 F.3d 300, 303 & n.2 (D.C. Cir. 2001) (noting "the same factors apply

14

in evaluating requests for preliminary injunctions and temporary restraining orders"). As courts have noted, "[t]he test is a flexible one." *CSX Transp.*, 406 F.3d at 670. "These factors interrelate on a sliding scale and must be balanced against each other." *Serono Labs., Inc. v. Shalala*, 158 F.3d 1313, 1318 (D.C. Cir. 1998). Thus, "'[i]f the arguments for one factor are particularly strong, an injunction may issue even if the arguments in other areas are rather weak.'" *Id.* (quoting *CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 747 (D.C. Cir. 1995)).

Accordingly, a party seeking emergency relief can show "either a combination of probable success and the possibility of irreparable injury or that serious questions are raised and the balance of hardships tips sharply in his favor." *Washington Metro. Area Transit Comm'n. v. Holiday Tours, Inc.*, 559 F.2d 841, 844 (D.C. Cir. 1977) (citation omitted). And the D.C. Circuit has also "often recognized that injunctive relief may be justified, for example, 'where there is a particularly strong likelihood of success on the merits even if there is a relatively slight showing of irreparable injury.'" *CSX Transp.*, 406 F.3d at 670 (quoting *CityFed Fin.*, 58 F.3d at 747).

Here, each of the four factors weighs heavily in favor of granting a temporary restraining order and preliminary injunction to prevent the D.C. Act from taking effect.

## I. PhRMA HAS A SUBSTANTIAL LIKELIHOOD OF SUCCESS ON THE MERITS OF ITS CLAIM.

PhRMA is likely to prevail on each of the constitutional challenges it asserts. Indeed — particularly if allowed to stand as model for other jurisdictions and other patented products — the Act would fundamentally undercut the U.S. patent system, would eviscerate limits on the authority of states and D.C. to regulate transactions occurring in other states, and would permit local jurisdictions to inject themselves into foreign commerce and foreign policy in a manner that would pose a grave threat to the ability of the nation to "speak with one voice" on matters

15

affecting relations with other countries.

### A. The Act Is Preempted Because It Undermines the Opportunities Offered By Congress To Drug Patent Holders and Thereby Undercuts Federal Efforts To Promote Medical Innovation.

The federal patent laws and related pharmaceutical market exclusivity laws reflect Congress's judgment of what economic protections and incentives are necessary to best promote the development of new life-saving medications. The D.C. Act undermines this carefully calibrated system by directly targeting patented drugs for regulation (while leaving non-patented drugs alone, even if they are still subject to market exclusivity) and drastically altering the protections and rewards that flow from a U.S. Patent. It is therefore preempted.

### 1. The Federal Patent and Market Exclusivity Laws Reflect Congress's Determination That Providing Broad Economic Incentives To Invest in Developing New Medications Best Promotes the Public Health.

The Constitution grants Congress the power "To Promote the Progress of Science" by giving "Inventors the exclusive Right to their . . . Discoveries." U.S. Const. art. I, § 8, cl. 8. Pursuant to this authority, Congress has created a patent system that encourages progress and development by offering inventors a period of exclusivity for making, using, and selling their inventions. *See* 35 U.S.C. § 154.[28] This exclusivity is offered as part of an "exchange" between the inventor and the government. *See, e.g., Eldred v. Ashcroft*, 537 U.S. 186, 216 (2003). In return for full disclosure, which enables public use and benefit once the patent has expired, the inventor enjoys exclusivity for a limited period. *See id.* "The basic quid pro quo . . . for granting a patent monopoly is the benefit derived by the public from an invention with substantial utility." *Brenner v. Manson*, 383 U.S. 519, 534 (1966).

---

[28]    *See Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 146 (1989).

Recognizing the critical importance of continued medical innovation to the public health, Congress has given pharmaceutical inventions even *greater* statutory protections than other kinds of inventions. The Patent Term Restoration Act of 1984 allows pharmaceutical manufacturers to extend the terms of their patents, adding additional periods of exclusivity for (1) the time during which the drug awaited final FDA approval, and (2) half the time it took to run clinical tests on the drug. *See* 35 U.S.C. § 156. In the same legislation (and several additional times), Congress has supplemented these increased patent protections with market exclusivity provisions — carefully tailored to encourage particular drug research and development activities Congress deemed especially important — that extend a manufacturer's rights to sell its products free from generic competition even after its patents expire.[29]

Exclusivity is the foundation of every one of these federal statutory protections because Congress has recognized that the financial returns that come from an exclusive right to sell compensate drug manufacturers for their massive and extraordinarily risky investments in research and development and encourage further costly and risky investments. The "economic philosophy" behind patent protection "is the conviction that encouragement of individual effort by personal gain is the best way to advance public welfare through the talents of . . . inventors." *Mazer v. Stein*, 347 U.S. 201, 219 (1954). The drug patent protections in the Patent Term Restoration Act are expressly grounded in this same "economic philosophy": "Patents are

---

[29]    *See, e.g.,* 21 U.S.C. § 355(c)(3)(E)(ii), (j)(5)(F)(ii) (five years additional exclusivity for new chemical entities not previously approved by the FDA, achieved by prohibiting consideration of abbreviated new drug applications submitted by generic competitors; added in 1984); 21 U.S.C. § 355(c)(3)(E)(iii)-(iv), (j)(5)(F)(iii)-(iv) (three years additional exclusivity where the manufacturer performs additional clinical testing for new indications or to develop new dosages, achieved by prohibiting consideration of abbreviated new drug applications submitted by generic competitors; added in 1984); 21 U.S.C. § 355a (six months additional exclusivity for pediatric clinical testing; added in 1997); 21 U.S.C. §§ 360aa-360dd (seven years additional exclusivity for "orphan drugs" used to treat rare diseases, achieved by prohibiting approval of all drugs containing the same active ingredient and treating the same condition; added in 1983 and materially amended in 1985).

designed to promote innovation by providing the right to exclude others from making, using, or selling an invention. They enable innovators to obtain greater profits than could have been obtained if direct competition existed. *These profits act as incentives for innovative activities.*"[30] One of the Act's sponsors, Rep. Waxman, explained that federal law enables holders of pharmaceutical patents to set a price in their discretion,

> because there is no one else in competition, and as a matter of public policy we, under the patent law, give that protection to the person who has put money into research and development for an innovative and new product. But at some point public policy calls for the free market system competition which will bring about the result of a lower price for the consumer. That is the purpose of the legislation.

130 Cong. Rec. 24,427 (1984) (statement of Rep. Waxman).

Courts have recognized that this federal statutory scheme is premised on a desire to provide companies with adequate incentives to undertake research and development. The link between drug patents and innovation is especially clear. "By restoring a portion of the patent term that is consumed during the approval phase, the incentive to develop and market products that require lengthy pre-marketing approval is intended to be preserved: The purpose of [the Patent Term Restoration Act] is to create a new incentive for increased expenditures for research and development of certain products which are subject to pre-market government approval." *Pfizer Inc. v. Dr. Reddy's Labs., Ltd.*, 359 F.3d 1361, 1364 (Fed. Cir. 2004). And the same is true for the non-patent market exclusivity statutes. *See, e.g., Barr Labs., Inc. v. Thompson*, 238 F. Supp. 2d 236, 239 (D.D.C. 2002) (noting in case involving pediatric exclusivity that

---

[30]     H.R. Rep. No. 98-857(I), at 17 (1984), *reprinted in* 1984 U.S.C.C.A.N. 2647, 2650 (emphasis added) (describing the purpose of the patent extension). In signing this provision into law, President Reagan similarly explained that it would "promote medical breakthroughs and drug innovation." Drug Price Competition and Patent Term Restoration Act of 1984: Remarks on Signing S. 1538 Into Law, 20 Weekly Comp. Pres. Doc. 1359 (Sept. 24, 1984).

