IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| PHARMACEUTICAL RESEARCH AND MANUFACTURERS OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>THE DISTRICT OF COLUMBIA et al.<br><br>Defendants. | Civil Action No., _____ |

## DECLARATION OF MARJORIE E. POWELL

I, Marjorie E. Powell, declare as follows:

1. I am the Senior Assistant General Counsel of the Pharmaceutical Research and Manufacturers of America ("PhRMA") and have served in that capacity since 2003. Prior to that, I was Assistant General Counsel of PhRMA, serving in that position since February 2003.

2. PhRMA is a non-profit corporation organized and existing under the laws of the State of Delaware. PhRMA's offices are located in Washington, D.C.

3. PhRMA is a membership organization. Its members are the Country's leading research-based pharmaceutical and biotechnology companies, which are devoted to inventing medicines that allow patients to live longer, healthier, and more productive lives. Together, these companies account for close to 70 percent of the sales of prescription drugs in the United States. In 2004, PhRMA member companies invested

1

approximately $38.8 billion in research and development. In the last ten years, more than 300 new medications, vaccines, and biologics for more than 150 conditions have been developed by private companies and approved by the Food and Drug Administration. Patented pharmaceuticals manufactured by PhRMA members are sold by retail pharmacies and hospitals in the District of Columbia.

4. PhRMA serves as the pharmaceutical industry's principal policy advocate, representing its members' interests in matters before Congress, the Executive Branch, state regulatory agencies and legislatures, and the courts. PhRMA is committed to, *inter alia*, advancing public policies that foster continued innovation, educating the public about drug development and discovery, and promoting a fair and competitive marketplace.

5. PhRMA is authorized by its Board of Directors to bring this suit on behalf of its members.

6. The regulation of patented prescription drugs is of vital concern to PhRMA and PhRMA's members. PhRMA and its members also have a substantial interest in the proper enforcement of the patent laws, which protect many PhRMA members holding patents for prescription drugs. PhRMA and its members are also concerned with ensuring that PhRMA members do not face a risk of liability for continuing to make patented prescription drugs available in the District of Columbia on the same terms as those drugs are made available throughout the United States. The D.C. Prescription Drug Excessive Pricing Act of 2005 ("the Act") threatens these interests by creating price caps for patented prescription drugs and by authorizing courts to impose damages, treble damages and fines against companies that exceed those caps.

7. Although PhRMA members supply very limited quantities of patented prescription drugs directly to doctors and healthcare institutions in the District of Columbia, the vast majority of patented prescription drugs that are eventually provided to patients in the United States are initially sold by pharmaceutical manufacturers either to drug wholesalers, such as AmerisourceBergen Corp., McKesson Corp., or Cardinal Health, Inc., or to large retail pharmacy chains that warehouse their own drugs ("warehousing retail chains"), such as CVS or Rite-Aid. Typically, a manufacturer ships prescription drugs by common carrier from its warehouse to the wholesaler's or retail chain's warehouse. Wholesalers then typically resell the patented prescription drugs to other wholesalers, retail pharmacies, and healthcare institutions. Patented prescription drugs initially sold to a warehousing retail chain are generally distributed to the chain's retail pharmacy outlets. Retail pharmacies and healthcare institutions then dispense patented prescription drugs to patients. The wholesalers and warehousing retail chains to which a manufacturer sells its patented prescription drugs generally do not act on behalf of the manufacturer when they resell those drugs, and the manufacturer generally does not control the terms of those resales.

8. No PhRMA member is headquartered in the District or has a warehouse in the District from which it ships patented prescription drugs. The wholesalers and warehousing retail chains to whom manufacturers sell the vast majority of their patented prescription drugs are also headquartered outside of the District and the warehouses at which they receive shipments of drugs from manufacturers are located outside the District.

9. The price paid by wholesalers or warehousing retail chain to a drug manufacturer is called the "ex-manufacturer price." The price at which wholesalers sell patented prescription drugs is called the "ex-wholesaler price" or the "wholesale" price. The price charged to patients is generally called the "retail" price.

10. Under the Act, a drug price is presumptively "excessive" if the wholesale price is 30 percent higher than the price of the comparable drug in any of four countries – Australia, Canada, Germany, and the United Kingdom – all of which have adopted regulatory regimes that embrace priorities that differ from those served by U.S. law and, most notably, do not take the same approach toward encouraging innovation that Congress has. When a plaintiff shows that a drug price exceeds this threshold, the Act requires the defendant to prove that the price is not "excessive" based on a list of factors, such as the cost of development of the drug and profits to date. Because the Act does not define the weight to be accorded to each factor, or how the factors should be applied in particular circumstances, PhRMA members will have no way to determine at the time their prices are established whether they will ultimately be deemed "excessive" by the reviewing courts.

11. PhRMA members will be irreparably injured if the D.C. Act is published and takes effect. As with all statutes, each PhRMA member company will have to conduct its own analysis and make its own independent business decisions regarding what steps it might take to comply with the D.C. Act. But given the breadth of the Act and its failure to define many of its own terms, it seems inevitable that, unless an individual PhRMA member takes steps to modify its pricing, distribution, or other business practices –

USIDOCS 5330129v1

actions that inevitably would injure the member – the presumption of excessive pricing under the Act would place the PhRMA member at substantial risk of liability.

12. As noted above, the vast majority of patented prescription drugs manufactured by PhRMA members that are eventually provided to patients in the District are initially sold by PhRMA members to wholesalers and warehousing retail chains and then are resold by those wholesalers to retailers. The ultimate price paid by a patient in the District for a pharmaceutical product is rarely in the manufacturer's control. Therefore, no matter what price a manufacturer charges to its direct customers, a PhRMA member likely would still face potential exposure unless it took additional steps to attempt to control prices set at a later point in the distribution chain. The direct cost to the PhRMA member of taking these steps to modify and potentially to monitor its sales or distribution schemes, plus the costs incurred by wholesalers, warehousing retail chains, and customers of wholesalers which might be passed back to the PhRMA member, would be very difficult to measure.

13. The D.C. Act might also cause an individual PhRMA member to forego or limit opportunities to sell one or more of its patented prescription drugs in the foreign countries referenced in the Act, and the damage to a member because of such action would be exceedingly difficult to quantify. Moreover, assuming the D.C. Act functions as intended, one possible result is that retailers and consumers from other states could travel to the District to purchase the lower-priced drugs. The loss to PhRMA members if this occurs could be significant and would be exceedingly difficult to measure.

14. Regardless of whether or how a PhRMA member changes its pricing or distribution practices in attempting to comply with the Act, the member will likely face a significant number of lawsuits under the Act. There are hundreds of thousands of

prescription drug sales in the District each year. PhRMA members could be subject literally to an unlimited number of suits brought by persons seeking to enforce the D.C. Act. The potential liability to a PhRMA member and the burden of defending these suits – even if they ultimately prove to be frivolous – could potentially be staggering.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 11, 2005.

*Marjorie E. Powell*
Marjorie E. Powell