UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| PHARMACEUTICAL RESEARCH AND MANUFACTURERS OF AMERICA, ) ) ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 05-2015 (RJL) |
| ) | |
| THE DISTRICT OF COLUMBIA, *et al.*, ) | |
| ) | |
| Defendants. ) | |

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES
IN OPPOSITION TO
PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER

The defendants herein (collectively, "the District"), by and through undersigned counsel pursuant to LCvR 65.1(c), hereby submit this Memorandum of Points and Authorities in Opposition to Plaintiff's Motion for a Temporary Restraining Order ("TRO").

II. Factual and Procedural Background

On October 4, 2005, the Mayor signed Bill No. 16-114, which became D.C. Act No. 16-171, the "Prescription Drug Excessive Pricing Act of 2005" ("the Act"). *See* Plaintiff's Exhibit No. ("PEx.") 1 to the Complaint (*to be codified at* D.C. Official Code §§ 28-4551 *et seq.* (2005 Supp.).[1] The Act prohibits excessive pricing of prescription drugs by manufacturers or licensees, and authorizes affected parties to bring civil suits for violations. *Id.* at 2.

_____

[1]     The District does not admit the allegations of the Complaint or plaintiff's motions except for the purposes of this opposition.

The Act was transmitted to Congress on October 6, 2005. *See* Council of the District of Columbia ("the Council") Legislative Information Management System, Bill No. 16-114 (available online at http://www.dccouncil.washington.dc.us/lims/BillRecord2.asp?legno=B16-0114).

The estimated date on which the Act will become effective, absent congressional action, is January 4, 2006. *Id*.


### III. Argument

The Court should deny the requested relief because plaintiff's claims are not yet ripe for review; there is no current need for emergency injunctive relief here because there is no "emergency" in any sense of the word. In addition, the relief plaintiff seeks, striking from the official record the official acts of the Council and the Mayor, is not appropriate.

Plaintiff has presented no case law authorizing the relief it now seeks—striking from the public record the actions of the elected representatives of the District.

By plaintiff's own admission, the Act "has no legal effect" right now, and will not be effective, if at all, until the 30-day period of congressional review has expired. Motion at 42.

Because of the upcoming holidays and scheduled and unscheduled congressional recesses and adjournments, the estimated effective date of the Act (assuming no intervention by Congress) is not until January 4, 2006, almost three full months from now. *See* D.C. Official Code § 1-206.02(c)(1) (2005 Supp.). Consequently, even assuming plaintiff's allegations are true, there can be no harm to plaintiff *until* the Act becomes effective. There is simply no imminent harm here on the mere publication of the Act; the injuries feared by plaintiff, even if they occur exactly

as articulated, will *not* be triggered by the publication of the Act. No purpose would be served in the hasty disposition of such a complex matter.[2]

*The Home Rule Act*

Unlike the States, the "unique feature" of the legislative process in the District is that, with some exceptions irrelevant here, legislation duly enacted by the District may not take effect until approved by Congress. *See, e.g., Atkinson v. D.C. Bd. of Elections & Ethics*, 597 A.2d 863, 864 (D.C. 1991).[3] Bills passed by the Council and signed by the Mayor must be transmitted to Congress for a 30-day period of review. D.C. Official Code § 1-206.02(c)(1) (2005 Supp.).

If Congress fails to pass a joint resolution of disapproval within that period, the legislation becomes law. *Id*. Moreover, there are a number of other indications within the Home Rule Act of Congress' plenary authority over the District. *See, e.g., Marijuana Policy Project v. United States*, 304 F.3d 82, 83 (D.C. Cir. 2002) ("[C]ongress expressly reserves the right to enact legislation concerning the District on any subject and to repeal D.C. Council enactments at any time. [D.C. Official Code § 1-206.01]. [The Home Rule] Act prohibits District officers and employees from expending any funds unless authorized to do so by Congress. [D.C. Official Code § 1-204.46].").

---

[2]    Due to the expedited nature of these proceedings, this Opposition will focus primarily on the District's procedural and ripeness concerns, and will only briefly touch on the substance of the Motion, as a complete analysis of such complex issues will obviously take additional time.

