UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

<table>
<tr><td>PHARMACEUTICAL RESEARCH AND MANUFACTURERS OF AMERICA,</td><td>)<br>)<br>)<br>)</td><td></td></tr>
<tr><td align="center">Plaintiff,</td><td>)<br>)</td><td></td></tr>
<tr><td align="center">v.</td><td>)<br>)</td><td>Civil Action No. 05-2015 (RJL)</td></tr>
<tr><td>THE DISTRICT OF COLUMBIA, <em>et al.</em>,</td><td>)<br>)</td><td></td></tr>
<tr><td align="center">Defendants.</td><td>)<br>)</td><td></td></tr>
</table>

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES
IN OPPOSITION TO
PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

The defendants herein (collectively, "the District"), by and through undersigned counsel pursuant to LCvR 65.1(c), hereby submit this Memorandum of Points and Authorities in Opposition to Plaintiff's Motion for Preliminary Injunction.

## I. Introduction and Summary of Argument

Plaintiff here seeks to prevent the District from protecting its citizens. This is not a case of impermissible "regulation of patent rights," but of the District exercising its traditional police powers to protect consumers. Plaintiff repeatedly argues that federal patent law gives its members the right to recoup their investments and make a profit. Patent law, of course, provides no such guarantee, and plaintiff does not cite to any authority for this sweeping assertion. Plaintiff's implicit argument is that states are completely preempted from any regulation of the price of sale of patented goods. This interpretation of patent law is wrong as a matter of law.

Moreover, plaintiff is asking the Court to assume, without any factual showing whatever, that the District Act will destroy its members' ability to recoup investment and make a profit. But the Act, at most, will simply regulate excessive prices, which police-power action is not preempted by any federal scheme.

This Court should deny the requested emergency relief because plaintiff has failed to meet the familiar four-part test for granting such injunctive relief, most notably by failing to demonstrate imminent, irreparable harm; plaintiff relies exclusively on the conclusory statements in a handful of self-serving declarations, which are nearly identical and do no little more than parrot the vague allegations in the complaint.

The "Prescription Drug Excessive Pricing Act of 2005" ("the Act") is simply an attempt by the District to rein in spiraling prescription-drug prices. The Supreme Court has already said that "Congress never envisioned [federal] pre-emption as blocking state health care cost control . . . ." *New York State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 667 n.6 (1995) ("*Travelers*").

## II. Factual and Procedural Background

In recent years, prices for prescription drugs have skyrocketed. *See, e.g.*, *Pharmaceutical Research & Manufacturers of Am. v. Walsh*, 538 U.S. 644, 649 & n.1 (2003) ("PhRMA") (between 1982 and 1988, prescription drug costs increased at an average annual rate of 9.5 %, more than any other component of the health care sector) (citation omitted); "Prescription Drug Trends," *Kaiser Family Foundation* (October 2004) (U.S. spending for prescription drugs in 2002 was $162.4 billion, four times larger than the amount spent in 1990); *id.* (retail prescription prices, which reflect both manufacturer price changes for existing drugs and changes in use to

newer, higher-priced drugs, have increased an average of 7.4% a year from 1993–2003, almost triple the average inflation rate).

"Brand-name-only drugs—drugs for which there are no generic or co-marketed alternatives—are the primary drivers of inflation in prescription drug costs." Families USA, "Sticker Shock: Rising Drug Prices for Seniors," at 9 (June 2004) (*available at* http://www.familiesusa.org). "Several studies have suggested that, although prices for pharmaceuticals are increasing across the board, prices are most likely to increase for newly branded drugs. Most of the top 20 selling drugs are newer, more expensive brand-name drugs." Nat'l Conf. of State Legislatures, "Frequently Asked Questions . . . Prescription Drugs," (Oct. 2005) (*available at* http://www.ncsl.org/print/health/FAQ_RxDrugs.pdf). In 2002, national spending on prescription drugs increased by 15.3%, with over a third of that increase attributed to rising drug prices. *Id*. at 10 (*citing, inter alia*, The Kaiser Family Foundation, *Trends and Indicators in the Changing Health Care Marketplace, 2004 Update* (*available at* http://www.kff.org/insurance/7031/ti2004-1-6.cfm)).

People without insurance (*i.e.*, those least able to afford prescription drugs), ironically pay the most by buying at retail, because they lack the bargaining power of large entities. The uninsured pay 123% more than the Veterans Administration price for the same drug, and over 65% more than the Medicaid price. William H. von Oehsen, III, *Pharmaceutical Discounts Under Federal Law: State Program Opportunities*, at 9 (Public Health Institute 2001).

Moreover, drug prices in the United States are substantially higher than those abroad, as plaintiff readily admits; 50% more than prices in Canada and Great Britain, 70% more than prices in France, and 90% more than prices in Italy. Alan Sager & Deborah Socolar, *A*

*Prescription Drug Peace Treaty*, at 16 (Health Reform Program, Boston Univ. Sch. of Public Health 2000); *Cf.* Complaint ¶ 53.

Surveys indicate that Americans face increasing difficulties in paying for necessary prescription drugs. *See, e.g.*, *USA Today*/Kaiser Family Foundation/Harvard School of Public Health, "Health Care Costs Survey," Aug. 2005 (*available at* http://www.kff.org/newsmedia/7371.cfm) (half of all Americans take prescription drugs on at least a daily basis; almost one-quarter reported that someone in their household did not fill a prescription, cut pills in half, or skipped doses in the last year because of the high costs); *id*. (71% say the high profits made by the drug and insurance companies is a "very important" factor in causing higher health care costs).

It is against this backdrop that the D.C. Council acted. Councilmember Catania, co-sponsored by Councilmembers Mendelson, Ambrose, and Gray, introduced legislation on February 1, 2005, in an effort to confront the problem of spiraling prescription drug costs. 52 D.C. Reg. 1295 (Feb. 11, 2005). The Committee on Health, in reporting favorably on the proposed legislation, noted the "alarming" rise in prescription drug prices, which easily outpaced the rate of inflation. Report of the Committee on Health on the "Prescription Drug Compulsory Manufacture License Act of 2005," at 3 ("Comm. Rep.").[1]

---

[1]      Specifically, the report noted:

Prices of the top 30 brand-name drugs increased by 22 percent over the past 3 years. Last year alone prescription drug costs increased four times the rate of inflation. At the same time, in 2002, 10 pharmaceutical giants amassed earnings higher than the rest of the 490 Fortune 500 companies combined.

*Id*. (citations omitted). *See also, e.g.*, Families USA, Pub. No. 02-015, *Profiting from Pain: Where Prescription Drug Dollars Go*, at 13–14 (2002) (*available at* http://www.familiesusa.org).

On October 4, 2005, the Mayor signed Bill No. 16-114, which became D.C. Act No. 16-171, the "Prescription Drug Excessive Pricing Act of 2005" ("the Act"). *See* Plaintiff's Exhibit No. ("PEx.") 1 to the Complaint (*to be codified at* D.C. Official Code §§ 28-4551 *et seq.* (2005 Supp.)).[2] The Act prohibits excessive pricing of prescription drugs by manufacturers or licensees only for transactions occurring in the District, and authorizes affected parties to bring civil suits for violations. *Id*. at 2.[3] The Act also specifically allows sued entities to demonstrate "the costs of invention, development and production of the prescription drug" in their defense. *Id*. at § 28-4554(b).

The Act was transmitted to Congress on October 6, 2005. *See* Council of the District of Columbia ("the Council") Legislative Information Management System, Bill No. 16-114 (available online at http://www.dccouncil.washington.dc.us/lims/BillRecord2.asp?legno=B16-

---

[2]    The District does not admit the allegations of the Complaint or plaintiff's motions except for the purposes of this opposition.

[3]    The Council specifically found that:

[T]he excessive prices of prescription drugs in the District of Columbia [are] threatening the health and welfare of the residents of the District as well as the District government's ability to ensure that all residents receive the health care they need, and these excessive prices directly and indirectly cause economic harm to the District and damage the health and safety of its residents;

[T]he traditional police powers of the District of Columbia include protecting and promoting the health, safety, and welfare of its residents, regulating monopoly pricing of goods and services, and regulating to assure consumer protection and to prevent and sanction unfair trade practices; and

[T]o promote the health, safety, and welfare of its residents, it is incumbent on the government of the District of Columbia to take action to restrain the excessive prices of prescription drugs through mechanisms that are consistent with District and federal law, including the Constitution.

52 D.C. Reg. at 9061.

0114). The estimated date on which the Act will become effective, absent congressional action, is January 10, 2006. *Id.*

Plaintiff filed the instant Complaint and motions for emergency injunctive relief on October 12, 2005, and the Court scheduled a hearing on the motion for a temporary restraining order ("TRO") for the next day. After hearing from counsel, the Court denied the TRO and subsequently issued a Minute Order to that effect.

The Act was published in the D.C. Register on October 14, 2005. *See* 52 D.C. Reg. 9061–9063 (Oct. 14, 2005).

Plaintiff's allegations each fail as a matter of law; plaintiff is not entitled to emergency injunctive relief.

### III. <u>Argument</u>

In order to obtain a preliminary injunction, plaintiff must satisfy *each* prong of the following four-part test: (1) there is a substantial likelihood of success on the merits; (2) plaintiff will suffer irreparable harm should the relief be denied; (3) an injunction would not substantially injure other interested parties; and (4) the public interest will be furthered by the issuance of the requested order. *Mova Pharmaceuticals Corp. v. Shalala*, 140 F.3d 1060, 1066 (D.C. Cir. 1998) (*quoting CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 746 (D.C. Cir. 1995)); *Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 843 (D.C. Cir. 1977); *Virginia Petroleum Jobbers Ass'n v. Federal Power Comm'n*, 259 F.2d 921, 925 (D.C. Cir. 1958).

Because interim injunctive relief is an extraordinary form of judicial relief, courts should grant such relief sparingly. *Cobell v. Norton*, 391 F.3d 251, 258 (D.C. Cir. 2004) (emergency injunctive relief "is an extraordinary remedy that should be granted only when the party seeking

relief, by a clear showing, carries the burden of persuasion.") (*citing Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (interim injunctive relief is "an extraordinary and drastic remedy")).

