IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| PHARMACEUTICAL RESEARCH AND MANUFACTURERS OF AMERICA | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil Action No. 05-2015 |
| THE DISTRICT OF COLUMBIA, et al., | ) ) ) | |
| Defendants. | ) ) | |
| BIOTECHNOLOGY INDUSTRY ORGANIZATION, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil Action No. 05-2106 |
| THE DISTRICT OF COLUMBIA, et al., | ) ) ) | |
| Defendants. | ) ) | |

**PHRMA'S AND BIO'S REPLY MEMORANDUM IN SUPPORT
OF THEIR MOTIONS UNDER RULE 65(a)(2) AND RULE 57
FOR AN ORDER THAT THE MERITS OF THEIR ACTIONS FOR DECLARATORY
JUDGMENT BE ADVANCED AND CONSOLIDATED WITH THE HEARING OF
THEIR APPLICATIONS FOR PRELIMINARY INJUNCTION**

Plaintiffs Pharmaceutical Research and Manufacturers of America ("PhRMA") and Biotechnology Industry Organization ("BIO") (collectively, "plaintiffs") submit this reply in support of their motions to consolidate the November 18, 2005 hearing on their Motions for Preliminary Injunction with a resolution of the merits of their actions for declaratory judgment.

As PhRMA demonstrated in its memorandum in support of its motion, proceeding directly to summary judgment is both appropriate and necessary. It is appropriate because this challenge to the D.C. Prescription Drug Excessive Pricing Act ("the Act") is purely legal and based on a handful of indisputable facts and the obvious and intended operation of the Act itself. And a Rule 57 "speedy hearing" on the merits of plaintiffs' claims for a declaratory judgment is necessary because that is the only way plaintiffs can achieve effective relief. The Act has been published and will imminently become effective — potentially as early as the week of December 4[1] — creating the prospect of an unlimited number of enforcement actions launched against plaintiffs' members by "private attorneys general."

The District defendants present no justification for stretching these proceedings out through many months and multiple phases. *First* — having secured the denial of a TRO by assuring the Court that it could enter judgment before the Act became effective — the District's claims that genuine factual issues require discovery and make precisely such relief infeasible ring hollow. *Second*, the District's half-hearted objection that plaintiffs have not formally filed a motion for summary judgment under Rule 56 is a red herring; the District itself concedes that no such motion is necessary and that it understands full well that plaintiffs have asked that their preliminary injunction motions be treated as motions for summary judgment. *Third*, the District's claims that it needs discovery going to the merits are vague and entirely unpersuasive. *Fourth*, the District's efforts to belittle the real harms that plaintiffs' members will suffer without

---

[1] By the time of the preliminary injunction hearing on November 18, approximately 25 days of the 30-day review period will have expired. *See* http://thomas.loc.gov/home/ds/index.html (last visited Nov. 8, 2005). Even if Congress recesses for Thanksgiving thereafter, if either house then returns for any legislative days prior to the end of the year the review period will quickly expire, potentially as early as the week of December 4.

2

speedy declaratory relief are entirely undermined by its concession that a preliminary injunction alone can do nothing to stop private parties from initiating enforcement actions, seeking injunctions and treble damages, the moment the Act becomes effective.

## ARGUMENT

*1. The District Encouraged this Court to Deny a TRO on the Ground that the Case Could Be Litigated to Judgment Before the Act's Effective Date; Its About-Face Since the TRO Was Denied Is Unjustified and Inequitable.*

The District fails even to acknowledge that it has made a dramatic about-face or to explain the reversal. Both in its papers and at the in-chambers TRO hearing, the District expressly assured the Court that an injunction against publication of the Act was unnecessary because it would be possible to litigate the case and obtain final judgment before the Act became effective. *See* Defs.' Mem. in Opp. to Pl.'s Mot. for a TRO at 4, 11. Having secured denial of the TRO, the District now claims that the alternative manner of protecting plaintiffs' members that D.C. itself proposed is infeasible. This new and contrary position is both suspect and inequitable.

