# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| PHARMACEUTICAL RESEARCH AND MANUFACTURERS OF AMERICA | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil Action No. 05-2015 |
| THE DISTRICT OF COLUMBIA, et al., | ) ) | |
| Defendants. | ) ) | |

| | | |
|---|---|---|
| BIOTECHNOLOGY INDUSTRY ORGANIZATION, | ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil Action No. 05-2106 |
| THE DISTRICT OF COLUMBIA, et al., | ) ) | |
| Defendants. | ) ) | |

## PLAINTIFFS' REPLY TO DEFENDANTS' OPPOSITION
## TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Plaintiffs Pharmaceutical Research and Manufacturers of America ("PhRMA") and Biotechnology Industry Organization ("BIO") (collectively "Plaintiffs") submit this Reply to Defendants' Memorandum of Points and Authorities in Opposition to Plaintiffs' Motion for Preliminary Injunction.

Defendants' submissions in opposition are remarkable less for what they say than for what they do not say. Defendants ignore many of Plaintiffs' principal arguments. In responding to Plaintiffs' preemption claim, they ignore the fact that Congress has repeatedly concluded that the public interest is best served by creating clear financial incentives for companies to undertake the enormous risk involved in researching and developing innovative pharmaceuticals. They fail to address *Baldwin v. G.A.F. Seelig, Inc.*, 294 U.S. 511 (1935) – the Commerce Clause case directly on point – and, in their latest filing, finally abandon all pretense that the Act can be defended as applied to out-of-state transactions, *see* Defs.' Supp. Mem. 5-6. In their supplemental memorandum, indeed, they finally back away entirely from their prior indefensible suggestion that a law can regulate the price at which out-of-state manufacturers sell to out-of-state wholesalers and yet not regulate out-of-state conduct. *See id.* Defendants also fail to discuss *Zschernig v. Miller*, 389 U.S. 429 (1968) – the most relevant foreign affairs power precedent. And they offer no response at all to Plaintiffs' Foreign Commerce Clause claim.

This Court, accordingly, should grant judgment for Plaintiffs or, in the alternative, enter a preliminary injunction enjoining Defendants from enforcing the Prescription Drug Excessive Pricing Act of 2005 (the "Act").[1]

---

[1]     Plaintiffs seek a preliminary injunction barring Defendants from enforcing the Act as well as declaratory and permanent injunctive relief. Plaintiffs have also filed a motion to consolidate consideration of this motion with the merits of the case, seeking summary judgment on an expedited basis on their constitutional claims. There are compelling reasons, set forth in the briefing on Plaintiffs' motion to consolidate the present Motion for Preliminary Injunction with a hearing on the merits, why the Court should issue final declaratory and injunctive relief now. In

1

**ARGUMENT**

**I.    The Act Violates the Constitution in Multiple Respects.**

**A.    Defendants Cannot Reconcile the D.C. Act With Federal Laws Designed To Create Strong Financial Incentives to Invest in Research and Development of Innovative Drugs.**

Notwithstanding Defendants' professed confusion, Defs.' Opp'n 15, the basis for Plaintiffs' preemption claim is clear: The Act conflicts with federal law. *See* PhRMA Mem. 21-24. The sole issue under conflict preemption, as Defendants concede, Defs.' Opp'n 15, is whether the Act "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Jones v. Rath Packing Co.*, 430 U.S. 519, 526 (1977) (citation omitted). The D.C. Act clearly does so.

Most strikingly, the Act is not a generally applicable state regulation of goods or prices, but rather *singles out* the price of patented products for special regulation. It targets only the prices of products covered by federal pharmaceutical patent laws and penalizes companies for doing precisely what federal law has made possible. This exclusive burdening of *patented* pharmaceuticals clearly signals the D.C. Act's purpose and function: to reduce the financial incentives that are the heart of the federal pharmaceutical patent program. The patent program and related pharmaceutical exclusivity laws reflect Congress's considered judgment that public health is best served when inventors of innovative pharmaceuticals are given the opportunity to charge the prices that the market permits during a period of exclusivity, and are thus given the

---

the alternative, Plaintiffs readily satisfy the four criteria considered by courts in awarding preliminary injunctive relief. Plaintiffs have a very high likelihood of succeeding on the merits of each of their claims. And with respect to irreparable harm – an issue that this Court will not need to address if it grants Plaintiffs' consolidation motion – it is clear that Plaintiffs' members will suffer irreparable injury from regulation by the unconstitutional Act. The balance of the hardships also tilts decidedly in Plaintiffs' favor, given that no cognizable harm will come to Defendants because of the requested relief. And a preliminary injunction would best serve the public interest by keeping regulation of the supply of and innovation in pharmaceuticals in compliance with federal law as required by the Constitution.

2

opportunity to recoup their investment and to receive a sufficient reward to induce further innovation and development. Significantly, in the field of pharmaceuticals – unlike other fields – Congress has supplemented the general patent laws to ensure that pharmaceutical companies have sufficient financial incentives to bear the enormous cost and risk of investment and has concluded that these incentives are necessary to promote the public health. The District may not second-guess that judgment and therefore may not target those incentives for reduction or other modification. *See* PhRMA Mem. 5-8, 16-19. Defendants do not dispute that the patent laws reflect Congress's "'careful balance'" among the many competing interests affected by these laws. *See* Defs.' Opp'n 13 (quoting *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 146 (1989)).[2] And yet they defend the Act even though it upsets the balance Congress has set through the District's own radical restrictions on patent holders.

In Defendants' view, the sole purpose of the patent laws and related regulations is to offer exclusivity. Because the Act does not put an end to exclusivity, they contend that it cannot stand as an obstacle to the accomplishment of Congress's objectives. Defs.' Opp'n 7, 11. But exclusivity is the *means* – not the *objective* – of federal patent law. Patent law was created to "Promote the Progress of Science and useful Arts." U.S. Const. art. I, § 8, cl. 8. "Patents are designed to promote innovation by providing the right to exclude others from making, using, or selling an invention."[3] And exclusivity operates as an incentive to innovate only to the extent patent holders enjoy the market advantages it affords: "[Patents] enable innovators to obtain

---

[2]    *See also Pfaff v. Wells Elecs., Inc.*, 525 U.S. 55, 63 (1998) (labeling the federal scheme a "carefully crafted bargain"); 130 Cong. Rec. 24,428 (1984) (statement of Rep. Moorhead) (the laws reflect "compromises between the various industries that are involved, the people that will be affected, . . . the people who manufacture generics, and the people whose patents need to be protected to guarantee that they can get a recovery on the investment that they have made").

[3]    H.R. Rep. No. 98-857, pt. 1, at 17 (1984) *reprinted in* 1984 U.S.C.C.A.N. 2647, 2650 (describing purpose of the patent extension contained in the Drug Price Competition and Patent Term Restoration Act).

greater profits than could have been obtained if direct competition existed. These profits act as incentives for innovative activities."[4]  And, given the critical importance and cost of innovation in the field of pharmaceuticals, Congress has gone to unique lengths to protect and calibrate the economic benefits of exclusivity.  As Congressman Waxman observed in explaining the rationale of the Patent Term Restoration Act, exclusivity provides:

> the ability to charge the highest [market] price because there is no one else in competition, and as a matter of public policy we, under the patent law, give that protection to the person who has put money into research and development for an innovative and new product.

