IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| PHARMACEUTICAL RESEARCH AND MANUFACTURERS OF AMERICA | ) ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | Civil Action No. 05-2015 |
| THE DISTRICT OF COLUMBIA, et al., | ) ) ) | |
| Defendants. | ) ) | |

| | | |
|---|---|---|
| BIOTECHNOLOGY INDUSTRY ORGANIZATION, | ) ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | Civil Action No. 05-2106 |
| THE DISTRICT OF COLUMBIA, et al., | ) ) ) | |
| Defendants. | ) ) | |

**PLAINTIFFS' MEMORANDUM OF POINTS AND
AUTHORITIES WITH RESPECT TO THE ISSUE OF STANDING**

Pursuant to this Court's request, Plaintiffs Pharmaceutical Research and Manufacturers of America ("PhRMA") and Biotechnology Industry Organization ("BIO") (collectively "Plaintiffs") submit this Memorandum of Points and Authorities with Respect to the Issue of Standing, to respond to Defendants' suggestion at oral argument that Plaintiffs lack standing to

challenge the constitutionality of the Prescription Drug Excessive Pricing Act of 2005 (the "Act").

## INTRODUCTION

At the November 23, 2005, hearing on Plaintiffs' Motion for Summary Judgment, Defendants advanced for the first time – without any notice to Plaintiffs — the argument that Plaintiffs lack standing.[1/] Specifically, Defendants argued that Plaintiffs had failed to establish injury-in-fact as required by Article III of the United States Constitution. This contention is meritless.

Plaintiffs have standing because there is a highly credible threat that the Act will be enforced against at least one of their members, as established by the plain terms of the Act, by undisputed facts set forth in Plaintiffs' Statement of Material Facts Not In Dispute and Plaintiffs' Declarations, and by undisputed facts in the public domain which this Court may judicially notice. By its express terms, the D.C. Act threatens manufacturers with liability for sales of patented prescription drugs *no matter where they occur* if such sales later "result in" any sale (including a retail sale) in the District of Columbia at an "excessive" price. It is a virtual certainty that the Act will be enforced against Plaintiffs' members — manufacturers of patented prescription drugs — by the District or one of the countless private attorneys general it

---

[1/]   Defendants suggested that Plaintiffs were on notice because the defense of standing was included in the Answer. *See* Tr. Oral Arg. 4 (Nov. 23, 2005) ("Tr."). An objection to Plaintiffs' standing, however, merely appeared in a laundry list of obviously inapplicable defenses, such as res judicata, that Defendants included in the Answer, apparently by rote. *See* Defs.' Answer 12. Like the other meritless defenses included in the Answer, Defendants had at no other point — not in subsequent submissions to this Court nor during multiple appearances — pursued this argument. And, although Defendants contended at argument that the issue of standing came to the fore after the Rule 57 hearing, *see* Tr. 4-5, at no point in the intervening eight days did Defendants alert Plaintiffs to this new argument, not even in the minutes before the hearing.

1

empowers. This threat of enforcement forces Plaintiffs' members to choose between modifying their business practices on the one hand or facing the threat of injunctive relief, fines, and treble damages on the other. Plaintiffs' have therefore established that their members suffer injury-in-fact that is fairly traceable to Defendants and would be redressed by a favorable decision from this Court. PhRMA and BIO, in turn, have associational standing to vindicate the rights of their members. Plaintiffs thus easily satisfy the requirements of Article III standing.

Defendants' arguments to the contrary are nothing more than a last-ditch attempt to stave off a ruling invalidating the Act. At bottom, their objection to Plaintiffs' standing rests on an unsupported view of the Act that is contrary to its text and would render it ineffectual. Indeed, the Act's stated and obvious purpose is to reduce the prices at which manufacturers and licensees sell patented prescription drugs. It expressly declares unlawful prices charged by those entities for patented prescription drugs. And it authorizes suits by the District and private attorneys general to enforce these price rules against those entities. If none of Plaintiffs' members will be the subject of suits purporting to enforce the Act, as Defendants seem to suggest, then it is difficult to imagine whom the Act would reach. The Court should reject Defendants' eleventh-hour efforts and confirm that Plaintiffs have standing to pursue their challenge.

## ARGUMENT

### I. Plaintiffs Readily Satisfy the Standing Requirements For Their Constitutional Challenge to the Act.

Plaintiffs challenge the constitutionality of the Act on behalf of their members, who include manufacturers of patented prescription drugs. An association has standing to bring claims on behalf of its members "when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual

members in the lawsuit." *Hunt v. Washington State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977).

