UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


| | | |
|---|---|---|
| BIOTECHNOLOGY INDUSTRY | : | Docket No. CV05-2106 (RJL) |
| ORGANIZATION, | : | November 23, 2005 |
| | : | |
| Plaintiff, | : | 10:00 a.m. |
| | : | |
| v. | : | |
| | : | |
| DISTRICT OF COLUMBIA, et al., | : | |
| | : | |
| Defendants. | : | |
| | : | |
| ----------------------------- | : | |
| | : | |
| PHARMACEUTICAL RESEARCH AND | : | Docket No. CV05-2015 (RJL) |
| MANUFACTURERS OF AMERICA, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| DISTRICT OF COLUMBIA, et al., | : | |
| | : | |
| Defendants. | : | |
| . . . . . . . . . . . . . . . | : | |


TRANSCRIPT OF PRELIMINARY INJUNCTION HEARING
BEFORE THE HONORABLE RICHARD J. LEON
UNITED STATES DISTRICT JUDGE


APPEARANCES:

For the Plaintiff:            DAVID WILLIAM OGDEN, ESQ.
Pharmaceutical Research       RANDOLPH D. MOSS, ESQ.
and Manufacturers of          Wilmer Cutler Pickering Hale &
America:                        Dorr, LLP
                              2445 M Street, N.W.
                              Washington, D.C.  20037

Page 2

APPEARANCES (continued):
For the Plaintiff:      ANNE SMALL, ESQ.
Pharmaceutical Research      Wilmer Cutler Pickering Hale &
and Manufacturers of      Dorr, LLP
America:      399 Park Avenue
      New York, New York  10022

For the Plaintiff      DANIEL E. TROY, ESQ.
Biotechnology Industry      ERIC SHUMSKY, ESQ.
Organization:      Sidley, Austin, Brown & Wood, LLP
      1501 K Street, N.W.
      Washington, D.C.  20005

For the Defendant:      ROBERT UTIGER, ESQ.
      RICHARD UTIGER, ESQ.
      ANDREW J. SAINDON, ESQ.
      D.C. Office of the Attorney
       General
      441 4th Street, N.W.
      Suite 600
      Washington, D.C.  20001

Court Reporter:      PATTY ARTRIP GELS, RMR
      Official Court Reporter
      Room 4800-C, U.S. Courthouse
      Washington, D.C. 20001
      (202) 962-0200

Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription

---

Page 3

         P R O C E E D I N G S
1
2        COURTROOM DEPUTY:  Your Honor, this is the
3   Pharmaceutical Research and Manufacturers of America versus the
4   District of Columbia, et al., Civil Action 05-2015.  Also,
5   Biotechnology Industry Organization versus the District of
6   Columbia, Civil Action 05-2106.
7        Counsel, come forth and state your appearances for the
8   record.
9        MR. OGDEN:  David Ogden, your Honor, for Pharma.  With
10  me at counsel table are Randy Moss and Anne Small.
11       THE COURT:  Good morning, everyone.
12       MR. TROY:  Dan Troy for the Biotechnology Industry
13  Organization.  With me at counsel table is Eric Shumsky.
14       THE COURT:  Good morning.
15       MR. TROY:  Thank you.
16       MR. UTIGER:  Good morning, your Honor.  Robert Utiger
17  for the District of Columbia.  And with me at counsel table are
18  Richard Love and Andrew Saindon.  And, your Honor, so the Court
19  is aware, the District had a preliminary matter it would like to
20  address before we start.
21       THE COURT:  All right.  Welcome, good morning.
22       All right.  Mr. Utiger, what's your preliminary matter
23  here?
24       MR. UTIGER:  Your Honor, the District -- we are here
25  for trial on the merits.  The District intends to argue standing

---

Page 4

1   as a jurisdictional bar to Plaintiff's complaint as a threshold
2   question, and it is the District's view that that should be
3   addressed up front.
4        THE COURT:  Do you feel you have adequately had a
5   chance to address this in your pleadings?
6        MR. UTIGER:  Well, your Honor, not really.  The only
7   substantive pleading we have filed is our opposition to a
8   Preliminary Injunction.  By its very nature, we are not required
9   to put forth all of our defenses because we don't have time to
10  do that.
11       In addition, jurisdiction -- this is a constitutional
12  question.  It can't be waived.  It can be raised at any time.
13  We did, in fact, raise it as a defense in our answers to both
14  complaints in this matter.  Plaintiffs are aware, surely, that
15  these need to properly allege standing.
16       One of the reasons why we are raising this now is,
17  frankly, the last time we were before the Court Plaintiff's
18  counsel made the observation that the only factual issue was
19  standing, and then rested on one of its proposed findings of
20  fact to establish it.
21       We went back.  We looked through the complaint.  We
22  looked through all the pleadings.  We looked through the
23  affidavits, and we think, as a matter of constitutional law,
24  they don't get there, and that this Court, therefore, does not
25  have the power to reach the merits.

---

Page 5

1        THE COURT:  But wouldn't that have related to your
2   defense that there was no reasonable likelihood of success on
3   the merits that's in your PI briefing?
4        MR. UTIGER:  It could have, your Honor.  But the cases
5   are pretty clear that you don't waive an issue by not raising it
6   at the Preliminary Injunction stage.
7        Frankly, at that time we raised that defense, we were
8   also seeking Discovery, and that issue had not yet been ruled
9   on.  The Discovery we sought, having now, in hindsight, looked
10  back, would have, I think, shed some light on the standing
11  issue.  Where we are at now -- and we are here on Plaintiff's
12  Motion.
13       THE COURT:  True.
14       MR. UTIGER:  We are here for trial.  This is it.  One
15  of the reasons why this case law requires the Court to
16  consolidate in advance of trial is so that anything you haven't
17  thought of you need to put out there.  The defense has to be
18  ready to put everything on.
19       THE COURT:  Well, this is a Motion for Summary Judgment
20  in the final analysis because if it were denied, would there not
21  still be available to the District of Columbia opportunities
22  for, at least in theory, Discovery?  Would the case necessarily
23  be over?
24       MR. UTIGER:  I think it is over, your Honor.
25  Plaintiffs moved under two rules.

1    THE COURT: Have you cross-moved for Summary Judgment?
2    MR. UTIGER: No, your Honor.
3    THE COURT: So if they move for Summary Judgment and
4  they lose, the case is --
5    MR. UTIGER: Is over, your Honor.
6    THE COURT: -- over?
7    MR. UTIGER: Yes, your Honor, because they moved under
8  Rule 57. This Court didn't advance Summary Judgment Motion and
9  consolidate that with the PI Motion -- the Court could have done
10  that and, if they failed, the case would go on and we get
11  Discovery.
12    They have said there are no factual issues at all, and
13  they moved this Court, which the Court granted, to consolidate,
14  or to advance trial on the merits under Rule 57.
15    When you go to trial on the merits, if the Plaintiff
16  does not prove its case because it hasn't alleged facts or
17  proven facts sufficient to establish all its elements, the Court
18  doesn't postpone the trial or adjourn the trial and let the
19  Plaintiff go back and cure their evidentiary defect.
20    If they don't prove their case, then the Defendant is
21  entitled to judgment as a matter of law. That was on their
22  Motion, and that's what the Court did.
23    THE COURT: What would you need, do you think, to
24  adequately set forth your position on standing in addition to
25  any oral argument today? Do you want a supplemental pleading on

1  that?
2    MR. UTIGER: I don't think we need a supplemental
3  pleading, your Honor. I think that on the case law and on the
4  face of the complaint there is a pleading defect of a
5  constitutional nature.
6    I think that they have not pled, nor do -- I think they
7  would have done it in their pleadings. But even if the Court
8  were to take into consideration the affidavits, which are
9  evidence, which we should have had the opportunity to challenge
10  if they were going to raise it, that they have now walked away
11  from -- but even if you considered those, at no point anywhere
12  in any of these pleadings is there any allegation that any
13  member of either one of the associations manufactures a drug
14  that, at the time the complaint was filed, was being sold in the
15  District wholesale for a price that would trigger the statute.
16    There is no adequate allegation that this statute --
17    THE COURT: Wait. You need to repeat that. Was being
18  sold in the District wholesale or was being sold wholesale
19  outside of the District that resulted in a price in the District
20  that could arguably be excessive as defined -- well, for the
21  purposes of making a prima facie case, as defined in the
22  statute? There is a difference there.
23    MR. UTIGER: The statute defines the prima facie case
24  based on a wholesale price --
25    THE COURT: Comparison of.

1    MR. UTIGER: -- being sold in the District. It's the
2  wholesale price in the District that triggers the statute. Not
3  a wholesale price -- there may be a long-arm effect outside the
4  District, but the wholesale price that triggers the prima facie
5  analysis is the wholesale price in the District. That's the
6  term of the statute. Plaintiffs haven't alleged --
7    THE COURT: Which section of the statute are you
8  addressing there, Mr. Utiger?
9    MR. UTIGER: Just a second, your Honor.
10    THE COURT: 4554(a)? Is that what you are looking at?
11  (A)?
12    MR. UTIGER: Yes, your Honor.
13    THE COURT: All right. So show me what you have in
14  mind there.
15    MR. UTIGER: A prima facie case of excessive pricing
16  shall be established when the wholesale price of a patented
17  prescription drugs in the District -- in the District -- is over
18  30 percent higher than the comparable price in any high income
19  country.
20    It's triggered by a wholesale price in the District.
21  It's not triggered by a wholesale price someplace else. If
22  there is no effect in the District, there is no trigger to the
23  statute.
24    THE COURT: If there are no wholesale prices and
25  transactions being conducted in the District, which is, as I

1  understand, the Plaintiff's position -- I will let them clarify
2  it further in a minute, obviously -- then that's one situation.
3    The District may or may not be able to -- may or may
4  not be of the position that that's this only way this can be
5  read. If that's your position, that's your position. It sounds
6  like you are saying that's the only way this can be read.
7    MR. UTIGER: I think it is, your Honor, and I think
8  that the reason for that is -- and you have to think -- they say
9  they don't make any wholesale sales in the District. Perhaps
10  true. But what the law requires is there has to be a wholesale
11  sale in the District.
12    Now, you can also be held liable if you cause a
13  wholesale sale in the District. That's where their potential
14  liability lies. I will take their allegation as true, that they
15  don't sell anything wholesale in the District, though I think
16  they say they do sell some drugs; they sell some directly to
17  hospitals and such.
18    THE COURT: Does the legislative history indicate,
19  Mr. Utiger, any information or -- well, let's just say
20  information that was at the disposal of the city council
21  indicating wholesale drug transactions within the District of
22  Columbia?
23    MR. UTIGER: I don't know, your Honor, but I think that
24  you only look at the legislative history if there is an
25  ambiguity in the statute. The District is taking the position

Page 10

1 that we are not regulating wholesale sales outside the District.
2 We are -- what our concern is and where our jurisdiction is is
3 the wholesale sale inside the District.
4     Now, there may be sales outside that affect that, and
5 there may be a long-arm way to get to the Plaintiffs if what is
6 happened is they put a drug into the stream of commerce at such
7 a high price that it inevitably results in price gouging in the
8 District. But that's a factual issue. That's not -- you know,
9 the statute itself, as far as the trigger on its face, is a
10 wholesale sale in the District. And there is no allegation --
11     THE COURT: The statute is not written quite -- at
12 least at first blush to me, written quite as clearly as you
13 suggest it's written. It doesn't say here whether the wholesale
14 price set in the District -- the phrase "in the District" comes
15 after "a patented prescription drug."
16     If not -- it doesn't appear to be necessarily intended
17 to relate to where the wholesale price is actually being either
18 set or offered the way it written, as it's constructed -- at
19 first blush, anyway.
20     It would appear to at least offer the possibility here
21 that the phrase "in the District" relates to the prescription
22 drug itself that's sold in the District where that turns out to
23 be -- again, this is the statute's language -- excessive by
24 virtue of a comparison to prices in foreign countries.
25     You know, if this is what your position is going to be,

Page 11

1 so be it. But I certainly don't want to -- on a matter of this
2 significance, I don't want to deprive either side the
3 opportunity to articulate fully and clearly its position,
4 especially in a matter of this significance.
5     So I will let you spend the next five minutes or so
6 talking about this standing issue. I will give the Plaintiffs a
7 chance to not only address it orally but to supplement their
8 arguments in writing -- probably give them, you know, a week or
9 something like that, because of the time crunch we are under
10 here, to do so.
11     But this appears, at least at first blush to me, to be
12 a different approach than you all have previously taken with
13 regard to this particular statutory provision.
14     And you are entitled to take a new approach if you
15 wish, but I want to make sure everybody is pretty much clear as
16 to what the playing field is. I don't like moving those goal
17 posts around at the last moment.
18     So you go ahead. If you want to argue some standing
19 for a little bit, go ahead.
20     MR. UTIGER: Let me first address the Court's statutory
21 construction comments. I think that you can only read
22 paragraph A in conjunction with the paragraph right above it.
23 In the paragraph right above it, it talks about the results in
24 the prescription -- for a patented prescription drug that
25 results in the prescription drug being sold in the District for

Page 12

1 an excessive price.
2     THE COURT: Well, I mean, obviously that could have
3 been written to read -- to have been sold in the District in a
4 wholesale transaction. Or it could have specifically -- could
5 have, in theory, for reasons perhaps the legislative history
6 will make clear. But for reasons that are otherwise not clear
7 at first blush, the city council chose, as it is its prerogative
8 to choose, not to limit that in any way to a wholesale
9 transaction that took place in the District or make any
10 distinction between a wholesale or a retail transaction in the
11 District.
12     MR. UTIGER: Resale -- retail sales --
13     THE COURT: Excuse me. Retail.
14     MR. UTIGER: -- are specifically excepted from the
15 statute. But even taking that construction as the proper
16 construction, Plaintiffs still have not alleged that any of
17 their members selling drug that's going to trigger the statute
18 no matter where the sale occurs, whether or not it happens in
19 Montana or Nevada or in the District. There is no declaration.
20 There is no affidavit. There is not even an allegation that any
21 member of either association is selling a drug that would
22 trigger the prima facie provision of the statute.
23     THE COURT: Well, haven't they taken the position in
24 their pleadings, Mr. Utiger, that, first of all, there are no
25 wholesale transactions in the District, as far as they know.