"Congress recognized that periods of market exclusivity would provide valuable incentives for drug manufacturers to engage in the research and development of new drugs.").[31]

As Congress's repeated fine-tuning of the patent and market exclusivity laws makes clear, Congress has engaged in a careful balancing of the competing interests in this field, and the statutes reflect a conscious determination by Congress as to what level of incentives is necessary to spur medical innovation.[32]   As one of the Patent Term Restoration Act's sponsors observed:

> We have struggled for a long time with this legislation, and most of the things that are in this bill . . . are the result of much effort and work over a long period of time and which resulted in compromises between the various industries that are involved, the people that will be affected, . . . the people who manufacture generics, and the people whose patents need to be protected to guarantee that they can get a recovery on the investment that they have made.[33]

The Supreme Court has repeatedly emphasized that federal patent laws reflect a "carefully crafted bargain" among the various interests at stake.  *Pfaff v. Wells Elecs., Inc.*, 525 U.S. 55, 63 (1998); *see also Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 33-34 (2003); *Aronson v. Quick Point Pencil Co.*, 440 U.S. 257, 262 (1979).  With respect to pharmaceutical patents in particular, the financial returns that may be generated during the period of exclusivity lie at the heart of Congress's "carefully crafted bargain" between the need to preserve incentives for innovation and the goal of making drugs widely available.

---

[31]      *See also Genentech, Inc. v. Bowen*, 676 F. Supp. 301, 303 (D.D.C. 1987) (orphan drug exclusivity "seeks to enhance the . . . manufacturer's ability to recover his investment by granting the manufacturer seven years of exclusive marketing rights for such drug 'for such rare disease or condition.'" (quoting 21 U.S.C. § 360cc)).

[32]      *See Teva Pharm. Indus. Ltd. v. Crawford*, 410 F.3d 51, 54 (D.C. Cir. 2005) (in the Patent Term Restoration Act, "Congress sought to strike a balance between incentives, on the one hand, for innovation, and on the other, for quickly getting lower-cost generic drugs to market."); *Teva Pharms. USA, Inc. v. Pfizer, Inc.*, 395 F.3d 1324, 1327 (Fed. Cir. 2005) (same).

[33]      130 Cong. Rec. 24,428 (1984) (statement of Rep. Moorhead).

## 2.  The D.C. Act Thwarts Congress's Design and Is Preempted.

The D.C. Act directly undermines the federal statutory scheme by singling out patented drugs for regulation and undermining the economic incentives that Congress intended for obtaining a U.S. Patent.  It discards Congress's careful calibration of the incentives necessary to promote investment in new medications (and the public health), and instead pegs drug prices to the government-regulated prices prevailing under very different foreign regulatory regimes operating under very different assumptions.  The Act threatens severe penalties and exposure to multiple lawsuits by "private attorneys general" and others when any manufacturer tries to set prices pursuant to the system of protection and incentives that Congress created.  By seeking to reduce the return on investment that manufacturers may obtain for their patented drugs, the consequences of the Act, and its implications for future investment in life-saving and enhancing drugs, are no less profound than a decision by the District to shorten the period of patent exclusivity by a number of years.  It accordingly cannot withstand scrutiny under the Supremacy Clause.

There is no question that the federal patent laws, "like other laws of the United States enacted pursuant to constitutional authority, are the supreme law of the land" and preempt inconsistent state legislation.  *Sears, Roebuck & Co. v. Stiffel Co.*, 376 U.S. 225, 229 (1964); *see also Bonito Boats, Inc. v. Thunder Craft Boats, Inc.,* 489 U.S. 141, 151-52 (1989); U.S. Const. art. VI, cl. 2.[34]  In particular, the Court has made clear that states may not reweigh Congress's balancing of the factors behind its laws protecting intellectual property:

---

[34]    The District of Columbia is treated as a state for preemption purposes.  *See, e.g., Booker v. Edwards*, 99 F.3d 1165 (D.C. Cir. 1996); *Washkoviak v. Student Loan Mktg. Ass'n.*, 849 A.2d 37, 41 (D.C. 2004) (citing *Goudreau v. Standard Fed. Sav. & Loan Ass'n.*, 511 A.2d 386, 389 n.4 (D.C. 1986)).

> The tension between the desire to freely exploit the full potential of our inventive resources and the need to create an incentive to deploy those resources is constant. Where it is clear how the patent laws strike that balance in a particular circumstance, that is not a judgment the States may second-guess.

*Bonito Boats*, 489 U.S. at 152.[35]

The D.C. Act clearly "stands as an obstacle to" the achievement of federal objectives and is thus preempted. *Jones v. Rath Packing Co.*, 430 U.S. 519, 526 (1977) (citation omitted); *see also Geier v. American Honda Motor Co.*, 529 U.S. 861, 869-74 (2000). Strikingly, the Act expressly applies *only* to drugs that are subject to federal patent protection. *See* Act § 2 (§ 28-4553) (regulating a manufacturer's transactions with respect to a "patented prescription drug"). A drug that is not patented is not subject to regulation, no matter how costly it may be. The D.C. Act is therefore not a general state regulation that happens to have an incidental effect on the price of patented goods; rather, it directly attacks the central mechanism of federal patent policy — namely, the affording of the patent holder the opportunity to obtain the full economic value of the invention during the period of exclusivity. The D.C. Act actually punishes the holders of pharmaceutical patents for recouping their investments and earning the very rewards that Congress made possible as a spur to innovation and development of new drugs.

The Act overrides Congress's judgment in part through the prima facie requirement, which links the lawfulness of prices in this country to prices under the price regulation and healthcare regimes of four foreign countries. This serves to replace Congress's judgment with the judgment of foreign governments that embrace different priorities from those served by U.S.

---

[35] *See also Eldred*, 537 U.S. at 216 ("*Bonito Boats* reiterated the Court's unclouded understanding: 'It is for Congress to determine if the present system' effectuates the goals of the Copyright and Patent Clause.") (quoting *Bonito Boats*, 489 U.S. at 168); *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 429 (1984) ("[I]t is Congress that has been assigned the task of defining the scope of the limited monopoly that should be granted to authors or to inventors in order to give the public appropriate access to their work product.").

law and, most notably, do not take the same approach toward encouraging innovation that Congress has. Australia and Germany commonly set the presumptive reimbursement rates for new patented drugs at the same level as older, generic drugs that treat the same condition, and these rates largely fail to compensate for the research and development investments that led to the new, and possibly significantly more effective treatments.[36] The U.K. effectively regulates pharmaceutical companies like public utilities, negotiating an overall rate of return they may earn while reserving the right to impose mandatory price ceilings if manufacturers fail to cooperate, demanding periodic across-the-board price cuts, and capping the research and development expenses they may claim as a credit against income.[37] And Canada sets maximum national prices for patented drugs based on either the price of those drugs in seven benchmark countries or the price of existing drugs in the same therapeutic class, caps reimbursement rates at the provincial level, and prohibits consideration of research and development costs exceeding Canada's proportion of total world sales for a drug.[38] Prices in these countries are the product of these very different regulatory structures with different policy goals.

As the Department of Commerce has found, foreign regimes like these "reduce company compensation to levels closer to direct production costs, leaving less revenue for R&D." *2004*

---

[36]     For Australia, *see* Pharmaceutical Benefits Pricing Authority, *Policies, Procedures and Methods Used in the Pricing of Pharmaceutical Products* 8-9 (Jan. 2005) (conceding that the "[l]evel of . . . new investment, production, research and development" is "presently not taken into consideration in determining prices," except through a limited program compensating certain expenditures with a nexus to Australia), and *2004 Commerce Report* at 62. For Germany, *see* Bernhard M. Maassen, *Reimbursement of Medicinal Products: The German Reference Price System Law, Administrative Practice, and Economics* 8-11 (Feb. 1996), and *2004 Commerce Report* at 85-86.

[37]     *See* Dep't of Health, *Pharmaceutical Price Regulation Scheme, Eighth Report to Parliament* 13, 23-25 (Mar. 2005); *2004 Commerce Report* at 99-100; *see also* Health Act, 1999, ch. 8, § 33-35 (Eng.).

[38]     *See 2004 Commerce Report* at 107; *see also* Canadian Patent Act, R.S.C., ch. P-4, § 85(3) (LexisNexis 2005).