[3]    Article I, section 8, clause 17 of the Constitution empowers Congress to exercise exclusive legislative authority over the District of Columbia. *See, generally*, *Bliley v. Kelly*, 23 F.3d 507, 508 (D.C. Cir. 1994). In 1973, Congress delegated most of this authority to the District by passing the Home Rule Act, Pub. L. No. 93-198, *codified at* D.C. Official Code §§ 1-201.01 *et seq*. (2005 Supp.).

Similarly, Congress—at any time—can pass appropriations legislation invalidating the legislative acts of the District. *See, e.g., Turner v. District of Columbia Bd. of Elections & Ethics*, 354 F.3d 890, 893–894 (D.C. Cir. 2004) (discussing the "Barr Amendment" to the D.C. Appropriations Act of 1999, which "prohibited use of the appropriated funds to 'conduct any ballot initiative which seeks to legalize or otherwise reduce penalties associated with' a controlled substance."). Congress therefore always maintains final control over all legislation adopted for the District of Columbia. *Seegars v. Ashcroft*, 297 F.Supp.2d 201, 237 (D.D.C. 2004).[4]

The injuries feared by plaintiff therefore *cannot* occur until—at the earliest—the period of congressional review has expired, almost three months from now.

Plaintiff complains that mere publication of the Act will cause it injury, "the loss of an effective remedy capable of preventing [plaintiff] from being subject to a multiplicity of suits" and is "independent of congressional approval." Motion at 36 n.52. Despite repeating that claim in a number of variant ways, plaintiff has not explained how the Court's subsequent invalidation of the Act—prior to its effective date—would *not* provide exactly that remedy. If the Court finds the Act unconstitutional, there could be no lawsuits filed under its authority.

Unlike most federal and state legislation, in the District publication is *not* the final ministerial act necessary prior to legislation becoming effective, but one of *two* preconditions that must be met, the other being expiration of the congressional review period with no action by Congress. Without both, District legislation is not effective.

---

[4]    The Home Rule Act requires that "every act shall be published and codified upon becoming law . . . ." D.C. Official Code § 1-204.04(d). In practice, the District publishes legislation several times, at a minimum on introduction and on its signature by the Mayor (or the overriding by the Council of a veto by the Mayor). The Council then usually submits a "notice of law" for publication in the D.C. Register after the congressional review period has expired.

Congress has historically not been reticent to intervene in District affairs. *See, e.g.*, *Bliley*, 23 F.3d at 509 (D.C. legislation making manufacturers of assault weapons strictly liable "met with immediate opposition in Congress;" resolution of disapproval introduced seven days after transmittal to Congress). *See also, e.g., Turner*, 354 F.3d at 893–894; Spencer S. Hsu and Lori Montgomery, "Lawmakers Say Congress Won't Allow Slots in D.C.," *The Washington Post*, at A1 (July 13, 2004).

Consequently, plaintiff's assumption that the Act will inevitably become effective is speculative at best.

*The Motion for TRO is Not Ripe.*

As noted, the Act will not become effective, if ever, until the period of congressional review has passed—currently estimated to be almost three months from now. Consequently, plaintiff's feared injuries are not imminent, and hence not ripe.

Ripeness, like standing and mootness, is a "justiciability doctrine" which courts must examine to determine if they have the power to decide "cases or controversies" under Article III of the Constitution. *See, e.g., Nat'l Treasury Employees Union ("NTEU") v. U.S.*, 101 F.3d 1423, 1427 (D.C. Cir. 1996). Similarly, ripeness—like standing—requires that "an injury in fact be certainly impending." *Id.* (*citing Duke Power Co. v. Carolina Environmental Study Group*, 438 U.S. 59, 81 (1978); *DKT Memorial Fund, Ltd. v. AID*, 887 F.2d 275, 297 (D.C. Cir. 1989) (holding that "the constitutional requirement for ripeness is injury in fact")). *See also Texas v. United States*, 523 U.S. 296, 300 (1998) ("A claim is not ripe for adjudication if it rests upon 'contingent future events that may not occur as anticipated, or indeed may not occur at all.'") (*quoting Thomas v. Union Carbide Agricultural Products Co.*, 473 U.S. 568, 580–581 (1985) (further citation omitted)).

The "injury in fact" constraint requires plaintiff to have suffered "an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (internal quotes and citations omitted).