While a strong showing on one of the four factors may make up for a weaker showing on another, *Serono Labs. v. Shalala*, 158 F.3d 1313, 1318 (D.C. Cir. 1998), a particularly weak showing on one factor may be more than the other factors can "compensate" for. *Taylor v. RTC*, 56 F.3d 1497, 1506 (D.C. Cir. 1995), *amended on other grounds on reh'g.*, 66 F.3d 1226 (D.C. Cir. 1995).

Plaintiff's feared injuries are entirely speculative; plaintiff's declarations fail to meet its burden. Plaintiff's "evidence" does not show that it faces the *imminent* threat of *irreparable* harm, or that it satisfies the other standards necessary for the grant of emergency relief. An injunction would injure District residents and the public interest, and therefore the balance of interests favors rejecting plaintiff's motion.

A.    Plaintiff Fails to Establish A Substantial Likelihood of Success On the Merits.

Plaintiff cannot show a substantial likelihood of success on the merits of any of its theories. The Act is a reasonable exercise of the District's police power. Moreover, the District's law does not attempt to regulate patent rights, despite plaintiff's strenuous assertions otherwise; it can no longer be reasonably questioned that states have the power to regulate (and even tax) transactions that occur within their borders. The Act does not alter the right of plaintiff's members to exclude others from their patented inventions and therefore the Act is not preempted by federal patent law. Finally, the Act does not violate the Commerce Clause, either directly or through an impermissible burden on interstate or foreign commerce.

*1.    Plaintiff's Facial Challenge Cannot Succeed.*

Because the law has not yet been enforced, plaintiff here brings a facial challenge to the Act. A facial challenge to a legislative act is "the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987).

"A high threshold must be met if a state law is to be pre-empted for conflicting with the purposes of a federal Act. Any conflict must be 'irreconcilable . . . The existence of a hypothetical or potential conflict is insufficient to warrant the pre-emption of the state statute.'" *Gade v. Nat'l Solid Wastes Mgmt.*, 505 U.S. 88, 110 (1992) (Kennedy, J., concurring) (*quoting Rice v. Norman Williams Co.*, 458 U.S. 654, 659 (1982)). *See also Steffan v. Perry,* 41 F.3d 677, 693 (D.C. Cir. 1994) (*en banc*); *Chemical Waste Management, Inc. v. U.S. Environmental Protection Agency*, 56 F.3d 1434, 1437 (D.C. Cir. 1995).

Legislative enactments are presumed to be constitutional and the burden of establishing invalidity is on the challenger. *PhRMA*, 538 U.S. at 661 (*citing Davies Warehouse v. Bowles*, 312 U.S. 144, 153 (1944)); *Regan v. Time, Inc.*, 468 U.S. 641, 652 (1984). *See also Pegram v. Herdrich*, 530 U.S. 211, 221 (2000) (legislature is the "preferable forum" for judgments of social value, such as the level of optimum health care expenditures); *FTC v. Beach Communications, Inc.*, 508 U.S. 307, 313–14 (1993) (where there are "plausible reasons" for the legislature's action, "our inquiry is at an end.") (*quoting United States Railroad Retirement Bd. v. Fritz*, 449 U.S. 166, 179 (1980)); *Vance v. Bradley*, 440 U.S. 93, 97 (1979) ("The Constitution presumes that, absent some reason to infer antipathy, even improvident decisions will eventually be

rectified by the democratic process and that judicial intervention is generally unwarranted no matter how unwisely we may think a political branch has acted.") (footnote omitted).[4]

The Act is simply a permissible exercise of the District's police power to protect consumers, in a reasonable attempt to rein in out-of-control prescription drug prices in the District. *See SEIU, Local 82 v. District of Columbia*, 608 F.Supp. 1434, 1444 (D.D.C. 1985) (consumer protection is a permissible police power objective) (*citing City of New Orleans v. Dukes*, 427 U.S. 297, 304–305 (1976) (*per curiam*)). *See also Med. Soc'y of the State of NY v. Cuomo*, 976 F.2d 812, 816 (2nd Cir. 1992) (holding that "regulation of public health and the cost of medical care are virtual paradigms of matters traditionally within the police powers of the state.").

To the extent plaintiff implies that the District cannot enact *any* law regulating prescription drugs, it is simply incorrect. *See, e.g., Whalen v. Roe*, 429 U.S. 589, 603 n.30 (1977)

---

[4]     The Supreme Court, in *Pegram v. Herdrich*, 530 U.S. 211 (2000) discussed the often perverse financial incentives facing health care providers today and noted that judgments about the appropriate level of expenditure for health care was not a proper subject of the judiciary:

> [S]uch complicated factfinding and such a debatable social judgment are not wisely required of courts unless for some reason resort cannot be had to the legislative process, with its preferable forum for comprehensive investigations and judgments of social value, such as optimum treatment levels and health-care expenditure. *Cf. Turner Broadcasting System, Inc. v. FCC*, 512 U.S. 622, 665-666 (1994) (plurality opinion) ("Congress is far better equipped than the judiciary to 'amass and evaluate the vast amounts of data' bearing upon an issue as complex and dynamic as that presented here" (*quoting Walters v. National Assn. of Radiation Survivors*, 473 U.S. 305, 331, n. 12 (1985))); *Patsy v. Board of Regents of Fla.*, 457 U.S. 496, 513 (1982) ("[T]he relevant policy considerations do not invariably point in one direction, and there is vehement disagreement over the validity of the assumptions underlying many of them. The very difficulty of these policy considerations, and Congress' superior institutional competence to pursue this debate, suggest that legislative not judicial solutions are preferable").

*Id*. at 221 (parallel citations omitted).

("[T]he State has broad police powers in regulating the administration of drugs by the health professions."); *Pharmaceutical Soc'y of the State of New York v. Lefkowitz*, 586 F.2d 953, 959 (2nd Cir. 1978) ("[B]ecause of the specialized nature of prescription drugs, their potential for harm to health, and their *susceptibility to price-gouging*, they and the people who dispense them have been properly subject to a wide variety of laws and regulations designed to protect the public against abuses that are unique to this profession.") (emphasis added) (*citing Whalen*).

The District is not alone in its concern over this issue. "As of October, more than 600 separate bills and resolutions in all 50 states proposed to address a wide array of policies affecting access, affordability, payment and other regulation of prescription drugs." Nat'l Conf. of State Legislatures, *2005 Prescription Drug State Legislation*, at 1 (Oct. 21, 2005) (*available at* http://www.ncsl.org/programs/health/drugdisc05.htm). Moreover, 28 states—in addition to the District—are considering legislation to regulate (and thereby hopefully lower) the price of prescription drugs. *Id*. at 4.[5] Consequently, far from being a radical departure from established norms, the District is joined in its concern by most of the rest of the country.

Plaintiff's fears are entirely speculative. "[I]n the absence of an enforcement action either commenced or specifically threatened, we have no actual or imminent concrete application of the statute in which to anchor our inquiry into whether any valid application is possible. [The

---

[5]    The states are California, Colorado, Connecticut, Florida, Georgia, Idaho, Illinois, Maine, Maryland, Massachusetts, Michigan, Mississippi, Missouri, Nevada, New Jersey, New Mexico, New York, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, Tennessee, Texas, Vermont, Virginia, Washington, and West Virginia. *See, e.g., id.* at 31 (Mass. H2683/S399 would establish a prescription drug "fair pricing program"; *id*. at 34 (Mich. HB4018 would enact a "prescription drug fair pricing act"; *id*. at 42 (N.J. A2549 would require drug manufacturers to offer their drugs to purchasers on terms and conditions offered to most favored purchaser); *id*. at 47–48 (N.Y. A6673/S4773 would mandate that the cost of patented or generic drugs be no more expensive than any other location where such drugs could be purchased); *id*. at 68 (W.V. HB2005 authorizes establishment of Federal Supply Schedule as benchmark for state purchases of brand-name prescription drugs).

appellants' challenges] are not justiciable at this time." *Navegar, Inc. v. United States*, 103 F.3d 994, 1002 (D.C. Cir. 1997). *See also Shell Oil v. Iowa Dept. of Revenue*, 488 U.S. 19, 29 (1988) ("the fears and doubts of the opposition are no authoritative guide to the construction of legislation.") (citations and quotation marks omitted); *NLRB v. Fruit & Vegetable Packers & Warehousemen, Local 760*, 377 U.S. 58, 66 (1964) (The Supreme Court has often "cautioned against the danger, when interpreting a statute, of reliance upon the views of its legislative opponents. In their zeal to defeat a bill, they understandably tend to overstate its reach.").

      2.      *The Act is Not Preempted by Federal Patent Law.*

Plaintiff is simply incorrect when it unequivocally states that the Act is preempted by federal patent law. Plaintiff's argument is based on a fundamental mischaracterization of patent law. The Act makes no attempt whatever to "regulate" patent rights and does not "punish" patent holders. P.Mem. at 1. The Act is not preempted by federal law because the Act does not alter in any way the right to exclude that federal patent law grants. The Act is only a regulation of transactions involving patented items, of a kind long held to be within the District's police power.

Where federal and non-federal laws overlap, the proper judicial approach is to reconcile the statutory schemes rather than hold one completely ineffectual. *See, e.g., Exxon Corp. v. Governor of Maryland*, 437 U.S. 117, 132 (1978) (Supreme Court "generally reluctant to infer preemption" and it would be "particularly inappropriate to do so in this case because the basic purposes of the state statute and the [federal act] are similar."). Here, however, plaintiff's interpretation of federal law would render the Act completely ineffectual.

Contrary to plaintiff's implications, patented products are not entirely immune from state regulation. As recently as 1989, the Supreme Court unanimously reaffirmed that "states are free to regulate the use of such intellectual property in any manner not inconsistent with federal law." *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 156 (1989) (*quoting Aronson v. Quick Point Pencil Co.*, 440 U.S. 257, 262 (1979)); *id.* at 155 ("state protection of trade secrets did not operate to frustrate the achievement of the congressional objectives served by the patent laws.") (*citing Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470 (1974)). *See also Decker v. FTC*, 176 F.2d 461, 464 (D.C. Cir. 1949) ("[P]atent rights are subject to the prohibitions and controls imposed by the states in the legitimate exercise of their powers over purely domestic affairs, whether of internal commerce or of police.").