At the TRO stage, the District expressly argued that the Court need not enjoin publication of the Act because the Court could "invalidat[e] . . . the Act . . . *prior to its effective date*" and thereby enable PhRMA to avoid a multiplicity of private suits once the Act became effective. *See* Defs.' Mem. in Opp. to Pl.'s Mot. for a TRO at 4 (emphasis added). *See also id.* at 11 (noting the Court could "adopt[] a reasonable briefing schedule, *completed in advance of the effective date of the Act* (assuming Congress takes no action), so that the Court will have the benefit of the District's *full consideration* of the complex issues implicated here") (emphasis added). Now, the District argues just the opposite and asks the Court to postpone its consideration of the merits until well after the Act takes effect. Yet stretching out consideration of the merits will deny plaintiffs' members effective relief because no injunction this Court now

3

can issue would restrain an unlimited number of potential plaintiffs from bringing enforcement actions against PhRMA and BIO members. Even the District "fully agree[s] that any preliminary injunction barring the District from enforcing the statute would not bar lawsuits filed by third parties" while the proceedings continued, and that "only a determination that the statute is unconstitutional would provide that protection." Defs.' Mem. in Opp. to Pl.'s Consol. Mot. at 6. ("Defs.' Opp."). Having left plaintiffs' members in a position where only final declaratory relief on or shortly after the effective date can suffice in part by representing to the Court that such relief was possible, the District's turnaround should be viewed with suspicion.

   2. *The District Concedes That No Formal Rule 56 Motion Is Necessary and That It Understands PhRMA Has Sought To Have Its Preliminary Injunction Motion Treated as a Motion for Summary Judgment.*

The District makes the half-hearted and highly formalistic suggestion in a footnote that it is "hampered in analyzing the appropriateness of summary judgment in this case" because "PhRMA has not filed a motion for summary judgment under Fed. R. Civ. P. 56" or a statement of material facts not in dispute under Local Civ. R. 56.1. Defs.' Opp. at 2 n.1. To the extent the District suggests that there is some procedural obstacle to advancing consideration of the merits, it is incorrect. Even the District concedes that a formal Rule 56 summary judgment motion is unnecessary, and that in many cases it is "appropriate" simply to deem the plaintiff's preliminary injunction motion as a summary judgment motion. *Id.* As PhRMA has explained, this is such a case. Pl.'s Mem. in Suport of Mot. to Consol. at 4. Moreover, PhRMA's Memorandum in Support of its Motion To Consolidate very clearly put the District on notice that it was seeking summary judgment. *See, e.g., id.* at 1, 4-5 (case "appropriate for summary judgment"); *id.* at 4 (citing authority for "treat[ing] plaintiff's motion for a preliminary injunction as a motion for summary judgment on the merits of plaintiff's claims"). The District admits that it understands

4

full well that plaintiffs have "s[ought] to have [their] preliminary injunction motion treated as a motion for summary judgment." Defs.' Opp. at 2 n.1.

Nor is the District "hampered in analyzing the appropriateness of summary judgment" by the lack of a formal statement of material facts not in dispute. The District has had full notice of PhRMA's legal arguments from the very outset of this case, and the very few facts upon which PhRMA relies in support of its request for summary judgment are clearly set forth in PhRMA's Complaint, Memorandum in Support of its Motion for a Preliminary Injunction, Memorandum in Support of its Motion to Consolidate, and Opposition to the District's Motion for Expedited Discovery. Nevertheless, to satisfy the formal requirements of the local rules, PhRMA attaches a Rule 56.1 Statement of Material Facts Not in Dispute to this reply memorandum. These facts are entirely indisputable propositions as to which no discovery is even plausibly required:

- PhRMA's members manufacture and sell prescription drugs that are covered by a United States Patent.

- PhRMA's members are all headquartered outside the District of Columbia, and they regularly sell patented prescription drugs from facilities located outside the District of Columbia to wholesalers and warehousing retail chains also located outside of the District of Columbia. In a portion of these sales, the drugs are subsequently resold to patients in the District of Columbia.

- It is an obvious consequence of the Prescription Drug Excessive Pricing Act of 2005 that PhRMA's members will have to consider potential liability in the United States under the Act when conducting or considering the conduct of business in Australia, Canada, Germany, and the United Kingdom.