130 Cong. Rec. 24,427 (1984) (also observing that generic competition at the end of the exclusivity period "will bring about the result of a lower price for the consumer").

The Supreme Court has confirmed that intellectual property "law celebrates the profit motive" and "recogniz[es] that the incentive to profit . . . will redound to the public benefit by resulting in the proliferation of knowledge." *Eldred v. Ashcroft*, 537 U.S. 186, 212 n.18 (2003) (citation omitted).  The federal courts have also recognized that the market power enjoyed by patent holders is not a *problem* created by the patent laws – as the District would have it – but rather their *goal*:  "This exclusionary right is granted to allow the patentee to exploit whatever degree of market power it might gain thereby as an incentive to induce investment in innovation and the public disclosure of inventions." *Valley Drug Co. v. Geneva Pharms., Inc.*, 344 F.3d 1294, 1304 (11th Cir. 2003).  As the Federal Circuit has explained:

> [T]he Patent Act creates an incentive for innovation. The economic rewards during the period of exclusivity are the carrot.  The patent owner expends resources in expectation of receiving this reward.  Upon grant of the patent, *the only limitation on the size of the carrot should be the dictates of the marketplace.*

*King Instruments Corp. v. Perego*, 65 F.3d 941, 950 (Fed. Cir. 1995) (emphasis added).

---

[4]      *Id.*

4

Defendants offer no explanation for how a local jurisdiction's decision to cap the very compensation that Congress – for the purpose of creating financial incentives for innovation – has made available through market exclusivity can be reconciled with federal law. The conflict is inherent and unavoidable. As the Supreme Court has explained:

> [O]ur past decisions have made clear that state regulation of intellectual property must yield to the extent that it clashes with the balance struck by Congress in our patent laws. The tension between the desire to freely exploit the full potential of our inventive resources and the need to create an incentive to deploy those resources is constant. Where it is clear how the patent laws strike that balance in a particular circumstance, that is not a judgment the States may second-guess.

*Bonito Boats,* 489 U.S. at 152.[5] Simply put, the District is not free to upset the balance Congress has struck in order to implement its own, different judgment of what is best for the public health. Yet, by penalizing manufacturers for selling patented pharmaceuticals at the market prices that Congress's grant of exclusivity makes possible, the D.C. Act obstructs Congress's objectives just as directly as would a state law purporting to shorten the period of patent exclusivity.

The cases that Defendants cite do not support a contrary conclusion. General anti-price gouging statutes, *see* Defs.' Opp'n 18 (citing *Standard Oil Co. v. United States*, 283 U.S. 163 (1931)), by definition do not single out patented products for price regulation or specifically limit the effect of the market advantage that federal law makes possible. Anti-price-gouging statutes correct for market failures, resulting from either improprieties by market players or temporary supply interruptions. Here, in contrast, D.C. seeks fundamentally, permanently, and exclusively to interrupt the market process that Congress relied on in formulating an incentive system for

---

[5]    Ironically, Defendants make much of the idea that complicated policy decisions, such as those implicated by the Act – "judgments of social value" – should be left to legislatures. Defs.' Opp'n 8, 9 n.4. But the legislature responsible for this issue is the United States Congress, which is constitutionally empowered to resolve these questions without obstruction by the states. Moreover, one major infirmity of the D.C. Act is that it leaves the question of "excessive price" in the hands of the local courts, rather than to the market as intended by Congress – yet courts are the very bodies Defendants themselves (correctly) deem ill-equipped to decide this important policy question.

drug innovation.  Nor does the existence of certain state or local laws that apply to patented products or pharmaceuticals, *see* Defs.' Opp'n 12 (trade secret laws), shed light on the question in this case.  "Both the law of unfair competition and state trade secret law have coexisted harmoniously with federal patent protection for almost 200 years, and . . . there are affirmative indications from Congress that both the law of unfair competition and trade secret protection are consistent with the balance struck by the patent laws." *Bonito Boats*, 489 U.S. at 166 (citations omitted).  But as the Supreme Court explained, the permissibility of such laws has nothing to do with state attempts to alter the federal patent regime, which "enter[] a field of regulation which the patent laws have reserved to Congress" and thus "represent[] a break with the tradition of peaceful co-existence between state market regulation and federal patent policy" and are preempted.  *Id.* at 167.  Like the law at issue in *Bonito Boats*, and unlike trade secret laws, the D.C. Act would second-guess and undermine carefully considered federal policy designed to create a certain level of encouragement to innovate.

Nor are Defendants aided by the plurality's decision in *PhRMA v. Walsh,* 538 U.S. 644 (2003), which concerned a claim of preemption under the Medicaid statute – and *not* the federal patent laws and related pharmaceutical exclusivity provisions.  *Walsh* involved a Maine statute providing that state officials were to use best efforts to secure from manufacturers a rebate for drug sales to participants in a state program equal to or greater than the rebate available under the Medicaid program.  *Id.* at 654.  But Justice Stevens's plurality opinion in *Walsh*, concerning the purposes and goals of the *Medicaid statute,* had nothing to do with the federal *patent laws* and *pharmaceutical exclusivity provisions*, at issue here, which serve entirely different goals.  It is not a goal, for example, of the Medicaid laws to promote innovation through the mechanism of market exclusivity.  In analyzing the question, moreover, Justice Stevens stressed a consideration

6

not applicable in this case – namely the broad discretion granted by federal law to states in defining their Medicaid programs. *Id.* at 666.[6]

Defendants also seek to avoid preemption with the surprising assertion that, in fact, "the Act and the federal law are clearly pursuing common purposes." Defs.' Opp'n 14. But the Medicare prescription drug "discount card" program on which Defendants rely for this remarkable contention is intended to reduce drug prices only for a specific and narrow segment of the population during the transition to a full prescription drug benefit under Medicare. *See* 42 U.S.C. § 1395w-141(b)(2)(A). This targeted, means-tested regulatory approach has nothing in common with the D.C. Act's treble-damages-enforced cap on all patented prescription drug prices, and indeed, merely serves to highlight that Congress has made the considered judgment to leave patented drug pricing in general to the market.[7]

Defendants also argue that the Act is not preempted because any conflict with federal law is a matter of conjecture. Defs.' Opp'n 8. To the contrary, the conflict is inherent in the Act. The Supreme Court has made clear that "pre-emption cases do not ordinarily turn on such compliance-related considerations as whether a private party in practice would ignore state legal obligations . . . or how likely it is that state law actually would be enforced." *Geier v. American*

---

[6]     Defendants also cite *Mickowski v. Visi-Trak Worldwide, LLC*, 415 F.3d 501, 510 (6th Cir. 2005), for the proposition that federal preemption under the patent laws is not that strict and that "there need not be complete, national uniformity in the protection of patent rights." Defs.' Opp'n 19 n.11. That case concerned a generally applicable law governing successor liability – not a law, like the D.C. Act, specifically designed to restrict the returns on investment available to pharmaceutical patent-holders.