Plaintiffs unquestionably satisfy all three requirements. The interests affected by the Act are indisputably germane to Plaintiffs' purposes, as required by the second *Hunt* factor. Plaintiffs advocate on behalf of their members and encourage policies that reward innovation, *see* Powell Decl. ¶ 4; Sachdev Decl. ¶ 5. The Act affects the incentives to invent and develop patented prescription drugs and the sales of such drugs by manufacturers. The third *Hunt* factor is also satisfied because the participation of individual members as parties is not required where, as here, the suit seeks only prospective declaratory and injunctive relief. *See, e.g., Warth v. Seldin*, 422 U.S. 490, 515-16 (1975); *American Hosp. Ass'n v. Sullivan*, No. 88-2027, 1990 WL 274639, at *3 (D.D.C. May 24, 1990) (unpublished).[2/]

The first *Hunt* factor, on which Defendants appeared to rest their entire argument at the hearing, is also satisfied. To meet it, all Plaintiffs must show is that at least *one* member would have standing to sue in its own right. *See United Food & Commercial Workers Union Local 751 v. Brown Group, Inc.*, 517 U.S. 544, 554 (1996); *Warth*, 422 U.S. at 511. This, in turn, requires a showing that "(1) [the member] has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc.*

---

[2/]    At the hearing, Defendants did not dispute that the second and third *Hunt* factors have been met.

3

*v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 180-81 (2000) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)).[3/]

Plaintiffs' members satisfy all three elements of standing. The Supreme Court has "held that a person who must comply with a law or face sanctions has standing to challenge its application to him, even if the threat of [enforcement] is not immediate — indeed, even if the law is not yet in effect." *Hays v. City of Urbana*, 104 F.3d 102, 103 (7th Cir. 1997) (citing *Pierce v. Society of Sisters*, 268 U.S. 510 (1925)). For an injury to be sufficiently "actual or imminent, not conjectural or hypothetical" in a pre-enforcement challenge to a statute, the key question is whether there is a "credible threat" of enforcement against the plaintiff. *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979).[4/] Where there is such a threat, plaintiffs face a Hobson's choice: either forego possibly lawful activity and incur costs in an attempt to comply with the law, or continue their current course and thereby subject themselves to enforcement actions. *See, e.g., Bland v. Fessler*, 88 F.3d 729, 737 (9th Cir. 1996) ("The civil statute thus places [plaintiff] between the rock of foregoing [an attractive business practice] and

---

[3/]   Defendants have not argued that any "prudential" limitation on standing is applicable, and none is. Plaintiffs reserve the right to address such arguments should they be raised for the first time in this briefing.

[4/]   Although this standard is most often applied in pre-enforcement challenges to criminal statutes, it also applies to statutes with civil enforcement provisions. *See, e.g., Vermont Right to Life Comm., Inc. v. Sorrell*, 221 F.3d 376, 382 (2d Cir. 2000) ("That [Plaintiff] faces the possibility of civil litigation rather than criminal prosecution here is of no moment."); *Bland v. Fessler*, 88 F.3d 729, 736 n.11 (9th Cir. 1996) (plaintiff who ceased proscribed conduct prior to filing suit had standing under the "credible threat of prosecution" standard even though he did not face criminal penalties, because he did "face grave consequences for violations of the civil statute, including civil fines and private suits for damages"); *Athens Lumber Co. v. FEC*, 689 F.2d 1006, 1012 (11th Cir. 1982) (rejecting argument that plaintiffs should be required to expose themselves to civil penalties in statute carrying both criminal and civil penalties before bringing pre-enforcement challenge).

the hard place of violating the law."). Plaintiffs are harmed no matter which course they select. Liability is plainly a harm, and "[c]osts of compliance necessary to avoid prosecution can constitute . . . injury," *Hays*, 104 F.3d at 103. Thus a plaintiff that establishes a credible threat of enforcement under a statute necessarily establishes injury-in-fact and the "personal stake in the outcome" of the litigation, *Warth*, 422 U.S. at 498, that is the touchstone of standing. *See Babbitt*, 442 U.S. at 298; *Vermont Right to Life Comm., Inc. v. Sorrell*, 221 F.3d 376, 382 (2d Cir. 2000).

In this case, the threat of enforcement is more than credible because the Act specifically targets manufacturers who, like Plaintiffs' members, sell patented prescription drugs that are resold in the District, and there is every reason to believe that the District and/or countless potential private attorneys general (with the active support of the District)[5] will file suit against Plaintiffs' members under the Act to enforce its provisions. The Act makes it unlawful for "any drug manufacturer or licensee thereof . . . to sell or supply for sale . . . a patented prescription drug that results in the prescription drug being sold in the District for an excessive price." Act § 2 (§ 28-4553). PhRMA's members include leading drug manufacturers, who collectively account for close to 70% of prescription drug sales in the United States. *See* Powell Decl. ¶ 3. BIO's more than 1100 members include "leading pharmaceutical and biotechnology research, development, and manufacturing companies." Sachdev Decl. ¶¶ 3, 5.[6] Plaintiffs' members sell

---

[5] The District of Columbia must receive notice and must be given an opportunity to intervene to defend the constitutionality of the Act when — as will inevitably be the case — it is challenged by a defendant in D.C. Superior Court. *See* D.C. Super. Ct. Rule of Civ. P. 24(c) & 24-I; *see also* Defs.' Opp'n to Mot. To Consolidate 7 n.4.