Page 13

1 The wholesale transactions take place outside the District where
2 they sell to distributors, whether they be national distributors
3 like Cardinal or whether they be to chains like CVS, for
4 example, who in turn end up doing the retail selling within the
5 District.
6     And so their theory, legally speaking, and factually,
7 has been that if you are going to bring this statute against our
8 clients, then by definition you have to be challenging the
9 wholesale price that they set outside of the District to one of
10 the distributors who would either sell it in the District on a
11 chain basis, like CVS would, or in some other way.
12     That's been their whole -- I mean, from the beginning
13 of their pleadings and the PI and, actually, the TRO -- the oral
14 arguments that were advanced in behalf of their clients with the
15 TRO proceeded from that premise.
16     So that's been the posture of it, at least
17 conceptually, since the beginning, hasn't it?
18     MR. UTIGER: I agree, your Honor. But what they
19 haven't done is say that right now -- or, actually, standing is
20 tested at the time the complaint is filed -- that at the time
21 the complaint was filed, that any drug being sold by any one of
22 their members was going to trigger --
23     THE COURT: In the District.
24     MR. UTIGER: Anywhere. Was going to trigger this
25 statute. It doesn't matter where the sale occurs. If it

Page 14

1   doesn't trigger the statute --
2       THE COURT: Okay.
3       MR. UTIGER: -- no matter what their construction is,
4   at some point they have to say, we have made a wholesale sale
5   outside the District of Columbia, and it triggers the statute.
6       THE COURT: All right. So, in other words, you are
7   claiming they have to have alleged up front that there is at
8   least one situation where using the excessive pricing definition
9   set forth -- not definition, but formulation set forth here for
10  a prima facie case, that it would meet that.
11      So, therefore, they are in a position to, in advance of
12  the statute going into effect, which is the posture we are in
13  right now. The statute -- I think we are at day 26 in the
14  legislative calendar; at least that's about where we are.
15      MR. UTIGER: Yes, your Honor.
16      THE COURT: Roughly four days to go in the legislative
17  calendar. Of course, we don't know what Congress will choose to
18  do. It may be that Congress will toll the statute. We don't
19  know what Congress is going to do. I don't have a crystal ball.
20      So you are saying in order to challenge it
21  constitutionally in advance to its going into effect, they have
22  to plead and demonstrate that at least one of their members has
23  this particular exposure?
24      MR. UTIGER: Yes, your Honor. And as the Supreme Court
25  has said in Lujan versus Defenders of Wildlife, it is an

Page 15

1   irreducible constitutional minimum.
2       THE COURT: All right.
3       MR. UTIGER: They have to show an actual or imminent --
4   it's not conjectural or hypothetical -- injury, in fact, to one
5   of their members.
6       Here, they haven't done it. And with the Court's
7   indulgence for a minute.
8       THE COURT: Yes.
9   (Pause.)
10      MR. UTIGER: Again, we are here in a posture, a
11  procedural posture based on Motions filed by Plaintiffs. In
12  July of 2005, the D.C. Circuit decided a case called
13  Commonwealth of Massachusetts versus EPA, et al. And the cite
14  for that is 415 F.3d 50. And there what the Court said is when
15  you are going to come on for a Motion for Summary Judgment and
16  your assertions are opposed by the Defendant, you have to put on
17  evidence, you have to put on declarations, you have to put on an
18  evidentiary showing.
19      Here, we oppose their standing. We put that in our
20  answer. We are coming on a trial on the merits. So all of our
21  defenses are at play.
22      What the Circuit said is you have to show that up front
23  for Summary Judgment. You also have to show it up front by
24  evidence. You have the obligation to put on evidence -- not
25  just argument, but evidence supporting it at trial on the

Page 16

1   merits.
2       And the Court also said this issue comes first. It
3   comes before the merits. It has to be decided up front. It is
4   a requirement that the Plaintiffs prove it, that it can be
5   considered an element of every other claim they have is that
6   they have standing.
7       Here, there are 11 -- I think 11 affidavits. Not one
8   of them -- not one affidavit suggests that any one of the
9   companies represented by the affiants, the declarants, is
10  selling a drug that triggers the statute.
11      Now, if they come forth now and present evidence, that
12  will become an evidentiary issue because we are not obligated to
13  take it as true. What they have said by the posture they have
14  put the case in, you don't have to look at any of that, but
15  everything they need is in their complaint.
16      Not only is the evidence not in the complaint, the
17  allegations aren't in the complaint. And this is a
18  constitutional minimum. It goes to the Court's power to act.
19      THE COURT: Okay.
20      MR. UTIGER: Clearly, if you take everything they have
21  said together, you can't reach the conclusion that they have
22  alleged a concrete harm likely to happen to an individual
23  member -- because these are organizations. Their standing is
24  derivative of their members' standings. They don't say it
25  anywhere.

Page 17

1       They say there is probably -- the assumption seems to
2   be if we manufacture all these drugs and there is a statute out
3   there for price gouging, it must be aimed at us. We must have
4   standing someplace. That's not definite enough to trigger the
5   Court's power under Article III.
6       At some point they need to say Acme Pharmaceutical
7   Company, on the day that this complaint was filed -- and I don't
8   think they have to show what the price would be on the day the
9   act went into effect. But to have a real injury -- to show a
10  real injury, an imminent injury or a reasonably-likely-to-occur
11  injury -- that Acme Pharmaceutical Company on the day they filed
12  the complaint produced a drug that, wherever the sale, however
13  they read the statute -- and they can make that argument any way
14  they want -- that that drug is being sold at a price that's
15  going to trigger this statute, and show it. And they haven't
16  done that.
17      THE COURT: All right, Mr. Utiger. Thank you, sir.
18      Mr. Ogden, or whoever.
19      Why don't we just stay on the standing issue before we
20  launch off into anything else. And, Of course, as I had pointed
21  out a minute ago, I am going to give you a chance to submit
22  something in writing, don't feel like you have to get
23  everything out this minute.
24      MR. OGDEN: I appreciate that. Certainly I think we
25  will be able to put in very organized fashion why we clearly

Page 18

1   have alleged and can establish standing here.
2          THE COURT: That's fine.
3          MR. OGDEN: Your Honor, the simple -- Mr. Utiger said a
4   lot of things, some of which had to say with his construction of
5   the statute which he is arguing should be viewed in ways that
6   should exclude the allegations that we have made from being
7   adequate.
8          I think those assertions about the meaning of the
9   statute are actually, on their face, highly problematic, and I
10  would be happy to address those.
11         THE COURT: We are going to get to those in the context
12  of the other arguments. So you might want to try to stay
13  more --
14         MR. OGDEN: With respect to the factual allegations,
15  just starting out with the complaint, there are clear
16  allegations in the complaint that drugs sold by Pharma members
17  and -- are resold in the District of Columbia, and I had
18  identified the specific paragraph and have -- I can't locate it
19  at the moment, but the --
20         THE COURT: We will get it.
21         MR. OGDEN: I believe it is -- paragraph 47 is one
22  which contains an allegation, talking about the distribution
23  system, which says, "The vast majority of patented prescription
24  drugs are not even arguably sold in the District unless and
25  until a wholesaler sells a drug to a retail pharmacy or

Page 19

1   healthcare institution in the District (which itself may take
2   possession of the pharmaceutical outside the District), or until
3   a warehousing retail chain that takes possession of the drugs
4   outside the District transports them to the District and fills a
5   prescription for a patient in the District."
6          The complaint alleges that -- and I think it is clearly
7   the case from the complaint and from the affidavits -- that
8   manufacturers which are located outside the District sell to
9   wholesalers or to warehousing retail chains that, in turn, sell
10  either to pharmacies or transmit the pharmaceuticals to the
11  District where they are resold at retail.
12         There are also allegations in the -- or statements
13  evidenced in the affidavits, which have not been controverted,
14  that there are sales made by specific Pharma member
15  manufacturers directly to hospitals and a limited number of
16  retail pharmacies in the District on occasion. That allegation
17  is also specifically made.
18         THE COURT: Would those be at wholesale, those sales
19  to -- say, to hospitals, would those be at the wholesale rate as
20  opposed to --
21         MR. OGDEN: That would be -- I mean, I think that would
22  be a definitional issue with respect to the triggering of the
23  prima facie case. But to go back to this question of the
24  interpretation of the statute, the relevant section of the
25  statute, the section that's the liability-creating section of

Page 20

1   the statute is section 4553, not section 4554.
2          Section 4553 says -- and I think your Honor was getting
3   to this earlier -- "It shall be unlawful for any drug
4   manufacturer or licensees thereof, excluding a point of sale
5   retail seller, to sell or supply for sale or impose minimum
6   resale requirements for a patented prescription drug that
7   results in the prescription drug being sold in the District for
8   an excessive price."
9          What that liability-creating provision does is it
10  addresses two different sales, basically. One of them is the
11  sale in the District. That's the ultimate sale. That's the
12  sale that -- the ultimate sale.
13         The liability-creating sale is the prior sale, the one
14  that results in that sale in the District at an excessive price.
15  That provision is not restricted at all as to location. The
16  second provision -- the second sale has to occur in the
17  District. The first sale clearly can occur anywhere in the
18  world so long as it results in a subsequent sale in the
19  District.
20         Now, the act exempts from liability point of sale
21  retail sellers.
22         THE COURT: The CVSs of the world?
23         MR. OGDEN: Yes. They can't be liable under the
24  statute. But their sale in the District can be a sale that is
25  the resultant sale under the statute. So clearly under the

Page 21

1   plain language of 4553, if a manufacturer makes a sale to a
2   wholesaler or to a warehousing retail seller anywhere in the
3   United States and that sale results in a sale by CVS in the
4   District at a price deemed to be excessive, that is a
5   liability-creating event.
6          And it is that fundamental function, that section, the
7   section that says excessive pricing in sales of prescription
8   drugs is a violation of law that creates the fundamental effect
9   of the statute, and that is what clearly sweeps in every sale by
10  a manufacturer or its licensee that's made across the United
11  States that results in a sale of a pharmaceutical in the
12  District. And that's clearly the intent of the statute.
13         This statute wasn't intended to exclude the vast
14  majority of retail sales of pharmaceuticals that occurred in the
15  District of Columbia. It clearly is a statute intended to
16  affect the price of all drugs sold at retail in D.C.
17         And any sale in the District can be excessive and any
18  sale anywhere that results in that excessive sale in the
19  District can give rise to liability. And that's why the
20  allegations of the complaint and the statements in the
21  affidavits which clearly say, look, this is no mystery. We sell
22  it -- manufacturers sell to wholesalers; wholesalers sell to
23  retailers; and ultimately the drug is sold in the District of
24  Columbia. We have potential liability.
25         Now, I think a whole number of the things that

Page 22

1  Mr. Utiger said around the edges with his long-armed statute and
2  his upstream responsibility -- I am not sure what all of that
3  adds up to, although it sounds to me like he is clearly
4  reserving the proposition that if there is a sale in the
5  District, ultimately you can reach back to the manufacturer to
6  hold him liable. That's clearly the intent of the statute.
7      THE COURT: Part of the difficulty, I think, of working
8  with and parsing the statute, at least for me, is that the term
9  "excessive price" is really being used in varying ways in the
10  legislative language. At one point, it seems to be specifically
11  focused on the price that the person is paying -- or the
12  retailer. But then in the very next paragraph, all of a sudden,
13  it seems to be relating to the price that's being set on a
14  comparative basis at the wholesale level.
15      And -- I mean, it would certainly seem, if you take a
16  step back from the statute, what they are certainly aiming to
17  protect the public against, which is, I think, the objective, at
18  least in part here, of the legislation, as stated itself, is
19  excessive to the person who is actually going in and buying
20  something at the retail level.
21      But they are backing into it, so to speak, by
22  attacking -- because they are excluding the retailers, they are
23  backing into it by trying to come up with a way to formulate at
24  the wholesale level prices as excessive as compared to what they
25  are in foreign -- certain foreign locations.

Page 23

1      So it is a little tricky, so to speak.
2      MR. OGDEN: But I think you understand it quite
3  clearly. What they are trying to do is to create liability for
4  manufacturers and their licensees. They are not trying to
5  create liability for retail sellers. But their focus is on
6  lowering the price of all sales in the District by whomever
7  made.
8      You can't hold the person, the pharmacy, liable, but
9  you can hold the people who make the sales, wherever they may
10  occur, that result in the pharmacy's price being excessive, in
11  the view of the District of Columbia. And it is that
12  fundamental structure that, number one, means -- is why we are
13  here. We clearly understand that we were the targets, and that
14  this is directed at attempting to lower the price that
15  pharmaceutical manufacturers, wholesalers sell their
16  pharmaceuticals.
17      So that's why we have standing. And I think we can
18  show from the affidavits and the complaint that the allegations
19  clearly establish that.
20      It's also why the statute is clearly unconstitutional
21  as a matter of the interstate commerce clause because it is
22  directly regulating those out-of-state transactions. It is
23  those out-of-state transactions that are the liability-creating
24  event.
25      THE COURT: We need to probably have an understanding,

Page 24

1  before we go any further on this -- I appreciate from a
2  rhetorical and advocacy point of view why you speak in those
3  terms. I appreciate that.
4      You are contending, in essence, that this is nothing
5  more than a thinly veiled effort to regulate wholesale pricing
6  outside of the District of Columbia. And you used the word
7  "regulate" to characterize the conduct.
8      But on the face of the statute -- the statute on its
9  face doesn't appear to be designed to regulate prices. It may
10  have the effect of regulating prices, but it doesn't on its face
11  evidence, does it, a legislative intent to regulate, as you used
12  the word -- or just, so to speak, in the vernacular, to regulate
13  wholesale prices outside of the District? You would have to
14  agree with me, wouldn't you?
15      MR. OGDEN: No. With great respect, your Honor,
16  although putting a footnote on the -- to use the vernacular.
17      THE COURT: We get lots of footnotes. We have got
18  footnotes everywhere.
19      MR. OGDEN: That's the question, what the vernacular
20  meaning of "regulate" is. But I think the legal meaning of the
21  term recognizes that where a statute would directly attack
22  liability based upon the price at which a pharmaceutical sold
23  its patented pharmaceutical, that that is regulating the price.
24  If you attach liability to a price because it is too high, you
25  are regulating it, and I think --

Page 25

1      THE COURT: Let me stop you there for a second. Has
2  the D.C. Circuit ever said that?
3      MR. OGDEN: Has the D.C. Circuit ever said that by
4  attaching liability to something you are regulating it? We can
5  look.
6      THE COURT: Okay. I haven't seen that case anywhere.
7  Okay.
8      How about the U.S. Supreme Court? Because those are
9  the two courts that, obviously, I am bound to follow. I mean,
10  it may be that this is just the first time any court in this
11  Circuit has ever dealt with this problem. Indeed, I am sort of
12  coming to the conclusion it probably is.
13      But has the Supreme Court ever said that structuring or
14  designing a statute in the way this one -- or similarly to the
15  way this one is designed constitutes regulation?
16      MR. OGDEN: I think that the Supreme Court has struck
17  down, on interstate commerce clause grounds, statutes that have
18  had a far more attenuated regulatory effect on out-of-state
19  prices, including all of the three principal cases that we rely
20  upon.
21      In the Baldwin against Seelig case, for example, which
22  is the case that's probably the closest on point, what you had
23  was a structure in which New York sought to regulate the
24  wholesale price at which in-state retailers purchased milk in
25  Vermont. And what the Court did was say that you can't sell

Page 26

1  milk at retail in New York if you purchased it out of state at a
2  price that is not acceptable to New York.
3          THE COURT: It's a Cardozo opinion.
4          MR. OGDEN: Cardozo opinion. And it's the foundational
5  opinion for a whole line of cases that includes the Brown-Forman
6  case and the Healy case.
7          And in that case, the Court said, look, you are
8  attaching consequences in New York for the price -- the
9  wholesale price charged in Vermont, and that constitutes
10  improperly regulating the price in Vermont.
11         And this case is more direct regulation of the price in
12  Vermont, if you will, because in this case you are actually
13  being sued for and being held liable for -- and the statute
14  declares unlawful the price that you charged in Vermont if it is
15  ultimately resold in the District, and it is deemed that you
16  caused that price to be excessive.
17         And the only way a Court is going to figure out whether
18  your sale resulted in a sale at an excessive price is to look at
19  the price that was charged at wholesale and decide whether it
20  can be justified, based on the specific factors that the statute
21  directs a Court to look at.
22         So what the statute does is invite the Superior Court
23  or whatever state court has one of these cases to simply decide
24  whether the price at wholesale, or the price -- the
25  X manufacturer price, the price charged by the manufacturer, can

Page 27

1  be justified or not. That is regulation. And you get treble
2  damages if your price can't be justified or the injunctions or
3  the rest. That is a direct regulation -- much more direct than
4  the situation in Baldwin.
5          And Healy and Brown-Forman, which are the other sort of
6  core commerce clause cases that we rely upon, which really, you
7  know, directly discuss all of this, were also situations where
8  the regulation fell directly on the in-state sale, but they said
9  it was an improper out-of-state regulation because the effect
10  was to control the prices out-of-state.
11         Here, we have direct -- a direct effort to control the
12  prices out-of-state because the thing that makes you liable is
13  what you do out-of-state. That is fundamentally different and
14  worse -- clearly worse than those cases. And --
15         THE COURT: So the affected party here, as defined in
16  the statute, could be an out-of-state party?
17         MR. OGDEN: Absolutely.
18         THE COURT: And could bring the action in the District
19  of Columbia even though they don't reside in the District of
20  Columbia because they are being either -- well, they couldn't
21  be, probably, directly affected because -- well, I'll take that
22  back. If they lived, say, in Maryland or Virginia, they might
23  buy prescription drugs within the District that they live
24  proximate thereto.
25         MR. OGDEN: Sure.