*Commerce Report* at *vii.*[39]  By tying prices to government-regulated benchmark prices in these four countries, this local law seeks to import the foreign drug price-regulation systems, replacing Congress's laws — and its goals — with those of foreign governments.

The manner in which the D.C. Act would frame the courts' ultimate determination of whether a particular drug's price is "excessive" confirms that the Act seeks to moderate or replace Congress's approach.  A manufacturer haled into court for charging a price that could normally not be challenged under congressionally mandated exclusivity will be forced to bear the burden of proving that the eventual price of the drug in the District was not excessive, given the costs of developing the drug, the public's ability to obtain access to it, and the manufacturer's profits on the product.  Act § 2 (§ 28-4554(b)).  But these are among the factors that Congress *already* weighed when it enacted the provisions conferring exclusivity in the first place.  Neither the D.C. Council nor a Superior Court judge is entitled to second-guess or seek to alter the balance that Congress has set by concluding, for example, that the patent holder has earned sufficient profits in 12 or 14 years as opposed to the 17 to 20 year period (as extended by the Patent Term Restoration Act) that Congress has established.  *See Bonito Boats*, 489 U.S. at 152 ("[S]tate regulation of intellectual property must yield to the extent that it clashes with the balance struck by Congress in our patent laws").  Nor may D.C. force a manufacturer to constantly relitigate drug-by-drug the overarching policy balance that Congress intended to set for the entire industry.  The obligation to defend patent exclusivity on a patent-by-patent basis undercuts the very purpose of the patent regime.  *See e.g., Schering-Plough Corp. v. F.T.C.*, 402

---

[39]     The Commerce Department further estimates that foreign price controls as a whole reduce the amount of R&D investment worldwide by approximately 17% and keep three to four new medications from being brought to market each year.  *See 2004 Commerce Report* at 29, 31.  This in turn costs U.S. drug buyers some $4.9 billion to $7.5 billion annually.  *See id.* at 25.

F.3d 1056, 1075 (11th Cir. 2005) ("[T]he caustic environment of patent litigation may actually decrease product innovation by amplifying the period of uncertainty around the drug manufacturer's ability to research, develop, and market the patented product or allegedly infringing product.").

In short, the District of Columbia is attempting to change one of the fundamental terms of patent law by punishing patent holders for obtaining compensation for their inventions pursuant to the system that Congress established to reward and encourage innovation. The Supremacy Clause does not permit this. "Obviously a State could not, consistently with the Supremacy Clause of the Constitution, extend the life of a patent beyond its expiration date or give a patent on an article which lacked the level of invention required for federal patents." *Sears, Roebuck*, 376 U.S. at 231. It is just as obvious that a State may not remove the financial benefit and incentives of patent protections offered by federal law or punish a patent-holder for doing nothing more than exactly what the federal patent system promotes and intends.[40]

### B. The D.C. Act Attempts to Regulate the Prices of Transactions Outside of the District of Columbia in Violation of the Interstate Commerce Clause.

Although the Act purports to be concerned with "excessive prices of prescription drugs in the District of Columbia" at the retail level, Act § 2 (§ 28-4551(1)), it does not directly regulate the setting of retail prices; to the contrary, the Act specifically excludes "point-of-sale retail seller[s]" in D.C. from its reach. *Id.* (§ 28-4553). Instead, the Act operates exclusively against

---

[40]    The Act's assertion that it was enacted pursuant to the District's traditional police powers, *see* Act § 2 (§ 28-4551(2)), does not alter the analysis. As the Supreme Court has recognized:

> [W]hen state law touches upon the area of federal statutes enacted pursuant to constitutional authority, it is familiar doctrine that the federal policy may not be set at naught, or its benefits denied by the state law. This is true, of course, even if the state law is enacted in the exercise of otherwise undoubted state power.

*Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 479-80 (1974) (quotation marks and citation omitted).

patent-holding manufacturers (and their licensees) by making it unlawful for them to "sell or supply for sale" a patented drug — regardless of where or under what circumstances the sale takes place — so long as somewhere downstream the transaction "results in" a subsequent sale in the District "for an excessive price." *Id.* That is, if a drug manufacturer located in California sells a quantity of a patented drug to a wholesaler located in Illinois, who in turn sells some portion of that lot to a warehousing retail chain in Rhode Island, who then transports a still smaller subset to D.C. and fills a prescription for a single retail customer in the District, the D.C. Act would purport to regulate the California-Illinois sale by the manufacturer even though that transaction occurs wholly outside the District. This naked attempt to regulate the prices of out-of-jurisdiction sales and to punish market participants for economic conduct occurring wholly outside D.C. violates the Interstate Commerce Clause.

The D.C. Act's extraterritorial effect is truly egregious. As noted above, the vast majority of the manufacturer transactions that the Act targets take place outside the District of Columbia in precisely this fashion. Manufacturers sell the overwhelming bulk of their patented drugs — virtually everything but a tiny proportion sold directly to hospitals, healthcare institutions, or other businesses in the District — to wholesalers or to large retail chains that perform their own warehousing and retail distribution. *See* Powell Decl. ¶ 7; Marmontello Decl. ¶ 4; Broughton Decl. ¶ 4; Belknap Decl. ¶ 4; Fish Decl. ¶ 4; Soto Decl. ¶ 5. Not a single PhRMA member is based in the District or has a warehouse here from which it ships patented prescription drugs. Nor do any of the wholesalers or warehousing retail chains to which manufacturers sell their patented prescription drugs have their headquarters in the District, or receive shipments of patented prescription drugs from manufacturers here. *See* Powell Decl. ¶ 8.

Many billions of dollars of patented drugs are sold by manufacturers in the United States every year, *see* U.S. Food and Drug Administration, *The Prescription Drug Marketing Act: Report to Congress* attach. G, at 1-25, § 1.5.1, tbl.1-8 (June 2001), some portion of which will inevitably find their way into retail outlets in the District of Columbia. The Act thus directly regulates and threatens draconian punishments for an enormous volume of transactions that occur *entirely* beyond the boundaries of the District of Columbia.

The Constitution vests Congress with exclusive authority "to regulate Commerce . . . among the several States." U.S. Const. art. I, § 8, cl. 3.[41] The Interstate Commerce Clause reflects a "special concern . . . with the autonomy of the individual States within their respective spheres." *Healy v. Beer Inst.*, 491 U.S. 324, 335-36 (1989) (footnotes omitted). It prevents states (and the District of Columbia) from enacting legislation that would "offend sister States and exceed the inherent limits of the State's power." *Id.* at 336 n.13 (quoting *Edgar v. MITE Corp.*, 457 U.S. 624, 643 (1982) (plurality opinion)).[42] A state statute that "directly regulates" commerce occurring beyond the boundaries of that state is, accordingly, per se invalid and is "generally struck down . . . without further inquiry." *Brown-Forman Distillers Corp. v. New York State Liquor Auth.*, 476 U.S. 573, 579 (1986). As the Supreme Court has explained:

> A statute that directly controls commerce occurring wholly outside the boundaries of a State exceeds the inherent limits of the enacting State's authority and is invalid regardless of whether the statute's extraterritorial reach was intended by the legislature. *The critical inquiry is whether the practical effect of the regulation is to control conduct beyond the boundaries of the State.*

---

[41]    The authority "has long been seen as a limitation on state regulatory powers, as well as an affirmative grant of congressional authority." *Fulton Corp. v. Faulkner*, 516 U.S. 325, 330 (1996) (citing *Oklahoma Tax Comm'n v. Jefferson Lines, Inc.*, 514 U.S. 175, 179-80 (1995); *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 6 (1824) (Marshall, C.J.) (dictum)).

[42]    The District of Columbia is considered a state for purposes of the Interstate Commerce Clause. *See Electrolert Corp. v. Barry*, 737 F.2d 110 (D.C. Cir. 1984).