Here, there is no certainty that plaintiff will suffer an injury on publication of the Act; the Act will not be effective for almost three months, and a number of events could occur in the interim to preclude its *ever* becoming law, including disapproval by Congress, either by the joint resolution of disapproval contemplated in the Home Rule Act, or otherwise. *See Marijuana Policy Project*, 304 F.3d at 83.

In the *NTEU* case, the Circuit affirmed the dismissal of the union's challenge to the constitutionality of the Line Item Veto Act, which was filed as soon as the statute was signed into law. *NTEU*, 101 F.3d at 1425–26. The Circuit held that the claim was unripe because the challenged veto power was "not only unexercised, but is as yet unavailable." *Id*. at 1431. The Circuit affirmed the trial court's finding that the threatened injury was not "'real and immediate, but instead was 'wholly speculative.'" *Id*. at 1426. *See also Wyoming Outdoor Council v. United States Forest Svc.*, 165 F.3d 43, 48 (D.C. Cir. 1999) ("the ripeness requirement excludes cases not involving present injury.").

Here, there is no present injury at all, hence the Motion for TRO is unripe. *See NTEU*, 101 F.3d at 1430 (Art. III requires not only that an injury be "concrete and particularized," but that it be "imminent.") (*citing Lujan, supra*).

Nothing is currently "imminent"—even assuming Congress approves the Act, almost three months will pass before the first of the "limitless parade of lawsuits" could even be filed. Motion at 2. The challenged action (enforcement of the Act by the District or the authorization of suits by

other affected parties) is, like the line-item-veto at issue in *NTEU*, similarly *unavailable* until the congressional review period expires, hence the Motion for TRO is currently unripe.[5]

Additionally, courts may find a dispute unripe under the "prudential portion" of ripeness doctrine. *NTEU*, 101 F.3d at 1426. A court testing for prudential ripeness should evaluate (1) the fitness of the issue for judicial decision, and (2) the hardship to the parties of withholding judicial review. *Id.*

The Court and the District here would clearly benefit from a fuller briefing of the complex issues involved, but that briefing may not even be necessary should Congress act in the interim to invalidate the Act.[6] As such, the TRO is not currently fit for judicial decision. Indeed, in light of the traditional ten-day period, any TRO will expire long before the Act could possibly go into effect. Moreover, plaintiff will suffer no hardship whatever by temporarily withholding judicial review, as it has already fully researched and briefed the issues it believes are relevant. A small delay here will simply allow the District to begin to address the substantive issues underlying this complicated matter. *See City of Williams, Arizona v. Dombeck*, 151 F.Supp.2d 9, 15 (D.D.C. 2001) ("[T]here will be virtually no impact upon the parties by a refusal to consider Plaintiffs' claims at this early stage.").

Here, Congress has almost three months to take action to invalidate the Act; the membership in plaintiff of a number of multi-national, billion-dollar corporations leads to the obvious

---

[5]    Plaintiff reluctantly addresses ripeness in its Motion, burying its argument in the fifty-second footnote on the thirty-sixth page of its brief, citing no current, controlling case law. Surely ripeness doctrine has evolved since 1925. *See* Motion at 36 n.52 (*citing Pierce v. Society of Sisters*, 268 U.S. 510, 530, 536 (1925)).

[6]    Also supporting the prudential determination that plaintiff's claims are not yet ripe is the "usually unspoken element of the rationale underlying the ripeness doctrine: If we do not decide it now, we may never need to." *NTEU*, 101 F.3d at 1431 ("Article III court should not make decisions unless they have to.").

assumption that plaintiff is likely exerting lobbying efforts in Congress on this issue which may yet prove effective. Because lack of congressional action is "an unavoidable condition precedent" to the effectiveness of the Act, the Motion for TRO is not yet ripe. *See United States House of Representatives v. United States Dept. of Commerce*, 11 F.Supp.2d 76, 92 (D.D.C. 1998) (discussing ripeness cases' rationale that "if specific steps did not transpire, there would never be an injury.") (*citing Texas*, *supra*, and *Boehner v. Anderson*, 30 F.3d 156, 163 (D.C. Cir. 1994)). In the absence of the contingent event of congressional inaction, there can be no current injury.