As an example, the District, like almost all 50 states, specifically regulates trade secrets; the District's law is based on the Uniform Trade Secrets Act, promulgated by the National Conference of Commissioners on Uniform Laws. *See* D.C. Official Code § 36-401 (2004 Supp.); Uniform Laws Annotated, Master Ed., Vol. 14. Thus, if *all* state attempts to regulate transactions involving intellectual property were preempted, as plaintiffs seem to imply, the District's (and 41 other states') trade-secret laws would be invalid.

Because the District's specific regulation of intellectual property (*i.e.*, the trade secret law) is presumptively valid, so too is the general law at issue here.

"In this as in other fields, the question of whether federal law pre-empts state law 'involves a consideration of whether that law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Aronson*, 440 U.S. at 262 (*quoting Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)).

The District's law does not stand as an "obstacle" to the purposes of Congress. Plaintiff baldly asserts that the Act "directly attacks the central mechanism of federal patent policy—namely, the affording of the patent holder the opportunity to obtain the full economic value of the invention during the period of exclusivity." P.Mem. at 21. The District respectfully asserts that plaintiff's proposition is too broad, and the cases it cites are readily distinguishable. *See, e.g., Bonito Boats*, 489 U.S. at 146 ("From their inception, the federal patent laws have embodied a careful *balance* between the need to promote innovation and the recognition that imitation and refinement through imitation are *both necessary* to invention itself and the *very lifeblood of a competitive economy*.") (emphasis added); *see also Aronson*, 440 U.S. at 262.[6]

Plaintiff falls prey to sloppy semantics, repeatedly arguing that the Act "punishes" patent holders or "negates" patent rights. Plaintiff's mischaracterizations aside, merely alleging that the Act may discourage something that federal law permits is insufficient to show a "conflict" for purposes of preemption.[7]

Courts must start with the presumption that Congress does not intend to supplant state law in fields of traditional state regulation under police power. "The historic police powers of the State include the regulation of matters of health and safety." *DeBuono v. NYSA-ILA Medical &*

---

[6]    *See id*. (*discussing Kewanee Oil*, 440 U.S. at 1885–86):

First, patent law seeks to foster and reward invention; second, it promotes disclosure of inventions, to stimulate further innovation and to permit the public to practice the invention once the patent expires; third, the stringent requirements for patent protection seek to assure that ideas in the public domain remain there for the free use of the public.

[7]    *See PhRMA* at 666–67 ("The mere fact that the [state] program imposed a nonfederal obstacle . . . did not provide a sufficient basis for preemption . . . .") (*citing New York State Dept. of Social Servs. v. Dublino*, 413 U.S. 405, 421 (1973)). *See also, e.g., Jones v. Rath Packing Co.*, 430 U.S. 519, 540 (1977) (no conflict preemption if it is possible to comply with local law "without triggering federal enforcement action.")

*Clinical Svcs. Fund*, 520 U.S. 806, 814 (1997). *See also Travelers*, 514 U.S. at 654 (general health care regulation has historically been a matter of local concern); *Calif. Div. of Labor Standards Enforcement v. Dillingham Constr.*, 519 U.S. 316, 325 (1997); *PhRMA*, 538 U.S. at 666 (presumption *against* federal preemption of state law "designed to foster public health" has "special force" when the two governments are pursuing "common purposes.") (*citing, inter alia, Hillsborough County v. Automated Medical Labs., Inc.*, 471 U.S. 707, 715–18 (1985)).

In light of Congress' recent creation of the Medicare prescription drug "discount card" program, *see* P.L. 108-173, 117 Stat. 2169 (Dec. 8, 2003), and its intended effect of lowering prescription drug prices, the Act and the federal law are clearly pursuing common purposes.

Moreover, the strong presumption against preemption "start[s] with the assumption that the historic police powers of the States were not to be superseded by [federal law] unless that was the clear and manifest purpose of Congress." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996) (internal quotation marks and citation omitted); *Geier v. American Honda Motor Co., Inc.*, 166 F.3d 1236, 1237 (D.C. Cir. 1999) (historic police powers, entitled to presumption against preemption, include the protection of citizens' health and safety), *affirmed*, 529 U.S. 861 (2000).[8]

Common law and statutory remedies regulating monopolies and unfair business practices in the interests of consumer protection—like the Act here—are areas traditionally governed by

---

[8]    That presumption also explicitly applies to federal patent law. *See Webber v. Virginia*, 103 U.S. 344, 347–48 (1880):

> Congress never intended that the patent laws should displace the police powers of the States, meaning by that term those powers by which the health, good order, peace, and general welfare of the community are promoted. Whatever rights are secured to inventors must be enjoyed in subordination to this general authority of the State over all property within its limits.

the states, and hence cannot be preempted without a "clear and manifest" expression of congressional purpose. *State of California v. ARC America Corp.*, 490 U.S. 93, 101–102 (1989).

The Act was passed under the District's police power authority. *See* PEx. 1; 52 D.C. Reg. at 9061. Plaintiff has failed to present any evidence of a "clear and manifest" expression in federal patent law to preempt the Act here.

The scope of federal preemption asserted by plaintiff is unclear. There are at least three types of preemption: (1) "express preemption," where a federal statute contains explicit preemptive language, (2) "field preemption," where Congress evinces an intent to occupy an entire field and the state law is within that field, or (3) "implied conflict preemption," where compliance with both federal and state law "is a physical impossibility" or the state law is an "obstacle" to the purposes of Congress. *Gade v. Nat'l Solid Wastes Mgmt.*, 505 U.S. 88, 98 (1992) (citations omitted).

Federal preemption can be express or implied. *Armstrong v. Accrediting Council for Continuing Education and Training, Inc.*, 168 F.3d 1362, 1369 (D.C. Cir. 1999) (*citing Cipollone v. Liggett Group, Inc*., 505 U.S. 504, 516–17 (1992) (express preemption if federal statute contains explicit preemption language)).

"Conflict preemption" occurs to the extent a non-federal law actually conflicts with federal law, or where non-federal law is an "obstacle" to the execution of federal law. *Armstrong*, 178 F.3d at 1369; *see also, e.g., Geier*, 529 U.S. at 873–74. Conflict preemption requires "identification of 'actual conflict,' and not on an express statement of pre-emptive intent." *Id*. at 884 (citations omitted). *See also, e.g., Jones*, 430 U.S. at 540 (no conflict preemption if it is possible to comply with local law "without triggering federal enforcement action.").

The Act is not expressly preempted, because plaintiff has not pointed to any federal statute explicitly forbidding what the District has done. There is no express preemption of any regulation of excessive pricing by federal patent law because the language of the Patent Act grants only a right to exclude others from the use of patented technology. *See* 35 U.S.C. § 154 ("Every patent shall contain a . . . grant to the patentee . . . of the right to exclude others from making, using, offering for sale, or selling the invention . . . .").

Plaintiff has similarly failed to meet the difficult burden established by "conflict preemption" case law—there is no "actual conflict" between the Act and federal patent law. Plaintiff does not (and cannot) argue that it is impossible to comply with federal patent law and the Act at the same time.

On a facial challenge, the conflict between the state and federal law must be the inevitable, and not merely a possible, outcome; the state law must "require or authorize conduct that necessarily constitutes a violation" of federal law "*in all cases.*" *Rice v. Norman Williams Co.*, 458 U.S. 654, 661 (1982) (emphasis added).[9]

In a similar recent matter, the Supreme Court has affirmed the role of states in efforts to control healthcare costs, rejecting the preemption arguments raised by the same plaintiff. In *PhRMA v. Walsh*, 538 U.S. 644 (2003), the instant plaintiff appealed a decision of the First Circuit, challenging Maine's attempt to "reduce prescription drug prices for residents of the State," alleging that the Maine law was preempted by federal law and violated the Commerce

---

[9]     *Cf. PhRMA.*, 538 U.S. at 682 (Thomas, J., concurring): "The disagreement between the plurality and dissent in this case aptly illustrates why '[a] freewheeling judicial inquiry into whether a state statute is in tension with federal objectives . . . undercut[s] the principle that it is Congress rather than the courts that pre-empts state law.") (*quoting Gade v. National Solid Wastes Management Assn.*, 505 U.S. 88, 111 (1992) (Kennedy, J., concurring in part and concurring in judgment)).

Clause. *Id.* at 653. The Maine law required drug manufacturers to sell their products at the Medicaid-negotiated price in non-Medicaid transactions, and imposed restrictions on firms that refused to do so. *Id.* at 649–50. The Supreme Court started with the presumption that the Maine law was valid, and ultimately affirmed the First Circuit, finding that the "mere fact" that the state law imposed a "modest impediment" to the goals of the federal legislation was insufficient to preempt the entire state program. *Id.* at 667.

> The record does demonstrate that [the Maine regulations] may well have a significant adverse impact on the manufacturers of brand name prescription drugs and that it will impose some administrative costs on physicians. The impact on manufacturers is *not relevant* because any transfer of business to *less expensive products will produce savings* for the Medicaid program.

*Id.* at 668 (emphasis added).[10]

Thus, in contrast to the instant matter, in *PhRMA* plaintiff had actually shown some potential adverse impact of the state law, but that alone was insufficient to preempt the law. Plaintiff's feared harms here are entirely speculative. In reviewing a preemption-based facial challenge, "we do not rest our decision on consequences that, while possible, are by no means predictable." *Dept. of Taxation and Fin. of N.Y. v. Milhem Attea & Bros., Inc.*, 512 U.S. 61, 69 (1994).

Here, the Act's "modest impediment" of encouraging reasonable prescription drug prices does not conflict with, and hence is not preempted by, federal patent law.