3. *Advancing Consideration of the Merits of Plaintiffs' Claims Is Appropriate Because the Issues Are Entirely Legal.*

Addressing summary judgment at this time under Federal Rules of Civil Procedure 65(a)(2) and 57 is appropriate because the disputed issues in this case are purely legal. The District itself has tacitly recognized this: Even in its motion for expedited discovery — which

the Court properly denied — the District exclusively sought discovery "directed to the question of irreparable harm." Defs.' Reply Mem. in Supp. of Disc. at 2. The District never once identified a single merits question that supposedly turned on a disputed fact or that required discovery, even after PhRMA specifically pressed it to do so.

The District's attempts to manufacture factual disputes are entirely unpersuasive. Taking each merits argument in turn:

*Preemption.* In the federal patent and exclusivity laws, Congress has carefully calibrated the rewards available to pharmaceutical patent holders to provide what it deems the appropriate level of incentives to innovation. The basis of plaintiffs' preemption claim is that the D.C. Act creates an obstacle to achievement of Congress's objectives by eviscerating the incentives and potentially punishing those who realize them. The only fact conceivably "material" to this preemption claim is indisputable: pharmaceutical manufacturers, including plaintiffs' members, produce and sell *patented* pharmaceuticals, and those sales result in downstream sales in the District. *See* Pl.'s Stmt. of Mat. Facts ¶ 1, 2. The District cannot plausibly dispute that fact — relevant only to PhRMA's standing — and indeed has not done so. Any discovery addressed to it would be unneeded and purely dilatory.

The merits question is *not*, as the District contends, whether lower economic returns provided by the D.C. Act will deny pharmaceutical manufacturers the ability to recoup their research and development costs. *See* Defs.' Opp. at 4. To the contrary, the *only* question is whether D.C. has attempted to *modify* Congress's chosen incentive structure and to moderate its effects. The Act, on its face, purports to displace Congress's judgment by declaring the market prices of prescription drugs that are made possible by federal patents to be "excessive," and punishing those who charge them. *See* Act § 2 (§ 28-4551(1)). This alone demonstrates that the

Act "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *Jones v. Rath Packing Co.*, 430 U.S. 519, 526 (1977) (citation omitted), and thus is preempted.

*Interstate Commerce Clause.* Plaintiffs' Commerce Clause argument is that the Act is invalid because it directly regulates economic transactions taking place outside the District's boundaries. *See* Act § 2 (§ 28-4553) (making it "unlawful for any drug manufacturer . . . to sell or supply for sale . . . a patented prescription drug that results in the prescription drug being sold in the District for an excessive price"). Such direct extraterritorial regulation constitutes a *per se* violation of the Commerce Clause. *See Healy v. Beer Inst.*, 491 U.S. 324, 336 (1989) ("[A] statute that directly controls commerce occurring wholly outside the boundaries of a State exceeds the inherent limits of the enacting State's authority and is invalid regardless of whether the statute's extraterritorial reach was intended by the legislature."); *Brown-Forman Distillers Corp. v. New York State Liquor Auth.*, 476 U.S. 573, 579 (1986) ("[W]hen a state statute directly regulates or discriminates against interstate commerce . . . we have generally struck down the statute without further inquiry."); *Baldwin v. G.A.F. Seelig, Inc.*, 294 U.S. 511, 524 (1935) ("[C]ommerce between the states is burdened unduly when one state regulates by indirection the prices to be paid to producers in another . . . .").

Again, the only fact material to this legal argument relates to standing: do any of plaintiffs' members make sales outside D.C. that result in downstream sales in D.C.? *See* Pl.'s Stmt. of Mat. Facts ¶ 2. There is absolutely no disputing that they do. The District cannot reasonably suggest — and does not appear to suggest — that there is any dispute as to where plaintiffs' members or the major wholesalers and warehousing chains who receive

7

manufacturers' shipments are located. Again, discovery on this topic would produce only delay and resultant injury to plaintiffs' members.

The District attempts to manufacture a disputable factual issue by looking at the wrong branch of Commerce Clause doctrine. The District suggests that the Act's validity under the Commerce Clause "must rest on the balance between the burden placed on interstate commerce by the Act against the local benefit." Defs.' Opp. at 4 (citing *Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970)). But this test applies to state legislation whose "effects on interstate commerce are only incidental." *Pike*, 397 U.S. at 142. The D.C. Act does not affect interstate commerce only "incidentally," however; it regulates extraterritorial transactions *directly*. As such, it is *per se* invalid without regard to any such balancing. *See, e.g. Baldwin*, 294 U.S. at 524. ("[C]ommerce between the states is burdened unduly when one state regulates by indirection the prices to be paid to producers in another . . . .").