[7]     Indeed, Congress expressly rejected an approach in the Medicare Modernization Act under which the federal government would have been the single negotiator for Medicare – a broader price control mechanism, though one still means-tested and far less draconian than the D.C. Act. Moreover, the Medicare discount card program seeks to reduce prices in no small part by encouraging generic substitution, a strategy that does not target directly the market returns for *on-patent* medicines. *See* 42 U.S.C. § 1395w-141(d)(3)(A). And to the extent the discount card program achieves direct price reductions on patented medicines, it does so through a *voluntary* system of negotiated discounts that card sponsors pass on to their customers. All this reflects yet another example of Congress's careful balancing of incentives regarding pharmaceutical innovation and is a far cry from D.C.'s heavy-handed threat of treble damages and injunctive relief to enforce *mandatory* price reductions that apply exclusively to on-patent drugs, *see* Act § 2 (§ 28-4555).

7

*Honda Motor Co.,* 529 U.S. 861, 882 (2000).  Moreover, there is every reason to believe that the

Act will be enforced.  The Act makes it "unlawful" for a manufacturer to sell a drug when that

sale "results in" the "drug being sold in the District for an excessive price."  Act § 2 (§ 28-4553).

The D.C. Council has already declared that, in its opinion, drug prices in D.C. are "excessive,"

*id.* (§ 28-4551(1)), and Defendants make repeated assertions to that effect in their opposition

brief, Defs.' Opp'n 2-4, 25, 27, 38, 42.  This Court can safely assume that the District and

numerous private attorneys general empowered by the Act, will bring suit to enforce it.  *See, e.g.,*

*Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 393 (1988) ("The State has not suggested that

the newly enacted law will not be enforced, and we see no reason to assume otherwise.");

*Alderman v. United States*, 394 U.S. 165, 175 (1969); *Commodity Trend Serv., Inc. v.*

*Commodity Futures Trading Comm'n*, 149 F.3d 679, 687 (7th Cir. 1998).[8]

Finally, Defendants cannot find refuge in the police power of the states and the

corresponding presumption against preemption.  Defs.' Opp'n 9, 13-14.  A state's exercise of its

police power cannot trump federal law.  *See Felder v. Casey*, 487 U.S. 131, 138 (1988) ("'[A]ny

state law, however clearly within a State's acknowledged power, which interferes with or is

contrary to federal law, must yield.'" (quoting *Free v. Bland,* 369 U.S. 663, 666 (1962))).  To put

it simply, "'[t]he relative importance to the State of its own law is not material when there is a

conflict with a valid federal law.'"  *Id.*[9]  Moreover, there is no "presumption against preemption"

here.  As the Supreme Court has observed, "[a]n assumption of nonpreemption is not triggered

---

[8]      The cases cited by Defendants, Defs.' Opp'n 8, are readily distinguishable:  Justice Kennedy spoke only for himself in *Gade v. National Solid Wastes Management Association*, 505 U.S. 88 (1992); *Rice v. Norman Williams Co.*, 458 U.S. 654 (1982), involved the impossibility-of-compliance strand of conflict preemption rather than the frustration-of-purpose strand at issue in this case; and *Steffan v. Perry*, 41 F.3d 677 (D.C. Cir. 1994) (en banc), and *Chemical Waste Management, Inc. v. EPA*, 56 F.3d 1434 (D.D.C. 1995), were not preemption cases.

[9]      *Webber v. Virginia*, 103 U.S. 344, 347-48 (1880), cited by Defendants for the proposition that "Congress never intended that the patent laws should displace the police powers of the States," Defs.' Opp'n 14 n.8, does not suggest otherwise.  The state law at issue was a generally applicable statute regulating sales and sellers in the state. It did not single out patented products or conflict with the federal patent laws.

when the State regulates in an area where there has been a history of significant federal presence." *United States v. Locke*, 529 U.S. 89, 108 (2000). In *Locke*, which concerned regulation of interstate navigation, "Congress ha[d] legislated in the field from the earliest days of the Republic, creating an extensive federal statutory and regulatory scheme." *Id.*; *see also Wachovia Bank, N.A. v. Burke*, 414 F.3d 305, 314 (2d Cir. 2005), *petition for cert. filed*, 74 U.S.L.W. 3233 (U.S. Sept. 30, 2005) (No. 05-431) (in a conflict preemption case, this presumption against preemption "disappears . . . in fields of regulation that have been substantially occupied by federal authority for an extended period of time" (citation omitted)). Likewise, in this case, there is a long history – going back to 1790 – of federal regulation of patents and the specific rights and obligations of patent-holders. *See Bonito Boats*, 489 U.S. at 146-48. Moreover, even if there were such a presumption here, it is easily overcome. The D.C. Act manifestly "stands as an obstacle" to the accomplishment and execution of the full purposes and objectives of the federal laws governing pharmaceutical patents and market exclusivity, and thus is preempted and invalid under the Supremacy Clause.

**B.    Defendants Cannot Salvage The Extraterritorial Reach of the Act and Now Concede That The Act's Application to Out-Of-State Transactions Is Unconstitutional.**

The morning that this reply was due – November 14, 2005 – Defendants filed a supplemental memorandum of points and authorities that effectively gives away the heart of their case. This memorandum concedes outright that "it is obvious that the District 'lack[s] the power to reach outside [its] borders,'" and that a "'state law [cannot] affect out-of-state prices.'" Defs.' Supp. Mem. 5-6 (quoting *K-S Pharmacies, Inc. v. American Home Prods. Corp.*, 962 F.2d 728, 730 (7th Cir. 1992)). Accordingly, Defendants now admit, the Act cannot constitutionally be applied to the prices of out-of-state transactions. *Id.* at 5-6. Having conceded the proposition

advanced by Plaintiffs and supported by over seventy years of Supreme Court precedent, Defendants attempt triage by arguing that "[t]o the extent that the D.C. Act can even be read to have the broad 'extraterritorial effect' feared by plaintiffs, it should not be." *Id.* at 5. Relying not on the recent case that is the purported basis for the supplemental memorandum, but on a 1992 Seventh Circuit case as well as other non-recent precedent, Defendants now ask this Court to read the statute to apply only to transactions within D.C.

This invitation to the Court to rewrite the D.C. Act ignores the Act's plain meaning and stretches traditional canons of statutory construction beyond their limits. *K-S Pharmacies*, the case upon which Defendants rest their new argument, specifically noted that "a federal court may not slice and dice a state law to 'save' it; we must apply the Constitution to the law the state enacted and not attribute to the state a law we could have written to avoid the problem." 962 F.2d at 730. A court's obligation to adopt a saving construction extends only to those interpretations that are reasonably supported by a statute's text; it does not permit resort to a construction that tortures that text beyond recognition. Although a court "will often strain to construe legislation so as to save it against constitutional attack, it must not and will not carry this to the point of perverting the purpose of a statute . . . or judicially rewriting it." *Aptheker v. Secretary of State*, 378 U.S. 500, 515 (1964) (citation omitted).