[6] At the outset of BIO's involvement in this case, BIO and Defendants negotiated a stipulation providing that BIO's evidence would not be considered by the Court, but that BIO would receive the benefit of any ruling the Court entered with respect to PhRMA. Because

5

the patented pharmaceuticals they manufacture.[7] The overwhelming majority of these sales — but not all of them, *see infra* note 19 — occur outside the District.[8] And in a portion of these out-of-state sales, the drugs are subsequently resold to patients in the District.[9] The Act thus regulates the initial sale made by Plaintiffs' members of patented drugs that are subsequently resold in the District and makes this ex-manufacturer sale unlawful to the extent it "results in" a retail sale in the District at an excessive price.[10]

Far more than a "credible threat," enforcement actions against Plaintiffs' members appear inevitable. The D.C. Council has already declared in the Act that, in its opinion, patented prescription drug prices in D.C. are "excessive," *id.* (§ 28-4551(1)). Defendants have made repeated assertions to that effect in their opposition papers, *see, e.g.*, Defs.' Opp'n to Pls.' Mot. for Prelim. Inj. 2-4, 25, 27, 38, 42 ("Defs.' Opp'n"). Defendants have never suggested the Act

---

Defendants have failed to execute that stipulation, this memorandum contains parallel citations to BIO's submissions where appropriate.

[7]   PhRMA's Statement of Material Facts ¶ 1; Powell Decl. ¶ 3; Sachdev Decl. ¶¶ 7-8; Belknap Decl. ¶ 3; Broughton Decl. ¶ 3; Fish Decl. ¶ 3; Marmontello Decl. ¶ 3; Soto Decl. ¶ 3; Bowen Decl. ¶ 4; Clark Decl. ¶ 4; Meyers Decl. ¶ 4. The D.C. Circuit has clearly stated that "the district court may properly consider affidavits submitted by the parties, in addition to the complaint, to resolve the standing question." *Spann v. Colonial Village, Inc.*, 899 F.2d 24, 28 n.1 (D.C. Cir. 1990).

[8]   PhRMA's Statement of Material Facts ¶ 2; Powell Decl. ¶ 7; Sachdev Decl. ¶ 8; Belknap Decl. ¶ 4; Broughton Decl. ¶ 4; Fish Decl. ¶ 4; Marmontello Decl. ¶ 4; Soto Decl. ¶ 5; Bowen Decl. ¶¶ 4-5; Clark Decl. ¶¶ 4-5; Meyers Decl. ¶¶ 4-5.

[9]   PhRMA's Statement of Material Facts ¶ 2; Powell Decl. ¶ 3; Sachdev Decl. ¶¶ 8-9; Belknap Decl. ¶ 4; Broughton Decl. ¶ 6; Fish Decl. ¶¶ 3-4; Marmontello Decl. ¶ 5; Soto Decl. ¶ 5; Bowen Decl. ¶ 4; Clark Decl. ¶ 4; Meyers Decl. ¶ 4.

[10]  As discussed at the hearing, § 28-4553 refers to two sales. *See* Tr. 20-21. The *first* gives rise to liability. Only the *second* must take place "in the District." And although "point of sale retailers" are exempted from liability, Act § 2 (§ 28-4553), retail *sales* plainly can serve as the "resulting" sale in D.C. at an excessive price giving rise to liability for the patentee or licensee who made the upstream sale.

will go unenforced by the District, and the Court should assume that it will be enforced. *See, e.g.*, *Virginia v. American Booksellers Ass'n*, 484 U.S. 383, 393 (1988) ("The State has not suggested that the newly enacted law will not be enforced, and we see no reason to assume otherwise."); *Alderman v. United States*, 394 U.S. 165, 175 (1969); *Commodity Trend Serv., Inc. v. Commodity Futures Trading Comm'n*, 149 F.3d 679, 687 (7th Cir. 1998). Nor would such a suggestion affect Plaintiffs' standing.[11/] Moreover, it is clear that the Act will be enforced against Plaintiffs' members, who as manufacturers of patented prescription drugs and their licensees are the targets of the Act. It is also virtually certain that at least one purchaser of patented pharmaceuticals in D.C. — or purported representative of the public interest empowered by the Act, *see* Act § 2 (§ 28-4552(1)) — will file suit against at least one of Plaintiffs' members. *See supra* note 5.