Page 28

1          THE COURT: But it doesn't put any geographical
2  limitations on affected parties. So the affected party could be
3  much further away and not be in a position to buy at the retail
4  level, but in theory here, could be indirectly affected by
5  excessive pricing within the District to bring the suit here.
6          MR. OGDEN: Well, in fact, the statute says that
7  somebody can bring a suit simply by, quote, representing the
8  public interest. That kind of an effect is sufficient to
9  support a right to bring a suit.
10         The suit would be predicated on a sale or sales that
11  occur in the District at retail, or otherwise, that they contend
12  to be excessive. But the party that would be sought to be held
13  liable would be a manufacturer or a wholesaler whose upstream
14  sale outside the District resulted in that in-District sale.
15  And it's the regulation of that conduct that's problematic.
16         It flies squarely in the face of what the Supreme Court
17  said in the Healy decision in '89 where the Court said -- and
18  these words are directly applicable here, and I think they go to
19  your question about regulation -- this is to quote: "The
20  commerce clause precludes the application of a state statute to
21  commerce that takes place wholly outside of the state's borders
22  whether or not the commerce has effects within the state." And
23  specifically, a state may not adopt legislation that has the
24  practical effect of establishing a scale of prices for use in
25  other states.

Page 29

1          And then here is the key language: The critical
2  inquiry is whether the practical effect of the regulation is to
3  control conduct beyond the boundaries of the state.
4          And this regulates in the sense that it attempts to
5  control the conduct of manufacturers and wholesalers outside the
6  state, to control the effect of their pricing by attaching
7  treble damages, liability, injunctive relief, and to declare it
8  unlawful if it has these effects within the state.
9          Now -- but the thing that's been confusing, I think,
10  about the way the District has talked about the statute is that
11  they had a tendency to suggest that if the out-of-state conduct
12  has effects in the District, such as the price here is
13  excessive, the price of the retail sales is excessive, somehow
14  those out-of-state transactions now aren't out-of-state anymore,
15  they suggest. They had consequences in the District, so they
16  are not out-of-state.
17         But that's just clearly -- under Brown-Forman and
18  Healy, that's just clearly wrong.
19         As the Supreme Court said in Brown-Forman, The mere
20  fact that the effects of New York's law are triggered only by
21  sales within the State of New York -- just like this. D.C.'s
22  law is triggered by a sale in the District; but the liability is
23  based on the out-of-state conduct -- that mere fact does not
24  validate the law if it regulates the out-of-state transactions
25  of distillers who sell in-state.

Page 30

1 That's exactly our situation. It regulates the cost --
2 the price of the out-of-state transactions, merely triggered by
3 a subsequent D.C. sale. And that function makes it
4 fundamentally inconsistent with the commerce clause. It is just
5 like those cases, and it is more direct regulation than we saw
6 in those cases.
7 Now, I think -- I am still not quite sure what the
8 District says the statute requires. But I think 4553 -- just
9 focusing on the language of 4553, it is only the ultimate sale,
10 not the liability-creating sale, but the ultimate sale that must
11 take place in D.C. The liability-creating sale is the first one
12 referenced in the statute, and that has no geographical
13 limitation attached to it.
14 THE COURT: I think we can all agree that it is the
15 ultimate sale that the judge in the Superior Court has to decide
16 whether or not that was excessive.
17 MR. OGDEN: That's right.
18 THE COURT: Has to -- I mean, that's the ultimate -- I
19 think no one is disagreeing on that. That's what the judge in
20 the Superior Court would have to say either is or isn't
21 excessive. Now, the prima facie case, however, in order to get
22 to a point where the judge is going to make that call one way or
23 the other, is premised upon a comparison of the wholesale price,
24 the upstream -- to use the language of this -- in this field --
25 the upstream price that was set, whatever that may be.

Page 31

1 Now, it could very well be at the time the case is
2 brought in the Superior Court that without the benefit of
3 Discovery the Plaintiff has no way of knowing what that upstream
4 wholesale price was and is really not in a position to know for
5 certain whether that wholesale price upstream was any different
6 than the wholesale price in the four countries that have been
7 set forth in the statute for comparative purposes, that there
8 has to be a 30 percent excessive amount to. Right?
9 I mean, how could they know that? They have a CVS
10 price, in my hypothetical, which is higher, perhaps, than it is
11 over in Munich or over in London, but how do you know if it
12 is --
13 MR. OGDEN: Well, there are various publications that
14 are not necessarily accurate, but that are out there that
15 reflect average wholesale prices. There are publications that
16 purport to publish the wholesale prices at which particular
17 patented pharmaceuticals are sold in the U.S. or overseas.
18 Those certainly could be referenced and used to allege a case.
19 But I think an important thing about the statute is
20 that 4553 appears to be entirely independent of 4554 in the
21 sense that liability under 4553 may exist even where a drug
22 isn't sold in one of the four foreign countries at all, let's
23 say.
24 If the -- all 4554 says is that this is a way to
25 establish a prima facie case. But 4553 is free-standing

Page 32

1 language. It says whoever -- it shall be unlawful for a drug
2 manufacturer or licensee to sell or supply for sale a
3 prescription drug that results in the prescription drug being
4 sold in the District for an excessive price. It doesn't say the
5 only way to prove that is through 4554.
6 In fact, even if a drug is not sold in a foreign
7 country or there is no evidence available with respect to that
8 price, 4553 would prohibit the sale if a Court decided, based on
9 whatever factors, that the out-of-state sale resulted in that
10 excessive price.
11 THE COURT: Whether or not something is excessive in
12 the final analysis, what you are saying is, as this statute sets
13 it out, is not subject to specific calculation or calibration;
14 it is not defined.
15 MR. OGDEN: No.
16 THE COURT: The only thing that's defined at all is a
17 manner in which to meet the prima facie case.
18 MR. OGDEN: That's correct.
19 THE COURT: But that is not -- the judge in the
20 Superior Court could decide that if something is 31 percent or
21 32 percent over whatever the wholesale price is in Canada, or
22 whatever, that's not excessive. But on the other hand, a
23 different judge in the Superior Court might say, well,
24 32 percent is over 30, and that's excessive.
25 So two different judges in the Superior Court could

Page 33

1 take a completely different position in their own mind as to
2 when something becomes excessive.
3 MR. OGDEN: That's correct.
4 THE COURT: One might say, well, it's got to be over
5 50 percent, and another might say 32 percent is fine. And in
6 this given case, then this Viagra, that's excessive, or in this
7 particular case, this Vioxx -- this is excessive or excessive.
8 MR. OGDEN: Right. It's completely unpredictable,
9 which is why it has a tremendous effect -- one doesn't know how
10 it's going to come out.
11 But, your Honor, even if the drug wasn't sold in
12 Germany or the United Kingdom or Australia or Canada, a lawsuit
13 could be brought alleging that the sale in the United States by
14 a manufacturer resulted in a sale at an excessive price under
15 4553, and the Court presumably would take evidence and make a
16 finding with respect to that.
17 THE COURT: Excessiveness, is this -- is like beauty;
18 it's in the eye of the beholder. Is this, perhaps, too vague
19 constitutionally?
20 MR. OGDEN: Well, I think it is extremely vague, your
21 Honor. We haven't brought that -- we haven't brought that
22 challenge, and that's not before the Court. We think there are
23 some much more fundamental, clear, per se constitutional
24 violations, including --
25 THE COURT: Let's go to those.

Page 34

1     MR. OGDEN:  -- extraterritoriality and -- we have
2  talked about the commerce clause.  I think Healy and
3  Brown-Forman, Baldwin versus Seelig, and even the cases the
4  District cites are very, very clear that because this statute
5  clearly regulates the prices of these extraterritorial -- these
6  sales outside D.C. with nothing more than a trigger in the
7  District, subsequent sale in the District, is clearly violative
8  of that doctrine.
9     This is extraterritorial regulation.  None of the other
10  cases that have been cited are situations where an excessive
11  price in an upstream transaction out-of-state is specifically
12  regulated -- has that ever been upheld.
13     And that's exactly what we have here.  We have the
14  situation where the manufacturer's sale, the wholesaler's sale
15  is the sale that gives rise to liability.
16     Those sales, as we have shown, happen all over the
17  place, virtually never in D.C.
18     THE COURT:  Before we turn to pre-emption, which I
19  would like to hear from you on before you leave -- you have got
20  about 12 more minutes.
21     MR. OGDEN:  Yes, your Honor.
22     THE COURT:  Just give me a couple minutes on any
23  difference of opinion you may have with Mr. Utiger on his
24  reading of 4554(a).  Now, he is reading it, as I understood
25  him -- I mean, he will get a chance to tell me if I

Page 35

1  misunderstood him.  But he is reading it to read 4554(a) to
2  require -- to require that the wholesale price occurred within
3  the District as opposed to outside of the District.
4     And I suggested, well, maybe it is not quite that
5  clear; it may be read another way.
6     So let me at least hear your point of view on that
7  issue.
8     MR. OGDEN:  Sure.  Yes.  The first point on that is the
9  prior point, that 4553 is independent of 4554.
10     THE COURT:  Okay.
11     MR. OGDEN:  And that's -- the most fundamental thing is
12  that any lack of clarity about that particular provision is
13  resolved by 4553 which simply says if you make a sale
14  out-of-state, that results in a sale in D.C. at an excessive
15  price.  That's a violation of D.C. law.  That's 4553.
16     THE COURT:  Right.
17     MR. OGDEN:  4554, I have always understood that
18  provision, that language to say the wholesale price of a
19  patented prescription drug in the District to be describing the
20  patented prescription drug in the District that's ultimately
21  sold at retail.  That is, if a drug is sold at retail in the
22  District and its wholesale price, wherever engaged in, violates
23  this 30 percent rule, then the prima facie case is triggered.
24     I think that way of reading the statute makes sense out
25  of it because it then regulates -- makes a certain amount of

Page 36

1  sense, because it then regulates all retail sales in the
2  District and doesn't get you into this sort of problem of
3  deciding where the wholesale transaction takes place.
4     If there is a sale in the District, then you look to
5  the wholesale price and decide whether that wholesale price
6  triggers the prima facie case.  That's how I've always
7  understood it.  I think that's the logical way of understanding
8  the statute.
9     THE COURT:  Well, it would certainly sound like it
10  would be more consistent with an appreciation of the way the
11  industry works.
12     MR. OGDEN:  Correct.
13     THE COURT:  The industry is structured in a way that
14  the wholesale events -- the wholesale pricing events occur
15  outside the District for the overwhelming majority of
16  situations, which -- again, no one is really contesting that.
17  Obviously, retail goes on every day in the District of Columbia.
18  But the wholesale pricing is occurring outside the District;
19  it's being sold to either the CVS-type distributors or the
20  Cardinal or whoever distributors.  We know that that's going on
21  outside.
22     So, you know, the specificity of the way this is
23  written does not suggest, at first blush anyway, that the
24  wholesale event had to occur in the District.
25     MR. OGDEN:  I agree with that, your Honor.  It seems to

Page 37

1  me the logic of the statute, the structure of 4553 and 4554
2  suggest that a patented prescription drug in the District is the
3  same drug that was sold in the District in the prior section.
4  That's how I've always understood it.
5     THE COURT:  Let's look at pre-emption.
6     MR. OGDEN:  Thank you, your Honor.  And I hope Mr. Troy
7  will have a few minutes to address the foreign --
8     THE COURT:  He is going to have ten minutes when you
9  are done.
10     MR. OGDEN:  Excellent.  He is going to talk about the
11  foreign issues.
12     THE COURT:  Right.  Of course.  Absolutely.
13     MR. OGDEN:  Well, we have brought to your Honor the
14  claim that the D.C. act is pre-empted by the patent and
15  pharmaceutical exclusivity provisions under the doctrine of
16  conflict pre-emption.
17     Now, D.C. has suggested in their papers that we have to
18  show that it is impossible to comply with both D.C. law and
19  Federal law in order to make out that claim.  But that's not
20  true, and it is not -- it's not true as a doctrinal matter and
21  it's not what we are seeking to show.
22     The question under Jones against Rath Packing Company
23  and any number of other Supreme Court decisions, the Geier
24  decision and the like, is whether the act, quote, stands as an
25  obstacle to the accomplishment and execution of the full

Page 38

1 purposes and objectives of Congress, close quote.  That is the
2 test.  Is it an obstacle to the accomplishment and execution of
3 the full purposes and objectives of Congress?
4       And this act clearly is that.  First, incentivizing
5 innovation in new drugs is a clear central objective of the
6 Federal patent and pharmaceutical exclusivity laws.
7       The objective of patent law itself, as stated in the
8 Constitution, to promote the progress of science and useful
9 arts.  President Reagan, when he signed one of the exclusivity
10 laws into -- into law, made clear that its purpose was, quote,
11 to promote medical breakthroughs and drug invention.
12       That's why we have, in large part, these exclusivity
13 rules and the patent laws and the supplemental rules that apply
14 to pharmaceuticals.
15       Moreover, the key to achieving that objective under the
16 patent laws and the exclusivity laws is the free market and the
17 profit motive.  That lies at the heart of it all.  These are
18 basic points, but the Supreme Court just said in the Eldred
19 decision, talking about the copyright clause, which is the
20 functional equivalent for these purposes -- and, in fact, citing
21 patent authorities for this proposition -- the profit motive is
22 the engine that ensures the progress of science.
23       Now, that's obviously a basic point.
24       Now, the key mechanism that creates the free market
25 incentive is the increased opportunity to profit that is created

Page 39

1 by patent exclusivity; that is, the limited degree of market
2 power that is afforded by a patent or by the other exclusivity
3 provisions that relate to pharmaceuticals.
4       As the Eleventh Circuit observed in the Valley Drug
5 case -- and it is just, again, basic stuff, but it is right
6 on -- this exclusionary right, talking about a Federal patent,
7 is granted to allow the patentee to exploit whatever degree of
8 market power it might gain thereby as an incentive to induce an
9 investment into the innovation and public disclosure of
10 inventions.
11       Now, the Federal Circuit which, of course, has a
12 special interest in patent matters, in the King Instruments
13 case, specifically said, "The Patent Act creates an incentive
14 for innovation.  The economic rewards during the period of
15 exclusivity are the carrot.  The patent owner expends resources
16 in expectation of receiving this reward.  Upon grant of the
17 patent, the only limitation on the size of the carrot should be
18 the dictates of the marketplace."
19       That's the theory of a patent; that's the theory of
20 exclusivity.  Congress has said this, too, in a variety of
21 contexts that we have quoted in our papers.
22       These are simple and obvious points.  They come down to
23 this:  The limited market power provided by exclusivity is the
24 engine that Congress intends will drive innovation.
25       Now, the third point in the pre-emption argument is