*Healy*, 491 U.S. at 336 (citing *Brown-Forman*, 476 U.S. at 579) (emphasis added); *see also In re Brand Name Prescription Drugs Antitrust Litig.*, 123 F.3d 599, 613 (7th Cir. 1997) ("A state's power to regulate interstate commerce is limited, however, by the provisions of the federal Constitution that limit the extraterritorial powers of state government.  A state cannot regulate sales that take place wholly outside it.").[43]

More specifically, the Supreme Court has long made clear that the Commerce Clause bars a state from attempting to control the local price of a good by regulating the price of transactions occurring outside the state — exactly what the District has attempted here.  In *Baldwin v. G.A.F. Seelig, Inc.*, 294 U.S. 511 (1935), the Supreme Court invalidated a New York statute that set minimum prices for milk purchased from in-state producers and banned the resale in New York of milk purchased outside the state at a lower price.  Even though the statute directly applied only to transactions in New York, the Court nevertheless found it tantamount to an attempt to regulate the price of milk sales in other states (in that case, Vermont) and held that "New York has no power to project its legislation into Vermont by regulating the price to be paid in that state for milk acquired there." *Id.* at 521; *see also id.* at 528 (Commerce Clause bars a state from "establish[ing] . . . a scale of prices for use in other states").

With all the unconstitutional hallmarks of the statute invalidated in *Baldwin*, the present Act is, if anything, more problematic:  Whereas the New York law technically regulated in-state conduct, the D.C. law purports to regulate the out-of-jurisdiction sales of patented drugs by manufacturers and their licensees.

---

[43]       *See also Star Scientific, Inc. v. Beales*, 278 F.3d 339, 355 (4th Cir. 2002); *National Foreign Trade Council v. Natsios*, 181 F.3d 38, 69 (1st Cir. 1999); *Cotto Waxo Co. v. Williams*, 46 F.3d 790, 793 (8th Cir. 1995); *City of New York v. Beretta U.S.A. Corp.*, 315 F. Supp. 2d 256, 285 (E.D.N.Y. 2004); *American Booksellers Found. For Free Expression v. Dean*, 202 F. Supp. 2d 300, 320 (D. Vt. 2002); *Dean Foods Co. v. Brancel*, 22 F. Supp. 2d 931, 937 (W.D. Wis. 1998).

More recent cases are in accord. The Supreme Court has twice struck down state statutes that purport to control in-state retail prices for alcohol by pegging wholesale prices to an extra-jurisdictional benchmark. In *Brown-Forman*, the Court invalidated a New York law requiring distillers to affirm that their wholesale prices in New York were no higher than their wholesale prices elsewhere in the country. 476 U.S. at 575-78. And in *Healy*, the Court struck down a similar Connecticut statute governing beer wholesalers. 491 U.S. at 326-27. The Court struck down these laws on the ground that distillers and beer sellers might be forced to change their sale practices in other states (such as granting promotional and volume discounts) to account for the fact that they would be required to offer the same terms throughout New York or Connecticut. *See Brown-Forman*, 476 U.S. at 582; *Healy*, 491 U.S. at 337-38.

Again, the invalidity of the D.C. Act is even clearer. The problem is not simply that manufacturers *might* change their behavior in other states as a result of regulation in the District; it is that the D.C. Act specifically identifies the manufacturers' out-of-state sales as *the very objects of regulation* and imposes punishments for them. *See* Act § 2 (§ 28-4553). Both *Healy* and *Brown-Forman* make clear that this type of extra-territorial price regulation is unconstitutional.[44] *See Healy*, 491 U.S. at 336; *Brown-Forman*, 476 U.S. at 579.[45]

---

[44]    *See also National Solid Wastes Mgmt. Ass'n v. Meyer*, 63 F.3d 652, 658-59 (7th Cir. 1995) (citing *Healy*, *Brown-Forman*, and *Baldwin* as part of "a long line of cases" making clear "that the Court will not hesitate to strike down a state law shown to have extraterritorial scope and an adverse impact on commerce occurring wholly outside the enacting state"). This case is readily distinguishable from *Pharmaceutical Research and Mfrs. of Am. v. Walsh*, 538 U.S. 644 (2003). The statute in that case provided that the state officials were to use best efforts to secure a rebate equal to or greater than the rebate under the Medicaid program. *See Pharmaceutical Research and Mfrs. of Am. v. Concannon*, 249 F.3d 66, 81 (1st Cir. 2001). The Supreme Court confirmed the approach of the First Circuit, which found that the Act "'does not regulate the price of any out-of-state transaction, either by its express terms or its inevitable effect.'" *Walsh*, 538 U.S. at 669 (quoting *Concannon*, 249 F.3d at 81-82). It thereby rejected plaintiff's claim that the rebate program served to lower prices on patented prescription drugs. As explained above, the express terms of the Act at issue in this case punish patent-holders and their licensees for the prices of out-of-state transactions and the inevitable effect is to regulate the price of those transactions.

[45]    That the District purports to be acting to protect the health and safety of its residents does not — and cannot — avoid the force of this rule. New York tried to justify its milk price rules on similar public health grounds by

28

## C. The Act Violates Both the Foreign Commerce Clause and the Constitution's Grant of Authority Over Foreign Affairs to the Federal Government.

The D.C. Act's effects expressly cross international boundaries as well as state lines, rendering it constitutionally infirm for two independent reasons. First, by yoking drug manufacturers' sales prices in the United States to government-regulated prices abroad, the Act has the practical effect of burdening manufacturers' conduct in other countries, discouraging them from making foreign sales at the artificially low prices set under foreign price regimes lest these sales expose them to punishment in the District of Columbia for their prices in out-of-District transactions in the domestic market. The Foreign Commerce Clause forbids state regulation having this kind of extra-national effect. Second, by incorporating for purposes of D.C. law the price regulatory regimes of foreign nations, the D.C. Act effectively requires that local courts render formal judgments on the adequacy of these foreign systems. The Supreme Court has held that these kinds of judgments threaten the ability of the federal government to speak with a single voice in foreign affairs, and it has invalidated statutes that enmesh state courts in foreign affairs in this fashion. Each of these flaws in the D.C. Act improperly injects the District into "the exterior relations of the United States with other nations and governments" — a field in which laws "should proceed exclusively from the legislative authority of the nation." *Bowman v. Chicago & N.W. Ry. Co.*, 125 US 465, 482 (1888).

---

suggesting that it was guaranteeing New York producers the revenue needed to adopt sanitary practices, but the Court rejected this argument. Creating a public health exception to the Commerce Clause would "eat up the rule under a guise of an exception." *Baldwin*, 294 U.S. at 523. Nor is the desire to give District of Columbia residents the economic benefits of lower prescription drug prices a legitimate justification; the Interstate Commerce Clause precludes "attempts to give local consumers an advantage over consumers in other States." *Brown-Forman*, 476 U.S. at 580. Congress has set the policy that regulates interstate commerce in this area, establishing rules to promote the public health that balance the goals of fostering innovation and promoting the availability of pharmaceuticals. Because the District fundamentally lacks the power to regulate beyond its borders, the asserted purpose of the D.C. Act is irrelevant.

## 1.    The Act Impermissibly Restrains Foreign Commerce.

The Constitution gives Congress the power "[t]o regulate Commerce with foreign Nations," U.S. Const., art. I, § 8, cl. 3, and that power is "exclusive and absolute." *Buttfield v. Stranahan*, 192 U.S. 470, 492-93 (1904). "[W]ith respect to foreign intercourse and trade the people of the United States act through a single government with unified and adequate national power." *Board of Trs. of the Univ. of Ill. v. United States*, 289 U.S. 48, 59 (1933). Accordingly, states may not regulate foreign commerce lest they "limit[], qualif[y], or impede[]" federal initiatives "to any extent." *Id.* at 56-57.

The bar on state regulation of foreign commerce operates in a similar manner to the bar on regulating interstate commerce, but it constrains state discretion even more.[46]  As the Supreme Court has held, "the Founders intended the scope of [Congress's] foreign commerce power to be . . . greater" than its power over interstate commerce. *Japan Line, Ltd. v. County of Los Angeles*, 441 U.S. 434, 448 (1979).[47]  And like the Interstate Commerce Clause, the Foreign Commerce Clause has effect even absent federal regulation:  "It has long been understood . . . to provide 'protection from state legislation inimical to the national commerce [even] where Congress has not acted . . . .'"  *Barclays Bank PLC v. Franchise Tax Bd.*, 512 U.S. 298, 310 (1994) (quoting *Southern Pac. Co. v. Arizona ex rel. Sullivan*, 325 U.S. 761, 769 (1945)).