Plaintiff has conceded that the Act will not become effective until sometime in the future. Motion at 42 ("The Act has no legal effect and pricing suits may not be brought under it until the 30-day period of congressional review mandated by the Home Rule Act expires."). That concession indicates only that plaintiff *might* suffer a future injury if what it fears transpires. Plaintiff's *current* demand for emergency injunctive relief is therefore unripe.

> "We do not mean to imply that [plaintiff's] alleged injury will be sufficiently imminent on [the effective date of the disputed legislation]. It is enough to say that [plaintiff's] claim is not now ripe, particularly when we subject the claim to analysis under the prudential aspect of the ripeness doctrine.
>
> * * *
>
> [Plaintiff] may, at some time in the future, suffer an imminent concrete injury that is fairly traceable to the Line Item Veto Act. Because that point has not yet been reached, we hold that [plaintiff's] claim is neither constitutionally nor prudentially justiciable.

*NTEU*, 101 F.3d at 1431–32.

While plaintiff may, at some time in the future, claim that it has suffered an imminent, concrete injury traceable to the act, that point has not yet been reached. Justice is best served here by the Court staying its hand and declining to issue the requested emergency injunctive relief now. *See City of Williams*, 151 F.Supp.2d at 16 ("As judicial resources are best preserved for conflicts

necessitating a resolution, rather than expended upon conflicts merely *anticipating* the need for judicial intervention, prudence dictates against addressing the merits of [plaintiffs'] claims at this point.") (emphasis in original).


*Plaintiff Fails to Qualify for Emergency Injunctive Relief.*

In order to obtain a TRO, plaintiff must satisfy *each* prong of the following four-part test: (1) there is a substantial likelihood of success on the merits; (2) plaintiff will suffer irreparable harm should the relief be denied; (3) an injunction would not substantially injure other interested parties; and (4) the public interest will be furthered by the issuance of the requested order. *Mova Pharmaceuticals Corp. v. Shalala*, 140 F.3d 1060, 1066 (D.C. Cir. 1998) (*quoting CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 746 (D.C. Cir. 1995)); *Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 843 (D.C. Cir. 1977); *Virginia Petroleum Jobbers Ass'n v. Federal Power Comm'n*, 259 F.2d 921, 925 (D.C. Cir. 1958).

Because interim injunctive relief is an extraordinary form of judicial relief, courts should grant such relief sparingly. *Cobell v. Norton*, 391 F.3d 251, 258 (D.C. Cir. 2004) (emergency injunctive relief "is an extraordinary remedy that should be granted only when the party seeking relief, by a clear showing, carries the burden of persuasion.") (*citing Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (interim injunctive relief is "an extraordinary and drastic remedy")).

While a strong showing on one of the four factors may make up for a weaker showing on another, *Serono Labs. v. Shalala*, 158 F.3d 1313, 1318 (D.C. Cir. 1998), a particularly weak showing on one factor may be more than the other factors can "compensate" for. *Taylor v. RTC*, 56 F.3d 1497, 1506 (D.C. Cir. 1995), *amended on other grounds on reh'g.*, 66 F.3d 1226 (D.C. Cir. 1995).

Plaintiff asserts that enjoining publication of the Act will "maintain the status quo" until the Court can rule on the constitutionality of the Act. Motion at 5. Plaintiff is incorrect; a TRO here will *not* preserve the status quo, but will require the District to take *affirmative steps* to halt the publication of legislation already passed unanimously by the Council and signed by the Mayor.[7]

As such, a TRO here would be a "mandatory injunction" requiring plaintiff to meet a "higher standard" than the typical four-part test for the usual "prohibitory" injunction. *See Veitch v. Danzig*, 135 F.Supp.2d 32, 35 & n.2 (D.D.C. 2001) (*citing, inter alia, University of Texas v. Camenisch*, 451 U.S. 390, 395 (1981) and *Dorfmann v. Boozer*, 414 F.2d 1168, 1173 (D.C. Cir. 1969)).

Plaintiff must therefore show "clearly" that it is entitled to immediate relief or that "extreme or very serious damage" will result from the denial of the TRO. *Veitch*, 135 F.Supp.2d at 35 n.2 (*quoting Phillip v. Fairfield Univ.*, 118 F.3d 131, 133 (2nd Cir. 1997)).

Plaintiff has failed to show that it is clearly entitled to immediate relief and has not shown the "extreme or very serious damage" that its members would allegedly incur on mere publication of the Act.