It appears, then, that plaintiff's argument is one of field preemption, *i.e.*, that federal patent law occupies the entire field of regulation of all articles containing patented technology,

---

[10]    Similarly, in *PhRMA v. Meadows*, 304 F.3d 1197 (11th Cir. 2002), the Eleventh Circuit held that federal law did not preempt Florida legislation that required drug manufacturers to agree to an additional "discount," over and above the federally imposed discount, in order to have their drugs included on the list of "preferred drugs" in the Florida Medicaid program.

displacing any state attempts to regulate the unconscionable pricing of such articles. Plaintiff's argument fails. *See, e.g., Bonito Boats*, 489 U.S. at 156.

Plaintiff's argument hinges on the assertion that federal patent law gives the patentee an *affirmative* right to use the invention in a particular manner, *i.e.*, free of any state regulation that may impact the price of that invention. *See, e.g.*, Complaint ¶ 23 ("the grant of the exclusive right to use and sell a patented product *also conveys the right to sell the product* at the market price that exclusivity permits"). Plaintiff fundamentally mischaracterizes patent law.

The right that the patent holder receives is *negative*—the right to exclude others from the use of the product, *not* the right to use the product in a certain manner. The Supreme Court has consistently interpreted patent law this way for over a century. *See Dawson Chemical Co. v. Rohm & Haas Co.*, 448 U.S. 176, 215 (1980) ("[T]he essence of a patent is the right to exclude others from profiting by the patented invention."); *Bloomer v. McQuewan*, 55 U.S. 539, 542 (1852) ("The franchise which the patent grants consists altogether in the right to exclude every one from making, using or vending the thing patented . . . . That is all that he obtains from the patent.").

As noted, states are free to regulate commerce in patented articles. *See Bonito Boats*, 489 U.S. at 156; *see also Florida Prepaid Postsecondary Educ. Expense Bd. v. College Sav. Bank*, 527 U.S. 627, 642 (1999) ("Patents . . . have long been considered a species of property" subject to state regulation). Plaintiff's argument is insupportably broad. Gasoline is produced with patented processes and contains chemical additives that are protected by patents, *see Standard Oil Co. v. United States*, 283 U.S. 163 (1931), but states are not thereby prohibited from enacting price-gouging laws that regulate the prices gas suppliers can charge.

Plaintiff has cited no cases that support its bald proposition that states (and the District) cannot regulate in ways that limit the rents that patent holders can demand for the sale of patented articles; it has certainly failed to prove a likelihood of success on this issue which would merit granting the extraordinary remedy of halting the implementation of a law before its effective date.

Of course, a state law may be subject to field preemption if it attempts to alter the balance struck by Congress between the right of exclusion that the patent affords and the right of the public to freely exploit inventive resources, for instance when a state law shortens or extends the terms of the exclusive patent right, but the Act is not such a law.

In both *Sears, Roebuck & Co. v. Stiffel Co.*, 376 U.S. 225 (1964), and *Bonito Boats, supra*, the Supreme Court invalidated state laws that offered "patent-like protection to intellectual creations which would otherwise remain unprotected as a matter of federal law." *Bonito Boats*, 489 U.S. at 156. However, those cases are utterly inapposite to the facts in the instant matter, as the Act does not—on its face—alter (or seek to alter) any federally protected property right.[11] The Act does not shorten or lengthen patent terms or otherwise alter the right to exclude granted by federal patent law. Indeed, the Act is careful to ensure that patent holders have every opportunity to justify their prices.

Defendants are unaware of *any* Supreme Court decision striking down a traditional unconscionable pricing law or other limitation on the abuse of market power based on preemption by federal patent law, and plaintiff has cited none.

---

[11]     *See id.* ("[O]ur decisions since *Sears* have taken a decidedly less rigid view of the scope of federal pre-emption under the patent laws . . . ."). *See also, e.g., Mickowski v. Visi-Trak Worldwide, Inc.*, 415 F.3d 501, 510 (6th Cir. 2005) (Supreme Court precedent "suggests that there need not be complete, national uniformity in the protection of patent rights.") (*discussing Goldstein v. California*, 412 U.S. 546, 558–60 (1973)).

3.      *The Act Does Not Violate the Commerce Clause*

Plaintiff alleges that the Act violates the Commerce Clause because it regulates commerce that takes place "wholly outside" the District. P.Mem. at 24–26. Plaintiff is incorrect.

Plaintiff does not argue that the Act either discriminates against or unduly burdens interstate commerce. Instead, it relies entirely on the argument that the Act regulates conduct outside the District, because all plaintiff's members are located outside the District, as are the drug wholesalers they sell to.

Plaintiff has clearly "misconstrued the role of" the Commerce Clause here. *SEIU v. District of Columbia*, 608 F.Supp. 1434, 1437 (D.D.C. 1985).[12] The fact that most (or all) drug manufacturers or wholesalers are located outside the District is completely incidental to the purpose and effect of the Act, which would be the exactly the same if all the manufacturers and wholesalers were located within the District.

The Supreme Court has regularly reaffirmed that "the States retain authority under their general police powers to regulate matters of legitimate local concern, even though interstate commerce may be affected." *Maine v. Taylor*, 477 U.S. 131, 138 (1986). It can no longer be

---

[12]      *See id.*:

[P]laintiff has made no showing whatever of the burden, if any, imposed by these regulations on interstate commerce. Cases in which local regulations or state laws have been struck down as violative of the commerce clause typically involve protectionist measures designed to insulate local industries against competition from outside the state, or discriminate against out-of-state dealers by, for example, refusing to license them for in-state operations. [P]laintiff has made no showing that these regulations will have any effect on out-of-state vendors different in any way from the effect on local vendors.

*Id*. (citations omitted).

reasonably questioned that, since the abolition of the "original package" doctrine, states may regulate transactions that wind up within their borders. *See, e.g., Camps Newfound/Owatonna, Inc. v. Town of Harrison, Maine*, 520 U.S. 564, 633–34 (1997) (*discussing Michelin Tire Corp. v. Wages*, 423 U.S. 276 (1976) (overturning doctrine that prohibited states from taxing imported articles so long as those articles remained in their original packages)).

In the typical case in which state laws have been struck down as violating the Commerce Clause, the law is usually a protectionist measure designed to insulate local industry from out-of-state competition, by burdening the flow of articles in interstate commerce. *SEIU*, 608 F.Supp. at 1437 (citing cases).

Here, the Act is not a protectionist law, and it does not suppress competition.

On its face, the Act does not favor intra-District economic interests over out-of-state ones, hence the *per se* rule of invalidity has no application here. P.Mem. at 26. *See, e.g., Oregon Waste Sys., Inc. v. Dept. of Environmental Quality*, 511 U.S. 93 (1994) (state law imposed higher disposal fee on out-of-state waste).

The District residents who need prescription drugs are not engaged in interstate commerce, and the reduction in drug prices is not designed to and will not build up "domestic" commerce at the expense of the industry and business of other states. The dormant Commerce Clause prohibits state laws that "benefit in-state economic interests by burdening out-of-state *competitors*." *West Lynn Creamery, Inc. v. Healy*, 512 U.S. 186, 192 (1994) (emphasis added). Here, no out-of-District competitors are burdened, nor are out-of-District consumers.

The Act "regulates evenhandedly with only 'incidental' effects on interstate commerce" and does not "discriminate against interstate commerce either on its face or in practical effect." *Oregon Waste*, 511 U.S. at 99.

The Act clearly ties its reach only to the District, PEx. 1 at 2, and does not have the impermissible "extraterritorial reach" proscribed by case law. *See Healy v. Beer Inst.*, 491 U.S. 324, 334 (1989). If a transaction occurs entirely outside the District, the Act has no application, and hence the District is not seeking to "project its legislation" into other States. *Baldwin v. G.A.F. Seeling, Inc.*, 294 U.S. 511, 521 (1935).

In *In re Brand Name Prescription Drugs Antitrust Litigation*, 123 F.3d 599 (7th Cir. 1997), the Seventh Circuit held that the Commerce Clause did not prohibit Alabama from enforcing its antitrust statute in a case alleging price-fixing of prescription drugs, even though "it is doubtful that any of the price-fixed sales attacked in the suit took place in intrastate rather than interstate commerce." *Id*. at 612. The Seventh Circuit reaffirmed the obvious—that a state cannot regulate transactions that take place wholly outside it, *id*. at 613, but *upheld* application of the Alabama antitrust statute "insofar as it challenges sales from other states to pharmacies in Alabama," so long as there are a "nontrivial number of such sales . . . ." *Id*. Similarly here, the District's Act does not regulate any transactions that occur wholly outside the District, but seeks only to regulate sales of prescription drugs "from other states" to consumers in the District, hence it has *no* "extraterritorial" effect. *See also In re Lorazepam & Clorazepate Antitrust Litigation*, 295 F.Supp.2d 30, 48 (D.D.C. 2003) (holding that Illinois antitrust law extends to activities that occur wholly within Illinois as well as "to activity which may have effects in that state and which may have occurred, in part, outside of Illinois.") (*citing, inter alia, In re Brand Name Prescription Drugs, supra*).

Plaintiff admits that there are a nontrivial number of direct transactions between drug manufacturers and buyers in the District, including HMOs, hospitals, and the government. *See* Declaration of Asha Soto, dated Oct. 6, 2005, ¶ 5; Declaration of Nick Marmontello, dated Oct.

3, 2005, ¶ 4; Declaration of Robert Belknap, dated Oct. 4, 2005, ¶ 4; Declaration of Marjorie E. Powell, dated Oct. 11, 2005, ¶ 7. These transactions are clearly subject to District regulation without transgressing the Commerce Clause.

The "extraterritorial effect" alleged by plaintiff, P.Mem. at 25–26, even if proven, amounts to no more than the upstream pricing impacts of a state regulation, which might result from *any* regulation by any state, and thus the Act has been of a kind long upheld by the courts. *See, e.g., Osborn v. Ozlin*, 310 U.S. 53, 62 (1940) ("[t]he mere fact that state action may have repercussions beyond state lines is of no judicial significance so long as the action is not with that domain which the Constitution forbids.").

While out-of-District prices of prescription drugs may be indirectly affected by the Act, out-of-District actors (like plaintiff's members) remain free to conduct commerce on their own terms elsewhere, without either scrutiny or control by the District.