*Foreign Commerce Clause.* Plaintiffs allege that the Act violates the Foreign Commerce Clause in two independent ways — by improperly tying prices for patented pharmaceutical products in the District to the prices in four foreign countries, and by impeding the federal government's ability to conduct foreign relations. Both challenges rely only on the text of the Act and its obvious and intended effects. *See* Pl.'s Stmt. of Mat. Facts ¶ 3.

As to the first claim, the Act itself expressly ties prices in the District to the prices in four foreign countries. *See* Act § 2 (§ 28-4554(a)). The Supreme Court has repeatedly made clear that this type of extrajurisdictional price-linking violates the Interstate Commerce Clause, *see, e.g., Healy,* 491 U.S. at 337-38, and the Court has further held that the restrictions imposed by the Foreign Commerce Clause are even tighter than those of its interstate counterpart. *See, e.g., Japan Line, Ltd. v. County of Los Angeles*, 441 U.S. 434, 448-49 (1979). Nothing about this

legal infirmity of the Act turns on disputed facts; it turns solely on the terms of the Act. The company declarations stating that — as a result of the D.C. Act — companies will be forced to take potential U.S. liability into account when deciding whether to sell in the countries singled out in the Act merely confirm the obvious effect of these unconstitutional provisions. The District cannot seriously dispute that the Act will force pharmaceutical companies to consider whether to sell in foreign markets when those foreign sales could create huge liabilities for them in the United States. Discovery directed to this issue, like the others, would serve only to harass and delay.

Plaintiffs' second foreign commerce clause claim is also purely legal. The Supreme Court has made clear that state statutes inviting local courts to opine on the wisdom of foreign regulations impinge on the federal government's exclusive constitutional power to conduct foreign affairs. *See Zschernig v. Miller*, 389 U.S. 429 (1968). Whether the Act has this effect is a pure issue of law, and is obvious from the face of the Act. The Act inevitably requires courts in D.C. to consider the reasonableness of pharmaceutical prices in relation to the drug regimes established in other countries. Act § 2 (§ 28-4554(b)). Courts will be unable to perform this analysis without determining such politically sensitive issues as whether foreign jurisdictions allow manufacturers to recover reasonable or appropriate costs.

    4. *The Only Way the Court Can Grant Plaintiffs Effective Relief Is To Issue a Declaratory Judgment Contemporaneously with the Act's Taking Effect.*

The District's opposition makes plaintiffs' case. The District concedes that — now that the Act has been published over PhRMA's request for a TRO — preliminary relief cannot protect plaintiffs' members from being hit with a potentially unlimited number of private lawsuits seeking to enforce the Act once it takes effect, and that only a final declaratory judgment can suffice to afford real protection against them: "Defendants fully agree that any

9

preliminary injunction barring the District from enforcing the statute would not bar lawsuits filed by third parties, only a determination that the statute is unconstitutional would provide that protection." Defs.' Opp. at 6.  Moreover, the Court can fairly assume that in the face of these lawsuits, plaintiffs' members will do as the Act intends and reduce prices in an effort to avoid ruinous liability. *See Geier v. American Honda Motor Co.*, 529 U.S. 861, 882 (2000) ("[T]his Court's pre-emption cases do not ordinarily turn on such compliance-related considerations as whether a private party in practice would ignore state legal obligations . . . . Rather, this Court's pre-emption cases ordinarily *assume* compliance with the state-law duty in question."); Pl.'s Mem. in Support of PI at 38-39.