Here, the Act's extraterritorial effect is inescapable. By its terms and design, the Act directly regulates transactions that occur entirely outside the District's borders. PhRMA Mem. 24-26. The Act regulates any manufacturer sale that ultimately "results in" a downstream sale in the District. Act § 2 (§ 28-4553). There are no express or implied geographical limits on the regulated transaction – i.e., the sale by the manufacturer to its wholesaler or other direct customer. Thus, for example, the price agreed to in a transaction between a manufacturer in

California and a wholesaler in New Jersey, where drugs are transferred from California to New Jersey, is subject to the Act so long as any of the drugs are later resold (even by a third party) in a separate transaction in the District. Furthermore, the District's proposed construction not only does violence to the Act's plain meaning, but also subverts the purposes the District obviously hoped to serve in enacting the measure. As Plaintiffs have asserted – and Defendants cannot possibly debate – Plaintiffs' members are all headquartered outside the District and sell pharmaceuticals to wholesalers and warehousing retail chains also located outside of the District. PhRMA Mem. 11-12. And it is those manufacturers that the Act specifically targets. *See* Act § 2 (§ 28-4553). Remarkably, the Act explicitly exempts the local entities that typically sell the drugs to D.C. patients – retail pharmacies. *See id.* Thus the language of the Act by its terms applies directly, and in practice almost exclusively, to out-of-state transactions – precisely the reverse of the interpretation Defendants now seek. Construing the Act to apply only to in-District transactions would render the Act a virtual nullity. No canon of construction can support Defendants' desperate resort to an interpretation that bears no resemblance to the language and purpose of the Act. *See Miller v. French*, 530 U.S. 327, 341 (2000) ("We cannot press statutory construction 'to the point of disingenuous evasion' even to avoid a constitutional question." (citation omitted)).

As written, the D.C. Act is unconstitutional as applied to the out-of-state transactions that are its clearly intended target. In their opposition brief, Defendants had conceded the standard under which the statute's application should be judged. The Interstate Commerce Clause reflects a "special concern . . . with the autonomy of the individual States within their respective spheres." *Healy v. Beer Inst.*, 491 U.S. 324, 335-36 (1989) (footnotes omitted). It prevents states (and the District of Columbia) from enacting legislation that would "offend sister States

and exceed the inherent limits of the State's power." *Id.* at 336 n.13 (citation omitted). Accordingly, as Defendants admit, "a state law that regulates 'commerce occurring beyond the boundaries of that state' is per se invalid." Defs.' Opp'n 24; *Brown-Forman Distillers Corp. v. New York State Liquor Auth.*, 476 U.S. 573, 579 (1986) (holding that state laws that "directly regulate[]" commerce outside the state are "generally struck down . . . without further inquiry").

This principal dooms the Act's application to Plaintiffs' members, as demonstrated by the Supreme Court precedent most directly on point – *Baldwin v. G.A.F. Seelig, Inc.*, 294 U.S. 511 (1935), a case Defendants have simply ignored. The *Baldwin* Court struck down under the Commerce Clause a New York statute banning the in-state resale of milk purchased outside the state at a lower wholesale price than that mandated for in-state wholesale milk sales. The *Baldwin* Court found that, even though the statute there technically regulated only in-state transactions – banning the in-state resale of milk if purchased out-of-state at a non-compliant wholesale price – the statute effectively regulated the price of the out-of-state transactions and thus was invalid. Writing for the Court, Justice Cardozo observed: "New York has no power to project its legislation into Vermont by regulating the price to be paid in that state for milk acquired there." *Id.* at 521. It did not save the statute in *Baldwin* that it regulated only out-of-state sales that "resulted" in downstream in-state sales. To the contrary, the attempted regulation of such transactions out-of-state was per se invalid under the Commerce Clause.[10]  Here, the

---

[10]    Defendants' emphasis on *District of Columbia v. Beretta USA Corp.*, 847 A.2d 1127, 1149 (D.C. 2004), *superseded by* 872 A.2d 633 (D.C. 2005) (en banc), Defs.' Opp'n 27, is misplaced. In *Beretta*, the court upheld a products liability law imposing strict liability on out-of-state gun manufacturers. Defendants contend that this case authorizes states to impose liability on entities not transacting business in the state so long as these acts have any consequences in the state. *Baldwin*, however, makes clear that *Beretta* cannot stand for so broad a proposition.

extraterritorial reach of the D.C. Act is direct. The per se invalidity of the Act thus follows from *Baldwin* a fortiori.[11]

The recent First Circuit opinion in *Pharmaceutical Care Management Association v. Rowe,* No. 05-1606, 2005 WL 2981063 (1st Cir. Nov. 8, 2005) – the purported basis for Defendants' supplemental memorandum filed this date – only confirms this conclusion. In that case, the statute at issue required pharmacy benefit managers doing business in Maine to undertake certain fiduciary duties and make certain disclosures about out-of-state transactions to their in-state business partners. *See id.* at *2. The First Circuit concluded that because Maine "[did] not dictate the terms" of the out-of-state transactions – it required only *disclosure of information* about these transactions – the Maine law did not "regulate . . . [the] out-of-state transaction." *Id.* at *14. Here, by contrast, the D.C. Act does "regulate" the out-of-state sales – the price, specifically – making them unlawful in certain circumstances, and seeking to punish out-of-state entities if the price of those transactions is – in the view of a D.C. court – too high.

In their opposition brief, rather than confront relevant precedent such as *Baldwin,* Defendants counter with a red herring that pervades much of their argument. Defendants argue that the Act does not discriminate against interstate commerce – the way a protective tariff does, for example – and therefore does not pose a problem under the Commerce Clause. Defs.' Opp'n 21 (noting that it is "usually a protectionist measure designed to insulate local industry from out-

---

[11]    Defendants do attempt to distinguish *Brown-Forman* and *Healy* – two additional Supreme Court cases fatal to the D.C. Act – but fail to address the core principle at issue in those cases. Defendants make the simplistic argument that, because the Act does not tie D.C. prices to prices in other states, as did the statutes in those cases, the Act is valid. Defendants posit that there can be no "price gridlock" without such price-tying arrangements and thus the Act implicates no constitutional concern. Defs.' Opp'n 25 & n.15. The suggestion that price-tying arrangements are necessary to create "price gridlock" is based on neither precedent nor logic – price-tying is not necessary to create conflicting regulations that can disrupt interstate commerce. Even more fundamentally, Defendants ignore the fact that, as a core principle of federalism, one state cannot regulate conduct occurring in another state. *See, e.g., BMW of N. Am., Inc. v. Gore,* 517 U.S. 559, 572 (1996) ("We think it follows from these principles of state sovereignty and comity that a State may not impose economic sanctions on violators of its laws with the intent of changing the tortfeasors' lawful conduct in other States.").

of-state competition" that is struck down in Commerce Clause cases). But the Supreme Court has identified *both* discrimination against interstate commerce *and* regulation of out-of-state commerce as two distinct categories of per se constitutional violation, *see, e.g., Brown-Forman*, 476 U.S. at 579 ("When a state statute *directly regulates or discriminates* against interstate commerce . . . we have generally struck down the statute without further inquiry." (emphasis added)), and Plaintiffs do not base their Commerce Clause challenge on the non-discrimination principle. As the analysis in PhRMA's opening memorandum makes perfectly clear, it is the Act's "naked attempt to regulate the prices of out-of-jurisdiction sales and to punish market participants for economic conduct occurring wholly outside D.C. [that] violates the Commerce Clause." PhRMA Mem. 25; *see generally id.* at 25-28.[12]

Defendants also engage in a lengthy and irrelevant discussion of the Commerce Clause principle that "if a statute regulates evenhandedly and has only incidental effects on interstate commerce, [the court] must balance the alleged burden on interstate commerce against the putative local benefit." Defs.' Opp'n 26 (citing *Pike v. Bruce Church*, 397 U.S. 137, 142 (1970)). But state laws, like the D.C. Act, that *directly regulate* out-of-state transactions, by their express terms or inevitable effect cannot be saved by such balancing – they are per se invalid. *See, e.g., Brown-Forman*, 476 U.S. at 579. Thus, no amount of supposed in-state benefits can make up for these efforts at direct extraterritorial regulation. *See Edgar v. MITE Corp.*, 457 U.S. 624, 642-43 (1982) (citing the *Pike* analysis but finding it inapplicable to direct extraterritorial regulations).