The inevitability of enforcement is only heightened by the provision permitting a plaintiff to make a prima facie case for excessive pricing where the wholesale price of a drug is more than 30% higher than the wholesale price in four benchmark countries. *See* Act § 2 (§ 28 4554). As this Court may judicially notice, and as Defendants themselves assert, there are studies in the public domain purporting to show that market-set prices in the U.S. exceed the price-controlled levels in the four benchmark countries by more than 30%. *See* PhRMA Compl. ¶ 53; Defs.'

---

[11/]   Even if Defendants had purported to adopt a non-enforcement policy for certain or even all of the transactions covered by the Act, courts have previously held that such policies do not dispel a "credible threat" of enforcement where the entity adopting the policy can change its mind. *See Chamber of Commerce v. FEC*, 69 F.3d 600, 603 (D.C. Cir. 1995). Moreover, as a federal district court recently observed in an analogous case, "the Act's private right of action makes the threat of enforcement more credible and more imminent than in *Chamber of Commerce* because civil plaintiffs would *never* be bound by the attorney general's narrow construction." *Rhode Island Medical Soc'y v. Whitehouse*, 66 F. Supp. 2d 288, 303-04 (D.R.I. 1999).

7

Opp'n 3-4.[12/]   The Commerce Department has reported, for example, that the average government-controlled price at which manufacturers sell drugs to wholesalers in the four benchmark countries ranges from 40% to 59% of the price in the United States. *See* PhRMA Compl. ¶ 53 (citing U.S. Dep't of Commerce, Int'l Trade Admin., *Pharmaceutical Price Controls in OECD Countries: Implications for U.S. Consumers, Pricing, Research and Development, and Innovation* 15 fig.3 (Dec. 2004)). Although the data on which comparisons of this type are based are seriously flawed, as are the comparisons themselves, the point for present purposes is that the District or another would-be enforcer of the Act could contend on the basis of such studies that it had established a prima facie case under § 28-4554. At a minimum it could maintain that it had pled a sufficient basis to pursue discovery. That reality increases the already virtual certainty that the Act will be enforced against at least one of Plaintiffs' members.

This credible threat of enforcement forces Plaintiffs' members to choose between either modifying their business practices or facing a multiplicity of lawsuits and the attendant risk of liability.[13/] As the D.C. Circuit recently reiterated, a credible threat of enforcement puts the

---

[12/]   *See, e.g., Kaempe v. Myers*, 367 F.3d 958, 965 (D.C. Cir. 2004) (taking judicial notice of public records referred to in complaint); *see also* 10A Charles A. Wright et al., *Federal Practice and Procedure* § 2723 (3d ed. 1998) (stating that the doctrine of judicial notice applies to motions for summary judgment).

[13/]   *See* PhRMA's Statement of Material Facts ¶ 3 ("It is an obvious consequence of the Prescription Drug Excessive Pricing Act of 2005 that PhRMA's members will have to consider potential liability in the United States under the Act when conducting or considering the conduct of business in Australia, Canada, Germany, and the United Kingdom."); Powell Decl. ¶ 11 ("[E]ach PhRMA member company will have to conduct its own analysis . . . regarding what steps it might take to comply with the D.C. Act. But given the breadth of the Act and its failure to define many of its own terms, it seems inevitable that, unless an individual PhRMA member takes steps to modify its pricing, distribution, or other business practices—actions that inevitably would injure the member—the presumption of excessive pricing under the Act would place the PhRMA member at substantial risk of liability."); Sachdev Decl. ¶ 13 ("Individual biopharmaceutical manufacturers would be required to make their own independent judgments

8

regulated entity to this choice, and that choice constitutes injury-in-fact. *See Sabre, Inc. v. Department of Transp.*, No. 04-1073, 2005 WL 3108499 (D.C. Cir. Nov. 22, 2005); *cf. Morales v. Trans World Airlines, Inc.*, 504 U.S. 374 (1992) (authorizing permanent injunctive relief in such circumstances).

In *Sabre*, the Department of Transportation ("DOT") permitted several regulations governing independent computer reservation systems ("CRS") to sunset, but stated that entities operating CRSs, including entities such as the plaintiff, would remain subject to DOT authority. 2005 WL 3108499, at *1-2. The plaintiff worried that this residual authority, which potentially included the power to prohibit unfair or deceptive trade practices, would be used to prohibit the very practices made lawful when the other regulations were allowed to sunset. *Id.* at *2-3. The plaintiff therefore sought a pre-enforcement declaratory judgment, challenging the DOT's conclusion that it could apply the prohibition on unfair or deceptive trade practices against the plaintiff. The Court held there was a sufficiently credible threat of enforcement against Sabre to support its standing, because "Sabre realistically expects that its [business conduct] will be perceived by the Department as a violation." *Id.* at *4. Although Sabre contended any enforcement action would be unlawful, the Court of Appeals held that this enforcement threat "has immediate, unavoidable implications for Sabre's business choices and investments, which constitutes a sufficiently distinct and palpable injury." *Id.*