Page 40

1 there is simply no room in the Federal scheme that regulates
2 patents, that regulates pharmaceutical exclusivity for state
3 interference with that incentive.  The Supreme Court said in the
4 Bonito Boats decision -- which we have cited extensively --
5 quote, state regulation of intellectual property must yield to
6 the extent that it clashes with the balance struck by Congress
7 in our patent laws.
8       Now, it's difficult to imagine a state law more clearly
9 targeted at regulating intellectual property than a law that
10 applies only to patented goods, like this one.  It is also very
11 difficult to imagine one that more clearly clashes with the
12 balance of incentives by Congress.  This law targets for
13 limitation the very market benefits on which achievement of
14 Congress' objectives depends.
15       The market value of exclusivity is the problem as far
16 as the District of Columbia is concerned.  They don't like what
17 the market yields.  They want to regulate, change it and impose
18 treble damages on it.
19       And, in fact, it is an effort to counteract the effect
20 of a Federal patent and of pharmaceutical exclusivity.  They
21 have a different view even than the Congress.  But of course --
22       THE COURT:  Has any Court ever said this?  This is a
23 novel -- I mean, the argument you are advancing, putting aside
24 the merits of it, this is novel, isn't it?
25       MR. OGDEN:  Well, I don't believe any state has ever

Page 41

1 attempted to specifically target patented goods to take away --
2 to regulate the price only of patented goods.  The Supreme Court
3 in the Bonito Boats case dealt with a state regulation that had
4 a lot more peripheral effect on the patent owner even than this
5 does.  That case was about a state law that simply regulated the
6 conditions under which someone could copy an unpatented boat
7 hull.  And the Supreme Court said, look, there is a
8 comprehensive scheme that regulates the incentives and the
9 opportunities that people have to copy and the incentives that
10 people have to develop intellectual property.
11       This changes that structure in an impermissible way.
12 It is up to Congress to set those boundaries.
13       We -- D.C. has done something nobody else has ever
14 done.  I think that's the key point is.  What D.C. has done --
15 there is no example of this.  D.C. has targeted just patented
16 drugs and said, we are going to take away the benefit of the
17 patent by regulating the price at which you can sell.  So the --
18       THE COURT:  Did the First Circuit deal with that in the
19 KS Pharmacies, Inc., case?  Was there a pre-emption
20 consideration there by the First Circuit?  They actually --
21       MR. OGDEN:  Pre-emption arose -- the KS case, if I am
22 recalling correctly, was a decision in which --
23       THE COURT:  That was pharmaceuticals, wasn't it?
24       MR. OGDEN:  I think the KS case was the Seventh
25 Circuit, if I am remembering correctly, and it dealt with

Page 42

1  commerce issues.  But the First Circuit decision that I am aware
2  of that does talk about these matters is the Concannon case.
3      THE COURT:  Concannon.
4      MR. OGDEN:  And I am sorry if I am wrong about KS.
5      THE COURT:  That's all right.  Go ahead.
6      MR. OGDEN:  In -- in Concannon, or the Walsh -- it's
7  also called Walsh -- C-O-N-C-A-N-N-O-N -- the Walsh decision in
8  the Supreme Court dealt with the Medicaid statute.  It didn't
9  deal with patent at all.
10     And what the Court said was that under the Medicaid
11 statute -- it was not an objective of that statute to protect
12 the interests of pharmaceutical manufacturers in earning a
13 profit.  But the Medicaid statute, of course, doesn't, you know,
14 do that.
15     THE COURT:  I am thinking of the Maine case, the Rowe
16 case.  That's the one --
17     MR. OGDEN:  Walsh was another Maine decision.  Rowe is
18 a decision that the District has advanced to talk about --
19 again, to talk about commerce clause issues, I believe.  We
20 think we -- Rowe -- we couldn't be more consistent, our argument
21 with the Rowe decision.
22     In that case, Maine only required companies wishing to
23 do business in Maine to disclose their business relationships.
24 That all you had to do.  If you wanted to do business in Maine,
25 you had to disclose your business relationships outside the

Page 43

1  state.  Maine didn't punish you for your business relationships.
2  Maine didn't tell you how to conduct them.  Maine just said, if
3  you want to do business here, you've got to disclose them.
4  That's not regulating in the way that this law regulates sales
5  outside the --
6      THE COURT:  So it wasn't pricing.
7      MR. OGDEN:  It wasn't pricing.  It wasn't direct
8  punishment for what you did out-of-state.  And the Court there
9  said, this is just different from Brown-Forman.  It's different
10 from Healy.  It's different from Baldwin because it doesn't
11 regulate prices.  It doesn't attach those consequences.  That's
12 like this case.
13     The Walsh decision turned on the issues relating to the
14 Medicaid act which doesn't protect pharmaceutical manufacturers.
15 The whole idea of the Patent Act and of pharmaceutical
16 exclusivity is that it does protect -- it's an incentive-driven
17 program, incentives that are driven by the market and driven by
18 the opportunity, if you get a grant of exclusivity, to earn
19 whatever the market would afford you.
20     And it is simply not open to the District in that
21 context to do that.  The District can't say, if you achieve the
22 incentives that the Federal Government lays out there for you,
23 we are going to hit you with treble damages.  The District can't
24 say, if you charge the price the market makes available as a
25 result of your exclusivity, you are in violation of --

Page 44

1      THE COURT:  If they had written the statute to apply
2  only to excessive pricing at the retail level, then there
3  wouldn't be any pre-emption issue, at least in theory, right?
4      MR. OGDEN:  Well, I think if it applied -- certainly if
5  it applied only to patented pharmaceuticals or was centered on
6  patented pharmaceuticals, there would be a significant
7  pre-emption issue.
8      I think there might -- depending on how it was written,
9  there might be a -- not a per se commerce clause problem,
10 because the regulation would presumptively be focused only on
11 the sales in the District.  But with respect to pre-emption, it
12 is a key factor here that patented pharmaceuticals are singled
13 out.  It certainly furthers, clearly, the pre-emptive effect
14 that it's only patentees and licensees that are potentially
15 liable.
16     THE COURT:  Were you able to find any other state that
17 adopted a statute or wrote a statute similar to this where it
18 was focused on excessive pricing, whether it be at the retail
19 level or the wholesale level?  Have you ever found one that was
20 written and then challenged thereafter?
21     MR. OGDEN:  Certainly not one dealing with patented
22 goods or patented pharmaceuticals.  There are -- you know, there
23 are certainly, you know, price -- general price gouging
24 statutes --
25     THE COURT:  Gasoline.

Page 45

1      MR. OGDEN:  Gasoline regulations or other price
2  regulations on goods found solely within the state.  Those stand
3  on a very different footing because what's being regulated is
4  not specifically a patented product.  If those laws singled out
5  the patented ingredients that were sold upstream and said, well,
6  we don't care how much you charge for the gas, but if you charge
7  too much for the patented product, you can't do that -- well,
8  that would present a case closer to this one.
9      No state has ever viewed it as an appropriate thing to
10 specifically regulate the privilege given by the Federal
11 Government of a patent or a pharmaceutical exclusivity, and
12 that's why this law clearly is pre-empted.  It seeks to deter
13 the holder's Federal rights from receiving the benefits the
14 Federal law intends to make available to them.
15     That is a clear obstacle.  You know, all the laws -- as
16 an obstacle to achieving the Federal objectives, it's hard to
17 imagine a greater -- more clear obstacle than a deliberate
18 targeted placing of a deterrence on somebody to achieve the full
19 benefits of Federal law.
20     Your Honor, I will -- if I may reserve ten minutes for
21 rebuttal and return to Mr. Troy.
22     THE COURT:  Right.  Absolutely.  You will get ten
23 minutes at the end.  So we will give Mr. Troy ten minutes now.
24 Then we will take a brief recess for a few minutes to give my
25 able reporter a few minutes so she can relax her fingers.

Page 46

1    MR. OGDEN: Thank you, your Honor.
2    THE COURT: Then we will hear from the Government.
3    MR. TROY: Thank you, your Honor. May it please the
4  Court, I'm Dan Troy and I'm representing both Bio and Pharma in
5  the argument that I'm making, although I'm counsel for Bio in
6  this matter.
7    THE COURT: All right.
8    MR. TROY: If I may, I am grateful to your Honor for
9  allowing us to put in a pleading on standing, but I would like
10 to just make two, if I could, very quick -- quick points.
11   First, Mr. Utiger conceded that some of our companies
12 did allege that they do sell directly into the District. So
13 even under his theory, there would be sales that are covered.
14   Second, Mr. Utiger conceded that the statute has a,
15 quote/unquote, long-arm effect -- I believe were the words he
16 used.
17   Now, we certainly agree that standing is a
18 Constitutional minimal, although it is normal, of course, to
19 raise the arguments sometime before the day of the hearing --
20 but Mr. Utiger seems to be contending that we would need to
21 concede liability to have standing, and I don't believe that
22 that is what the case law says. I would also direct the Court
23 to Pharma complaint paragraph 47 which essentially talks about
24 the sales that are in the District that would be subject to this
25 statute.

Page 47

1    Now, your Honor, in addition to what I am going to
2  address, of course, is the foreign commerce clause arguments.
3    THE COURT: Right.
4    MR. TROY: And essentially there are two independent
5  reasons why we believe D.C.'s law violates the foreign affairs
6  powers, if you will. The first is a very straightforward,
7  literal application of the Healy and Brown-Forman cases, and
8  that is that tying prices in D.C. to foreign prices has the
9  unconstitutionally extraterritorial effect of preventing
10 manufacturers from undertaking competitive pricing in D.C. and
11 in the four-named countries based on, essentially, the
12 prevailing market conditions.
13   In other words, those cases suggest you can make an
14 independent determination about how to price and not tie them
15 together.
16   Second and independently, your Honor, D.C.'s law really
17 interferes with the political branch's ability to have one
18 foreign policy for the United States and violates those cases
19 which say that states may not have their own foreign policies.
20 Let me address the first issue, the first argument, and I think
21 that I am, in some senses, reiterating and building upon some of
22 the things that Mr. Ogden said.
23   First of all, when you are construing Congress' ability
24 to regulate commerce with foreign nations, the Japan Limited
25 case makes very clear that a more extensive constitutional

Page 48

1  inquiry is required than is the case with the interstate
2  commerce clause. That's because the normal concerns for
3  Federalism and state sovereignty don't come into play.
4    To put it another way, if something is unconstitutional
5  under the interstate commerce clause, it is a fortiori that it
6  is unconstitutional under the foreign commerce clause argument.
7    And let me suggest that really all the Court needs to
8  do to find D.C.'s law unconstitutional is just read and apply
9  Healy and substitute the word "pharmaceutical manufacturer" for
10 the word "brewer" and add the word "foreign" to the discussion
11 of other states, and I will do the exercise.
12   As in Healy, when a drug manufacturer agrees to a price
13 in any one of the named price-controlled countries, it will --
14 now to quote Healy at 491 U.S. 338 -- it will have to,
15 necessarily, quote, take account of the price it hopes to charge
16 in D.C. You will have to just relate one to the other.
17   And the end result will be that a manufacturer can --
18 again, quoting Healy -- undertake competitive pricing based on
19 the market realities of the four of D.C. or the four countries
20 with price controls, but not both because the -- substituting
21 D.C. law for Connecticut -- ties pricing to the regulatory
22 schemes of the foreign states. And this is precisely what was
23 condemned in Healy and Brown-Forman.
24   And as Mr. Ogden pointed out, what you look to is the
25 practical effect. And although there is some independence

Page 49

1  between the liability-creating provision and the
2  prima facie-creating provision, the fact that, as your Honor
3  recognized, that there is the potential for different outcomes
4  shows why the practical effect of this statute is going to be --
5  to drive companies to no choice but to consider the pricing in
6  one state, in these foreign states, and what its impact is going
7  to be on the District of Columbia.
8    THE COURT: So if you are a pharmaceutical company --
9  if I understand you correctly, if you are a pharmaceutical
10 company who wants to sell your goods retail in the District of
11 Columbia, retail, then you are going to have to set your
12 wholesale price, arguably in most instances outside of the
13 District, at a rate 30 percent -- less than 30 percent of what
14 it is set in these other four countries or be willing to take
15 the cost, the expense and the burden of litigation in the
16 District of Columbia any time an individual organization says
17 it's excessive and we can, you know, meet the prima facie
18 standard.
19   MR. TROY: I think that's right, your Honor.
20   THE COURT: That's the necessary effect, from your
21 point of view.
22   MR. TROY: That is the necessary and practical effect,
23 that you are going to have to -- now, of course, if CVS jacks
24 the price up way up, you may still end up in a lawsuit, right?
25 You may still end up in a lawsuit because somebody comes in and

Page 50

1  says, hey, you know, I was charged this incredibly excessive
2  price. Under this statute, I can't sue you, CVS, but I am going
3  to go sue these people because I think that the reason why I had
4  this excessive price was because of your actions upstream, and
5  then even if we have done everything we can to possibly comply
6  with this statute, we still are subject to the incredible
7  burdens of litigation that, you know, ensue under the statute.
8      So to continue tracking Healy's language, what the D.C.
9  law does is it requires basically state shippers to forego the
10  implementation of competitive pricing schemes in state markets
11  because the pricing decisions are imported by the statute into
12  D.C. regardless of the prevailing market conditions.
13      And D.C., again, applying and quoting Healy, may not
14  deprive businesses and consumers in either D.C. or in other
15  countries of other whatever competitive advantage they may have
16  based on the conditions in the local market.
17      Now, you might say, well, the problem is that there
18  aren't competitive situations in the foreign markets -- and that
19  may be true. There are still some competitive situations.
20  But --
21      THE COURT: Could you figure out, Mr. Troy, from
22  looking at the legislative history here, what the possible
23  relevance was to the D.C. city council of what the pricing
24  structure is in those four particular countries? Could you
25  discern it from the legislative history?

Page 51

1      MR. TROY: No, your Honor, in part because, I will
2  confess, I have not carefully studied the legislative history.
3  I know a little bit about that --
4      THE COURT: Maybe Mr. Utiger will be able to explain
5  that. But what goes on in the streets of Berlin for a person
6  who walks into the equivalent of a CVS and what the charge is
7  there for a particular drug, and what the cost is to a person in
8  this city, what difference does it make, you know, what's the
9  price set in Berlin or London or Toronto vis-a-vis a person
10  here? There could be a whole host, in theory, of regulatory
11  factors that have a huge impact on the retail and wholesale
12  price in Berlin, London or Toronto, could there not be?
13      MR. TROY: Well, you are absolutely correct, your
14  Honor, and that's what actually gets us into the second
15  argument, and that is that states are not permitted to establish
16  their own foreign policy, and this law interferes with the
17  foreign affairs powers, really, in two ways.
18      First, it's inevitably going to draw D.C. Superior
19  Court judges into judging whether the amount of money that a
20  foreign sovereign is paying for a drug is reasonable, not --
21  because to establish that the price that ends up being charged
22  in D.C., or the wholesale price, is not excessive, the
23  manufacturers will have no choice but to show that the price
24  being charged in the foreign states is unfair, unreasonable, not
25  competitive and doesn't give us an adequate return.