---

[46]    The Supreme Court has relied on Interstate Commerce Clause precedents in determining whether conduct violates the Foreign Commerce Clause. *See, e.g., Barclays Bank PLC v. Franchise Tax Bd.*, 512 U.S. 298, 310-11 (1994) (relying on Interstate Commerce Clause cases to interpret the scope of the Foreign Commerce Clause, while observing that "in the unique context of foreign commerce, a State's power is further constrained because of "the special need for federal uniformity." (citation omitted)); *Wardair Canada, Inc. v. Florida Dep't of Revenue*, 477 U.S. 1, 7-8 (1986) (relying on Interstate Commerce Clause principles and case law to interpret the Foreign Commerce Clause while also recognizing the "special need for uniformity.").

[47]    *See also Japan Line*, 441 U.S. at 446 ("The premise of appellees' argument is that the Commerce Clause analysis is identical, regardless of whether interstate or foreign commerce is involved.  This premise, we have concluded, must be rejected.  When construing Congress' power to 'regulate Commerce with foreign Nations,' a more extensive constitutional inquiry is required.").

The D.C. Act burdens manufacturers' sales in other countries in violation of the Foreign Commerce Clause. Under the Act, a decision to sell a drug in Australia, Canada, Germany, or the United Kingdom at the government-mandated or government-regulated price will have consequences under D.C. law: it will potentially require the manufacturer to maintain artificially low prices for at least certain U.S. sales or expose the company to severe liability in D.C. A company deciding whether and on what terms to sell in the four listed countries, therefore, will be compelled to take those domestic consequences into account. *See, e.g.*, Marmontello Decl. ¶ 6; *see also* Powell Decl. ¶¶ 11, 13. For example, Valeant Pharmaceuticals has asserted that if the Act goes into effect it will have to cease selling its drug, Diastat(R) AcuDial – the only FDA approved at-home treatment for management of emergency seizures – in Australia and Canada. *See* Soto Decl. ¶ 4. Moreover the interference with and potential impact on foreign market conduct is dramatically increased when one considers, as Supreme Court precedent requires, the practical effect if other states were to adopt comparable legislation.[48] The greater the portion of the domestic market that is put at risk by selling abroad, the more that manufacturers would be likely to restrict foreign sales.

The Supreme Court has made clear that comparable state regulation that has the practical effect of forcing companies to alter or forego their sales activities in other *states* violates the Interstate Commerce Clause. In *Brown-Forman* and *Healy*, the Supreme Court struck down alcohol pricing statutes that required wholesalers selling in one state to affirm that their prices were equal to or lower than all other states (*Brown-Forman*) or neighboring states (*Healy*). The

---

[48] As the *Healy* Court explained, "the practical effect of the statute must be evaluated not only by considering the consequences of the statute itself, but also by considering how the challenged statute may interact with the legitimate regulatory regimes of other States and what effect would arise if not one, but many or every, State adopted similar legislation." 491 U.S. at 336.

Court held that the price mirroring provisions constrained the wholesaler's ability to set its prices in out-of-state markets because it would be forced to set those out-of-state prices with regard to what would happen in the in-state market when the prices were mirrored there; thus the "practical effect" of the law was to regulate out-of-state transactions. *See Brown-Forman*, 476 U.S. at 582-83; *Healy*, 491 U.S. at 337-38. Because the Foreign Commerce Clause imposes broader restraints on the states than the Interstate Commerce Clause, these cases indicate that comparable effects in other countries would undoubtedly violate the Foreign Commerce Clause.

Like the pricing statutes in *Brown-Forman* and *Healy*, the D.C. Act requires drug manufacturers as a practical matter to make sales and pricing decisions in foreign markets that take into account the fact that the heavily regulated terms of those foreign sales might require corresponding price or distribution decisions in the domestic market. A decision authorizing *any* U.S. jurisdiction to adopt legislation like D.C.'s would both preclude a uniform federal international commercial policy and make the impact of foreign sales in the U.S. market that much more severe, and would provide compelling incentives for manufacturers to resist foreign government efforts to depress prices in the foreign markets (if possible) or to abandon those foreign sales altogether. *Brown-Forman* and *Healy* make clear that because the effects of the D.C. legislation logically extend far beyond the District into the four nations whose prices were selected as benchmarks in the Act, the Act violates the Foreign Commerce Clause.

### 2. The Act Impinges on the Federal Government's Exclusive Authority To Conduct Foreign Relations by Inviting D.C. Courts To Render Opinions on Foreign Drug Pricing Regimes.

The Constitution grants exclusive authority over foreign affairs to the federal government. U.S. Const. art. I, § 8 (granting Congress authority to provide for national defense, regulate foreign commerce, declare war, and regulate immigration); *id.* art. II, § 2 (providing that

32

the President is Commander in Chief and authorizing him to make treaties and appoint ambassadors).   At the same time, it explicitly forbids the states from exercising any similar authority.   *See id.* art. I, § 10 ("No State shall enter into any Treaty, Alliance, or Confederation . . . [;] lay any imposts or duties on Imports or Exports . . . [;] enter into any Agreement or Compact . . . with a foreign Power[;] or engage in War.").   These provisions give the "Federal Government . . . full and exclusive responsibility for the conduct of affairs with foreign sovereignties," *Hines v. Davidowitz*, 312 U.S. 52, 63 (1941), and make clear that "[p]ower over external affairs is not shared by the States," *United States v. Pink*, 315 U.S. 203, 233 (1942).[49]   "Our system of government is such that the interest of the cities, counties and states, no less than the interest of the people of the whole nation, imperatively requires that federal power in the field affecting foreign relations be left entirely free from local interference." *Hines*, 312 U.S. at 63.

Federal uniformity in foreign relations is essential.   For that reason, state laws violate the Constitution when they prevent the federal government from speaking with "one voice." *Pink*, 315 U.S. at 242 (Frankfurter, *J.*, concurring).   "If state laws and policies did not yield before the exercise of the external powers of the United States, then our foreign policy might be thwarted. These are delicate matters.   If state action could defeat or alter our foreign policy, serious consequences might ensue.   The nation as a whole would be held to answer if a State created difficulties with a foreign power." *Pink*, 315 U.S. at 232.

---

[49]     *See also Bowman v. Chicago & N.W. Ry. Co.*, 125 U.S. 465, 482 (1888) ("Laws which concern the exterior relations of the United States with other nations and governments are general in their nature, and should proceed exclusively from the legislative authority of the nation"); *Henderson v. Mayor of New York*, 92 U.S. 259, 273 (1875) (when regulation "concerns our international relations, in regard to which foreign nations ought to be considered and their rights respected," the regulation "must of necessity be national in its character"); *Pink*, 315 U.S. at 233 ("[T]here are limitations on the sovereignty of the States.   No state can rewrite foreign policy to conform to its own domestic policies.").

The Supreme Court has applied the "one voice" rule to strike down state statutes that invite state courts to opine on and make determinations about the wisdom of foreign law, finding that they have a "direct impact upon foreign relations." *Zschernig v. Miller*, 389 U.S. 429, 441 (1968). In *Zschernig*, the Court struck down a state law that barred the distribution of an estate to a foreign heir if the proceeds of the estate were subject to confiscation by the heir's government or if American citizens would not enjoy reciprocal rights of inheritance in the foreign jurisdiction. Even though the statute did not undermine any particular foreign policy, the Court invalidated the statute because it required state courts to examine and inquire into foreign law and to assess diplomatic statements. These state court activities created a "great potential for disruption or embarrassment." *Id*. at 435.[50] The Court explained that "foreign policy attitudes, the freezing or thawing of the 'cold war,' and the like are the real desiderata. Yet they of course are matters for the Federal Government, not for local probate courts." *Id*. at 437-38 (footnote omitted).