*Plaintiff Has Suffered No Irreparable Harm.*

An essential prerequisite to injunctive relief is a sufficient showing by the plaintiff that it will suffer irreparable harm if the injunctive relief is not granted. *See*, *e.g.*, *Davenport v. Int'l*

---

[7]    On information and belief, documents to be published in the D.C. Register are sent to the printer on a Monday or Tuesday, along with mailing labels for subscribers. When the Register is formally published on Friday of the same week (and is first available electronically), the printer mails copies to subscribers, and sends copies back to the District by Friday afternoon. The Act in dispute here is currently at the printers, along with all the other documents making up Friday's edition of the Register.

*Brotherhood of Teamsters,* 166 F.3d 356, 360 (D.C. Cir. 1999). *See also Sampson v. Murray*, 415 U.S. 61, 88–90 (1974).

"Despite this flexibility, we require the moving party to demonstrate at least 'some injury . . . .'" *CityFed*, 58 F.3d at 747 (*citing, inter alia, Sea Containers Ltd. v. Stena AB*, 890 F.2d 1205, 1208 (D.C. Cir. 1989) (preliminary injunction properly denied "where moving party may have been 'likely to succeed' but did not carry burden of showing irreparable harm, since 'the basis of injunctive relief in the federal courts has always been irreparable harm.'") (*quoting Sampson*, 415 U.S. at 88 and *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 506 (1959))).

Plaintiff has failed to demonstrate how it will be specifically injured by the mere publication of the Act. Plaintiff asserts that "[o]nce publication occurs, this Court's ability to order a complete remedy will disappear." Motion at 3. In addition to being wrong as a matter of law, plaintiff never explains *how* that is so. Plaintiff's zeal for hyperbole trips it up—plaintiff claims that if the Act takes effect, "myriad lawsuits" could be underway before the Court could issue a final judgment. *Id*. But plaintiff does not seek a final judgment here, but a TRO, with no showing of imminent, irreparable injury.

Similarly, plaintiff asserts that the Act "forces PhRMA members either to attempt to comply with an unconstitutional law, or to wait for the barrage of enforcement actions and lawsuits that are certain to result . . . ." Motion at 39. But plaintiff presents a false dichotomy. There is at least one additional option—adopting a reasonable briefing schedule, completed in advance of the effective date of the Act (assuming Congress takes no action), so that the Court will have the benefit of the District's full consideration of the complex issues implicated here. There is simply *no* imminent injury here on the mere publication of the Act, hence a TRO is unwarranted.

Plaintiff has failed to establish imminent, irreparable harm.

*The Balance of Equities Favors Denying Injunctive Relief.*

Plaintiff asks this Court to take the extraordinary act of enjoining the local legislative process and indeed, plaintiff's request, if granted, would require the District to violate its own laws on publication. The balance of equities tips decidedly in favor of the defendants where plaintiff essentially is asking this Court to issue a mandatory injunction at the onset of the case. In other words, plaintiff seeks the ultimate relief at the beginning of the litigation. An injunction would substantially injure the District, its citizens, and, potentially, the legislative process. "[A]ny time a State [or local government] is enjoined by a court from effectuating statutes enacted by the representatives of its people, it suffers a form of irreparable injury." *New Motor Vehicle Board of California v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977) (Rehnquist, J., in chambers).

Plaintiff, in addition to seeking to enjoin the *results* of the legislative process, seeks here to enjoin the mere publishing of the *content* of that process, potentially implicating the First Amendment, as discussed below. In these circumstances, the balance of the equities favors the District of Columbia.

*The Public Interest Favors the District.*

It should go without saying that the public interest is served by allowing the District to simply *publish* its laws, to say nothing of eventually enforcing them.

It cannot be reasonably disputed that, leaving aside the rights of the citizens of the District, the Councilmembers themselves have a First-Amendment right in the expression of ideas contained in legislation. *See, e.g., Clarke v. United States*, 886 F.2d 404, 406 (D.C. Cir.

1989), *vacated as moot*, 915 F.2d 699 (D.C. Cir. 1990). In *Clark*, a unanimous Circuit affirmed the finding by the trial court that Congress' attempt to require the Council to enact specific legislation violated the individual Councilmembers' right to free speech. *Id.* ("the votes of each [Councilmember], like the votes of any other legislator, constitute 'speech' protected by the First Amendment.").