Plaintiff essentially argues that the Act will harm its members' profits. But as the First Circuit noted in *PhRMA v. Concannon*, 249 F.3d 66, 82 (1st Cir. 2001), "simply because the manufacturers' profits might be negatively affected by [state law] does not necessarily mean that [the law] is regulating those profits."[13] That court also noted that "the fact that a law may have 'devastating economic consequences' on a particular interstate firm is not sufficient to rise to a Commerce Clause burden." *Id.* at 84 (*quoting Instructional Sys., Inc. v. Computer Curriculum Corp.*, 35 F.3d 813, 826 (3rd Cir. 1994)). *See also Exxon Corp. v. Governor of Md.*, 437 U.S. 117, 127–28 (1978) (Commerce Clause "protects the interstate market, not particular interstate firms, from prohibitive or burdensome regulations."); *PhRMA*, 538 U.S. at 668.

---

[13]     The Supreme Court subsequently upheld the First Circuit's Commerce Clause analysis. *PhRMA*, 538 U.S. at 669–70.

The Act does not control any out-of-District transaction. Drug manufacturers and wholesalers subject to the Act may transact business anywhere outside the District with any entity they choose, and on any terms they can negotiate.

Plaintiff relies on well-known Supreme Court precedent for the unremarkable proposition that a state law that regulates "commerce occurring beyond the boundaries of that state" is *per se* invalid. P.Mem. at 26 (*citing Brown-Forman Distillers Corp. v. New York State Liquor Authority*, 476 U.S. 573 (1986) and *Healy, supra*). While plaintiff is correct as to that general proposition for laws that "directly regulate" interstate commerce, the Act here cannot have the effects ascribed to it.

When a state regulates internal matters, and the state law has some external effects, that fact alone does not render the law *per se* invalid. *CTS Corp. v. Dynamics Corp.*, 481 U.S. 69, 81 (1987). *See also Head v. New Mexico Bd. of Examiners in Optometry*, 374 U.S. 424, 428 (1963) ("[l]egislation . . . may affect commerce and persons engaged in it without constituting a regulation of it, within the meaning of the Constitution.") (citation and internal quotation marks omitted).[14]

"While a State may seek lower prices for its consumers, it may not insist that producers or consumers in other States surrender whatever competitive advantages they may possess."

---

[14]    *See also District of Columbia v. Beretta USA Corp.*, 827 A.2d 633, 658 (D.C. 2004) (*en banc*):

> Differences in the conditions and risks of doing business from state to state are in part the inevitable result of any state economic regulation, but the effects that these differences have on commercial decisions, even those that involve interstate trade, are not by themselves nearly so direct as to 'affect commerce' in the constitutional sense.

*Id.* (*quoting Bowman v. Niagara Mach. & Tool Works, Inc.*, 832 F.2d 1052, 1056 (7th Cir.1987) (emphasis in original)).

*Healy*, 491 U.S. at 333 (*quoting Brown-Forman*, 476 U.S. at 580). Here, while the Act certainly seeks lower prices for the District's consumers, it does not require producers or consumers in *any other state* to surrender any "competitive advantages" they may possess. The issue in *Brown-Forman* and *Healy* was not simply that a state law set a price; the laws there tied in-state retail prices to retail prices *in other states*. The Act is distinguishable, then, on that basis alone. Plaintiff's members remain free to set their prices elsewhere in the United States at whatever level the market will bear. *See, e.g., Healy*, 491 U.S. at 336 ("a State may not adopt legislation that has the practical effect of establishing '*a scale of prices for use in other states*,'") (emphasis added) (*quoting Baldwin v. G.A.F. Seelig, Inc.*, 294 U.S. 511, 528 (1935)).

The Act does not establish a "scale of prices" for use in other states, nor is the Act tied to any other state's prices. The "practical effect" of the Act is not to control conduct beyond the boundaries of the District. *Brown-Forman*, 476 U.S. at 579.[15] *See also Healy*, 491 at 345 ("innumerable valid state laws affect pricing decisions in other States—even so rudimentary a law as a maximum price regulation.") (Scalia, J., concurring).

---

[15]    The Supreme Court has also directed that the "practical effect" must be considered in terms of what might happen if "not one, but many or every, State adopted similar legislation" because the Commerce Clause prohibits "inconsistent legislation arising from the projection of one state regulatory regime into the jurisdiction of another State." *Healy*, 491 U.S. at 336–37 (citations omitted). Here, because the Act does not tie District prices to the prices of any other state, it will not have the forbidden "extraterritorial effect" under the Commerce Clause; every other state may enact similar legislation without the feared "price gridlock," because intrastate prices are *not tied* to any particular state's prices. *Id.* at 340; *see also id.*, 491 U.S. at 336–37 (state law is invalid because it forces out-of-state merchants to seek New York approval before undertaking an out-of-state transaction).

This Circuit itself has rejected the implicit argument that plaintiff makes here—that the Commerce Clause "requires manufactures to charge the same prices both within and without" a state (or the District). *PhRMA v. Thompson*, 362 F.2d 817, 819 (D.C. Cir. 2004).[16]

Plaintiff alleges a number of ways the Act could conceivably affect interstate commerce. *See* P.Mem. 24–28. But plaintiff's guesses are entirely "attenuated and speculative" as to the ultimate effect of the law. *PhRMA v. Thompson*, 362 F.3d at 827. Such a slim showing is plainly insufficient to demonstrate a violation of the Commerce Clause.

> The Act clearly does not interfere with regulatory schemes in other states. Ultimately, the [Act] simply regulates activity that occurs in state . . . the purchase of the prescription drugs. [B]ecause the regulation only applies to in-state activities, there is no extraterritorial reach and the Act is not *per se* invalid under the Commerce Clause.

*Concannon*, 249 F.3d at 82.

Finally, under the lowest level of Commerce Clause scrutiny, if a statute regulates evenhandedly and has only incidental effects on interstate commerce, as the Act plainly does, a court must balance the alleged burden on interstate commerce against the putative local benefit. *Pike v. Bruce Church*, 397 U.S. 137, 142 (1970).

Moreover, state laws, like the Act here, that purport to regulate "the health, life, and safety" of its citizens are entitled to special deference in Commerce Clause analysis. *Head*, 374

---

[16]    The Circuit also found that "PhRMA's theory rests on an attenuated and speculative causal relationship between the [state-law] requirement and the price a manufacturer charges for a reference drug out-of-state and, as the district court recognized, the claimed effect, if any, "will occur only sporadically and incidentally." *Id*. at 827 (citation omitted). Here, the same attenuated and speculative causal relationship is proffered, with plaintiff failing to show how the Act will have *any* effect on out-of-state drug prices. *See also Rush Prudential HMO, Inc. v. Moran*, 536 U.S. 355, 381 n.11 (2002) ("And although the added compliance cost to the HMO may ultimately be passed on to the ERISA plan, we have said that such "indirect economic effect[s]," [*Travelers*, 514 U.S. at 659], are not enough to preempt state regulation even outside of the insurance context.").

U.S. at 428, *accord, Gen'l Motors Corp. v. Tracy*, 519 U.S. 278, 306 (1997) (Commerce Clause was "never intended to cut the States off from legislating on all subjects relating to the health, life, and safety of their citizens, though the legislation might indirectly affect the commerce of the country.") (*quoting Huron Portland Cement Co. v. Detroit*, 362 U.S. 440, 443–44 (1960) (additional citations omitted)); *Electrolert Corp. v. Barry*, 737 F.2d 110, 113 (D.C. Cir. 1984).

The "benefits" of the Act are reflected in the legislative history, and the Act's stated purpose to attempt to increase access to necessary prescription drugs. *See* Comm. Rep. *See also District of Columbia v. Beretta USA Corp.*, 847 A.2d 1127, 1149 (D.C. 2004) (D.C. Court of Appeals rejected Commerce Clause challenge to District's strict-liability law for gun manufacturers because the "strong governmental interest" is not "clearly excessive" in relation to the "fanciful" effects on interstate commerce feared by the manufacturers). Plaintiff's Commerce Clause challenge must fail.

The Supreme Court, in *PhRMA v. Walsh*, 538 U.S. 644 (2003), a case involving a state attempt to regulate prescription drug pricing, affirmed the First Circuit's ruling that the *local benefits* of a state law (*i.e.*, increasing access to prescription drugs) appeared to outweigh the law's burden on interstate commerce (*i.e.*, the loss of profits incurred by manufacturers), hence the law did not violate the Commerce Clause. *Id.* at 670; *PhRMA v. Concannon*, 249 F.3d 66, 84 (1st Cir. 2001) (local benefits are "substantial" because, without the law, "needy Maine citizens will continue to be deprived of necessary medical care because of rising prescription drug costs"), *affirmed sub. nom.*, 538 U.S. 644 (2003).

The identical interests are at issue here: increasing access to prescription drugs *vs*. a loss of profits by drug manufacturers. Thus, under the *Pike* balancing test, the Act does not unconstitutionally burden interstate commerce, and plaintiff's minimal showing here is

insufficient for emergency injunctive relief. *See PhRMA*, 538 U.S. at 671 (PhRMA "cannot obtain a preliminary injunction simply by showing minimal or quite 'modest' harm—even though Maine offered no evidence of countervailing Medicaid-related benefit") (*Breyer, J., concurring*).[17]

The Act is not discriminatory in purpose or effect, and the provision of prescription drugs to District citizens at fair prices is an important local public interest. *See, e.g., New Energy Co. of Indiana v. Limbach*, 486 U.S. 269, 279 (1988) ("[c]ertainly the protection of health is a legitimate state goal").

Plaintiff's predictions that the Act will have the opposite effect than the one intended merit little consideration.[18] The Act does not violate the Commerce Clause.

---

[17]    The District avers that the Court should spend little time studying the hypothetical and speculative impacts the Act will have on plaintiff's members' bottom lines, even if shown to be inevitable.