The District's suggestion that the injuries resulting from this inevitable wave of litigation are not "irreparable" is both wrong and beside the point.  It is wrong because the burden of complying with this unconstitutional law will impose economic costs that cannot be recouped because those losses will be too difficult to calculate.  See Mem. in Support of TRO at 40 (citing *CSX Transportation, Inc. v. Williams*, 406 F.3d 667, 673-74 (D.C. Cir. 2005).  Moreover, the courts have long held that irreparable harm *does* exist where plaintiffs can obtain relief only by asserting their rights in a multiplicity of lawsuits.  *See, e.g., Lynch Corp. v. Omaha Nat. Bank*, 666 F.2d 1208, 1212 (8th Cir. 1981) ("Lynch's injury is irreparable and there is no adequate remedy at law because a multiplicity of suits would be required to gain relief.").[2]  And it is beside the point because the question at hand is whether the Court should advance its

---

[2]  *See also Roof v. Conway*, 133 F.2d 819, 827 (6th Cir. 1943) (finding injunctive relief necessary to avoid "irreparable damage" and observing that "the difficulty in estimating damages in an action at law and the likelihood of multiplicity of suits furnish ample reasons for the exercise by a court of equity of its injunctive power to restrain wrongdoing."); *Savoie v. Merchants Bank*, 84 F.3d 52, 58 (2d Cir 1996) (finding that being required to assert challenges to the statute as a defense in litigation is "so impractical as to be infeasible, and constitutes irreparable harm.").

consideration of *permanent* relief, not whether *preliminary* relief is required while the litigation proceeds. The whole point of granting declaratory relief — and the point of "order[ing] a speedy hearing of an action for declaratory judgment and . . . advanc[ing] it on the calendar" under Fed. R. Civ. P. 57 — is to help parties "avoid a multiplicity of actions by affording an adequate, expedient, and inexpensive means for declaring in one action the rights and obligations of litigants." *See* 10B Charles Allen Wright et. al., Federal Practice & Procedure, § 2751 (3d ed. 1998). Delaying declaratory relief until after the launch of a myriad of private enforcement actions would deny PhRMA's and BIO's members the very relief that the Declaratory Judgment Act is intended to provide.

Although the District maintains that this concern about a large number of private enforcement actions is "vague," Defs.' Opp. at 6, there is every reason to expect that the Act will be enforced according to its terms. The Act gives "any person directly or indirectly affected by excessive prices of patented prescription drugs, including . . . *any person or organization representing the public interest*" a right to bring suit over any patented drug any manufacturer sells. Act §2 (§ 28-4552(1)) (emphasis added). That plaintiffs' members could be subject to multiple lawsuits seeking treble damages and injunctive relief under a standing provision this broad is hardly just some inchoate "fear." Defs.' Opp. at 6. Only a declaratory judgment issued contemporaneously with the effective date can stop enforcement actions and thus provide assurance that compliance with the law's illegal demands is not required.[3]

---

[3] The option of seeking consolidation of all suits, *see* Defs.' Opp. at 6-7, is very cold comfort indeed and hardly a reason to avoid speedy declaratory relief. Although plaintiffs' members certainly may *move* to consolidate particular cases brought against them under the Act, whether consolidation will be possible depends on how future plaintiffs frame their litigation, which will determine whether the cases involve different defendants, different drugs, different sales, different research and development costs, different foreign country comparative prices, and

## CONCLUSION

Plaintiffs respectfully request that the Court advance consideration of the merits of their claims and consolidate that consideration with its hearing on plaintiffs' motions for preliminary injunction pursuant to Rules 65(a)(2) and 57.

Dated:  November 9, 2005                                  Respectfully submitted,


                                                                                                 s/  David W. Ogden
                                                                                                  s/ Randolph D. Moss
David W. Ogden (D.C. Bar No. 375951)
Randolph D. Moss (D.C. Bar No.417749)
Jonathan J. Frankel (D.C. Bar No. 450109)
WILMER CUTLER PICKERING HALE AND DORR LLP
2445 M Street, N.W.
Washington, D.C.  20037-1420
(202) 663-6000
(202) 663-6363 (facsimile)

*Counsel for Plaintiff Pharmaceutical Research and Manufacturers of America*


                                                                                                  s/ Daniel E. Troy
Daniel E. Troy (D.C. Bar No. 4425370)
SIDLEY AUSTIN BROWN & WOOD LLP
1501 K Street, N.W.
Washington, D.C. 20005
(202) 736-8000
(202) 736-8711 (facsimile)

*Counsel for Plaintiff Biotechnology Industry Organization*

---

different social benefits.  Moreover, regardless of whether the cases are consolidated, PhRMA's and BIO's members would still have to succeed in obtaining stays of any litigation in order to avoid the harms described in the text.