---

[12]    In any event, although not necessary to establish that the D.C. Act is unconstitutional, it is hard not to view the Act as having a protectionist bent because it exempts those sellers – point-of-sale retail sellers – that are in-state. *See* Act § 2 (§ 28-4553). The Act thus exempts local vendor interests and imposes its burdens exclusively on out-of-state businesses.

For the same reason, Defendants' reliance on *PhRMA v. Concannon*, 249 F.3d 66 (1st Cir. 2001), the First Circuit decision reviewed by the Supreme Court in *Walsh*, is misplaced. The statute at issue there created a rebate program for manufacturers' sales to participants in a state program. The First Circuit noted that unlike the statutes struck down in *Baldwin* and *Healy*, "the Maine Act does not regulate the price of any out-of-state transaction, either by its express terms or by its inevitable effect. Maine does not insist that manufacturers sell their drugs to a wholesaler for a certain price." *Concannon*, 249 F.3d at 81-82. Here, of course, the D.C. Act specifically regulates manufacturers' drug sales (which typically occur outside D.C.) and actually *exempts* the bulk of local transactions (those involving point-of-sale retail sales). Under the D.C. Act, the price regulation is principally external and some of the indirect effects are internal – the exact opposite of *Concannon* and similar cases on which Defendants rely.

Nor are the challenged applications of the D.C. Act saved by any "special deference" due to regulations involving the public health. Defs.' Opp'n 20, 26-27. Deference does not afford a license to violate the Constitution, as Supreme Court cases invalidating state health and safety laws under the Commerce Clause make clear. *See, e.g., Dean Milk Co. v. City of Madison*, 340 U.S. 349, 354 (1951) (invalidating a law enacted pursuant to the state's "unquestioned power to protect the health and safety of its people"). The cases Defendants cite[13] stand only for the unremarkable and irrelevant proposition that where a law has only incidental effects on interstate commerce, the fact that the regulation serves state health and safety goals weighs in favor of the regulation's validity. They do not suggest, much less hold, that such factors are relevant to the

---

[13]     *See* Defs.' Opp'n 26-27 (citing *Head v. Bd. of Examiners in Optometry*, 374 U.S. 424, 428 (1963); *Gen. Motors Corp. v. Tracy*, 519 U.S. 278, 306 (1997); *Electrolert Corp. v. Barry*, 737 F.2d 110, 113 (D.C. Cir. 1984)).

constitutional validity of state laws directly regulating out-of-state commerce – which are per se invalid.[14]

Finally, contrary to Defendants' suggestions, Defs.' Opp'n 22, Plaintiffs' Commerce Clause challenge is not weakened by hypothesizing the possibility of some valid applications to plainly in-state transactions. Plaintiffs do not contend the law is facially invalid – invalid in all or virtually all conceivable applications – under the Interstate Commerce Clause.[15] Rather, Plaintiffs challenge the Act under the Interstate Commerce Clause as it applies to transactions that occur out of state.[16] In these – the vast majority of the Act's applications – it is clearly unconstitutional as applied. In their supplemental memorandum, Defendants concede as much.

---

[14]     Indeed, even the "wide latitude to regulate" liquor sales expressly conferred upon states by the Twenty-first Amendment "did not entirely remove state regulation . . . from the reach of the Commerce Clause," *Brown-Forman*, 476 U.S. at 584. It goes without saying, therefore, that the police power, even when exercised to promote health and safety, does not do so either. *See also Granholm v. Heald*, 125 S. Ct. 1885 (2005).

[15]     Although Plaintiffs' preemption and foreign commerce challenges are facial challenges, the Interstate Commerce Clause challenge seeks a declaration of invalidity only as to the D.C. Act's sweeping unconstitutional application to out-of-state transactions. Contrary to what Defendants apparently assume, *see* Defs.' Opp'n 8, pre-enforcement challenges can be either facial or as-applied. *See, e.g., American Library Ass'n v. Reno*, 33 F.3d 78, 83 (D.C. Cir. 1995) (rejecting defendant's claim that pre-enforcement, as-applied challenge was instead a facial challenge); *American Charities for Reasonable Fundraising Regulation, Inc. v. Pinellas County*, 221 F.3d 1211 (11th Cir. 2000) (remanding for consideration of as-applied due process claim even though county had not brought enforcement action against the plaintiff).

[16]     Defendants are wrong to suggest that sales by out-of-state entities directly to entities – such as hospitals – located in D.C. "are clearly subject to District regulation without transgressing the Commerce Clause." *Id.* at 23. To the contrary, where such a transaction occurs out of state, *Baldwin* invalidates even that small class of the Act's applications. In *Baldwin*, the issue was whether New York law could bar a supplier from reselling milk obtained from dairies in Vermont where Vermont did not have the same price floors imposed by New York. The Court held unlawful New York's attempted regulation of the price charged by an out-of-state wholesaler to an in-state retailer. "Such a power, if exerted, will set a barrier to traffic between one state and another as effective as if customs duties, equal to the price differential, had been laid upon the thing transported." 294 U.S. at 521. The D.C. Act is unconstitutional as applied to such sales for the same reason. The antitrust cases cited by Defendants, *In re Brand Name Prescription Drugs Antitrust Litigation*, 123 F.3d 599 (7th Cir. 1997), and *In re Lorazepam & Clorazepate Antitrust Litigation*, 295 F. Supp. 2d 30 (D.D.C. 2003), Defs' Opp'n 22, do not suggest otherwise. Critical to these cases is the status of antitrust law as an example of "cooperative federalism" – the coordination of federal and state enforcement. *See Younger v. Jensen*, 605 P.2d 813, 818 (Cal. 1980). The cases say nothing about the scope of the Commerce Clause prohibitions outside the antitrust context, and obviously cannot stand for the proposition that a state may regulate the price of out-of-state transactions like those at issue in *Baldwin*. Moreover, it is important to note that in assessing the permissible scope of the Alabama antitrust law at issue, the Seventh Circuit explained: "State A cannot use its antitrust law to make a seller in State B charge a lower price to a buyer in state C. Insofar as the Alabama suit challenges sales from plants or offices in other states, it exceeds the constitutional scope of the Alabama antitrust law." *In re Brand Name Prescription Drugs Antitrust Litig.*, 123 F.3d at 613. Thus, far

C.    **Defendants Fail To Offer Any Argument to Sustain the D.C. Act Under the Foreign Commerce Clause and Offer Only Irrelevant Arguments Concerning the Act's Interference With the Federal Government's Foreign Affairs Power.**

Plaintiffs have presented two additional *independent* grounds for striking down the Act: The Act violates the Foreign Commerce Clause, *and* it interferes with the federal foreign affairs power. Defendants ignore the former defect and offer no meaningful response to the latter.