Here, of course, there is an even greater likelihood of enforcement. The D.C. Act on its face declares the current prices of Plaintiffs' members to be unlawful. It authorizes not only a

---

as to how to attempt compliance with the D.C. Act. Regardless of what changes a manufacturer makes to its pricing strategy, distribution processes, or other business practices, all of the potential methods by which a BIO member might avoid liability would result in serious detriment."); *see also* Belknap Decl. ¶ 5; Fish Decl. ¶ 7; Marmontello Decl. ¶¶ 6-7; Soto Decl. ¶ 4, 6; Bowen Decl. ¶¶ 6-8; Clark Decl. ¶¶ 6-8; Hamm Decl. ¶¶ 7-9; Meyers Decl. ¶¶ 6-8.

9

government agency, but also literally anyone claiming to represent the public interest, to file suit. And the choices for Plaintiffs' members are exactly those confronted by Sabre: change business practices or face a significant risk of an enforcement action. As the Court observed at the summary judgment hearing, the question whether any given price is "excessive" under the Act is largely indeterminate. *See* Tr. 32-33, 63-64, 90-92. No company can know the answer in advance of a ruling by the D.C. Superior Court or another court. Yet, given the consequences of a violation — indeed, even the consequences of being sued — *all* of plaintiffs' members will have to consider changing their business practices. *See supra* note 13.

The D.C. Circuit's decision in *Navegar, Inc. v. United States*, 103 F.3d 994 (1997), which has been called into serious question, *see Seegars v. Gonzales*, 396 F.3d 1248, 1253-54 (D.C. Cir. 2005), is not to the contrary. There, the court strongly reaffirmed that a threat of enforcement supports pre-enforcement standing. *Navegar*, 103 F.3d at 1001. In finding, however, that two particular weapons manufacturers lacked standing to bring a pre-enforcement challenge to a federal law prohibiting the manufacture, transfer, or possession of a class of firearms, the court concluded there was an insufficient showing that the government would choose to enforce the broad and generic portions of the law against those two manufacturers in particular. *Id.* at 1001-02. In *Seegars*, the Court similarly found an insufficient likelihood that D.C.'s general prohibition on possessing pistols would be enforced against the five plaintiffs who wanted to keep firearms in the District. *Seegars*, 396 F.3d at 1255. In those cases, in short, the Court of Appeals denied standing because it found the threat of enforcement against the individual plaintiffs not to be sufficiently credible. Here, by contrast, the Act significantly governs the price of Plaintiffs' members' products; it can be enforced not only by a particular government agency, but also by every D.C. purchaser of each member's product or by any self-

10

identified representative of the public interest; and PhRMA's members account for close to 70% of prescription drug sales in the United States, *see* Powell Decl. ¶ 3, and BIO has more than 1100 members, *see* Sachdev Decl. ¶ 5. It is therefore a virtual certainty that the D.C. Act will be enforced against one or more of Plaintiffs' members.

Plaintiffs plainly have demonstrated sufficient injury-in-fact on the part of their members to satisfy the requirements of Article III standing. *See Abbott Labs. v. Gardner*, 387 U.S. 136, 154 (1967) ("[T]here is no question in the present case that petitioners have sufficient standing as plaintiffs: the regulation is directed at them in particular; it requires them to make significant changes in their everyday business practices; if they fail to observe the Commissioner's rule they are quite clearly exposed to the imposition of strong sanctions."), *overruled on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977). Indeed, if Plaintiffs' members do not have a sufficient "personal stake in the outcome" of this litigation to warrant the "invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers," *Warth*, 422 U.S. at 498, it is difficult to imagine who would.[14]

---

[14] At the hearing, Defendants did not contest causation and redressability, and both requirements go hand-in-hand with injury in this context. The injury is "fairly traceable to the challenged action of the defendant" because the Act creates the cause of action under which suits would be brought against Plaintiffs' members and because there is every reason to believe the District would attempt to enforce the Act if given the chance. The injury is also redressable by the declaratory and injunctive relief plaintiffs seek. Such relief will be binding on the District of Columbia and preclude the District from bringing any enforcement action under the Act. That result alone will provide a significant measure of relief to Plaintiffs' members, because the District is likely the potential plaintiff with the greatest interest in and ability to bring suit under the Act. *See Bland*, 88 F.3d at 738. Moreover, the authority of a declaratory judgment from this Court that the Act is unconstitutional and preempted by federal law — binding on the sovereign under whose authority the law is promulgated — will (at a minimum) deter and materially assist Plaintiffs' members in defending suits by plaintiffs other than the District under this unconstitutional law. Moreover, the District would presumably intervene in any case in which one of Plaintiffs' members asserts a constitutional defense, and relief in this case would preclude the District from actively assisting future plaintiffs in such a manner. Thus, the relief plaintiffs

## II. Defendants' Arguments That Plaintiffs Lack Standing Ignore Applicable Law and Undisputed Facts and Depend Upon Constructions of the Act That Are Entirely Implausible.