Page 52

1      Now, that determination will inevitably involve a state
2  court sitting in judgment not of trying to find the content of
3  foreign law, but a quintessentially political policy, economic
4  and public health decision of a foreign country, and that is not
5  the kind of decision that state courts are permitted to make
6  under the Zschernig case.
7      And I think it's worth mentioning, your Honor, that no
8  matter what a state court decides, there is a potential to
9  impair the foreign policy of the United States because if the
10  state court finds that one of our key ally's prices is
11  unreasonable, well, that could potentially impair our ability to
12  conduct foreign policy, to negotiate, and could embarrass us,
13  et cetera, et cetera. But if they find the state court -- if
14  the state court finds the foreign price is reasonable, then this
15  could undercut and conflict with U.S. policy and ongoing
16  diplomatic efforts currently being pressed by the United States
17  Government around the world to combat foreign price controls.
18      There is no question that the United States
19  Government's policy is opposed to these precise kinds of
20  pharmaceutical price controls that D.C. is relying on. The
21  Trade Act of 2002 establishes principal negotiating objectives
22  for the executive branch in trade negotiations with foreign
23  countries, and one of those objectives -- and I quote 19 USC
24  3802(b)(8)(D), one of the objectives is, quote, to achieve the
25  elimination of Government measures such as price controls and

Page 53

1  reference pricing which deny full market access for United
2  States products, unquote.
3      You can look it up, as Casey Stengel used to say. It's
4  in the statute. That's what the Trade Act says. And in fact,
5  if you look on the HHS web site, the HHS deputy secretary, Alex
6  Azar was just in Ireland less than two weeks ago pressing, on
7  behalf of the United States Government, for an argument against
8  price controls. He pointed to data demonstrating that price
9  controls cause three to four fewer new molecular entities
10  annually in the system that --
11      THE COURT: So just to be very practical for a minute
12  here, if a Superior Court judge has a case involving a
13  particular sale that the Plaintiff alleges is excessive, and the
14  Plaintiff, for whatever reason, chooses one of those four
15  countries -- he may choose all four, but let's assume he just
16  picks one of the four, just for simplicity's sake. Let's say he
17  picks Canada, our neighbor to the north, and claims that the
18  wholesale price in this instance was 30 percent higher than it
19  was in Canada, and that's the basis for my prima facie case in
20  this particular case. So here is this Superior Court judge
21  sitting there. Okay. That's the prima facie case.
22      All right. Now -- then the burden shifts, and now the
23  manufacturer says, all right, I want to demonstrate that it's
24  not excessive because, remember, there is no bright line -- 31,
25  61, 91. There is no bright line.

Page 54

1    So the manufacturer in that instance, if I understand
2  you correctly, is put in a position where it has to demonstrate
3  that the differential between the wholesale price in the U.S.
4  and Canada is not really an excessive differential because it
5  may be, for example, that the reason why it's lesser in Canada
6  is because of X, Y and Z factors that involve the Canadian
7  legislative process, the Canadian regulatory process, the
8  Canadian business environment, whatever, and then a judge in the
9  Superior Court is going to have to evaluate the regulatory
10  scheme in Canada and make a decision whether or not that is or
11  is not a sufficient basis to find the price in the United States
12  is excessive. Is that right?
13    MR. TROY: Precisely, your Honor. In fact, one of the
14  issues that would clearly come up in that case is that Canada's
15  policy is that it will not reimburse for research and
16  development costs in excess of Canada's share of pharmaceutical
17  sales around the world. It is essentially a policy that says,
18  we are not going to -- you know, we are not going to bear any
19  more than what we think to be our fair share of R&D. Okay.
20    That whole issue would inevitably have to come, and a
21  D.C. Superior Court would have to address that kind of a
22  question. And there are all sorts of things -- again --
23    THE COURT: Do we even have any Federal Courts that
24  engage themselves in such comparative evaluation?
25    MR. TROY: Not that I know of, your Honor, and I think

Page 55

1  that, frankly, if a Federal Court were put in this position, it
2  would raise many of the same concerns that are in the Healy
3  case, the Crosby case and the Zschernig case, because the idea
4  is that it's the political branches that get to speak for the
5  United States in foreign policy questions. States cannot have
6  their own foreign policy.
7    And even if it would be a Federal Court, it would be
8  applying, of course, the state law and the state foreign policy
9  that D.C. has created which is to say, we like those prices. We
10  want those prices, or at least something closely resembling them
11  which, again, is directly contrary to the Trade Act of 2002 and
12  directly contrary to ongoing United States efforts to try and
13  insure a fair, adequate return that promotes innovation to --
14  for the pharmaceutical sector.
15    I mean, this is not hypothetical, your Honor. Again,
16  it happened within the last few weeks, and it is also a matter
17  of public record that the United States Government was pressing
18  this issue with the government in Australia in the most recent
19  trade negotiations with Australia.
20    So this is, you know, something that is very real and
21  has the potential to impair the exercise of our foreign affairs.
22    THE COURT: I will give you another minute or two and
23  then we are going to take a break.
24    MR. TROY: I will reserve the balance of my time for
25  Mr. Ogden to have on rebuttal.

Page 56

1    THE COURT: All right.
2    MR. TROY: Thank you, your Honor.
3    THE COURT: We will take a ten-minute recess here, and
4  then we will hear 40 -- the Government gets 40 minutes under the
5  prior agreed-upon plan, of which they can use all or whatever
6  they want. And then the Plaintiffs will get a ten-minute
7  rebuttal when we return.
8    We will take a ten-minute recess in the meantime.
9    (Recess.)
10    MR. UTIGER: Good morning, your Honor. As a
11  preliminary matter -- a different preliminary matter -- I wanted
12  to alert the Court to the count. We are now at I think the 25th
13  or 26th day. And it does appear that Congress is going to come
14  back, at least one house, on the 6th.
15    THE COURT: One house is enough.
16    MR. UTIGER: One house is enough. So there is at least
17  a potential that by December 10th or 11th, somewhere in there,
18  that the 30 days will run.
19    THE COURT: They sit one day a week, right?
20    MR. UTIGER: I believe so. I am not sure.
21    THE COURT: Has there been any uprise in the relevant
22  committees over this statute that indicates that they are
23  circling the wagons and getting ready to issue a death blow to
24  it?
25    MR. UTIGER: Not that I know of.

Page 57

1    THE COURT: You haven't heard of any, have you?
2    MR. UTIGER: No, your Honor.
3    THE COURT: Is that evidence of anything? Or maybe I
4  shouldn't draw any inferences from that. That was a trick
5  question.
6    MR. UTIGER: Yes, your Honor.
7    THE COURT: Maybe I would be the first Court of all
8  time to recognize an inactivity by the Congress to necessitate a
9  demonstration of an intent on the part of Congress. I don't
10  think I will be the first Court to do that, though.
11    MR. UTIGER: No, your Honor. The Court had asked
12  whether or not either the Circuit or the Supreme Court had ever
13  ruled on the constitutionality of price gouging statutes. And
14  in fact, the Supreme Court has. And here I am quoting from
15  Pennell versus City of San Jose which is 485 U.S. 1, a 1988
16  case.
17    THE COURT: Now, was that a patented -- what was the
18  commodity in that one?
19    MR. UTIGER: It was rent control. But in that context,
20  they say that, "We have recognized that the Government may
21  intervene in the marketplace to regulate rates or prices that
22  are artificially inflated as a result of the existence of a
23  monopoly or near monopoly."
24    THE COURT: All right.
25    MR. UTIGER: And in doing so, they cite to Florida

1  Power Corporation at 480 U.S. 245, 1987, which was a power case.
2        THE COURT:  How about something more along these lines,
3  where the commodity in question is a commodity that clearly is
4  in interstate commerce, you know, the way, for example, gas
5  would be or milk or certain other products that, you know,
6  everybody -- well, beer is one that we have heard reference to
7  this morning also.
8        In other words, a commodity -- you know, rent tends to
9  be, let's face it, that's a landlord in a particular state.
10  It's not really an interstate commerce type commodity.
11        But how about in the case of excessive price statutes
12  that address excessive pricing as it relates to a commodity --
13  not necessarily patented, I might add, although that raises
14  separate issues which we will get to, undoubtedly, in a minute.
15  We have talked about them already from the other side's
16  perspective.  But how about as relates to a commodity that is
17  clearly in interstate commerce?
18        MR. UTIGER:  Not that I know of, but I also know of no
19  case where the court has struck such a statute.  Generally, the
20  analysis has not been under the commerce clause -- or the due
21  process clause.
22        THE COURT:  Okay.  And you agree with me that -- and I
23  think that the Plaintiffs do, too -- that we don't have really
24  out there a case by either the Supreme Court or the Court of
25  Appeals -- and perhaps not even any other Circuit -- where the

1  pre-emption approach that they are advancing here with regard to
2  patent law has been recognized by a Court as a basis for
3  pre-emption?
4        MR. UTIGER:  No, your Honor.  There are no other Court
5  cases.
6        THE COURT:  So we have got your old classic case of
7  first impression here?
8        MR. UTIGER:  It would appear that way, your Honor.
9        THE COURT:  Great.
10        MR. UTIGER:  I wanted to take two minutes just to go
11  back to the standing issue.
12        THE COURT:  Of course.  No, absolutely.  Go ahead.
13  Take a minute.
14        MR. UTIGER:  If the Court takes everything Mr. Ogden
15  said as true, everything, that the statute is aimed at Pharma's
16  members, that the intent is to bring down Pharma members'
17  prices -- if you take all of that as true and you adopt any
18  interpretation of the statute that Pharma has put forward, they
19  still haven't alleged injury effect.  Because taking their
20  theory, whatever their theory may be, they need to be able to
21  say that under our theory, not that we have potential
22  liability -- and I think that's the words that Mr. Ogden used,
23  was "potential liability" -- but that they have imminent
24  liability, that they are actually going to trigger the statute.
25        Because this statute is not -- all that we are talking

1  about here, the entire case, from both sides, the discussion has
2  been premised on the trigger, the trigger for a prima facie
3  case.
4        They don't say that the statute is triggered.  They
5  don't say that under their theory and the facts as they allege
6  it that, if the statute went into effect tomorrow, that they
7  would be in violation -- or not even in violation -- that they
8  would be selling at a price, anywhere that triggers the statute.
9  And I think that's what's required for constitutional standing,
10  an actual case in controversy, somebody with a real current or
11  imminent interest in the case that's going to be actually
12  affected by the statute.
13        There is nothing in this record that can -- that
14  establishes that.  And I think for that reason at all, this case
15  goes out on jurisdiction.
16        THE COURT:  So they would have to -- from your point of
17  view, they would have to wait until it went into effect and then
18  at least one manufacturer that's a member of their -- of either
19  of the Plaintiffs --
20        MR. UTIGER:  No, your Honor.  I don't think they have
21  to wait until it goes into effect.  I think that -- you know,
22  constitutional standing is very rigid and it's very demanding.
23  I think that they could probably say that right now -- because
24  you measure standing as of the point of the filing of the
25  complaint.

1        THE COURT:  Right.
2        MR. UTIGER:  I think that the Court's analysis, if that
3  was accepted, would say, you have to wait until the statute goes
4  into effect and there is actual harm -- and while I wish that
5  was the law, I don't think it is.
6        I think that, at the minimum, though, at the absolute
7  minimum, they should have to be able to say if the statute went
8  into effect today, it would affect us.  It would affect some
9  member in a real, concrete way.  And I don't think they have
10  done that.
11        Let me start with the commerce clause.  I think that's
12  the most significant issue here.  It is a fact that the intent
13  of this statute, under anybody's theory of what it means, is to
14  prevent price gouging, to bring down an excessive price.
15        THE COURT:  At the retail level.
16        MR. UTIGER:  Ultimately, yes.  I think that the goal is
17  to protect the citizens of the District of Columbia and the
18  consumers of prescription drugs.  So, ultimately, yes, at the
19  retail level.
20        THE COURT:  Right.
21        MR. UTIGER:  At the retail level, I think one of the
22  reasons why that's exempted is because there is competition.
23  You know, the same patented drug may be sold to many different
24  retailers.  You know, there is a marketplace mechanism to
25  prevent anti-gouging and, therefore, it is less necessary to

Page 62

1   take a look at that.
2         All this statute does -- it doesn't set a price, it
3   doesn't dictate the price inside or outside the state at which a
4   drug must be sold. It doesn't set a ceiling. What it does is
5   say, if you sell -- whatever the trigger is, whether or not it's
6   the last wholesale price in the District, whether or not it's
7   the retail price, it doesn't matter for purposes of
8   constitutional analysis.
9         Whatever that trigger is, all that sale does, wherever
10  it occurs, is raise a rebuttable presumption and allow a
11  Plaintiff to bring the case that challenges the excessiveness of
12  the price.
13        THE COURT: Let's be practical here now. I mean,
14  someone thinks they are being charged excessively,
15  hypothetically speaking. People, just as a general proposition,
16  don't just bring lawsuits for the sake of bringing lawsuits.
17  They usually, especially if they are being represented by
18  parties who are going to front the expense of bringing a
19  lawsuit, they have to give some thought -- maybe not in every
20  case, but in most cases -- give some thought to the chances of
21  succeeding.
22        And here, the statute specifically provides a means for
23  which -- by which you can meet your prima facie case. It gives
24  you a road map, in effect.
25        It's not exclusive. I think we are all in agreement on

Page 63

1   that. You don't -- to make your prima facie case, you don't
2   have to use, you know, the foreign locale's pricing structure
3   per se. You don't have to, but you can.
4         MR. UTIGER: I am not sure we are in agreement on that,
5   Judge.
6         THE COURT: Oh, okay.
7         MR. UTIGER: The reason is one of the -- I think it
8   dovetails into --
9         THE COURT: I would love to hear from you on that. Do
10  you think it is a requirement?
11        MR. UTIGER: I think it dovetails into the standing
12  argument. I don't know. But at this point --
13        THE COURT: Well, wait a minute. Hold on, Mr. Utiger.
14  If you don't know -- if the Attorney General's Office of
15  District of Columbia doesn't know, how is the guy on the street
16  to know what he has got to, or she has to got to, or it has got
17  to have in order to bring a suit in good faith under this
18  statute?
19        I mean, a judge someone in the Superior Court is
20  supposedly going to decide whether something is excessive or
21  isn't excessive.
22        MR. UTIGER: Absolutely, your Honor.
23        THE COURT: And I think we are all in agreement that
24  there is no magic line that has to be crossed for it to -- for
25  the judge to decide, okay, it's now excessive or it isn't

Page 64

1   excessive.
2         I used a hypothetical, well, one judge in the Superior
3   Court might say 32 percent above what the wholesale price is in
4   Germany is excessive, and another might say, well, no, this
5   is -- you know, in the case of Viagra, that's -- you know, it
6   should be 75 percent above, whereas in the case of Lipitor,
7   because more people need that, it should only be 35 percent
8   above. Judges can have different points of view as to what
9   constitutes excessive, and this statute certainly doesn't say
10  that they can't.
11        MR. UTIGER: Absolutely, your Honor. But as to whether
12  or not the requirement for a prima facie case, or the criteria
13  for making a prima facie case, encompasses a negative pregnant,
14  that if you can't do that, you don't have a prima facie case, is
15  a question of statutory construction of a local law statute that
16  doesn't have a constitutional component to it and, therefore, is
17  not really before this Court.
18        That determination, what that statute means there, will
19  be decided in the context of an actual case in controversy where
20  a Plaintiff comes in and says, this is what I have got; it is a
21  prima facie case, and a Defendant will come in and say, no, you
22  haven't met the trigger. And it will be decided in the context
23  of an actual case in controversy, which is part of the problem.
24  We have a statute here with no case law at all that is defining
25  it.