The D.C. Act suffers from the same flaw. By arbitrarily injecting certain foreign price-regulation systems into the mandates of local law, it gratuitously invites D.C. courts to opine on the wisdom of the drug-pricing laws and healthcare policies of other sovereign nations, involving local courts in foreign policy judgments that the Constitution has left in the hands of the federal government. If a plaintiff demonstrates that the wholesale price of a drug in the District exceeds the wholesale price of the same drug in Australia, Canada, Germany, or the United Kingdom by

---

[50] In *Clark v. Allen*, 331 U.S. 503 (1947), the Court upheld a state reciprocity statute on the ground that it had only indirect effects on foreign affairs. As *Zschernig* noted, the statute in Clark "require[ed] just matching of laws." *Zschernig*, 389 U.S. at 433 n.5. The *Zschernig* Court also noted that, in *Clark*, it had not been considering the argument that the statute was enacted to prevent hostile nations that were preparing for war on this country to obtain American assets. And it suggested that had the Court been reviewing a lower court holding in which the court did not just identify a foreign provision, but also questioned or assessed its enforcement and meaning, it would have reached a different result. *Id*.

34

more than 30%, the D.C. court must determine whether the manufacturer's price is excessive, considering such factors as global profits and the costs of production and development. Act § 2 (§ 28-4554(b)). The D.C. law will necessarily draw D.C. courts into an analysis of how the benchmarked drug price is set in the benchmarking country and whether that country's pricing laws permit manufacturers to recover reasonable or appropriate costs — whatever those may be. The court will quickly be invited to pass judgment on whether the foreign healthcare system and its treatment of patent rights are reasonable and how they compare to U.S. law and practice. And, the D.C. courts will inevitably be injected into the politically-sensitive debate on whether foreign governments are free-riding on the massive investment in life-saving and enhancing drugs that the U.S. patent and drug laws help induce. These are the very kinds of judgments that *Zschernig* held that state courts must not render, lest they "disturb foreign relations." 389 U.S. at 440-41.

Like the statute at issue in *Zschernig*, moreover, the problem with the Act is *not* that it has direct effects on foreign countries, but simply that the "Constitution entrusts" the power over "foreign affairs and international relations . . . solely to the Federal Government." *Id.* at 436. The federal government is regularly involved in delicate negotiations with other countries over their regimes for protecting intellectual property.[51] It cannot negotiate with "one voice" if local courts are in the business of rendering their own decisions about whether foreign countries are doing an adequate job.

---

[51]     The international community, including the United States, has addressed the pressing question of patent protections in treaties such as the Agreement on Trade-Related Aspects of Intellectual Property Rights (TRIPS) adopted as part of the Uruguay Round of the General Agreement on Tariffs and Trade. TRIPS makes very clear the commitment of the signatory nations, including the United States, to respecting and protecting the patent rights of inventors in recognition of the importance of those rights and of the need for a systematized set of protections.

## II.  PhRMA MEMBERS WILL SUFFER IRREPARABLE HARM IF THE COURT DOES NOT PREVENT PUBLICATION OF THE ACT.

As explained below, the Act would force PhRMA members to make sweeping adjustments to their business practices and suffer economic damages incapable of precise calculation, or at least to cope with a barrage of lawsuits from D.C., "private attorneys general," or others that will follow publication of the Act. PhRMA and its members also would suffer irreparable injury simply by being subject to the D.C. Act because the Act exceeds the District's authority and PhRMA and its members have an interest in being free from such regulation.

A temporary restraining order and an injunction against the publication of the Act are necessary to prevent the Act from taking effect and thus to ensure that PhRMA and its members can obtain complete relief. An injunction against enforcement by the District would provide only partial relief. Other litigants could still bring suit on their own based on their own purchases of pharmaceuticals or their view of "the public interest," which means the Act would continue to be enforced and thus affect the day-to-day operations of PhRMA members and pose a risk of multiple lawsuits. Because publication removes the possibility of complete relief, publication itself works an irreparable harm on PhRMA, its members, and the public health.[52]

### A.  PhRMA Members Will Suffer Irreparable Harm by Being Subject to a Law that Violates the Supremacy and Commerce Clauses.

Simply being subject to a law that is preempted and that violates the Interstate and Foreign Commerce Clauses constitutes irreparable injury. *See* 11A Charles Alan Wright et al.,

---

[52]    That the Act is not yet effective does not render this motion unripe for adjudication. "A challenge may be ripe . . . even when the statute is not yet effective." *American Booksellers Ass'n, Inc. v. Hudnut*, 771 F.2d 323, 327 (7th Cir. 1985); *see also Pierce v. Society of Sisters*, 268 U.S. 510, 530, 536 (1925) (suit ripe even though statute would not take effect until over a year after case was decided); *see also Arizona v. Atchison, Topeka & Santa Fe R.R.*, 656 F.2d 398, 402-03 (9th Cir. 1981) (suit ripe even though filed nearly six months before law would become effective). The injury PhRMA will suffer from publication of the Act — most notably the loss of an effective remedy capable of preventing it from being subjected to a multiplicity of suits — is imminent and independent of congressional approval.

36

*Federal Practice & Procedure* § 2948.1 (2005) ("When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary."); *cf. Elrod v. Burns*, 427 U.S. 347, 373-74 (1976) (plurality); *National Treasury Employees Union v. United States*, 927 F.2d 1253, 1254-55 (D.C. Cir. 1991). As this Court has recognized, where a state law is preempted by federal law and thus "violate[s] the Supremacy Clause[,] . . . this alone constitutes irreparable harm." *United States v. Ferrara*, No. 92-2869, 1993 WL 405477, at *1 (D.D.C. Feb. 8, 1993). In a case involving an unconstitutional attempt by states to regulate commercial airline advertising, the Fifth Circuit explained:   "If [] states were permitted to enforce their various laws, the airlines would be subjected to the demands and criteria of numerous legislatures rather than being required to comply only with federal laws and regulations.  This would cause irreparable injury by depriving the airlines of a federally created right to have only one regulator in matters pertaining to rates, routes and services." *Trans World Airlines, Inc. v. Mattox*, 897 F.2d 773, 784 (5th Cir. 1990), *aff'd in part and rev'd in part on other grounds*, 504 U.S. 374 (1992).[53]

Similarly, numerous courts have held that a violation of the dormant Commerce Clause constitutes irreparable harm.  *See American Libraries Ass'n v. Pataki*, 969 F. Supp. 160, 168 (S.D.N.Y. 1997) ("Deprivation of the rights guaranteed under the Commerce Clause constitutes irreparable injury."); *C & A Carbone, Inc. v. Town of Clarkstown*, 770 F. Supp. 848, 854 (S.D.N.Y. 1991) ("Inasmuch as plaintiffs have demonstrated that Local Law No. 9 threatens to or actually deprives plaintiffs of their constitutional rights, privileges or immunities under the

---

[53]    *See also Greyhound Lines, Inc. v. City of New Orleans*, 29 F. Supp. 2d 339, 341 (E.D. La. 1998) ("Because this case involves preemption, a finding of success on the merits implicitly carries with it a determination that the other three requirements [for a preliminary injunction] have been satisfied.").  *But see American Petroleum Inst. v. Jorling*, 710 F. Supp. 421, 432 (N.D.N.Y. 1989) (finding that Supremacy Clause violation, without more, does not constitute irreparable harm).

Commerce Clause, this deprivation unquestionably constitutes irreparable injury.").[54]  Thus, the District's extraterritorial regulation of wholly out-of-state conduct, like its regulation in conflict with Congress's directives, irreparably harms PhRMA members.

### B. PhRMA Members Will Suffer Irreparable Injury Because They Will Need To Comply with the Law and/or Face a Multitude of Lawsuits.