Here, plaintiff's demand that the Act not even be published would similarly impact the Councilmembers' First Amendment rights, not to mention the rights of the citizens of the District (and anyone else) to know the contents of the legislative process. Any grant of a TRO here to enjoin publication of the Act, leaving aside the merits of plaintiff's constitutional challenges, would certainly impact the First Amendment. *See Perot v. FEC*, 97 F.3d 553, 559 (D.C. Cir. 1996) (if court were to issue the requested injunction to enjoin a presidential debate or the choosing of debate candidates, "there would be a substantial argument that the court would itself violate the [Commission on Presidential Debates'] First Amendment rights.") (citations omitted). *See also Tory v. Cochran*, ___ U.S. ___, 125 S.Ct. 2108, 2111 (2005) ("[P]rior restraints on speech and publication are the most serious and the least tolerable infringement on First Amendment rights") (*quoting Nebraska Press Assn. v. Stuart*, 427 U.S. 539, 559 (1976)).

Even should the Court determine to issue the requested TRO and enjoin publication of the Act itself, the Court could not enjoin publication of the entire Register without a "ripple effect"—from the costs and delays of republication (and/or of stripping out just the offending text), the unquantifiable harm and uncertainty faced by subscribers and citizens, and the potential lack of effectiveness of *other* legislation contained in the Register which could conceivably

jeopardize federal funding.[8] Similarly, the Register typically contains notices of Council intent to act on legislation or notices of Council hearings; Council rules require publication of these notices in the Register before the Council can hold hearings. If the publication of the Register were enjoined, those notices and any hearings thereunder would need to be republished and rescheduled. Such a broad-based injunction would thus have far-reaching effects. *See Tory*, *supra* (order issued in First Amendment prior-restraint case "must be 'precis[e]' and narrowly 'tailored' to achieve the 'pin-pointed objective' of the 'needs of the case') (*quoting Carroll v. President and Comm'rs of Princess Anne*, 393 U.S. 175, 183–84 (1968)).

Plaintiff essentially wants to stop the District from merely publicizing legislative action, regardless of its merits. It is plaintiff's financial self-interest, not the public interest, which is at the root of this complaint. The public interest here, in light of the above, therefore favors the denial of emergency injunctive relief.

## III. Conclusion

Plaintiff has failed to satisfy the requisite elements of the four-part test for emergency injunctive relief and its claims are currently unripe. Accordingly, its Motion for a TRO should be denied.

DATE: October 13, 2005          Respectfully submitted,

ROBERT J. SPAGNOLETTI
Attorney General, D.C.

---

[8]     On information and belief, the District Department of Health submitted for publication in Friday's Register notice of an emergency and proposed rulemaking, pursuant to "An Act To enable the District of Columbia to receive Federal financial assistance under Title XIX of the Social Security Act for a medical assistance program, and for other purposes," approved December 27, 1967 (81 Stat. 744; *codified at* D.C. Official Code § 1-307.02(a)(2)). Delay in publication of this notice could jeopardize funds going to the District's neediest citizens.

GEORGE C. VALENTINE
Deputy Attorney General, D.C.
Civil Litigation Division


_____/s/ Robert Utiger_____
ROBERT UTIGER, D.C. Bar No. 437130
Senior Assistant Attorney General
Civil Litigation Division
Office of the Attorney General for the District of Columbia
441 Fourth Street, N.W., 6th Floor South
Washington, D.C. 20001
Telephone: (202) 724-6532
Facsimile: (202) 727-3625
robert.utiger@dc.gov


_____/s/ Richard S. Love_____
RICHARD S. LOVE, D.C. Bar No. 340455
Chief, Equity I
441 Fourth Street, N.W., 6th Floor South
Washington, D.C. 20001
Telephone: (202) 724-6635
Facsimile: (202) 727-0431
richard.love@dc.gov


_____/s/ Andrew J. Saindon_____
ANDREW J. SAINDON, D.C. Bar No. 456987
Assistant Attorney General
Equity 1
441 Fourth Street, N.W., 6th Floor South
Washington, D.C. 20001
Telephone: (202) 724-6643
Facsimile: (202) 727-0431
andy.saindon@dc.gov