> It may be true that PhRMA's members have been invited into a high stakes game of public policy poker with the State of Maine and with each other. Will any member of PhRMA dare to thumb its nose at Maine and refuse to provide rebates? If this occurs, will others follow suit or will PhRMA's members turn on one another to gain a competitive advantage? Or, might a drug manufacturer simply refuse to sell its products in Maine? These are all difficult business decisions to be sure; but the prospect of making difficult business decisions in a competitive marketplace is not an injury for which one seeks redress in court.

*PhRMA v. Nicholas*, 353 F.Supp.2d 231, 242 (D.R.I. 2005) (on remand from *Walsh*, after Maine amended its law). *See also id*. at 243 ("It is not this Court's role to protect PhRMA's members from the marketplace.").

[18]    The Supreme Court has recently reaffirmed that it is not the function of courts to attempt to predict the efficacy of legislation. A unanimous Court in *Lingle v. Chevron U.S.A., Inc.*, No. 04-163, 544 U.S. ___, 125 S.Ct. 2074 (May 25, 2005), upheld Hawaii's authority to respond to concerns about the high price of gasoline by limiting the rent that multinational oil companies can charge dealers leasing company-owned stations. The Court expressly rejected language from precedent which had indicated that a "taking" would be found if the challenged action did not "substantially advance legitimate state interests . . . ." *Id*. at 2083 (*quoting Agins v. Tiburon*, 447 U.S. 255, 260 (1980)). The Court held that the *Agins* analysis was an improper

4.    *The Act Does Not Violate the Foreign Commerce Clause.*

Plaintiff alleges that the Act "impermissibly restrains foreign commerce." P.Mem. at 30. Plaintiff's argument borders on specious, and is predicated on incorrect facts. The Act will have no impact whatever on foreign commerce.

Generally, plaintiff is correct that the Commerce Clause gives Congress the exclusive power "[t]o regulate Commerce with foreign Nations" and protects foreign corporations "from state legislation inimical to the national commerce [even] where Congress has not acted . . . ." *Barclays Bank, PLC v. Franchise Tax Bd. of Calif.*, 512 U.S. 298, 310 (1994) (*quoting* U.S. Const., Art. I, § 8, cl. 3, and *Southern Pacific Co. v. Arizona ex rel. Sullivan*, 325 U.S. 761, 769 (1945)).

---

"means-ends test," because it required courts to ask "in essence, whether a regulation of private property is *effective* in achieving some legitimate public purpose." *Id.* (emphasis in original). Such a focus, said the Court,

> would also present serious practical difficulties. The *Agins* formula can be read to demand heightened means-ends review of virtually any regulation of private property. If so interpreted, it would require courts to scrutinize the efficacy of a vast array of state and federal regulations—a task for which courts are not well suited. Moreover, it would empower—and might often require—courts to substitute their predictive judgments for those of elected legislatures and expert agencies.
>
> Although the instant case is only the tip of the proverbial iceberg, it foreshadows the hazards of placing courts in this role. To resolve [plaintiff's] takings claim, the District Court was required to choose between the views of two opposing economists. [F]inding one expert to be "more persuasive" than the other, the court concluded that the [legislature's] chosen regulatory strategy would not actually achieve its objectives. [W]e find the proceedings below remarkable, to say the least, given that we have long eschewed such heightened scrutiny . . . . The reasons for deference to legislative judgments about the need for, and likely effectiveness of, regulatory actions are by now well established, and we think they are no less applicable here.

*Id.* at 2085–86 (citations omitted).

Nevertheless, states may regulate, and even impose properly apportioned taxes on, articles in foreign commerce, if the state action complies with "the special need for federal uniformity." *Wardair Canada, Inc. v. Florida Dept. of Revenue*, 477 U.S. 1, 8 (1986); *Japan Line, Ltd. v. County of Los Angeles*, 441 U.S. 434, 449 (1979) (the United States "must speak with one voice when regulating commercial relations with foreign governments.") (*quoting Michelin*, 423 U.S. at 285).

Here, quite simply, no "foreign commerce" is being regulated; the Act does not seek to influence any international transaction, it applies only to products made by domestic corporations for consumption within the District. Plaintiff's argument is based on its incorrect assertion that the Act is "tying" local prices to foreign prices. The Act simply states that a plaintiff suing under the Act can establish a *prima facie* case of excessive price by reference to prices in the referenced countries, but if that showing is made, it merely shifts the burden of proof to a defendant, giving it a "safe harbor" for claims of excessive pricing, if it can demonstrate the factors listed in the Act. *See* D.C. Official Code § 28-4554(b) (factors include "demonstrated costs of invention, development and production of the prescription drug").

Plaintiff hyperbolically claims that the Act "gratuitously invites D.C. courts to opine on the wisdom of the drug-pricing laws and healthcare policies of other sovereign nations . . . ." P.Mem. at 34. Plaintiff is plainly wrong: the Act nowhere authorizes (or even suggests) that type of analysis, but merely sets the benchmark for "excessive price" of prescription drugs in comparison to the drugs' price in other countries. Any court under the Act will have no need to examine or otherwise opine on a foreign country's laws or policies. The Act is the equivalent of tying a rate of exchange in a local currency to that published in a foreign newspaper; the rate is established by publication, *why* the foreign rate is at a given level is *irrelevant*.

Under the Act, local courts reference "foreign commerce" only to see what the relevant price is, *not* to examine or analyze the "reasons" behind the price. Plaintiff has failed to explain how the Act might lead to this forbidden "analysis." P.Mem. at 35. Of course, the Supreme Court has overturned state laws that invited "minute inquiries concerning the actual administration of foreign law" and so provided "occasions for state judges to disparage certain foreign regimes . . ." *American Ins. Assn. v. Garamendi*, 539 U.S. 396, 417 (2003) (*quoting Zschernig v. Miller*, 389 U.S. 429, 435 (1968)), but the Act is not such a law, in either purpose or effect, by its plain language.[19]

The Act here will have no effects similar to those discussed in *Garamendi*; the foreign prices for drugs are no more than a published rate which the District's prices are compared to. The *reasons* behind the foreign price levels are not (and will never become) relevant. Nothing in the Constitution prohibits the District from accepting information from other countries to determine whether monopoly suppliers of essential goods are overcharging District consumers. A determination that a price in the District is excessive will have no bearing on the rate being charged in any other country.

---

[19]    The *Garamendi* decision held preempted by the foreign Commerce Clause a California statute that required any insurers doing business in that state to disclose information about all policies sold in Europe between 1920 and 1945. *Id*. at 401. The Supreme Court held that the Holocaust Victim Insurance Relief Act was preempted, even though Congress had not acted in the area, because it interfered with the President's independent foreign-affairs responsibility, by conflicting with the "national position" contained in several executive agreements with European countries. *Id*. at 421. "Quite simply, if the [California] law is enforceable the President has less to offer and less economic and diplomatic leverage as a consequence." *Id*. at 424 (*quoting Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 377 (2000)). Here, plaintiff has failed to even allege, much less present *any* evidence of *any* "national positions" regarding trade with foreign countries in prescription drugs with which the Act conflicts, and is thus incapable of demonstrating an *actual* conflict.

"[W]e cannot conclude that 'the foreign policy of the United States—whose nuances . . . are much more the province of the Executive Branch and Congress than of this Court—is [so] seriously threatened by [the state's] practice as to warrant our intervention." *Barclays*, 512 U.S. 298 at 327 (*quoting Container Corp. of Am. v. Franchise Tax Bd.*, 463 U.S. 159, 196 (1983)).

Plaintiff has failed to show that the Act will have any effect whatever on foreign commerce, hence the Act does not violate the Foreign Commerce Clause.

B.    Plaintiff Has Suffered No Irreparable Harm.

An essential prerequisite to injunctive relief is a sufficient showing by the plaintiff that it will suffer irreparable harm if the injunctive relief is not granted. *See*, *e.g.*, *Davenport v. Int'l Brotherhood of Teamsters,* 166 F.3d 356, 360 (1999). *See also Sampson v. Murray*, 415 U.S. 61, 88–90 (1974). Plaintiff fails to make any showing of imminent, irreparable harm and therefore its motion must fail.

"Despite this flexibility, we require the moving party to demonstrate at least 'some injury . . . .'" *CityFed*, 58 F.3d at 747 (*citing, inter alia, Sea Containers Ltd. v. Stena AB*, 890 F.2d 1205, 1208 (D.C. Cir. 1989) (preliminary injunction properly denied "where moving party may have been 'likely to succeed' but did not carry burden of showing irreparable harm, since 'the basis of injunctive relief in the federal courts has always been irreparable harm.'") (*quoting Sampson*, 415 U.S. at 88 and *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 506 (1959))).

In other words, if plaintiff makes no showing of irreparable injury, a court may deny its motion without considering any other factors. *CityFed*, 58 F.3d at 747. *See also PhRMA*, 538 U.S. at 671 (PhRMA "cannot obtain a preliminary injunction simply by showing minimal or quite 'modest' harm") (*Breyer, J., concurring*).

*Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985), sets forth the guiding principles for determining whether irreparable harm exists that (1) the injury must be both *certain* and *great*, not something merely feared as likely to occur at some indefinite time; (2) the injury must be of such imminence that there is a "clear and present" need for relief to prevent it; and (3) economic loss is insufficient to constitute irreparable harm unless the plaintiff's very existence is threatened. *See also Sampson*, 415 U.S. at 88–90.

All of the threatened harms alleged by plaintiff are entirely speculative and exclusively financial in nature. No factual support was presented by plaintiff, only self-serving declarations setting forth in conclusory fashion what would happen if the Act were to become law. The self-serving declarations do little but vaguely assert feared harms, with no concrete support whatever for the conjectural "injuries" the Act will allegedly entail.[20]

While it is generally true that where feared injuries are difficult to calculate, which fact might suffice to show irreparable injury, *see CSX*, 406 F.3d at 673–74, plaintiff appears to think that that case law excuses it entirely from *any* showing of injury. "Difficult to calculate" is not the equivalent of "just trust us."