1.    **The Act Impermissibly Restrains Foreign Commerce.**

Defendants concede that the Commerce Clause "gives Congress the exclusive power '[t]o regulate Commerce with foreign Nations,'" Defs.' Opp'n 29 (quoting *Barclays Bank PLC v. Franchise Tax Bd.*, 512 U.S. 298, 310 (1994) (citations omitted)), and that, in the realm of foreign commerce, state regulation must "compl[y] with 'the special need for federal uniformity,'" Defs.' Opp'n 30 (quoting *Wardair Canada, Inc. v. Florida Dep't of Revenue*, 477 U.S. 1, 8 (1986), and citing *Japan Line, Ltd. v. County of Los Angeles*, 441 U.S. 434, 449 (1979)). In accordance with these principles, states may not regulate foreign commerce lest they "limit[], qualif[y], or impede[]" federal initiatives "to any extent." *Board of Trs. v. United States*, 289 U.S. 48, 57 (1993).

By looking to prices charged in the four benchmark countries – Australia, Canada, Germany, and the United Kingdom – to determine whether the wholesale price of a drug sold in the U.S. is presumptively excessive, the Act ties domestic prices to the prices in those benchmark countries. *See* Act § 2 (§§ 28-4554(a), 28-4552(2)); PhRMA Mem. 10, 22. As Defendants concede, Defs.' Opp'n 25, where out-of-state benchmarks are used rather than foreign ones, such a price-tying regime is a classic violation of the Interstate Commerce Clause. *See, e.g., Brown-*

---

from providing support for the D.C. Act, Judge Posner's opinion in *In re Brand Name Prescription Drugs* directly supports Plaintiffs' central Commerce Clause claim.

*Forman*, 476 U.S. at 579-80. Price tie-ins violate the Interstate Commerce Clause because they carry the "inherent practical extraterritorial effect of regulating . . . prices in other States." *Healy*, 491 U.S. at 343. This Commerce Clause rule applies with even greater force in the sphere of foreign commerce, where "a State's power is further constrained." *Barclays Bank*, 512 U.S. at 311; *see also Japan Line*, 441 U.S. at 448. Accordingly, the D.C. Act violates the *Foreign* Commerce Clause because it regulates the tied foreign transactions in precisely the same forbidden manner.

Defendants' *entire* response to this argument is the unsupported assertion that "no 'foreign commerce' is being regulated." Defs.' Opp'n 30. That assertion, however, does not even attempt to explain why *Brown-Forman* and *Healy* are not controlling and is at odds with common sense. A company that sells drugs in the U.S. and in one of the four foreign countries inevitably will face choices that include (1) accepting the risk of severe penalties under D.C. law, (2) reducing its prices below market levels in the U.S., or (3) withdrawing from the foreign market or, if possible, increasing its prices in that market. In confronting its selling decisions abroad, companies will need in each instance to take into account U.S. market prices and the D.C. law consequences. *See* PhRMA Mem. 31 (citing Marmontello Decl. ¶ 6; Powell Decl. ¶¶ 11, 13; Soto Decl. ¶4 ). And the Act's interference with such foreign transactions is even more apparent when one considers – as the Commerce Clause cases say courts must, *see* Defs.' Opp'n 25 n.15 (citing *Healy*, 491 U.S. at 336-37) – the potential effect of multiple states instituting similar rules. The Act's linkage of prices in the United States and liability in the District to drug prices in foreign markets thus renders it an impermissible regulation of foreign commerce.[17]

---

[17] That the prima facie case creates a rebuttable presumption, *see* Defs.' Opp'n 30, does not save the Act. The "prima facie case" by itself has devastating implications. The mere prospect of defending one or more lawsuits purportedly seeking to vindicate the "public interest" with respect to all sales of a particular pharmaceutical carries

##### 2.      The Act Interferes with Federal Authority over Foreign Relations.

The Supreme Court has consistently recognized, and Defendants acknowledge, that the Constitution reflects an "overriding concern that 'the Federal Government must speak with one voice when regulating commercial relations with foreign governments.'" *Japan Line,* 441 U.S. at 449 (quoting *Michelin Tire Corp. v. Wages,* 423 U.S. 276, 285 (1976)); *see also* Defs.' Opp'n 30. In the face of this "special need for federal uniformity," *Wardair Canada,* 477 U.S. at 8, the D.C. Act improperly opens the door for D.C. courts to evaluate the wisdom of foreign governments' drug-pricing regimes, an inquiry that would carry "great potential for disruption or embarrassment," *Zschernig v. Miller,* 389 U.S. 429, 435 (1968).

In responding to this argument, Defendants utterly fail to explain how the Act can be squared with *Zschernig,* where the Supreme Court invalidated a state statute that required courts to opine on and assess foreign laws. Indeed, Defendants, once again, simply do not discuss *Zschernig,* much less distinguish it.[18]

Defendants' claim that the Act requires D.C. courts merely to consult foreign law for the ministerial purpose of applying the presumption of excessive pricing, Defs.' Opp'n 30-31, ignores the statutory mechanism through which company defendants will be compelled to rebut that presumption. To determine whether a particular manufacturer has rebutted a prima facie case of excessive pricing, a court will inevitably be asked to consider the rationality of the relevant benchmarked foreign price, given a variety of factors including costs of invention,

---

an enormous litigation price tag and threatens discovery into sensitive trade secret information. There is also a risk of preliminary injunctive relief based on an alleged "prima facie case" disrupting sales during the pendency of the litigation. And the prospect of successfully rebutting the presumption will hardly be a comforting one when the Act provides nothing more than vague factors and therefore no assurance whatsoever that any particular argument or combination of arguments will persuade a court that the defendant has carried its burden of rebutting the presumption and that the presumptively "excessive" price is not "excessive" after all.

[18]      Instead, Defendants' analysis is devoted to distinguishing *American Insurance Association v. Garamendi,* 539 U.S. 396 (2003), a case on which Plaintiffs never relied. *Garamendi* held that a state policy was preempted by a specific set of federal executive agreements and thus sheds minimal light on this case.

19

global sales, and access to drugs by D.C. residents. *See* Act § 2 (§ 28-4554(b)). Because the foreign prices selected by the Act are the product of the foreign regulatory regimes that artificially depress them, any finding by a court on this point necessarily will reflect the court's judgment as to the rationality of the foreign regulatory systems that produce the benchmarks. The invitation to render such judgments will involve those courts impermissibly in matters of foreign relations that are properly reserved to the federal government. *See Zschernig*, 389 U.S. at 433-36.

## II.    Plaintiffs Have Met the Additional Requirements for Preliminary Injunctive Relief.

As even Defendants have conceded, because the Act has now been published, "only a [final] determination that the statute is unconstitutional would provide" the protection Plaintiffs seek. Defs.' Mem. in Opp. to Mot. To Consolidate 6. If the Court grants Plaintiffs' request for consolidation and decides the merits of the case, it need not consider whether the remaining factors governing the issuance of a preliminary injunction are satisfied. *See, e.g., Mylan Pharms., Inc. v. Shalala*, 81 F. Supp. 2d 30, 46 n.18 (D.D.C. 2000) (issues relating to irreparable harm were "immaterial to [the] analysis of the merits" where preliminary injunction and summary judgment motions had been consolidated). Yet if the Court denies that request, it is clear that the remaining factors favor granting preliminary relief.