Plaintiffs are hampered in responding to Defendants' arguments on standing by Defendants' complete failure, at any point, to brief the issue and thereby intelligibly to set forth their claims. So far as Plaintiffs could discern at the summary judgment hearing, Defendants seemed to be making two types of argument. First, Defendants appear to be asserting that any injuries to Plaintiffs' members from enforcement of the Act are somehow too speculative to support standing. Second, Defendants appear to contend that Plaintiffs fail to allege injury based on Defendants' own new and very crabbed reading of the Act. Both arguments fail.

### A. Plaintiffs' Allegations of Injury Are Not "Matters of Conjecture."

Defendants appeared at times to be contending that a plaintiff must concede liability under a statute to challenge it prior to its enforcement. *See, e.g.*, Tr. 14, 17, 59-60. Specifically, they argued that Plaintiffs must allege that their drugs are sold at prices that "trigger" the statute to establish standing. *See, e.g.*, Tr. 7, 12, 13, 14, 16, 17, 59-60, 66. As the foregoing discussion makes clear, however, the remarkable proposition that a party can challenge a law only if it is willing to assert with certainty that its conduct violates the law is wrong. In pre-enforcement challenges, all that is required to establish standing is a "credible threat" of enforcement. *See, e.g.*, *Pennell v. City of San Jose*, 485 U.S. 1, 8 (1988) ("The *likelihood of enforcement*, with the

---

have requested will provide more than sufficient remedy to satisfy the redressability requirement. *See Meese v. Keene*, 481 U.S. 465, 476-77 (1987) (finding redressability prong satisfied where the requested injunction "would at least partially redress" the plaintiff's injury); *Foretich v. United States*, 351 F.3d 1198, 1215-16 (D.C. Cir. 2003) (finding redressability prong satisfied where a favorable judicial decision would "provide meaningful relief — even if not complete" to the plaintiff); *Swan v. Clinton*, 100 F.3d 973, 980-81 (D.C. Cir. 1996) (holding that "partial relief is sufficient for standing purposes").

concomitant *probability* that a landlord's rent will be reduced below what he or she would otherwise be able to obtain in the absence of the Ordinance, is a sufficient threat of actual injury to satisfy [Article III's] requirement that '[a] plaintiff who challenges a statute must demonstrate a *realistic danger* of sustaining a direct injury as a result of the statute's operation or enforcement.'" (citation omitted and emphases added)); *Dixon v. Edwards*, 290 F.3d 699, 712 (4th Cir. 2002) ("A *threat of liability* for civil or criminal trespass constitutes the type of injury that . . . is both 'concrete and particularized,' and 'actual or imminent.'" (citation omitted and emphasis added)).

In *Pennell*, for example, the Supreme Court found that an association of landlords had standing to pursue a Takings Clause challenge to an ordinance that permitted city officials to consider hardship to tenants when deciding whether to approve a landlord's proposed rent increase, even though "at no time did [plaintiffs] allege that [any plaintiff] ha[d] 'hardship tenants' who might trigger the Ordinance's hearing process," and even though plaintiffs did not specifically allege that they had been or would be aggrieved by any determination by a hearing officer that a proposed rent increase was unreasonable on the ground of tenant hardship. 485 U.S. at 6. Rather, the plaintiffs' allegations that their properties were "subject to the terms of" the ordinance and that the plaintiff association represented most residential unit owners in the city and had many hardship tenants created a sufficient likelihood of enforcement to establish injury-in-fact for purposes of Article III. *Id.* at 7-8.

Defendants' demand that Plaintiffs concede liability under the Act would have the unacceptable effect of leaving many businesses threatened with enforcement without a practical way of challenging it in advance, thus chilling the constitutionally protected conduct threatened by the law. Even where a statute is susceptible to competing interpretations, the threat of