Page 65

1         THE COURT: Which would mean a Superior Court judge in
2   the actual case that's brought would have to decide the
3   constitutionality? Or would it be removed to the Federal Court
4   on diversity grounds or whatever so that a Federal Court would
5   decide whether or not it's unconstitutional? Which would you
6   envision would be the more likely scenario?
7         MR. UTIGER: Well, I think a Superior Court could
8   resolve the constitutional question, just as a Court here could.
9   Whether or not it could be removed -- it couldn't be removed on
10  diversity. There is no diversity against the District. The
11  District is never diverse. If the District is a party, the
12  District cannot be diverse. But that's not really what I'm
13  saying.
14        I am not saying that that reason alone deprives this
15  Court of jurisdiction to decide the constitutional question.
16  What I am saying is to the extent that what we are doing is
17  talking about how the law will be applied, you know, in ways
18  that don't necessarily impact on the constitutionality, that
19  will be decided in large part by the case law that develops
20  around the law, just as other laws are developed and defined.
21        And for this purpose, I am not sure it's necessary to
22  go there. I don't think we need to have that question answered
23  because I don't think that this is the right forum to answer it
24  unless it has a direct impact on this case.
25        And again, we are dealing with a case where we have

Page 66

1  perhaps -- there's 1200 members of one organization, 800 members
2  of another -- and no allegation that if this law went into
3  effect tomorrow, that even the one provision that sets a
4  prima facie case would be triggered. And that's the only piece
5  that's tied to any price outside the District. If you take that
6  piece out, then what they are saying is that any law anywhere
7  that -- for whatever reason, that you can't challenge excessive
8  pricing of drugs within a state.
9        I don't see any support for that. And all the cases
10  that have talked about the police power of the states seem to go
11  the other way.
12       THE COURT: Well, we certainly don't have any specific
13  case that I am aware of. Maybe you may be, but I am not aware
14  of any specific case where a Federal Court has addressed that.
15  Excessive -- a statute that a state that banned excessive pricing
16  of drugs in that state that was held unconstitutional or
17  constitutional by a Federal Court in this country -- I haven't
18  found that case. No one has pointed it to out me.
19       MR. UTIGER: We do have cases that have the practical
20  effect of reducing the prices of drugs, including patented
21  drugs, statewide in a slightly different way, or perhaps more
22  than a slightly different way.
23       When Maine used its economic power to coerce the
24  pharmaceutical companies into lowering their prices by giving
25  rebates, that was held constitutional by the Supreme Court. So

Page 67

1  the idea that a state action that has the effect of lowering the
2  prices of drugs put into interstate commerce -- that question
3  has been answered. You know, if that's the sole question --
4        THE COURT: Which case was that?
5        MR. UTIGER: That's the Pharma versus Walsh.
6        THE COURT: The Walsh case, all right. Go ahead.
7        MR. UTIGER: Because that was an issue. It may have
8  been a Medicaid statute, but there was a commerce clause issue
9  on whether or not you could drive down the price of -- that
10  clearly didn't bother the Supreme Court. In fact, two judges, I
11  believe -- I think it was the Walsh case with both Justice
12  Scalia and Justice Thomas said there is no dormant commerce
13  clause.
14       THE COURT: Okay. Go ahead.
15       MR. UTIGER: This law does have an extraterritorial
16  effect. We acknowledge that. We acknowledge that it can have
17  an effect. Under certain circumstances, they have employed
18  it -- but it could have an effect, a potential effect on
19  transactions outside the District.
20       THE COURT: Well, especially if it's true -- and the
21  District hasn't changed the truth, I don't believe, of the
22  propositions set forth by the Plaintiffs that the wholesale
23  pricing of the drugs that are sold on a retail basis in the
24  District occurs outside the District.
25       MR. UTIGER: I think that if that is not completely

Page 68

1  true, it is probably largely true.
2        THE COURT: Right.
3        MR. UTIGER: And I don't think that that's of any
4  constitutional significance.
5        Consider this, your Honor. If you take their argument
6  and you change the context slightly --
7        THE COURT: Why isn't it of significance if the statute
8  exempts retail pricing -- retailers and the retailers' conduct
9  from violation of the statute so all that's left is wholesale
10  pricing? Why is it not of significance?
11       MR. UTIGER: I don't know how that impacts on the
12  constitutionality of regulating the monopolistic impact to
13  prevent price gouging. The retailers have a mechanism to
14  protect against -- and there is a way that the citizens are
15  protected against excessive retail pricing.
16       THE COURT: How?
17       MR. UTIGER: There is a market. There is a CVS next to
18  an Eckerd's.
19       THE COURT: Right. But you could, in theory anyway,
20  have a situation where a CVS, for whatever reason -- perhaps
21  because of its location in the city, perhaps because of its
22  hours that it is scheduling or whatever, in theory, they are
23  charging a higher price on a going rate basis for Lipitor or
24  whatever the drug is than Eckerd's is, and they believe the
25  market that they are catering to within the District not only

Page 69

1  can bear that cost but will pay that cost higher than what
2  Eckerd's is charging.
3        And it could be, in theory, that Eckerd and CVS, in our
4  hypothetical, both paid a wholesale price equivalent from the
5  same manufacturer. It's just that CVS decided that, well,
6  within this part of the city in this location, charging -- being
7  available to the consumers for this many numbers of hours a day,
8  or a week or a month or a year, we can get away with, and people
9  will pay, a higher price for that convenience and for that
10  accessibility.
11       MR. UTIGER: It is possible, your Honor, and it is
12  possible that the legislative judgment -- that's a problem we
13  need to address. But the legislative judgment here is that
14  that's a problem that we are not going to address, or we don't
15  need to address at this time. The fact that the council chose
16  not to address retail pricing has no logical effect on its power
17  to regulate wholesale prices.
18       THE COURT: Right. So the necessary impact, though --
19  all I am suggesting to you is the necessary impact of the
20  statute the way it is currently drafted in light of the
21  necessary -- not necessary, but the apparent way in which this
22  industry conducts itself is that it will have -- it will have an
23  impact on wholesale pricing outside of the District.
24       MR. UTIGER: Absolutely, your Honor.
25       THE COURT: So the question becomes, then, is that

Page 70

1  conduct that will necessarily flow from this statute conduct
2  which constitutes regulation, however that's defined? And I
3  think we are all in agreement the D.C. Circuit has never defined
4  it.
5       So is this regulation, in effect, by the District's
6  statute on the wholesale pricing of an industry outside of the
7  District?
8       MR. UTIGER: And I would submit that it is not, your
9  Honor.
10      THE COURT: It's not regulation?
11      MR. UTIGER: It is certainly not Healy. It is
12 certainly not Forman. It's not a direct regulation. There may
13 be an effect outside the District.
14      THE COURT: Does it have to be direct? I mean, if you
15 are a manufacturer facing this reality -- Mr. Troy, I think,
16 acknowledged -- when I was discussing this with him,
17 acknowledged that their clients are basically faced with the
18 reality of, if you are going to do business through retailers in
19 the District of Columbia with this statute in effect, that you
20 better adjust your price to be below that 30 percent margin
21 which is a vehicle for meeting the prima facie standard in order
22 to ensure that you don't have to withstand the costs and the
23 burdens of litigation in the District of Columbia.
24      That's his position. That's how he views it. You
25 would say not so?

Page 71

1       MR. UTIGER: It's an interesting way to put it, your
2  Honor. If you are sitting outside the District --
3       THE COURT: That's why I put it that way.
4       MR. UTIGER: -- and you are making the decision of
5  whether or not to do business in the District, to put drugs into
6  the stream of commerce with the intent of having them come into
7  the District, do you have to take cognizance of the District's
8  laws on price gouging? Yes.
9       But the effect -- what we are regulating is the price
10 of drugs in the District. The fact that there may be some event
11 outside the District that triggers that -- consider this, your
12 Honor. A recent case, Beretta, in the D.C. Court of Appeals.
13 Strict liability on gun manufacturing.
14      We will use a pharmaceutical -- Merck sells Vioxx to a
15 wholesaler. Not in the District. Last time it has any contact
16 with it is when it sells it completely outside the District. It
17 goes from that wholesaler to another wholesaler to a retailer,
18 is sold in the District of Columbia. Somebody takes it, alleges
19 an injury, sues for product liability.
20      It's a product put in the stream of commerce completely
21 outside the District of Columbia. The District of Columbia's
22 laws apply and allow for recovery because of the effect in the
23 District.
24      You place a drug in the stream of commerce that has the
25 effect in the District because of what you have done -- because

Page 72

1  at the end of the day, that's what you have to show, what they
2  did was excessive, has the effect in the District of harming a
3  District resident.
4       THE COURT: But the statute the way it's written,
5  Mr. Utiger, isn't it on the one hand focusing on excessive
6  pricing at the retail level, but making actionable excessive
7  pricing at the wholesale level? Isn't that the practical effect
8  of this statute?
9       MR. UTIGER: Yes, your Honor.
10      THE COURT: By exempting the retailers from suit --
11 they are taken off the table -- it's the excessive pricing that
12 it seeks to avoid at the retail level is being prosecuted, for
13 lack of a better word, for excessive pricing at the wholesale
14 level. Okay?
15      MR. UTIGER: Yes, your Honor. It is an excessive
16 pricing at a wholesale level that causes an injury in the
17 District of Columbia.
18      THE COURT: Okay.
19      MR. UTIGER: The analysis -- I mean, the fact that the
20 statute is structured in such a way that it holds one party
21 liable and not another I don't think is of constitutional
22 significance. It is the -- under the statute, to hold the
23 manufacturer outside the District liable still requires a
24 determination by a Court that the price they charged was
25 excessive under certain factors.

Page 73

1       All the prima facie language does is trigger the
2  ability to bring a suit or provide one measure of how you prove
3  your case, depending on how you read the statute which, again, I
4  don't think is of constitutional significance.
5       THE COURT: So the Superior Court judge, in a given
6  situation -- you have a Plaintiff claiming, okay, I am paying
7  excessive prices here at the retail level. And my theory is
8  it's because the price at the wholesale level was excessive.
9  Okay? And the Plaintiff backing into that by either one of two
10 things. They are either doing a comparative evaluation of what
11 the wholesale price was in four countries around the world, any
12 one of four, or maybe all four. Or they are just coming up with
13 some other independent evidentiary basis to allege that it's
14 excessive to meet the prima facie case standard, to shift the
15 burden.
16      MR. UTIGER: Well --
17      THE COURT: I mean, I don't know how they would come up
18 with that, but let's say there is another way to do it here.
19 But it is still goes to, in the final analysis, a decision on
20 what the -- whether the retail sale is excessive, in whole or in
21 part, because the wholesale price was excessive, which
22 necessarily requires the Superior Court judge, under this
23 statute, to not only determine through the evidentiary process
24 what the wholesale price was, but also look at the factors that
25 may have gone into the retail prices -- even though they are not

Page 74

1 a party in it -- differential between what they paid for it and
2 what they charged for it, right?
3     MR. UTIGER: Absolutely, your Honor.
4     THE COURT: I mean, that's what he or she is going to
5 have to do, in the final analysis.
6     MR. UTIGER: Absolutely, your Honor. And I am not sure
7 that that raises a constitutional concern.
8     Let me back up just a minute. I think while you may be
9 able to -- you know, it's a question of statutory construction
10 that's open to debate whether or not you can bring a case if you
11 can't make the prima facie case under the statute. But what's
12 clear is only a showing that you have -- that there was a sale
13 in the District 30 percent higher triggers the prima facie.
14     Other than that, if you can indeed come under a
15 different theory, you come in the same shoes as any other
16 Plaintiff where you bear the burden of proof.
17     THE COURT: Right.
18     MR. UTIGER: And you are restricted by, you know,
19 Rule 11. When a Plaintiff brings its case, it still has a
20 requirement to have done its diligence and to have a good faith
21 basis for bringing the claim and to craft a complaint that, you
22 know, passes muster on a Motion to Dismiss.
23     THE COURT: Do you have insight from the legislative
24 record here as to what it was in particular, in whole or in
25 part, that the city council was relying upon in deciding to pick

Page 75

1 these four countries as kind of the benchmark against which a
2 Plaintiff could evaluate the comparative wholesale price once it
3 could be determined what it was in his or her particular case to
4 determine whether or not that might be in some way a grounds for
5 possible excessiveness at the retail level?
6     MR. UTIGER: Let me change the question slightly to
7 answer it. Yes, I have some indication, and I think it's fairly
8 clear.
9     I don't think that it's a comparative. I would say
10 that there is no comparison -- you never take a look at why --
11 and I will get to this when I talk about the foreign commerce
12 clause. You never get to why the price in Canada or Australia
13 or Germany or England is what it is. It is simply a trigger.
14 It is simply an amount. After that, the analysis is all what
15 happens here in the United States.
16     But I think the reason why those four countries are
17 chosen is clear. They are four wealthy, sophisticated countries
18 that have drug prices reached in arm's-length negotiations
19 between the countries and the manufacturers. And in those
20 cases, I think almost always -- and I am sure that Mr. Ogden or
21 Mr. Troy will correct me if I am wrong -- direct negotiations
22 between manufacturers selling directly to governments. And it's
23 negotiated at arm's length. It is presumed -- you know,
24 presuming a rational consumer or a marketplace to be fair. And
25 then add 30 percent on top of that.

Page 76

1     THE COURT: What's the relevance of what the wholesale
2 price is in Canada, for example, in a hypothetical situation, to
3 what the wholesale price is in the United States, recognizing
4 that there could be different factors that may militate or
5 dictate that the wholesale price in one country needs to be
6 different than the wholesale price in another country? What's
7 the possible relevance of it?
8     MR. UTIGER: And all that may be -- and all those
9 factors, those other factors, those are all factors laid out in
10 the statute that the --
11     THE COURT: -- Superior Court judge will have to
12 evaluate.
13     MR. UTIGER: But not the factors in Canada, only the
14 factors here in the United States. All this is is a trigger.
15     THE COURT: A trigger.
16     MR. UTIGER: All it does is trigger a prima facie case.
17 That's all it does. You never need to look at what went into
18 that. There has been a legislative finding that, you know, we
19 have to pick a number. Let's pick a number. We want to have a
20 prima facie case.
21     Clearly, a legislature can do that. There no reason
22 why it can't. The legislature in its determination says, let's
23 try to tie it to the real world. We will try to tie it to these
24 four countries. You know, that's not determinative. It doesn't
25 bind anybody. It doesn't establish a case. It makes a prima

Page 77

1 facie case. And after that, all it is is a burden of proof
2 issue. If it's below that amount, you know, under Mr. Ogden's
3 theory, the burden of proof is a little over 50 percent for the
4 Plaintiff. If it's above it, it's a little over 50 percent for
5 the Defendant. That's all it does.
6     The answer is, I think, that there is a rational
7 reason, but there is not one that's necessary. If the council
8 had said -- if they had picked some other number --
9     THE COURT: Won't the judges, in the final analysis in
10 the Superior Court, have to involve themselves in making the
11 ultimate determination as to whether or not something is
12 excessive, do an evaluation of why the pricing in the foreign
13 country is or is not excessive vis-a-vis the pricing in this
14 country.
15     MR. UTIGER: I don't think they do, your Honor. In
16 fact, I think that the factors that are listed in the statute
17 itself doesn't include that. The Court is directed -- the
18 Superior Court is directed to look at certain factors, none of
19 which is why the price is what it is in Canada or why the price
20 is what it is in Germany or England or Australia.
21     Once -- all that number is relevant for is whether or
22 not there is a prima facie case. Whatever that means. Or what
23 the practical effect of that is. That's all that that analysis
24 is done for. And under the statute, there is no other purpose
25 for it.

Page 78

1    THE COURT: Well, let's look at those factors. Are you
2  talking about 4554(b)?
3    MR. UTIGER: Yes, your Honor.
4    THE COURT: Let's talk about some of those factors. We
5  are going to have our Superior Court judges evaluating these
6  factors, right?
7    MR. UTIGER: Absolutely, your Honor.
8    THE COURT: All right. So let's look at some of them.
9  What's the first one here?
10    MR. UTIGER: Costs of innovation.
11    THE COURT: All right.
12    MR. UTIGER: Development and production of prescription
13  drugs, so the R&D costs. The global sales and profits to date.
14    THE COURT: All right.
15    MR. UTIGER: How much money have they made so far off
16  of it? Consideration of any Government funded research that
17  supported the development of the drug. And I imagine it could
18  be either U.S. Government or foreign government support in the
19  actual R&D process. And the impact of price on access of the
20  prescription drugs by residents and the Government of the
21  District of Columbia.
22    None of those impact the reason why -- or make relevant
23  the reason why Germany sets its price where it does. Germany
24  sets it price where it does because that's the price they could
25  negotiate at an arm's-length negotiation with the drug

Page 79

1  manufacturer, which may be the reasonable price, and anything
2  above it may be excessive, and it may not be. Plaintiffs are
3  free to come in, you know, if there is a prima facie case made,
4  and say, here; this is what's reasonable. We are entitled to
5  make this amount of profit. This is the kind of R&D costs we
6  have. This is what's fair, and we are not so far out of line
7  that it shocks the conscience.
8    THE COURT: But whether or not a wholesale price set
9  that was set by a manufacturer when it sold its goods to CVS,
10  for example -- whether or not that wholesale price was
11  excessive. In this case here, it is at least in part -- in
12  theory, the benchmark to what happened in a foreign country for
13  the same drug.
14    MR. UTIGER: To a degree. I wouldn't say benchmarked.
15  It's not setting a price. It is not saying anything above this
16  is excessive.
17    THE COURT: All right.
18    MR. UTIGER: It is saying here is a level at which it
19  makes sense to take a look at it. Here is a level at which if,
20  it's above this, then, you know, you get to come in and
21  challenge it, and we will give you a prima facie case. We will
22  shift the burden.
23    There is no constitutional issue with shifting the
24  burden between the Plaintiff and the Defendant.
25    THE COURT: I don't think the Plaintiff said there was.