The D.C. Act's particular consequences for PhRMA members also constitute irreparable injury.  The Act would force PhRMA members into a dilemma: they must either take multiple steps to restructure their pricing, distribution, or other business practices in an attempt to conform to the Act, or face exposure from a multitude of lawsuits from D.C. or private parties empowered to enforce the Act.  *See* Belknap Decl. ¶ 5; Fish Decl. ¶ 7; Marmontello Decl. ¶ 7; Powell Decl. ¶ 11; Soto Decl. ¶ 6.

The Supreme Court has found irreparable injury where plaintiffs were forced to choose between violating a law and conforming their behavior to comply with a likely unconstitutional law.  For example, in *Morales v. Trans World Airlines*, 504 U.S. 374 (1992), the Court found that permanent injunctive relief was appropriate where petitioners were faced with suits by state officers "to enforce . . . an unconstitutional state law," "repetitive penalties attach[ed] to continuing or repeated violations," and petitioners "lack[ed] the realistic option of violating the law once and raising its federal defense."  *Id.* at 381.  Injunctive relief was appropriate because the challenged law forced petitioners to decide to "continually violate the [] law and expose themselves to potentially huge liability; or violate the law once as a test case and suffer the injury

---

[54]     *But see, e.g., Grand Cent. Sanitation, Inc. v. City of Bethlehem*, No. 94-5928, 1994 WL 613674, at *2 (E.D. Pa. Nov. 2, 1994) (finding that violation of Commerce Clause is not *per se* irreparable harm).

of obeying the law during the pendency of the proceedings and any further review." *Id.* at 381.[55]

Similarly, here, the D.C. Act forces PhRMA members either to attempt to comply with an unconstitutional law, or to wait for the barrage of enforcement actions and lawsuits that are certain to result, and then raise their federal defenses in each of those many suits.

Either way, PhRMA members will suffer irreparable harm. First, any attempt to comply with the Act — which, given the indeterminacy of the Act's standard of "excessiveness," would be uncertain at best — would necessitate significant changes to day-to-day domestic operations; PhRMA members will have to consider how and whether they need to alter their current operations and/or their prices. *See* Powell Decl. ¶¶ 10-12. PhRMA members would also need to consider the impact of drug marketing and pricing in Australia, Canada, Germany, and the United Kingdom on domestic prices and revenues, *see* Marmontello Decl. ¶ 6, and may even be forced to forgo sales of their drugs in those countries, *see* Soto Decl. ¶ 6. *See* Powell Decl. ¶¶ 11, 13. In addition to being burdensome, these compliance efforts would cause PhRMA members to lose significant sums of money if sales abroad were abandoned, steps were taken in an attempt to ensure that prices for drugs conceivably destined for the District were lowered throughout the distribution chain, or earnings from other states were siphoned off as consumers traveled to the District to purchase the lower-priced drugs. *See id.*

The direct and indirect costs to PhRMA members of taking these steps to comply with the Act would be exceedingly difficult to calculate. Any attempt to comply with the Act by changing pricing or distribution practices would require a manufacturer to attempt to control

---

[55]    Analogously, in *Abbott Labs. v. Gardner*, 387 U.S. 136, 152-53 (1967), *overruled on other grounds*, *Califano v. Sanders*, 430 U.S. 99 (1977), the Court justified pre-enforcement review on the ground that petitioners faced the difficult choice between undertaking cumbersome steps to comply with the regulations or violating the regulations and risking serious criminal and civil penalties.

39

actions at a later point in the distribution chain, imposing costs not easily measured. *See id.* ¶ 12. Moreover, costs incurred by wholesalers and others that might be passed back to manufacturers would be difficult to calculate. *See id.* Finally, calculating the costs due to lost sales in foreign jurisdictions and the costs imposed by consumers traveling to the District to make their patented drug purchases similarly would be exceedingly difficult. *See id.* ¶¶ 12-13.

Courts have found that legislation that requires such costly, but difficult to measure, changes to business operations presents the threat of irreparable harm. In *CSX Transportation*, for example, the D.C. Circuit found irreparable harm justifying preliminary injunctive relief because plaintiffs would be forced to substantially decrease the capacity and flexibility of their rail network and it would be "exceedingly speculative . . . to place a dollar figure on the difference in value" between ordinary operations and operations in compliance with the law. *CSX Transp.,* 406 F.3d at 673-74.[56] Thus, even though such injury would be economic, the difficulty in ascertaining the financial damages rendered these harms irreparable. *Id.* (citing *Danielson v. Local 275*, 479 F.2d 1033, 1037 (2d Cir. 1973) ("[I]rreparable injury is suffered when monetary damages are difficult to ascertain or are inadequate.")).

Second, the D.C. Act also threatens irreparable harm by exposing PhRMA members to a barrage of private lawsuits.[57] These actions may be brought by "any affected party," including the District, in any court of "competent jurisdiction." Act § 2 (§ 28-4555(a)). Because an

---

[56]    *Cf. ANR Pipeline Co. v. Corporation Comm'n*, 860 F.2d 1571, 1578 (10th Cir. 1988) (recognizing that plaintiffs satisfied the actual controversy requirement because they "face[d] a threat of irreparable harm from [] unconstitutional state statute and regulation" that would have "an immediate and direct effect on the day-to-day business of all interstate pipeline companies doing business in the State of Oklahoma").

[57]    Indeed, to a certain extent PhRMA members will not be able to avoid these lawsuits by attempting to comply with the Act; the pricing restraints of the Act are sufficiently ill-defined that even if a manufacturer lowered prices to a level it perceived to be consistent with the Act, an individual plaintiff, public interest groups, or the District could disagree and bring suit against the manufacturer. *See* Powell Decl. ¶¶ 10-12.

"affected party" includes any party claiming to represent "the public interest" whether or not it has actually purchased a patented drug in the District, *id.* (§ 28-4552(1)), PhRMA members would be subject to an unlimited number of lawsuits seeking to enforce the D.C. Act. *See* Powell Decl. ¶ 14. In each of these actions, PhRMA members would be forced to relitigate their federal defenses and potentially to engage in lengthy and fact-intensive disputes regarding the costs of drugs in foreign jurisdictions, their development and production costs, their sales and profits, government research funds, and the effect of the price on access to the drug in the District. *See* Act § 2 (§ 28-4554(b)). In each action, PhRMA members would face the threat of penalties, including treble damages. *See id.* (§ 28-4555(b)(3)). The costs of litigation, as well as the potential liability, could be enormous for PhRMA members. *See* Powell Decl. ¶ 12, 14.

Irreparable harm exists in cases in which a plaintiff can obtain relief only through asserting its rights in a multiplicity of lawsuits. *See, e.g., Lynch Corp. v. Omaha Nat'l Bank*, 666 F.2d 1208, 1212 (8th Cir. 1981) (finding that plaintiff had established irreparable injury sufficient for preliminary injunctive relief because a "multiplicity of suits would be required to gain relief"); *Roof v. Conway*, 133 F.2d 819, 827 (6th Cir. 1943) (finding injunctive relief necessary to avoid "irreparable damage" and observing that "the difficulty in estimating damages in an action at law and the likelihood of multiplicity of suits furnish ample reasons for the exercise by a court of equity of its injunctive power to restrain wrongdoing"). Being required to assert their challenges to the statute as a defense in litigation is "so impractical as to be infeasible, and constitutes irreparable harm." *Savoie v. Merchants Bank*, 84 F.3d 52, 58 (2d Cir 1996) (affirming district court's grant of a preliminary injunction).[58] The volume of lawsuits

---

[58]    That PhRMA members will have the right to raise their federal defenses in the many actions that will likely result from publication of the D.C. Act does not protect them from irreparable harm. In *Wilson v. Illinois Southern R.R. Co.*, 263 U.S. 574 (1924), the Supreme Court found that no adequate remedy existed where failure to

facing drug manufacturers imposes a severe burden and creates an enormous risk for PhRMA members and also creates the potential for inconsistent judgments.[59] *Cf. ANR Pipeline*, 860 F.2d at 1578 (recognizing that plaintiffs faced irreparable harm sufficient for an actual controversy where state law would create "the real possibility of generating lawsuits between the Pipelines and their existing suppliers" and raised "the likelihood of the Pipelines being subject to conflicting directives").