Plaintiff has set forth insufficient proof of the alleged difficulties it will face in complying with the Act, relying instead on the conclusory statements within the declarations. Of course, excessive compliance burdens "disproportionately imposed on out-of-jurisdiction enterprises"

---

[20]    Plaintiff's claims regarding the costs of research and development should be viewed with particular skepticism. *See, e.g.*, Jeff Gerth & Sheryl Gay Stolberg, "Medicine Merchants: Birth of a Blockbuster; Drug Makers Reap Profits On Tax-Backed Research," N.Y. Times, Apr. 23, 2000, at __ (in part due to the pharmaceutical industry's reliance on taxpayer-supported research, its longstanding estimate of $500 million per drug to bring a new drug to market "is a lot of bull.") (*quoting* Dr. Nelson Levy, former head of research and development at Abbott Laboratories) (hereinafter "Gerth & Stolberg").

may violate the Commerce Clause. *Barclays*, 512 U.S. at 313.[21] But plaintiff has not detailed what its members' compliance burdens will be, except in very general terms, much less explained how those burdens are excessive or disproportionate as measured against any intra-District enterprise.

Taking the cookie-cutter declarations individually, even a cursory reading reveals the fatal flaws in plaintiff's evidentiary support.

Declarant Asha Soto states that plaintiff member Valeant will forgo selling one of its patented prescription drugs in Canada and Australia because of the Act, even though it does not currently sell the drug in those markets. Soto Decl. ¶ 4. Soto complains that the Act "injures Valeant by depriving it of future sales of Diastat in Australia and Canada." *Id*. ¶ 6. But Soto never explains how the Act will *require* it to forgo those markets; the decision not to sell in those markets, in addition to being speculative, would be unilateral, entirely Valeant's choice.

Similarly, with one exception, each of the declarations broadly asserts "under any scenario, [the company] will be injured by operation of the Act." Soto Decl. ¶ 6 (Valeant); Fish Decl. ¶ 7 (GlaxoSmithKline); Marmontello Decl. ¶ 7 (Wyeth); Belknap Decl. ¶ 5 (Boehringer-Ingelheim). The only support offered for that conclusory allegation is another conclusory allegation—that the companies will be injured unless they modify their pricing or distribution

---

[21]    In *Barclays*, a United Kingdom corporation complained that California's reporting requirement for corporate franchise taxes was overly burdensome and violated the Foreign Commerce Clause, because it forced Barclays to "convert its diverse financial and accounting records from around the world into the language, currency, and accounting principles of the United States . . . at prohibitiv[e] expense." *Id*. at 313. The Supreme Court rejected Barclays' argument, finding that it had failed to demonstrate the "inordinate compliance burdens on foreign enterprises" necessary for invalidation under the Foreign Commerce Clause, in part because the California regulations specifically required that the state take into account "the effort and expense" required to obtain the mandated information. *Id*. at 314.

Here, plaintiff has similarly failed to demonstrate any inordinate compliance burdens on out-of-jurisdiction enterprises.

practices. *See* Soto Decl. ¶ 6; Fish Decl. ¶ 7; Marmontello Decl. ¶ 7; Belknap Decl. ¶ 5. But, as a matter of law, requiring regulated entities to "modify" their operations occurs daily as a result of federal and local law, and is not, alone, "proof" of irreparable injury. *See PhRMA*, 538 U.S. at 659–60 (affirming First Circuit's finding that PhRMA's affidavits "fall short of establishing that the Act will inflict inevitable or even probable harm" and were "insufficient to support a pre-emption-based facial challenge.").

The declaration of Michael L. Broughton offers even less support, as it fails to even allege *any* harm to Eli Lilly & Co. as a result of the Act, merely describing in general terms that company's operations.

Finally, the declaration of Marjorie E. Powell is similarly unhelpful, as she is an attorney for the plaintiff, and sets forth legal conclusions, conclusory opinions, and speculation as "facts." For instance, she declares that the Act "might" cause one or more plaintiff's members to forgo selling prescription drugs in the foreign countries referenced in the Act, and that it is "possible" that out-of-District retailers and consumers could travel to the District to purchase drugs here. Powell Decl. ¶ 13. Additionally, the Powell declaration is inconsistent with facts asserted in the other declarations. *Cf. id.* ¶¶ 7, 13 (final price paid by a consumer in the District is "rarely in the manufacturer's control.") and Soto Decl. ¶ 5 ("Valeant does not control the terms of those resales."); Fish Decl. ¶ 6 ("GSK does not control the terms, including price, of any such resales."); Broughton Decl. ¶ 6 ("Lilly has no control over the terms of the resale of its products . . . ."); Belknap Decl. ¶ 4 ("Boehringer does not control the terms of those resales."). As the Powell declaration implies, and because the Marmontello declaration lacks the statement parroted in the other declarations, some pharmaceutical companies, such as Wyeth, must therefore control the terms of drug resales in the District. Any entity that controls the terms of a

sales transaction in the District is clearly subject to District law. *See, e.g., Gorman v. Ameritrade Holding Corp.*, 293 F.3d 506, 509 (D.C. Cir. 2002) (local courts may exercise "specific jurisdiction" over a corporation for claims that arise from the corporation's "transacting any business" in the District, and may exercise "general jurisdiction" over a foreign corporation as to claims not arising from the corporation's conduct in the District, if the corporation is "doing business" in the District) (citations omitted).

To the extent plaintiff fears a "barrage of private lawsuits," P.Mem. at 40, its allegations are entirely speculative, unsupported by any evidence. Moreover, these types of nebulous worries cannot—as a matter of controlling law—constitute irreparable harm. *See Alabama Power Co. v. FERC*, 993 F.2d 1557, 1567 n.5 (D.C. Cir. 1993) ("'[m]ere litigation expense, *even substantial and unrecoupable cost*, does not constitute irreparable injury.'") (emphasis added) (*quoting FTC v. Standard Oil Co.*, 449 U.S. 232, 244 (1980) (*quoting Renegotiation Bd. v. Bannercraft Clothing Co.*, 415 U.S. 1, 24 (1974)); *Ticor Title Ins. Co. v. FTC*, 814 F.2d 731, 740 (D.C. Cir. 1987) (same). *See also, e.g., Sears Roebuck & Co. v. NLRB*, 473 F.2d 91, 93 (D.C. Cir. 1972) ("Irreparable harm cannot be established by mere reliance on the burden of [litigation]. This is a risk of litigation that is inherent in society and not the type of injury to justify judicial intervention."); *East St. Louis Laborers' Local 100 v. Bellon Wrecking & Salvage Co.*, 414 F.3d 700, 704 (7th Cir. 2005) ("[T]he unease that often accompanies litigation is one of the ordinary burdens of our legal system that, like litigation expense, does not qualify as the type of injury warranting a preliminary injunction.") (*citing Bannercraft*).

Similarly, plaintiff complains of the difficulty in calculating "lost sales" (or voluntarily foregone sales) elsewhere, but that analysis is regularly calculated in ordinary contract disputes. *See, e.g., Register.Com, Inc. v. Verio, Inc.*, 356 F.3d 393, 427 (2nd Cir. 2004) ("Unlike

[*Danielson v. Local 275, Laborers Int'l Union of N. Amer.*, 479 F.2d 1033 (2nd Cir. 1973)], damages calculations based on [plaintiff's] lost business opportunities, although potentially complicated, is the type of calculation commonly required in contract disputes.") (additional citations omitted). *See also Samaritan Inns, Inc. v. District of Columbia*, 114 F.3d 1227, 1235 (D.C. Cir. 1997) ("[W]hile a plaintiff seeking to recover lost profits must ordinarily prove the fact of injury with reasonable certainty, proof of the amount of damages may be based on a reasonable estimate. [A] court will not permit a plaintiff to recover damages based on 'mere speculation or guess.'") (citations omitted).

Moreover, plaintiff makes no attempt to even estimate the costs of compliance with the Act by its members, merely relying on the vague, conclusory statements in the declarations. P.Mem. at 39. Such a showing is insufficient to support the grant of emergency injunctive relief. *See, e.g.*, *Nat'l Assn. of Psychiatric Health Sys. v. Shalala*, 120 F.Supp.2d 33, 44 & n.9 (D.D.C. 2000) (preliminary injunction denied to association and others where plaintiffs "offer[ed] no concrete, reliable evidence to support their contentions of irreparable harm."); *id.* (most of the evidence of the cost of compliance came from declarations, and, although rule has been in effect for more than a year, "Plaintiffs offer no economic data as to what, if any, adverse effects they or their clients have suffered.").[22]

---

[22]    While *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374 (1992) indicated that injunctive relief may be appropriate where state enforcement actions of unconstitutional laws are imminent and repetitive penalties attach, the Supreme Court also cautioned against courts' uncritical acceptance of plaintiff's overbroad allegations in fashioning emergency injunctive relief:

> In suits such as this one, which the plaintiff intends as a "first strike" to prevent a State from initiating a suit of its own, the prospect of state suit must be imminent, for it is the prospect of that suit which supplies the necessary irreparable injury. [W]e have recognized in a related context that a conjectural injury cannot warrant equitable relief. Any other rule (assuming it would meet Article III case-or-

It is well-documented that pharmaceutical companies spend more on marketing and administrative expenses than on research and development. *See, e.g.*, Gerth & Stolberg at __ ("Pharmacia spent 40% of its overall revenue on marketing and administrative expenses last year, more than twice what it spent on research."); Prescription Drug Trends, *supra* (drug manufacturers spent $25.3 billion for advertising in 2003); 145 Cong. Rec. S8395-01, at S8398 (July 18, 2005) (statement of Sen. Dorgan):

> [T]he drug industry says they charge that price in the United States because they can and because they must in order to gather the funds for research and development. But, of course, the record shows that is not the case either. The drug industry actually spends more money on marketing and advertising than they do on research and development. And they actually spend about the same amount on research and development in Europe that they do in the United States when, in fact, in Europe they charge lower prices for exactly the same prescription drugs.

*Id.*[23]

Consequently, plaintiff's argument that its members need excessive profits "to recoup research and development outlays," P.Mem. at 2, must be viewed with suspicion, even if that allegation had been supported by evidence.