### A.    The D.C. Act Will Irreparably Harm Plaintiffs' Members.

Under *Geier*, this Court should assume the Act will work exactly as it is designed to, that the District and a phalanx of private attorneys general will enforce the Act exactly as its sponsors intended, and that, absent relief from this Court, manufacturers will comply with its unlawful terms. *See* 529 U.S. at 882. The Court should therefore assume that, through enforcement actions and threatened enforcement against manufacturers, the Act will injure manufacturers by

forcing them to take steps to modify their business practices and/or to defend themselves against a multitude of lawsuits.[19]

The burdens that Plaintiffs' members will suffer under the Act are thus both massive and ineluctable. The member companies will face a choice between seeking to ensure they cannot be accused of non-compliance with an unconstitutional law – presumably resulting in sub-market prices in the U.S. or forgone foreign sales – on the one hand, and transgression of the statutory benchmarks with attendant massive exposure to suit, injunctions, and treble damages on the other. *See Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992) (finding irreparable harm where plaintiffs had to decide between violating a law and facing "repetitive penalties" and exposure to "potentially huge liability," or conforming their conduct to an unconstitutional law). In the public and private enforcement actions that will inevitably result, Plaintiffs' members will be forced to defend their pricing decisions, research and development costs, and other expenditures in a multitude of high-stakes suits, potentially for every eventual D.C. sale of every patented product they manufacture. Even if the "[m]ere litigation expense" of a single suit is not irreparable harm, Defs.' Opp'n 36,[20] the courts are clear that injunctive relief *is* justified when a

---

[19]    Given the substantial constitutional harms imposed by the D.C. Act, it is clear that it imposes irreparable injury. As a matter of law, in any event, in the light of Plaintiffs' overwhelming likelihood of success on the merits, Plaintiffs' burden of showing irreparable injury is "relatively slight." *CSX Transp., Inc. v. Williams*, 406 F.3d 667, 670 (D.C. Cir. 2005) (citation omitted).

[20]    The cases Defendants cite in support of this proposition almost all rely on *Renegotiation Board v. Bannercraft Clothing Co.*, 415 U.S. 1, 24 (1974). But *Bannercraft* simply observed that litigation expenses do not warrant an exception to the general principle requiring exhaustion of administrative remedies. Judge Edwards, writing only for himself in *Ticor Title Insurance Co. v. FTC*, 814 F.2d 731, 740 (D.C. Cir. 1987), echoed this observation, finding that litigation expenses "standing alone" do not justify "the disruption of ongoing agency proceedings." *Sears, Roebuck & Co. v. NLRB*, 473 F.2d 91 (D.C. Cir. 1972), addressed the question of when courts could enjoin agency hearings and found that generally "the burden of submitting to agency hearings" does not constitute irreparable harm, but "[w]here the expense of submitting to administrative proceedings is extraordinary, judicial intervention may be justifiable." *Id.* at 93 & n.3. *East St. Louis Laborers' Local 100 v. Bellon Wrecking & Salvage Co.*, 414 F.3d 700, 704 (7th Cir. 2005), simply holds that mere uncertainty about the outcome of a case in the absence of an injunction cannot constitute irreparable harm. And *Alabama Power Co. v. FERC*, 993 F.2d 1557 (D.C. Cir. 1993), references the *Bannercraft* rule but suggests its application may be limited and ultimately concludes that "petitioners' allegation that a FERC order has infringed upon a valuable, bargained-for right to be

party is faced with this kind of avalanche of multiple proceedings.[21] In addition, for purposes of

a preemption analysis, the Supreme Court "assume[s]" that Plaintiffs' members will "compl[y]

with the state-law duty," *Geier*, 529 U.S. at 882, and overhaul their pricing and distribution

practices – an entirely reasonable assumption, given the purpose of the Act. This too constitutes

irreparable harm. *See, e.g., CSX Transp.*, 406 F.3d at 673-74 (finding irreparable harm where

plaintiffs would be forced to substantially decrease the capacity and flexibility of their rail

network to comply with law).[22]

     Now that the D.C. Act has been published and thus will go into effect at the conclusion of

thirty legislative days, a preliminary injunction barring Defendants from enforcing the Act

cannot prevent these harms in their entirety, because that injunction cannot bar private litigation.

*See* Reply Mem. in Supp. of Mot. To Consolidate 2, 9-11. But a preliminary injunction against

Defendants would nonetheless have substantial value because it would reduce the irreparable

harm. An injunction barring Defendants from suing under the Act would eliminate the risk of

suit by the only potential litigant identified by name in the Act and the litigant with the most

substantial resources.[23] In addition, the Act specifically authorizes the District to "seek remedies

on its own behalf, on behalf of all residents of the District of Columbia, or both," Act § 2 (§ 28-

4555(a)), and thus absent injunctive relief the District could seek enormous damage awards and

comprehensive injunctive relief. The Act also permits the District to seek "[a]ppropriate fines

---

uninhibited by the threat of agency investigation for certain periods of time is reviewable prior to final resolution of
the investigation itself." *Id.* at 1567.

[21]     *See, e.g., Savoie v. Merchants Bank*, 84 F.3d 52, 58 (2d Cir. 1996); *Lynch Corp. v. Omaha Nat'l Bank*, 666
F.2d 1208, 1212 (8th Cir. 1981); *Roof v. Conway*, 133 F.2d 819, 827 (6th Cir. 1943).

[22]     Defendants incorrectly cite *Walsh*, 538 U.S. at 659-60, for the proposition that adjustments to business
operations do not constitute irreparable harm. Defs.' Opp'n 35. The question at issue was whether the Maine law
under review would cause sufficient harm *to Medicaid patients* to support a preemption-based facial challenge, *not*
whether PhRMA or its members would suffer irreparable harm from the law.

[23]     Moreover, this Court's finding of Plaintiffs' likelihood of success on the merits would have persuasive
precedential value in private enforcement actions pending a final ruling.

for each violation." *Id.* § 28-4555(b)(2). Even Defendants concede that "injunctive relief may be appropriate where state enforcement actions of unconstitutional laws are imminent and repetitive penalties attach." Defs.' Opp'n 37 n.22 (citing *Morales*, 504 U.S. 374). Finally, absent an injunction, Plaintiffs' members will suffer per se irreparable harm by being subjected to an unconstitutional law.[24]

Defendants' primary response is to feign doubt that the Act will have any effect at all; Defendants suggest it is entirely speculative whether anybody will file suit under the Act and the law will in fact induce manufacturers to change their prices or practices. Defs.' Opp'n 36-39. Yet Defendants repeatedly *concede* that the Act is *intended* to force manufacturers to make dramatic cuts in the prices of patented prescription drugs in D.C.[25] And the Act contains one, and only one, mechanism for forcing manufacturers to make these changes: it authorizes the District of Columbia and private attorneys general to threaten them with suits for treble damages, fines, and injunctions against sales. The Court is entitled to assume that the Act is not a nullity and will operate exactly as intended.[26] Defendants' further suggestion that the harm-triggering