13

enforcement and consequent chilling effect is no less injurious where a business's practices "at least arguably violat[e]" the law. *American Library Ass'n v. Barr*, 956 F.2d 1178, 1196 (D.C. Cir. 1992); *see also American Booksellers*, 484 U.S. at 392 (finding injury-in-fact where the challenged "law is aimed directly as plaintiffs, who, *if their interpretation of the statute is correct*, will have to take significant and costly compliance measures or risk criminal prosecution" (emphasis added)); *Stern v. United States Dist. Ct. for the Dist. of Mass.*, 214 F.3d 4, 11 (1st Cir. 2000) (finding standing where plaintiffs intended to engage in conduct "*arguably* proscribed" by the statute (emphasis added)). The credible threat that suits will be brought against Plaintiffs' members injures them by forcing them to choose between incurring the costs of avoiding or minimizing that threat or facing burdensome enforcement suits. The unconstitutional injuries inherent in such a choice are not eliminated by the prospect of successfully defending such a suit, especially where, as here, enforcement actions are likely to be numerous. Moreover, the unconstitutional harms visited upon Plaintiffs' members — extraterritorial regulation and local second-guessing of the incentives created by federal patent law — are perfected by the mere existence and attempted enforcement of the statute, regardless of whether a particular manufacturer would ultimately be able to convince a D.C. court that its prescription drugs were reasonably priced in a given case. Under established precedent, the credible threat of enforcement against Plaintiffs' members affords them standing to test the constitutionality of the law.

**B.     Defendants' Construction of the Statute Is Flawed and Fails to Defeat Standing.**

At the hearing, Defendants advanced an interpretation of the Act that, they contend, shows no manufacturers will ever be affected by it. Defendants appeared to contend that the D.C. Act applies only to wholesale transactions that occur entirely within the District of

Columbia and that Plaintiffs' members will therefore suffer no injury as a result of the Act because, in large part, they do not participate in such sales. *See* Tr. 8-12. This argument is contrary to the plain meaning of the Act and is inconsistent with its structure. And because the declarations show that Plaintiffs' members do make even the few sales Defendants now say the Act would cover, Plaintiffs have standing in any event.

First, the statute obviously does not carry the meaning Defendants now attribute to it. The liability-creating provision of the Act, § 28-4553, makes it unlawful "for any drug manufacturer or licensee thereof . . . to sell or supply for sale . . . a patented prescription drug that results in the prescription drug being sold in the District for an excessive price." Act § 2 (§ 28-4553) (entitled "[e]xcessive pricing in sales of prescription drugs, a violation of law"). It is thus the *initial* sale from the manufacturer (or its licensee) that gives rise to civil liability, provided only that it "results in" a different, subsequent sale within the District at a price deemed to be excessive. *See* PhRMA Mem. in Supp. of Mot. for Prelim. Inj. 24-26; Pls.' Reply in Supp. of Mot. for Prelim. Inj. 10-11. Unlike the subsequent sale, the initial liability-creating sale is *not* geographically restricted: it may occur *anywhere* and still occasion liability under D.C. law. By its plain terms, therefore, the Act imposes liability on manufacturers' transactions regardless of where they occur, provided only that they are connected to a downstream sale in D.C.[15]

---

[15] To the extent Defendants' standing argument depends on their prior suggestion that the Court read the Act narrowly in order to save it from unconstitutionality, *see* Defs.' Supp. Mem. 5-6, they have offered nothing to overcome the long-standing principle that a court "cannot press statutory construction 'to the point of disingenuous evasion' even to avoid a constitutional question," *Miller v. French*, 530 U.S. 327, 341 (2000) (citation omitted). Defendants' suggestion that this Court should construe the Act to apply only to in-District transactions flies in the face of the statutory language and would require the Court to rewrite the legislatively enacted text; the suggested saving construction is thus every bit as meritless in the context of standing as it is in the context of the Act's unconstitutionality under the Commerce Clause. *See* Pls.' Reply 9-11.

15

Plaintiffs' members will thus face liability under the Act for manufacturer sales wherever they take place.[16/]

At the hearing, Defendants did not appear to dispute this understanding of § 28-4553 — the provision that creates liability and defines the violation of law. Instead, Defendants rested their argument on a different provision, § 28-4554, which identifies a prima facie case of excessive pricing and establishes a burden-shifting framework for those cases in which a prima facie case is shown. Arguing that the phrase "in the District" in § 28-4554 modifies "wholesale price" as used in § 28-4554, Defendants apparently contend that the Act creates liability only for wholesale transactions that take place in D.C. *See* Tr. 8. Even assuming that Defendants' interpretation of § 28-4554 were correct — and as discussed at the hearing, *see* Tr. 10, 35-37, it is not[17/] — that interpretation would not limit the scope of liability created in § 28-4553. Section 28-4554 simply provides one means of pursuing a claim; it does not require plaintiffs to proceed in that manner, and it says nothing to confer amnesty upon manufacturers who would otherwise

---

[16/]   Indeed, if § 28-4553 were meant to reach only sales in D.C., it is difficult to understand that section's two-sale structure. Why — if that were the D.C. Council's intent — would the Act not simply prohibit the sale in the District of a patented pharmaceutical at an excessive price, exempting "point-of-sale retailers" from liability? There would be no reason to restrict other sales that "result" in such in-state sales. The answer, of course, is that the law is structured to reach and control the price of upstream sales wherever they occur.