Page 80

1    MR. UTIGER: Right. So if you can do that -- suppose
2  that without that --
3    THE COURT: All right.
4    MR. UTIGER: -- the District set a number, had a
5  committee. The council had hearings. You know, it would be
6  impractical to do, you know, given the wide range of drugs.
7  But, you know, assume in a perfect world they could do it.
8    And they came up with, you know, we don't know
9  everything, but we think that everything that we know, this is
10  the presumptively reasonable price, and we are going to make it
11  the presumptively reasonable price. But Plaintiffs -- you know,
12  the drug manufacturers can come in and change that based on all
13  the relevant factors, or challenge it.
14    THE COURT: Aren't these factors that the Superior
15  Court judge will have to be looking at and weighing and
16  evaluating here in trying to decide whether the retail prices
17  was excessive, ultimately?
18    Ultimately, aren't these the kind of factors that
19  Congress is weighing and balancing itself in setting up its
20  patent law exclusivity rights that it has, through its
21  regulatory processes, applied to the drug industry? I mean, the
22  pre-emption argument that's being raised, in effect, argues that
23  Congress has already considered all of these things when it gave
24  certain exclusivity rights, through patent law, to the various
25  drug manufacturers, and it's not for the individual states to be

Page 81

1  inserting itself into the -- into the decision-making process
2  with regard to the wholesale prices that are being set here?
3    MR. UTIGER: Plaintiffs certainly make that argument,
4  and they make it with some very high-sounding sweeping language.
5  This is pre-emption, pre-emption of a state statute, or
6  pre-emption -- the District is treated as a state.
7    The presumption is that state statutes aren't
8  pre-empted. And the beginning of the analysis in any
9  pre-emption argument is to look at the language of the statute
10  or the regulation --
11    THE COURT: Right.
12    MR. UTIGER: -- on its face. I have reread the papers.
13  There is no discussion -- there is no statutory language
14  addressed. There is nothing to which Plaintiffs tie their
15  pre-emption argument other than, well, they must have meant that
16  drug companies should be able to make a good profit without
17  interference from the states.
18    Vioxx got a patent. State law allows you to bring a
19  negligence case against the manufacturers, destroys their
20  profit. That doesn't violate the -- the negligence laws aren't
21  pre-empted.
22    THE COURT: But negligence -- laws that permit
23  actionable suits under a theory of negligence, a product's
24  liability, wouldn't that not be a conceptually different thing
25  than trying -- than a state trying to regulate the pricing at

Page 82

1  which the product is sold?  And that's very -- aren't those
2  conceptually very different ideas?
3       MR. UTIGER:  They are different, but not under
4  Plaintiff's theory.  If Plaintiff's theory is that the patent
5  laws are designed to make sure that patented drugs get this
6  profit without interference from state laws -- even legitimate
7  state police power regulations that would otherwise be okay are
8  pre-empted because of the patent laws -- and again, we are back
9  to what patent laws?  Under what theory?  Under what language?
10       You start with the statutory language.  I think that
11  they cite one little snippet of legislative history.  But, of
12  course, legislative history is only relevant in construing an
13  ambiguous statute or an ambiguous regulation.
14       They haven't identified an ambiguity because they
15  haven't identified a statute or a regulation.  They just have a
16  sweeping, generalized -- if Congress wanted to say that,
17  Congress could have said that.  If Congress wanted to say, we
18  are going to pass a law that keeps the states from doing
19  anything, that pre-empt the states -- you know, many states have
20  pre-emption clauses in them.  This one doesn't.  At least they
21  haven't pointed to any pre-emption clause in any of the
22  legislation.  They haven't pointed to any regulation that our
23  law is inconsistent with.
24       Patent laws give exclusivity, an exclusive right to
25  sell the product, the manufacturer's product, for a period of

Page 83

1  years.  Nothing -- and whatever economic benefits you can get
2  from that.  No guarantees.  You may go belly up.  Most patented
3  products never make a dime.  But you get what you get.  What you
4  get is exclusivity.  We are not touching that.  We are not
5  saying that somebody else gets to manufacture a drug that's
6  under patent.  Not at all.
7       You know, we don't impact on the right of a patent.
8  And they don't argue otherwise.  And it's a little funny that
9  they cite to Bonito Boats.  Bonito Boats was a case where the
10  Court found that states -- not can't interfere with the patent,
11  can't grant patent rights.  The theory in Bonito Boats was if
12  Congress, through its patent process, has not given an
13  exclusivity to a patent holder, then the intellectual property
14  belongs to the people -- remains in the public domain for
15  whoever want to use it.  And only through the patent laws
16  enacted by Congress can it be taken out of the public domain.
17       Bonito Boats involved a case where the State of Florida
18  was, in essence, granting a patent.  It was granting protection.
19  It was not taking protections away, not hurting a patent holder.
20  And what the Court says is there is no patent there.  Anybody
21  who wants to use this technology can use it because you don't
22  have a patent, and only the Federal Government can get one.
23       There are no cases where the patent laws have been used
24  to pre-empt anything close to this.
25       And the conceptual argument that, well, it's going to

Page 84

1  interfere with this nebulous right to recoup all your costs,
2  it's got to be tied to something more specific than that.
3       THE COURT:  Well, if the District is aiming to impact
4  the pricing at the wholesale level by enabling people to
5  challenge excessive pricing at the retail level, isn't that the
6  necessary effect of it?  Isn't the necessary --
7       MR. UTIGER:  The necessary effect is to bring down the
8  price of a patented drug but not to destroy the patent.
9       THE COURT:  Well -- yes, but hold on.  By excluding
10  retailers from being actionable in this case, in the statute, by
11  excluding retailers from being actionable and by aiming to
12  influence pricing at the wholesale level that will be done
13  largely outside the District, the District, by having this
14  statute here, so to speak, as a -- you know, it's not the
15  carrot; it's the hammer, you know, it's the stick.  By having
16  this as a stick -- the District, that is -- having it as a way
17  to discourage excessive pricing not only at the retail level,
18  but more specifically at the wholesale level, they are seeking,
19  by doing that, are they not, to directly influence pricing set
20  at the wholesale level outside of the District that will result
21  ultimately in sales within the District?
22       MR. UTIGER:  To a degree, that's true.  I think that is
23  true, your Honor.  But it's not -- it certainly isn't pre-empted
24  by the patent laws.
25       And again, I go back to -- I am a little bit at a

Page 85

1  disadvantage in arguing the case because of the way it was
2  presented.  You know, they have a theory.  You know, no experts
3  have come forward.  You know, they have a theory of what the
4  purpose is and what the effect is and that it's going to drive
5  down -- but they have no law.  They have no case law and they
6  have no statutory pronouncement from Congress.
7       You know, clearly Congress did not intend to pre-empt
8  everything that could affect the pricing of a patent.  There is
9  a case in the D.C. Circuit, Electrolert, where the District
10  declared illegal radar detectors.  Can't have them in the
11  District, can't sell them in the District.  Clearly the fact
12  that you can't sell them in the District is going to affect the
13  ability of the manufacturer of radar detectors to make a profit.
14  It's going to bring their profits, nationally, down because here
15  is an area they can't sell.
16       THE COURT:  Right.
17       MR. UTIGER:  It's not unconstitutional.  Withstood a
18  commerce clause challenge.  If Congress wanted to pre-empt
19  anything that would affect the pricing of patented drugs, that
20  would have the effect of bringing down the ultimate price of a
21  patented drug, they knew how to do it.  They didn't.
22       You can't -- you know, Plaintiffs would have you delve
23  into the mindset of 300-some-odd House members and 50 Senators
24  and the President that signed a bill outside of the context of
25  what they said.  And there is nothing in what they said that

Page 86

1  pre-empts what we are doing or gave the indication that they
2  didn't want this to happen.
3      THE COURT: Why don't -- you have got a few minutes
4  left here. Why don't you spend a little time on the arguments
5  relating to the foreign commerce clause.
6      MR. UTIGER: I think the foreign commerce clause
7  argument badly misreads the District's statute. It badly
8  misreads the effect on the way that it goes -- the statute, when
9  implemented, would go into effect.
10     No Court in the District of Columbia has to look at the
11 pricing or the reasoning for the pricing in Germany or Canada or
12 Australia or England. It doesn't have to look at that. I would
13 say shouldn't look at it.
14     THE COURT: But as a practical matter, if a Superior
15 Court judge has a party before it, him or her, that premises its
16 prima facie case of excessiveness on a comparative evaluation of
17 what the wholesale price is in Canada vis-a-vis the wholesale
18 price in the United States, and the defense of the case is going
19 to be, by the manufacturer, well, there's good reasons why the
20 wholesale price in Canada -- excuse me -- why the wholesale
21 price in United States is 30 percent or higher than it is in
22 Canada, and those reasons are as follows: Whatever they are.
23     Isn't the Superior Court judge, by necessity, in order
24 to evaluate the defense, going to have to look at those specific
25 contentions that are made by the defense as to why the price set

Page 87

1  30 percent or higher in the United States vis-a-vis Canada, in
2  my hypothetical, is really not excessive, that there is a good
3  faith and an articulable basis for believing that there is a
4  good rational basis for doing that?
5      MR. UTIGER: There is nothing in the statute that
6  requires that kind of comparison. And I would suggest that you
7  could easily try that case without making that kind of
8  comparison. I can't say Plaintiff's counsel wouldn't try to do
9  it or that a defense counsel would not raise that as a defense,
10 but it's not required by the statute. The statute sets a
11 trigger. All the reference to the prices in one of those four
12 trigger countries is is a trigger for rebuttable presumption.
13 That's all it is.
14     THE COURT: Isn't it realistic to assume that most
15 Plaintiffs, having at their disposal an objectively verifiable
16 basis to meet their prima facie standard, will, in fact, use
17 that as a means to at least cover that first hurdle and get
18 themselves before the Court and be able to overcome a Summary
19 Judgment Motion which invariably would be filed in a case of
20 this kind?
21     Isn't it realistic to assume that most Plaintiffs,
22 especially if the Plaintiffs are being represented by either
23 institutions or counsel who are fronting the cost of the suit,
24 which is probably a realistic assumption also, that they will go
25 for what is accessible in the realm of objectively verifiable

Page 88

1  data -- I think Mr. Ogden pointed out that there is -- I am not
2  an expert on this field, but it sounds like there is a lot of
3  information out there in the stream of commerce, probably
4  computer-accessible, where you can figure out average wholesale
5  price in Canada just by punching up some, you know, database
6  somewhere, and you can come up with information that would put
7  you, as a Plaintiff's counsel, in a position to very quickly
8  have what you think is a basis to get you over the hurdle of a
9  Summary Judgment Motion, have your prima facie case, and then,
10 okay, we will leave it up to the Superior Court judge to have to
11 determine whether or not that wholesale price in Canada or the
12 wholesale price in Australia or whatever, although lower, is or
13 isn't reasonably lower than the United States?
14     MR. UTIGER: I was with you until the very end, Judge.
15 I think to get over the Summary Judgment Motion, sure, it
16 creates a prima facie case. The prima facie case clearly puts a
17 factual issue there and gets you over the Summary Judgment.
18     But to resolve the case of whether or not the drug was
19 actually sold at an excessive wholesale price, you don't need to
20 know how Canada's price was arrived at. In fact, I don't think
21 you need to. I think what you look at are the factors that the
22 statute says you look at.
23     Look at the R&D costs. You don't need to know how the
24 price in Germany was set to know that. Total sales so far: How
25 much of a profit have you made? You don't need to know what

Page 89

1  went into the negotiations between the pharmaceutical company
2  and Germany to know that? There is none of the factors that go
3  to the ultimate determination of whether or not the price is
4  excessive.
5      They have referenced to the systems of setting prices
6  in Canada, Germany, England or Australia. It is simply a
7  mechanism above which you have a prima facie case. And
8  arguably, arguably -- and again, this is a question of local
9  statutory construction. Arguably, the negative pregnant that if
10 you sell below that, there is no case.
11     THE COURT: Well, but the practical reality, isn't it,
12 Mr. Utiger, is that if a Plaintiff's case is tied to wholesale
13 pricing in those four, any one of those four countries -- or all
14 four -- for the purposes of meeting a prima facie case, that a
15 Defendant in that situation is going to be faced with the
16 reality of having to defend themselves by showing, in whole or
17 in part, that the wholesale price in this particular case,
18 although higher than in those foreign countries, was not
19 excessive and, frankly, even above that and beyond that, since
20 the statute is aimed ultimately at the excessive pricing at the
21 retail level, that the price set at the wholesale level was
22 either unnecessarily inflated or unnecessarily set at a price by
23 the retailer after it was sold to it on a wholesale level.
24     The Superior Court judge will have to get into that
25 kind of analysis, won't he, or she?