### III.    THERE IS NO IMMEDIATE HARM TO THE DISTRICT DEFENDANTS.

The balance of hardships decisively favors a temporary restraining order and preliminary injunction barring publication of the Act. Compared to the substantial and irreparable harm that PhRMA will experience, D.C. will be minimally, if at all, injured by the requested relief.

The District will suffer no immediate harm because it cannot enforce the Act in the short term even if it is published. The Act has no legal effect and pricing suits may not be brought under it until the 30-day period of congressional review mandated by the Home Rule Act expires. *See* D.C. Code § 1-206.02(c)(1). And the District will not experience any "additional financial or regulatory burden from any delay of the act of publication." *Comanche Nation*, 2005 WL 1322994, at *13. Thus, in the short term, enjoining publication and enforcement could not possibly injure the District. By contrast, publication will deprive PhRMA of its only real

---

issue a permanent injunction would require petitioner to defend its rights in five different lawsuits involving complicated issues. The Court reasoned that "the right of full defense in those suits, if it exists, is not an adequate remedy at law." *Id.* at 576-77; *see also Coca-Cola Co. v. FTC*, 475 F.2d 299, 304 (5th Cir. 1973) ("The 'right' to be free from defending a multiplicity of lawsuits is . . . an equitable principle properly looked to by an equity court.").

[59]    *Renegotiation Bd. v. Bannercraft Clothing Co.*, 415 U.S. 1, 24 (1974), is not to the contrary. *Bannercraft* concerned the entirely inapposite situation in which the Court ordered the plaintiff to exhaust its administrative remedies against the defendant before pursuing a judicial remedy against the same defendant. Here, in contrast, PhRMA has no administrative remedies to exhaust and the litigation that it seeks to avoid relates not only to possible litigation with the District, but to the thousands of potential plaintiffs that could seek to bring a claim under the D.C. Act. Moreover, PhRMA members likely would never be able to track and recover the enormous costs that would result from such a multitude of lawsuits.

opportunity to obtain complete relief from this unconstitutional Act. This imbalance between the imminent threat to PhRMA members and the lack of any effect on D.C. in the near term militates strongly in favor of granting a TRO and preliminary injunction against publication of the Act; indeed, the preliminary injunction question, if not the merits of the whole case, can likely be resolved before congressional review is complete.

Even if the interim relief would extend beyond the congressional review period and delay the effective date of the Act, the harm to PhRMA members substantially outweighs any harm to D.C. *First*, any delay while the court considers the merits of the case is likely to be slight because there are no genuine issues of material fact and the case can be resolved expeditiously in favor of PhRMA on a motion for summary judgment. *See Ferrellgas Partners, L.P. v. Barrow*, No. 04-12548, 2005 WL 1736276, at *7 (11th Cir. July 26, 2005) (per curiam) (hardship of preliminary injunction reduced where existence of fully briefed summary judgment motions shortened its anticipated duration). *Second*, the District has no legitimate interest in publishing a law that exceeds its authority in multiple respects.[60] Although it has declared the prices enabled by the patent system to be a "threat" to its residents, Act § 2 (§ 28-4551(1)), the District can have no interest in removing a "threat" that is, in reality, the product of a carefully calibrated regulatory system created by Congress and geared to benefit the public health in the long run. And the District has no legitimate interest in overriding the federal system through ultra vires extraterritorial regulation. Finally, enjoining publication of the Act will not harm the District's

---

[60]     *See Trans World Airlines, Inc. v. Mattox*, 897 F.2d 773, 784 (5th Cir. 1990) ("[T]here is no injury to the states to weigh against that which they threaten to inflict on the airlines. Since Congress expressly preempted this area of regulation, the states are not injured by the injunction."); *Greyhound Lines*, 29 F. Supp. 2d at 341 ("[W]hen considering the balance of hardship, enjoining a preempted ordinance would not subject the City to any undue hardship or penalty because the injunction would require only the City's compliance with federal law under the Supremacy Clause."). *Cf. Champion Int'l Corp. v. Brown*, 731 F.2d 1406, 1409 (9th Cir. 1984) ("Montana has no cognizable state interest in enforcing those age discrimination laws that are preempted by federal law.").

43

claimed interest in protecting the health of its citizens because Congress has already determined how best to advance the public health interests of all Americans, including residents of D.C.

## IV. THE REQUESTED RELIEF IS IN THE PUBLIC INTEREST.

The public derives substantial benefit from the carefully balanced system of incentives Congress has created to encourage the development of new medications. Indeed, Congress created this system to benefit the public health. Congress has repeatedly recognized that the public interest requires that any short-term benefit that might be gained from low prices on patented drugs be balanced against the long-term interest in encouraging innovation. *See* pp. 5-8, 16-20, *supra*. This congressional determination of where the public interest lies is entitled to considerable deference. *Teva Pharm. Indus. Ltd. v. Crawford*, 410 F.3d 51, 54 (D.C. Cir. 2005) ("Congress sought to strike a balance between incentives, on the one hand, for innovation, and on the other, for quickly getting lower-cost . . . drugs to market. Because the balance struck between these competing goals is quintessentially a matter for legislative judgment, the court must attend closely to the terms in which the Congress expressed that judgment.").

If the D.C. Act goes into effect, it will upset the careful balance struck by Congress and leave potential innovators and investors in innovation uncertain whether they will be able to recoup the substantial research and development expenses they are incurring and will incur to develop new drugs. This uncertainty may put the public health goals of the federal system at risk. Accordingly, the public interest is best served by a temporary restraining order and injunction that will retain the status quo established by Congress, at least until the Court can assess the constitutionality of the D.C. Act. *See Berman v. Parker*, 348 U.S. 26, 32 (1954) ("Subject to specific constitutional limitations, when the legislature has spoken, the public interest has been declared in terms well-nigh conclusive."); *Eli Lilly & Co. v. Premo Pharm.*

44

*Labs., Inc.*, 630 F.2d 120, 138 (3d Cir. 1980); *cf. Trans World Airlines, Inc. v. Mattox*, 897 F.2d 773, 784 (5th Cir. 1990) (public interest favors an injunction to preserve the exclusivity of federal regulations intended to serve the public interest).

Apart from contradicting Congress's determination of how best to serve the public health, the means through which the D.C. Act seeks to advance local interests are not in the public interest more broadly considered. Even if the Act succeeded in lowering the prices of patented pharmaceuticals in D.C., such lower prices would mean less compensation to inventors and diminished incentives to future innovation, or higher prices in other states. Either residents of other states will have to pay, through higher prices, a greater share of the research and development costs to make up for D.C., or research and development seed money will simply be lost, inhibiting drug development for those inside and outside the District. In *CSX Transportation, Inc. v. Williams*, 406 F.3d 667 (D.C. Cir. 2005), which addressed a District law concerning shipment of hazardous materials, the court observed that "[t]he effect of the D.C. Act . . . is simply to shift this risk, or at least some of the risk, to other jurisdictions." 406 F.3d at 674. The same is true here, and thus there is no net benefit to the public interest from the Act.

## CONCLUSION

For these reasons, this Court should grant plaintiff's motion for a temporary restraining order barring publication of the Act and a preliminary injunction barring publication and enforcement of the Act.[61]

---

[61]     The security required by Federal Rule of Civil Procedure 65(c) is not relevant in this case. Rule 65 explains that security is intended to pay "such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). Defendants would suffer no injury from the issuance of the requested temporary restraining order and preliminary injunctive relief. *See* Part III, *supra*. Accordingly, PhRMA requests that the Court require no security, or minimal security at most, in this case.

Dated:  October 12, 2005

Respectfully submitted,

*Randolph D. Moss*

David W. Ogden (D.C. Bar No. 375951)
Randolph D. Moss (D.C. Bar No.417749)
Jonathan J. Frankel (D.C. Bar No. 450109)
WILMER CUTLER PICKERING HALE AND
DORR LLP
2445 M Street, N.W.
Washington, D.C.  20037-1420
(202) 663-6000
(202) 663-6363 (facsimile)

*Counsel for Plaintiff Pharmaceutical Research
and Manufacturers of America*