---

> controversy requirements) would require federal courts to determine the constitutionality of state laws in hypothetical situations where it is not even clear the State itself would consider its law applicable. This problem is vividly enough illustrated by the blunderbuss injunction in the present case, which declares pre-empted "any" state suit involving "any aspect" of the airlines' rates, routes, and services. As petitioner has threatened to enforce only the obligations described in the guidelines regarding fare advertising, the injunction must be vacated insofar as it restrains the operation of state laws with respect to other matters.

*Id.* at 382–83 (citations omitted).

[23]    *See also* Jonathan P. Glazier, Note, "The Drug Pricing Controversy: A Review of Actions Taken by the Pharmaceutical Industry and the Federal and State Governments," 1 J. Health & Biomedical L. 163, 165 (2004) ("Current industry spending on marketing averages around 30–40 percent of pharmaceutical industry budgets.") (footnote omitted).

That there can be no irreparable harm from financial losses, even if substantial, has been firmly established by the Supreme Court, the D.C. Circuit, and nearly every federal court of appeals. That overwhelming precedent holds that loss of income and its attendant financial consequences do not, as a matter of law, constitute irreparable harm. *Sampson v. Murray,* 415 U.S. at 90–91; *Virginia Petroleum Jobbers Ass'n*, 259 F.2d at 925; *Davenport v. International Brotherhood of Teamsters,* 166 F.3d at 367; *National Treasury Employees Union v. United States*, 927 F.2d 1253, 1256 (1991); *Taylor v. RTC*, 56 F.3d 1497, *amended by* 66 F.3d 1226 (D.C. Cir. 1995); *Chilcott v. Orr,* 747 F.2d 29 (1st Cir. 1984); *Jayaraj v. Scappini*, 66 F.3d 36 (2nd Cir. 1995); *Guitard v. Sec'y of Navy,* 967 F.2d 737 (2nd Cir. 1992); *Guerra v. Scruggs,* 942 F.2d 270 (4th Cir. 1991); *Smallwood v. Jefferson County, Ky.,* 1996 U.S. App. LEXIS 24221 (6th Cir. 1996); *Hetreed v. Allstate*, 135 F.3d 1155 (7th Cir. 1998); *Adam-Mellang v. Apartment Search, Inc.*, 96 F.3d 297 (8th Cir. 1996); *Christie v. Garrett,* 1992 U.S. App. LEXIS 7108 (9th Cir. 1992).

"Recoverable monetary loss may constitute irreparable harm *only* where the loss threatens the very existence of the movant's business." *Washington Gas Co.*, 758 F.2d at 674 (emphasis added). Plaintiff has utterly failed to meet this standard.

Plaintiff has also failed to establish the factual predicate underlying its claims of irreparable injury—that it is (or will soon be) in violation of the law. Moreover, there is no "imminence" here in any sense of the word, as the Council's prediction of January 10, 2006, is the *earliest* date the Act can go into effect, absent congressional action.[24]

---

[24]    While some have called for Senate confirmation hearings before the end of the year on the pending Supreme Court nominee, others indicate that such a scenario seems unlikely. *See, e.g.,* David D. Kirkpatrick, "Court In Transition: The Overview; Judge Said He Struggled On '91 Abortion Opinion," N.Y. TIMES, Nov. 3, 2005, at A24.

Plaintiff asserts that merely being subject to an unconstitutional law is, itself, irreparable injury. P.Mem. at 36. Plaintiff is incorrect, which may perhaps be inferred in that plaintiff cites, as its first authority for that proposition, a legal treatise and not controlling case law. Imminent violation of constitutional rights does not, by itself, constitute irreparable injury.

Controlling precedent makes clear that the *Elrod* analysis is limited to cases involving the pre-exercise deprivation of First Amendment rights. *Elrod v. Burns*, 427 U.S. 347, 373–74 (1976) (plurality opinion). In *Elrod*, the Supreme Court specifically held that the pre-exercise deprivation of First Amendment freedoms, for even a minimal period of time, constituted irreparable injury. *Id*. at 374. *Cf. Morales*, 504 U.S. at 382 (the prospect of an "imminent" state civil or criminal enforcement suit of an unconstitutional law may comprise the necessary irreparable injury to qualify for emergency injunctive relief).

Plaintiff's contentions in this regard are supported only by the self-serving declarations, which are insufficient as a matter of law to support the grant of emergency injunctive relief. *Wagner v. Taylor*, 836 F.2d 566, 577 n. 76 (D.C.Cir.1987) ("[I]n cases involving a claim by movant of interference with protected freedoms or other constitutional rights, . . . the finding of irreparable injury cannot meaningfully be rested on a mere contention of a litigant."); *Veitch v. Danzig*, 135 F.Supp.2d 32, 37 (D.D.C. 2001) (violation of constitutional rights is not itself an irreparable harm) (*citing Elrod*); *Ashland Oil, Inc. v. FTC*, 409 F.Supp. 297, 307 (D.D.C. 1976) ("[T]he required showing of irreparable injury is not eliminated simply by virtue of a claim alleging violation of statutory or constitutional rights."), *aff'd*, 548 F.2d 977 (D.C.Cir.1976).

There is considerable persuasive precedent directly *contrary* to plaintiff's argument. *See Siegel v. LePore*, 234 F.3d 1163, 1177 (11th Cir. 2000) (*en banc*) (rejecting plaintiff's contention that "violation of constitutional rights always constitutes irreparable harm."); *Morton v. Beyer*,

822 F.2d 364, 372 (3rd Cir. 1987) (in context of preliminary injunction, affirming district court's finding that while plaintiff was likely to succeed on due process claim, there was no basis for a finding of irreparable injury); *Public Service Co. of New Hampshire v. Town of West Newbury*, 835 F.2d 380, 382 (1st Cir. 1987) (alleged denial of due process, without more, does not "automatically trigger" a finding of irreparable injury).

Plaintiff has not—and cannot—cite precedent from this Circuit (or anywhere else) which applies the "*per se* irreparable harm" theory it advances. Plaintiff's feared injuries are chiefly economic in nature and, even if those injuries and the constitutional allegations were proven, do not entitle plaintiff to emergency injunctive relief.

Plaintiff has failed to establish imminent, irreparable harm.


C.    The Balance of Equities Favors Denying Injunctive Relief.

Plaintiff asks this Court to take the extraordinary act of forbidding the District from exercising its authority to enact laws to protect its citizens. The balance of equities tips decidedly in favor of the defendants where plaintiff essentially is asking this Court to issue a mandatory injunction at the onset of the case. In other words, plaintiff seeks the ultimate relief at the beginning of the litigation. An injunction would substantially injure the District, its citizens, and, potentially, the legislative process. "[A]ny time a State [or local government] is enjoined by a court from effectuating statutes enacted by the representatives of its people, it suffers a form of irreparable injury." *New Motor Vehicle Board of California v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977) (Rehnquist, J., in chambers); *District of Columbia v. Greene*, 806 A.2d 216, 233 (D.C. 2002) (*per curiam*) (*quoting New Motor Vehicle*).

In these circumstances, the District of Columbia enjoys the balance of the equities in its favor.

D.    The Public Interest Favors the District.

It should go without saying that the public interest is served by allowing the District to attempt to protect its citizens from the spiraling costs of health care. The Act represents the legislature's reasonable action taken in the public interest. The District of Columbia acts in its role "as a guardian and trustee for its people." *White v. Mass. Council of Constr. Employers*, 460 U.S. 204, 207 n.3 (1983). The District is attempting to tackle a complex issue of great public importance, the regulation of prescription drug prices.

It is plaintiff's financial self-interest, not the public interest, which is at the root of this complaint. The public interest here therefore favors the denial of injunctive relief.

III. Conclusion

"The problems confronting society in these areas are severe, and state governments, in cooperation with the Federal Government, must be allowed considerable latitude in attempting their resolution." *PhRMA*, 538 U.S. at 667 (*quoting New York State Dept. of Social Servs. v. Dublino*, 413 U.S. 405, 413 (1973)).

> To stay experimentation in things social and economic is a grave responsibility. Denial of the right to experiment may be fraught with serious consequences to the nation. It is one of the happy incidents of the federal system that a single courageous state may, if its citizens choose, serve as a laboratory; and try novel social and economic experiments without risk to the rest of the country. This Court has the power to prevent an experiment. [B]ut, in the exercise of this high power, we must be ever on our guard, lest we erect our prejudices into legal principles. If we would guide by the light of reason, we must let our minds be bold.

*New State Ice Co. v. Liebmann*, 285 U.S. 262, 310 (1932) (Brandeis, J., dissenting) (footnote omitted).

Plaintiff has failed to satisfy the requisite elements of the four-part test for emergency injunctive relief. Accordingly, its motion for a preliminary injunction should be denied.

DATE: November 3, 2005          Respectfully submitted,

                                         ROBERT J. SPAGNOLETTI
                                         Attorney General, D.C.

                                         GEORGE C. VALENTINE
                                         Deputy Attorney General, D.C.
                                         Civil Litigation Division

                                             /s/ Robert Utiger
                                         ROBERT UTIGER, D.C. Bar No. 437130
                                         Senior Assistant Attorney General
                                         Civil Litigation Division
                                         Office of the Attorney General for the District of Columbia
                                         441 Fourth Street, N.W., 6th Floor South
                                         Washington, D.C. 20001
                                         Telephone: (202) 724-6532
                                         Facsimile: (202) 727-3625
                                         robert.utiger@dc.gov

                                             /s/ Richard S. Love
                                         RICHARD S. LOVE, D.C. Bar No. 340455
                                         Chief, Equity I
                                         441 Fourth Street, N.W., 6th Floor South
                                         Washington, D.C. 20001
                                         Telephone: (202) 724-6635
                                         Facsimile: (202) 727-0431
                                         richard.love@dc.gov

                                             /s/ Andrew J. Saindon
                                         ANDREW J. SAINDON, D.C. Bar No. 456987
                                         Assistant Attorney General
                                         Equity 1
                                         441 Fourth Street, N.W., 6th Floor South
                                         Washington, D.C. 20001
                                         Telephone: (202) 724-6643
                                         Facsimile: (202) 727-0431
                                         andy.saindon@dc.gov