---

[24]    *See Trans World Airlines, Inc. v. Mattox*, 897 F.2d 773, 784 (5th Cir. 1990), *aff'd in part and rev'd in part on other grounds sub nom. Morales v. Trans World Airlines, Inc.*, 504 U.S. 374 (1992) ("If the states were permitted to enforce their various laws . . . . [t]his would cause irreparable injury by depriving the airlines of a federally created right to have only one regulator . . . ."); *United States v. Ferrara*, No. 92-2869, 1993 WL 405477, at *1 (D.D.C. Feb. 8, 1993) (preemption); *Greyhound Lines, Inc. v. City of New Orleans*, 29 F. Supp. 2d 339, 341 (E.D. La. 1998) (preemption); *American Library Ass'n v. Pataki*, 969 F. Supp. 160, 168 (S.D.N.Y. 1997) ("Deprivation of the rights guaranteed under the Commerce Clause constitutes irreparable injury."); *C & A Carbone, Inc. v. Town of Clarkstown*, 770 F. Supp. 848, 854 (S.D.N.Y. 1991) ("Inasmuch as plaintiffs have demonstrated that Local Law No. 9 threatens to or actually deprives plaintiffs of their constitutional rights, privileges or immunities under the Commerce Clause, this deprivation unquestionably constitutes irreparable injury."). Defendants do not address the cases cited by Plaintiffs in which courts have found per se irreparable harm based on preemption and Commerce Clause claims. In any event, the fact that the injury at issue here is a constitutional injury, at a minimum, weighs heavily in favor of granting preliminary relief.

[25]    *See, e.g.*, Defs.' Opp'n 9 (describing the Act as an "attempt to rein in out-of-control prescription drug prices in the District"), 14 (noting the Act's "intended effect of lowering prescription drug prices"), 25 (conceding that "the Act certainly seeks lower prices for the District's consumers").

[26]    Defendants cite *National Association of Psychiatric Health Systems v. Shalala*, 120 F. Supp. 2d 33 (D.D.C. 2000), for the proposition that Plaintiffs have failed to offer sufficient concrete evidence of irreparable harm. *See* Defs.' Opp'n 37. In that case, however, the court found that the plaintiffs had failed to demonstrate irreparable harm

events are not "imminent" because the Act takes effect in the future, *see* Defs.' Opp'n 39, is frivolous. Absent congressional action, the Act will take effect sometime between the beginning of December and mid-January according to a statutorily prescribed formula.[27]

Defendants also note that several of the harms plaintiffs have claimed are economic, Defs.' Opp'n 39, but Defendants answer their own objection when they concede (as they must) that "it is generally true that where feared injuries are difficult to calculate, [that] fact might suffice to show irreparable injury," *id.* at 33 (citing *CSX Transp.*, 406 F.3d at 673-74); *Danielson v. Local 275*, 479 F.2d 1033, 1037 (2d Cir. 1973) ("Irreparable injury is suffered when monetary damages are difficult to ascertain or are inadequate."). Even more so than the D.C. ordinance enjoined in *CSX*, "[i]t would be exceedingly speculative . . . to place a dollar figure on" the effects the Act will have on manufacturers' prices and operations. *CSX Transp.*, 406 F.3d at 674.[28]

---

because they could not offer economic data regarding the harms *they had already suffered* from a rule that had *already been in effect* for more than a year. *Id.* at 44 & n.9. Such evidence clearly is not required in a case like this one because the Act has not yet taken effect. *Cf. Virginia v. American Booksellers Ass'n*, 484 U.S. 383, 393 (1988) (finding that plaintiffs had made a sufficient showing of injury to satisfy standing requirements based on the fact that the "State has not suggested that the newly enacted law will not be enforced . . . . [and] plaintiffs have alleged an actual and well-founded fear that the law will be enforced against them").

[27] When a statute has been enacted but its effectiveness has been postponed for a short period, the statute can still be challenged. *See, e.g., Arizona v. Atchison, Topeka & Santa Fe R.R.*, 656 F.2d 398, 402-03 (9th Cir. 1981) (suit filed nearly six months before law would become effective).

[28] Defendants' suggestion (Defs.' Opp'n 40) that litigation affidavits "are insufficient as a matter of law" to establish per se irreparable harm is premised on a misleading truncation of the relevant passage. Defendants quote *Wagner v. Taylor* for the proposition that "in cases involving a claim by movant of interference with protected freedoms or other constitutional rights, . . . the finding of irreparable injury cannot meaningfully be rested on a mere contention of a litigant." 836 F.2d 566, 577 n.76 (D.C. Cir. 1987) (Defendants' ellipses). But the court there went on to say that such a finding ". . . depends on an appraisal of the validity, or at least the probable validity, of the legal premise underlying the claim of right in jeopardy of impairment." *Id.* (internal quotation marks omitted). In other words, a claim of per se irreparable injury turns on the analysis of the merits, and *not*, as Defendants misleadingly suggests, on some heightened proof of facts.

**B.    Preliminary Injunctive Relief Would Neither Harm Defendants Nor Disserve the Pubic Interest.**

For the reasons stated in PhRMA's opening brief, the balance of hardships and public interest both favor granting preliminary relief. *See* PhRMA Mem. 43-45. Defendants simply can have no legitimate interest in enforcing a statute that is preempted and unconstitutional, and any harm to the District would, in any event, be short-lived. Defendants' discussion of the public interest, which looks exclusively to the short-term interests of D.C. residents, uses the incorrect time frame and level of analysis. *See Alabama ex rel. Siegelman v. EPA*, 925 F.2d 385, 391 (11th Cir. 1991) (criticizing the district court for "focus[ing] narrowly on the public interest of Alabama citizens" and "fail[ing] to consider the competing interests of Texas citizens and United States citizens that undeniably were implicated"). Any short-term benefit to District residents from artificially sub-market drug prices would come either at the expense of the citizens of other states, who would have to pay a greater share of research and development costs to compensate for D.C.'s free-riding, or at the expense of future drug development, which would be hindered by a reduction in the amount of seed money available and interference with the incentives Congress has deemed necessary to encourage the desired levels of investment-risk-taking.

## CONCLUSION

For the reasons set forth in PhRMA's Memorandum of Points and Authorities in Support of its Motion for Preliminary Injunction and in PhRMA's Motion to Consolidate and Plaintiffs' reply to Defendants' Opposition to the Motion to Consolidate, this Court should resolve the merits of Plaintiffs' claims and declare the Act unconstitutional and invalid and permanently enjoin its enforcement by Defendants. Alternatively, the Court should grant Plaintiffs' Motion for Preliminary Injunction barring enforcement of the Act.

25

Dated:  November 14, 2005

Respectfully submitted,


  /s/ David W. Ogden
David W. Ogden (D.C. Bar No. 375951)
Randolph D. Moss (D.C. Bar No. 417749)
Jonathan J. Frankel (D.C. Bar No. 450109)
WILMER   CUTLER   PICKERING   HALE
AND DORR LLP
2445 M Street, N.W.
Washington, D.C.  20037-1420
(202) 663-6000
(202) 663-6363 (facsimile)

*Counsel   for   Plaintiff   Pharmaceutical*
*Research and Manufacturers of America*

Daniel E. Troy (D.C. Bar No. 442537)
SIDLEY AUSTIN BROWN & WOOD LLP
1501 K Street, N.W.
Washington, D.C. 20005
(202) 736-8000
(202) 736-8711 (facsimile)

*Counsel for Plaintiff Biotechnology Industry*
*Organization*