[17/]   Another interpretation, one consistent with the other provisions and the spirit of the Act, would be to read "in the District" as modifying "patented prescription drug" rather than "wholesale price." Under this reading, the prima facie case would apply to any patented prescription drug in the District depending on the wholesale price of that drug, wherever the wholesale transaction took place. Viewed in conjunction with § 28-4553, which includes no such "in the District" requirement, the logical reading of § 28-4554(a) is that "in the District" refers to the eventual in-jurisdiction sale of the drugs, not the location of the upstream wholesale transactions.

be liable under § 28-4553.[18/] The liability created independently in § 28-4553 applies without geographical limitation, and thus clearly encompasses sales by Plaintiffs' members no matter where they occur.

In any event, even assuming Defendants' cramped reading of the Act were correct, Plaintiffs have alleged that a small portion of their wholesale transactions include sales directly to doctors and healthcare institutions in the District of Columbia.[19/] Even accepting Defendants' new arguments, therefore, these transactions in and of themselves afford Plaintiffs standing to challenge the Act.[20/]

---

[18/]   If the prima facie case were the sole means of establishing liability, then manufacturers that do not sell drugs in any of the four benchmark foreign countries would be totally unregulated and no price controls would apply to those drugs, no matter how high the price in D.C. Section 28-4553 does not appear to support such a restriction. Similarly, the statute's use of the phrase "[w]here a prima facie case of excessive pricing is shown" to introduce the burden-shifting framework in § 28-4554(b) further demonstrates that the prima facie case need not come into play in all lawsuits brought under the Act. The logical implication of that language is that where a prima facie case has *not* been shown, the traditional allocation of burdens will govern the lawsuit, and the plaintiff will simply have to establish the excessiveness of the challenged prices by some means other than the statutory prima facie case.

[19/]   *See* Powell Decl. ¶ 7; Sachdev Decl. ¶ 8; Belknap Decl. ¶ 4; Marmontello Decl. ¶ 4; Soto Decl. ¶ 5; Bowen Decl. ¶ 4; Hamm Decl. ¶ 6. Defendants conceded at the summary judgment hearing that Plaintiffs have alleged direct sales in the District of Columbia. *See* Tr. 9. In addition, the wholesalers and retail chains that do conduct sales in the District obtain prescription drugs from Plaintiffs' members; the impact of the Act on those wholesalers and retail chains will therefore harm the manufacturers as well, because it will affect the demand for and price of manufacturers' prescription drugs at the wholesale level.

[20/]   At the summary judgment hearing, Defendants also asserted that should the Court deny Plaintiffs' motion for summary judgment, it would be required to enter judgment in favor of Defendants rather than proceeding to discovery and trial. *See* Tr. 5-6. That is wrong. Plaintiffs clearly indicated before the hearing that they were moving to advance their motion for summary judgment. *See* Reply in Supp. of Mot. To Consolidate 4-5 ("Addressing summary judgment at this time under Federal Rules of Civil Procedure 65(a)(2) and 57 is appropriate because the disputed issues in this case are purely legal."). Defendants, meanwhile, conceded at the hearing that they had not filed a cross-motion for summary judgment. *See* Tr. 6. Nor did they ever indicate that they were seeking summary judgment in their favor at this time. Thus, should the

17

## CONCLUSION

For the reasons stated above, Plaintiffs have established standing to pursue their claims. Therefore, for the reasons stated in Plaintiffs previous filings and at the hearing, this Court should declare the Act unconstitutional and invalid and permanently enjoin its enforcement by Defendants.

Dated: December 1, 2005                                  Respectfully submitted,

/s/ David W. Ogden
David W. Ogden (D.C. Bar No. 375951)
Randolph D. Moss (D.C. Bar No. 417749)
Jonathan J. Frankel (D.C. Bar No. 450109)
WILMER CUTLER PICKERING HALE
AND DORR LLP
2445 M Street, N.W.
Washington, D.C. 20037-1420
(202) 663-6000
(202) 663-6363 (facsimile)

*Counsel for Plaintiff Pharmaceutical Research and Manufacturers of America*

Daniel E. Troy (D.C. Bar No. 442537)
SIDLEY AUSTIN BROWN & WOOD LLP
1501 K Street, N.W.
Washington, D.C. 20005
(202) 736-8000
(202) 736-8711 (facsimile)

*Counsel for Plaintiff Biotechnology Industry Organization*

---

Court determine that it needs additional evidence to decide whether Plaintiffs have standing to raise their claims, Plaintiffs should have an opportunity to present that evidence. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 326 (1986) (summary judgment not appropriate unless "the losing party was on notice that she had to come forward with all of her evidence").