Page 90

1    MR. UTIGER:  Certainly in the question of the retail
2    price, yes.  But that doesn't violate the foreign commerce
3    clause and it doesn't violate the dormant commerce clause.
4    Certainly they can -- a defense of the pharmaceutical company is
5    it looked good when it left us.  We were reasonable.  You know,
6    our defense is that somebody else inflated the price down the
7    line.  And how do you know that our price was reasonable when it
8    left here?  Well, take a look at these factors, and then take a
9    look at how far up the price went downstream.  We didn't cause
10   the injury in the District of Columbia.  That's their defense:
11   We didn't cause that injury.
12       THE COURT:  Let's assume the Superior Court judge says,
13   I am not going to look at what the wholesale price is in
14   Australia.  I mean, the Plaintiff pegged it to that to meet his
15   burden, and it triggered that.  Okay.  So now the burden has
16   shifted, and Merck or whoever -- okay; now it's up to you.  Why
17   isn't it excessive here?  But don't tell me about what it is in
18   Australia or Canada.  I don't care about that.  I just want to
19   look at why it's not excessive in this particular case here?  I
20   am not going to involve myself in what happened in those
21   transactions in a foreign country.  Okay.
22       Now, at that point, with no benchmark whatever -- we
23   have got 65 judges in the Superior Court.  We are going to have
24   65 standards as to what constitutes excessive?  How about the
25   vagueness problem we've got there?  I mean, how is a Defendant

Page 91

1    going to defend himself with no benchmark to a foreign country
2    to know, in 65 different Superior Court judges' cases, whether
3    or not something -- where something becomes excessive?
4        I mean, before, when I used my other hypothetical, I
5    said, well, in some judge's case, it might be 31 percent above
6    what it is in Australia or Canada or whatever, and in another
7    case it might be 75 percent.  At least in that hypothetical
8    there is a benchmark to something.  What are we left with if we
9    take those benchmarks out?  Is it not just too vague?
10       MR. UTIGER:  I don't think so, your Honor, because it
11   allows -- certainly, there is some discretion.  I am not sure
12   discretion and vagueness are the same thing.  There are factors
13   that have to be looked at.  But since we are being practical,
14   the practical effect is, sure, three or four judges would
15   probably get cases like this.  My guess is they are all
16   consolidated.
17       THE COURT:  Three or four out of 65?
18       MR. UTIGER:  My guess is that they are -- that many of
19   them will be consolidated.
20       THE COURT:  How could they be?  How could a case
21   challenging, as excessive pricing against Lipitor, in a
22   hypothetical case, be the same as Viagra?  How would you merge
23   those two cases?  There are different -- I mean, there was
24   different R&D.  There was different -- there's different sales
25   data.  There is going to be different --

Page 92

1        MR. UTIGER:  That's true, your Honor, but eventually --
2    the same with any other statute that has a certain amount of
3    play in it.  And different judges, including, you know, U.S.
4    District Court judges, interpret a statute.  Different judges on
5    the same bench may interpret the statute or apply it
6    differently.  Eventually, it gets to the Circuit.  The Circuit
7    sets the standard.
8        Here, is there a possibility that judges will look at
9    the law a little bit differently?  Will -- you know, that it
10   appears to be a bench issue -- will weigh the evidence a little
11   bit differently?  Sure.  And it will get to the Court of Appeals
12   because the drug companies are going to -- if we're being
13   practical, they will appeal every decision, and it will go to
14   the Court of Appeals, and the Court of Appeals will resolve
15   though issues.  It is a local law statutory issue.  It is not an
16   issue of constitutional -- I mean, I understand the Court's
17   concerns over vagueness.  That's not a claim here.
18       But there is a practical way that works out.  It works
19   out the way, you know, state laws do everywhere.  Trial judges
20   may make different kinds of analysis.  And --
21       THE COURT:  They need an "as applied" challenge for
22   that to actually come to the fore.
23       MR. UTIGER:  I think so.  And at the end of the day, a
24   Court of Appeals resolves those issues and issues directives.
25   And that's how it sorts out.  And that's the way laws work in

Page 93

1    this country.  They are not always neat.  There may be some
2    bumps in the beginning, but there is a mechanism for resolving
3    those kinds of issues.
4        THE COURT:  All right.
5        MR. UTIGER:  I think I have touched on the foreign
6    commerce clause by --
7        THE COURT:  Unless you have anything else, thank you,
8    Mr. Utiger.
9        MR. UTIGER:  Thank you.
10       THE COURT:  Mr. Ogden?
11       MR. OGDEN:  Thank you, your Honor.  I would like to
12   start by addressing some issues that Mr. Utiger discussed
13   relating to the commerce clause and some of your Honor's
14   questions on that, the dormant commerce clause issue.
15       Fundamentally, the question as laid out in the Healy
16   case and the Brown-Forman case and the Baldwin against Seelig
17   case is the practical effect of the state regulation at issue.
18   Is the practical effect to predicate liability in this state or
19   a violation of state law on pricing decisions outside the state?
20   That's what each of those cases is about.
21       Those are, actually, price control cases.  Each one of
22   them deals with a state law seeking to attempt to control prices
23   in one way or the other.  All of them are cases in which the
24   Supreme Court declared the attempt at controlling prices to be
25   unconstitutional under the dormant commerce clause because the

Page 94

1   practical effect of the statute was to predicate liability on
2   pricing decisions in transactions that occur out-of-state.
3          And that is exactly what we have here, as I think we
4   have amply demonstrated through the course of this morning: It
5   is the pricing decisions that occur at wholesale by
6   manufacturers, by their licensees, which will be out-of-state
7   which will give rise to liability under this statute.  And so
8   this is -- I mean, in terms of citing the chapter and verse
9   Supreme Court case on point, those three cases just resolve that
10  issue.  This is direct regulation.
11         THE COURT:  Do you agree that this is a statute that,
12  on the face of it, seeks to address excessive pricing at the
13  retail level but ends up doing it by going after excessive
14  pricing at the wholesale level?
15         MR. OGDEN:  I think there is -- I think so, your Honor,
16  although I actually think that the real target of the law, the
17  ultimate target of the law is also the mechanism of the law.
18  This law is targeted at sales by patentees and licensees.  They
19  are the only ones who can violate it.
20         And so the real goal here is to do what the statute
21  does, I believe, which is to regulate those sales and to
22  counteract the benefit that's provided by Federal law to
23  patentees and licensees of exclusivity.  That's the goal of this
24  thing, and it is triggered by, in D.C., retail sales downstream.
25         The Walsh case which Mr. Utiger mentioned and which

Page 95

1   your Honor asked about the Supreme Court decision, which is
2   called Concannon, which I discussed earlier in the First
3   Circuit, is a case that really is entirely different and
4   distinguishable from this situation.
5          In the commerce clause context, that case involved a
6   Maine statute under which manufacturers could avoid a burden on
7   their Medicaid participation, a pre-authorization requirement,
8   if they agreed to pay a rebate on certain purchases of their
9   pharmaceuticals that occurred in Maine.
10         So, essentially, the manufacturer had to pay a rebate
11  with respect to each Maine purchase of their pharmaceuticals or
12  they would face a pre-approval process in the Medicaid statute.
13         The Supreme Court said -- First Circuit said -- no
14  extraterritorial effect on any transaction.  The only
15  transaction at issue is the Maine -- in-Maine transaction.  You
16  can get a rebate.  Not an extraterritorial effect.
17         Fundamentally different from this statute where, like
18  Baldwin and the other cases, liability is predicated expressly
19  on pricing in out-of-state transactions.  So it's just
20  fundamentally from Walsh on the commerce clause side.
21         And Walsh is also the Medicaid pre-emption argument
22  that failed.  And there, Medicaid again -- the purposes of that
23  statute are different.  Congress gave the states a good deal of
24  control over the mix, the Supreme Court advised on the
25  pre-emption side -- Bonito Boats is very clear that there is not

Page 96

1   control given to the states over the mix, that Congress has set
2   it very, very tightly.
3          The stream of commerce argument, the argument based on
4   products liability and the like, Baldwin and Healy an
5   Brown-Forman, these cases just completely dispose of that
6   argument.  It is a completely different thing to predicate
7   products liability based on the qualities of a product that is
8   in your jurisdiction, which is the Beretta gun situation, where
9   the long arm statute can reach the manufacturer's out-of-state
10  conduct -- fundamentally different and on the other side of the
11  line drawn by the Supreme Court from the regulation of price
12  terms of transactions in other states which the Supreme Court
13  has just said, D.C. can't do it, New York can't do it; that's
14  just prohibited.
15         Now, on the pre-emption front, I know your Honor has
16  indicated a couple of times that you view our theory as a novel
17  one.  I think the novelty is actually in the statute and not in
18  our theory.  We don't have a case in which a jurisdiction has
19  targeted patented products to take away -- to regulate their
20  prices.  We don't have that case because it has never been done
21  before.  Mr. Utiger agreed to it.
22         Our theory is a basic pre-emption theory, conflict
23  pre-emption.  The question is whether the local statute
24  constitutes an obstacle to the achievement of Congress'
25  objectives.

Page 97

1          Mr. Utiger expresses concern that we haven't pointed to
2   statutory language.  That's because this branch of pre-emption
3   looks to Congress' objectives, not specific language.  And it
4   attends to situations that Congress intended to leave
5   unregulated and that can be inferred from the goal or the
6   purpose of the Congressional legislation.
7          Here, the purpose is unquestionably to promote the
8   progress of science and the useful arts, to promote the
9   development of new pharmaceuticals and life-saving drugs.
10  That's not imagination.  That's the Constitution.  That's the
11  language of all of the -- President Reagan, when he signed the
12  bills into effect -- and it's the obvious purpose of giving
13  exclusivity through a patent and a few of these other things --
14  is to create incentives for patentees to develop new patents and
15  life-saving drugs.
16         So we are not making that up, and it's obvious that --
17  the whole point there is to give a benefit to market
18  exclusivity.  What D.C. has done is target that and specifically
19  take it away.  A state can't do that.  It's very different from
20  a law of general application that may have the effect of
21  reducing the profitability of patented goods, other goods.
22  Those are just general market conditions.
23         But when a state says Federal patent might relieve
24  people who produce drugs under Federal exclusivity -- we are
25  going to take away the opportunity that Congress intended to

Page 98

1  provide to create an incentive -- that pre-emption under basic
2  rock-solid pre-emption doctrine of presenting an obstacle to the
3  achievement of a Federal objective.
4        Agree completely with the import of your some of your
5  Honor's questions relating to the foreign commerce issues.  It
6  is the inevitable effect of the way the statute is structured
7  that Courts will simply -- Superior Court judges, if they are
8  called upon to do all of this, will simply have to say, well,
9  what's the reason for this differential?  Why is there a
10 35 percent difference?
11       A Defendant is going to come in, and you bet they are
12 going to say, why?  Because the regulatory scheme in this other
13 country doesn't make sense.  The price that we are forced to pay
14 there forces us right down to marginal costs; it's an irrational
15 program -- of course they are going to say that, and a judge is
16 going to have to think about it because to not think about it
17 would be not to give the Defendant a fair shake.
18       THE COURT:  More importantly, perhaps, won't the judge
19 have to choose?  I mean, because if a Defendant is put in a
20 position -- by virtue of the fact that the Plaintiff chose to
21 use this vehicle to meet the prima facie standard, the Defendant
22 is, in effect, put in a position where the comparison having
23 been relied upon to meet the prima facie standard is squarely
24 before the Court.
25       MR. OGDEN:  Of course.

Page 99

1        THE COURT:  And so now it's a question of, well, the
2  price in the United States, although higher, nevertheless not
3  excessive vis-a-vis the price in whatever one of those four
4  countries are?
5        MR. OGDEN:  Exactly.  And the inevitable pressure of
6  that would be to say, let me explain why it's 30 percent higher.
7  And part of that has to do with costs and part of it has to do
8  with conditions in the country where the price is low and
9  Government regulation.  And that, of course, is why those four
10 countries were selected.  They are countries where prices are
11 very low as a result of strong government control over the
12 prices that can be charged.
13       And that, of course, makes it a very appealing
14 benchmark because it generates, as we have pled in our papers --
15 I mean, there is a lot of stuff out there claiming that those
16 prices are typically more than 30 percent lower than the typical
17 market-established price in the United States.
18       And so we will see, if this law goes into effect,
19 courts considering the reasonableness of those schemes, the
20 factors considered comparing -- whether they include or don't
21 include the factors that are set out in the statute.
22       I also think your Honor is exactly right that the
23 factors that the statute calls upon Superior Court judges to
24 consider are a big flashing sign as to why this has to be a
25 pre-empted statute, because they are asking -- those factors ask

Page 100

1  each Superior Court judge to decide at retail with respect to
2  every -- to use a different kind of retail, to decide with
3  respect to every drug that comes before it, whether the
4  incentives are enough.  Were they beneficial?  Were they high
5  enough?  Were costs recovered?  Is there a need to make it
6  available to citizens at a lower price?
7        That's exactly what Congress has looked at, and under
8  the Bonito Boats doctrine has said, we are going to let the
9  market control.  This incentive is going to be controlled by the
10 market price made possible by exclusivity.  D.C. can't come in
11 and change that, and nor can any other state in the United
12 States.
13       With respect to standing, your Honor, we will submit
14 something a week from today, with your permission --
15       THE COURT:  I said -- in light of the holiday, I think
16 a week from tomorrow.
17       MR. OGDEN:  I appreciate that very much.
18       THE COURT:  Give everyone an extra day here.  Both
19 sides will be welcome to submit -- I am not going to get into
20 round of briefing.  But each side is welcome to submit whatever
21 it wishes to on the issue of standing -- just standing, now; I
22 am not getting into other issues -- a week from tomorrow.  So
23 next Thursday, by close of business.
24       And I would like you to do that.  I would also like
25 both sides to submit a letter to the Court individually, copies

Page 101

1  to each side, on -- I believe Congress returns -- at least one
2  house will be returning, I think you said, the 6th.
3        MR. OGDEN:  That's correct.
4        MR. UTIGER:  That's how it's scheduled now, your Honor.
5        THE COURT:  Right.  So I think the 8th.  Give me your
6  best assessment, each of you independently, with a copy to the
7  other, of where we stand on the 8th.
8        Now, usually Congress sits three of the five days of
9  the week, and the other two are travel days, so to speak.  So I
10 am kind of proceeding on, at least at the moment, on an
11 assumption that they will sit 6th, 7th, 8th, and then they will
12 announce on the 8th what their plans are for the following week.
13       It could turn out they are sitting the 9th, too.  But
14 at least one way or the other, I am going to get your assessment
15 on the -- by the close of business on the 8th -- where they
16 stand vis-a-vis the 9th and vis-a-vis the following week.  And
17 then we will know at least where we are on the count.  I guess
18 that would put us somewhere in the vicinity of 29.
19       MR. OGDEN:  That's correct.  By our count, we are at 26
20 right now.  And so the 6th would be 27th.  28th -- 29th will be
21 the 8th.  And the Senate has indicated it will be back the
22 following week, whether the House is or not.  So --
23       THE COURT:  That's Tuesday.
24       MR. OGDEN:  I believe that's correct, your Honor.  So
25 we think there is a chance this could go into effect as early as

1  the 9th.  It may not be until the 12th, but that's certainly our
2  view, and we will be glad to provide that information in a
3  letter.
4        THE COURT:  All right.
5        MR. OGDEN:  We would also to very much thank the Court
6  for all of the time that you have given us this morning, and on
7  the expedited schedule that you have made possible for us.
8  Thank you, your Honor, very much.  If you have no further
9  questions --
10        THE COURT:  No.  This is a case of obvious import and
11  obvious -- just as obvious complexity.  I am happy to say we
12  have here extraordinarily experienced counsel that have filed
13  very high quality pleadings.  Would that we got this in every
14  case in the court.
15        And I want to compliment all the parties in their fine
16  jobs so far, both orally and in writing.  I know that whatever
17  else I get next week will be of equally high caliber.
18        It's the nature of the situation we find ourselves in
19  here that matters sometimes of the highest import are thrust
20  upon us on exigent circumstances.  But nonetheless, it certainly
21  matters a lot to have the benefit of all this hard work and high
22  quality lawyering.  So I want to compliment you all for it.
23        As I have said previously, it is my absolute goal and
24  endeavor -- I am not promising -- I cannot promise an
25  absolute -- with a guarantee, since there are something in the

1  order of 280 other cases that I am working on every day, many of
2  which have their own exigencies, I might add.  But it is my
3  absolute goal and desire to be in a position, on day 31, to give
4  you a ruling, whichever way it should come out.
5        I don't know, of course, whether I will be able to meet
6  that or not.  I can only assure you you will get my best effort,
7  my wholehearted best effort to meet that goal.  And I don't want
8  presume what Congress will do, either.  I have no idea what
9  Congress will do.
10        Perhaps it is that Congress' apparent inattention to
11  the issue at this point might mean that they won't be doing
12  anything.  Frankly, I have proceeded on the assumption from
13  day one that they won't be doing anything because I think there
14  is kind of a historical pattern in that regard with regard to
15  statutes in the District of Columbia over a long period of time
16  since home rule was enacted.
17        So I don't think there is a long or even much, frankly,
18  of a history of Congress acting under any circumstance.  So I am
19  pretty much proceeding on the assumption that they will not be.
20        So I wish you all a wonderful Thanksgiving.  And again,
21  thank you for your efforts under extreme circumstance.  Thank
22  you.
23        (Whereupon, at 12:58 p.m., the proceedings were
24  concluded.)
25

1              CERTIFICATE OF REPORTER
2
3        I certify that the foregoing is a correct transcript
4  from the record of proceedings in the above-entitled matter.
5
6
7
8           _____
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25